**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Judge Charlotte N. Sweeney

Lead Civil Action No. 1:22-cv-02384-CNS-SKC
*Consolidated with Civil Actions 1:22-cv-02805-CNS-SKC and 1:22-cv-02893-CNS-SKC*

MINCHIE GALOT CUPAT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

PALANTIR TECHNOLOGIES INC.,
ALEXANDER C. KARP,
DAVID GLAZER, and
SHYAM SANKAR,

Defendants.

**DEMAND FOR JURY TRIAL**

---

# CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....1

II. SUMMARY OF THE ALLEGATIONS ....6

III. JURISDICTION AND VENUE ....17

IV. PARTIES ....18

V. BACKGROUND ....21

A. Palantir's Business Segments ....21

B. Palantir's Acquire, Expand, Scale Business Model ....23

C. Palantir's Financial Metrics ....25

VI. DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS ....26

A. With Tens of Millions of Options in Palantir Stock Set to Expire, the Individual Defendants Devise a Scheme to Take Palantir Public ....27

B. Palantir Profits Handsomely from the COVID-19 Pandemic, Setting the Stage for Taking the Company Public ....30

C. Defendants Announce in July 2020 that Palantir Is Going Public and Prime the Market with a High-Margin Growth Story ....32

1. Defendants Begin Promoting the Offering at Investor Day ....33

2. Defendants Repeatedly Emphasize Palantir's Strong Contribution Margin as Key to Its Success ....36

3. Defendants Continue to Tout a Stellar Growth Story in the Registration Statement ....38

D. Palantir Goes Public to Enable Defendants to Sell Billions of Dollars of Their Own Palantir Shares at Prices Inflated by Defendants' Fictional Growth Story ....43

E. Just Months After the Direct Listing, Defendants Obscure Palantir's Decelerating Growth and Profitability Trends ....45

1. Defendants Were Aware of Palantir's Declining Growth and Profitability Trends ....47

**Page**


2. The SPAC Scheme .....53

3. Defendants Mislead by Saying the SPACs Used Foundry "from Day 0" for "Production," "Manufacturing," and "Execution" .....58

4. Defendants Conceal Their Expansion of the SPAC Scheme to Further Inflate Commercial Growth .....61

5. Defendants Reject Questions About Whether Palantir Was Buying Revenue and Call the SPACs a "Long-Term Strategy" .....63

6. Defendants' August 12, 2021 Statements Concealed Their Last-Gasp Expansion of the SPAC Scheme .....65

F. Defendants' Scheme Unravels .....67

G. To Obscure Investor Scrutiny, Defendants Repeatedly Changed the Metrics They Reported to the Public and Stopped Reporting Others Altogether .....74

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .....78

A. The Offering .....78

1. Investor Day .....78

2. The Registration Statement .....81

B. 3Q20 Earnings Report .....87

C. FY20 Earnings Report .....94

D. 1Q21 Earnings Report .....102

E. 2Q21 Earnings Report .....115

F. 3Q21 Earnings Report .....128

G. FY21 Earnings Report .....139

H. 1Q22 Earnings Report .....148

**Page**

VIII. DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS" AND OTHER MATERIAL INFORMATION IN VIOLATION OF ITEM 303 OF REGULATION S-K ....158

A. Palantir Concealed the Impact of the SPAC Scheme on Its Commercial Segment Profit Margins ....160

B. Palantir Concealed Key Performance Indicators and Other Metrics that Were Necessary to Understand and Evaluate the Company's Business Model ....163

C. Palantir Failed to Disclose Material Segment-Level Information Including Commercial Segment Expenses and Profit Margins ....167

IX. ADDITIONAL SCIENTER ALLEGATIONS ....170

A. The Scheme Required the Participation and Approval of Karp, Thiel, and Cohen ....170

B. The Fraud Involved Palantir's Entire Business and Executives at Palantir's Highest Levels, Who Had "Strong Visibility" into the Company's Future Revenue, Were Directly Involved in Palantir's Sales Efforts, and Received Regular Company-Wide Updates ....172

C. The Individual Defendants' Knowledge of the SPAC Scheme Further Supports a Strong Inference of Scienter ....175

1. The Individual Defendants Implemented the SPAC Scheme to Buy Illusory Revenue and Growth, Knowing It Was Unsustainable ....175

2. The Individual Defendants Knew Their SPAC-Related Statements Were Misleading from Palantir's Due Diligence and the Complete Customer Data They Unlocked by Installing Foundry ....176

3. The Individual Defendants Knew Most of the First Stage SPACs Could Not Afford Foundry and Lacked Viable Products or Commercial Operations ....177

4. The Individual Defendants Knew They Were Expanding the Scope of the SPAC Scheme ....179

5. Defendants Further Concealed More SPACs and Their Deal Terms ....182

**Page**

D. The Individual Defendants' Obfuscation of Negative Trends by Changing the Metrics Palantir Reported Further Supports a Strong Inference of Scienter ....184

E. Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Palantir's Key Metrics and SPAC Transactions ....185

F. The Individual Defendants' Motivation to Take Palantir Public and Massive Insider Selling Further Support a Strong Inference of Scienter ....186

G. The Individual Defendants Occupied High-Ranking Positions and Signed SOX Certifications Attesting that They Personally Supervised Palantir's Controls and Procedures ....190

X. LOSS CAUSATION ....191

XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ....197

XII. CLASS ACTION ALLEGATIONS ....198

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ....200

COUNT I ....200

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder ....200

COUNT II ....203

For Violations of §20(a) of the Exchange Act ....203

COUNT III ....204

For Violations of §20A of the Exchange Act ....204

XIV. SECURITIES ACT ALLEGATIONS ....208

A. Securities Act Parties ....208

B. The False and Misleading Registration Statement ....209

**Page**

1. Misleading Statements About Growth Rates, Sustainability of Growth, and TAM .....209

2. False and Misleading Statements About Palantir's Operational Efficiencies and Margins .....213

3. False and Misleading Statements About Strategic Partnerships .....215

XV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .....216

COUNT IV .....216

For Violations of §11 of the Securities Act .....216

COUNT V .....218

For Violations of §15 of the Securities Act .....218

PRAYER FOR RELIEF .....219

DEMAND FOR TRIAL BY JURY .....220

Lead Plaintiff California Public Employees' Retirement System ("CalPERS") and additional named plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 (together, "Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP ("Counsel"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I. INTRODUCTION

1. This action asserts violations of the federal securities laws against Palantir and certain of its officers and directors on behalf of Plaintiffs and all other persons and entities that purchased or otherwise acquired Palantir Class A common stock between September 30, 2020 and August 5, 2022, inclusive (the "Class Period"), and were damaged thereby.[2]

2. Palantir is a software and data analytics company founded in 2003. Palantir offers bespoke software products built on one of its two customer-facing platforms, Gotham and Foundry. Gotham is designed to find patterns and organize data in large and complex datasets, and Foundry links disparate and largely incompatible data sources into a central operating system.

3. For years, Defendants resisted taking Palantir public, with Chief Executive Officer ("CEO") Alexander Karp insisting in 2014 that going public would be "'corrosive to our culture,

---

[1] Plaintiffs' information and belief is based on, among other things, the independent investigation of Counsel, which includes, but is not limited to, a review and analysis of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of Palantir Technologies Inc. ("Palantir" or the "Company") senior management's conferences with investors and analysts; (iii) interviews of former Palantir employees; (iv) interviews of former employees of companies in which Palantir invested; (v) releases and media reports issued about and disseminated by the Company; (vi) analyst reports issued about Palantir; (vii) other public information and data regarding the Company; and (viii) documents cited herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2] The defendants are defined *infra* §§IV., XIV.A.

corrosive to our outcomes.'"[3] By then, Karp had been a longtime holder of 68.9 million options to purchase Palantir Class B common stock, which options were set to expire on December 3, 2021. Karp's options were use-them-or-lose-them, that is, if Karp didn't exercise the options before their expiration date, he would "lose all the shares."

4. Karp's opinion on going public changed as the once-distant December 2021 expiration date on his options drew closer. By July 2020, Karp and Palantir's other senior insiders had implemented a multifaceted scheme to take Palantir public, and then utilize the public trading market in Palantir shares to pocket billions of dollars via the exercise of their stock options and sale of their Palantir shares into the market. As part of Defendants' scheme, Karp, President Stephen Cohen, and Palantir Chief Operating Officer ("COO") Shyam Sankar were given ***additional*** stock and option awards worth billions of dollars pursuant to a change in Palantir's Executive Compensation Plan, made in August 2020, just prior to Defendants' planned public offering. Karp's award alone, which included another 141 million stock options, was valued at the time at ***$1.1 billion***. *The Wall Street Journal* described the award as one of "the biggest compensation packages ever awarded." To unlock these awards, and others given to other Palantir insiders, including Chief Financial Officer ("CFO") David Glazer, all the Individual Defendants needed to do was take Palantir public.

5. Unlike most public offerings, Palantir went public via a direct listing, meaning that there would be no underwriters selling Palantir's shares via a firm commitment underwriting and the Company would receive none of the proceeds of the Offering.[4] Instead, the Individual

[3] Citations are omitted and emphasis is added unless otherwise noted.

[4] "Offering" is defined *infra* in ¶115.

Defendants and other Company insiders would profit from the Offering, selling their personally held shares directly to investors. As Karp explained on the first day of the Class Period, in response to a question of "why now" with respect to Palantir's direct listing: "***[Q]uite frankly I believe the people at Palantir who built this company over 17 years deserve access to liquidity***."

6. Defendants' timing was impeccable – Palantir had posted significant growth in the first half of 2020 over the same period the prior year ("year-over-year" or "YoY").[5] To complete the Offering, unlock their awards, and then offload their shares for top dollar, Defendants needed to demonstrate to investors that Palantir was poised to break its unblemished record as a private company of consistently posting substantial net losses and would, instead, turn a profit as a public company by sustaining its recent revenue growth and improving operating efficiencies. To do so, beginning in September 2020, Defendants disseminated to investors a story of gangbuster growth in Palantir's two business segments (commercial and government) that was designed to induce investor interest in Palantir.

7. Unbeknownst to investors, Defendants' growth story was a fiction. Palantir's strong results reflected a temporary, unsustainable boost to the Company's government business resulting from agencies signing short-term contracts in response to the unprecedented COVID-19 pandemic. The segment's growth rate quickly peaked in 4Q20 (the quarter that began ***the day after*** Palantir went public) and stagnated when the COVID-19-related, short-term contracts expired and rolled off. Palantir's commercial pipeline was in no better shape, as Palantir was experiencing paltry revenue growth. To post the growth rate Defendants assured the market of,

[5] Palantir's fiscal year (or "FY") runs concurrent with the calendar year. Thus, for example, the first half of 2020 (or "1H20") comprised the first quarter of 2020 ("1Q20") and the second quarter of 2020 ("2Q20").

Palantir had to quickly pivot to industries in which Palantir had never operated. To land customers in these new industries, Palantir had to provide prospective clients with a test run of its software at low- or no-cost (a "pilot deployment"), during which the Company was compelled to invest substantial time, money, and manpower finding a use for its software and then building a bespoke platform to suit that use. Coupled with the highly customized nature and high cost of Palantir's software, this meant that signing new commercial customers was much more difficult and, thus, far more costly and less profitable than Defendants publicly represented.

8. Defendants assured investors of Palantir's solid 2020, 2021, and 2022 prospects, confirming to the market they had "***strong visibility*** into future revenues across [Palantir's] customer base" due to several factors, including: (i) the Company's intimate customer base (which at the beginning of the Class Period comprised just 125 customers); (ii) senior management's personal involvement in negotiating contracts; (iii) the multiyear nature of Palantir's customer contracts; and (iv) that the Company recognized revenue ratably over the life of a contract such that revenue recognized during a quarter from preexisting contracts would obfuscate a "decline in new or renewed contracts," which would be known to Company insiders at the time it occurred but not to investors until later quarters. That is, Defendants knew about the negative trends in Palantir's business at least two quarters before the Company's operating results reflected the effects of those trends. As Karp recently summed up: "***I run this business, for better or worse. I know how the business is doing***."

9. In the face of stagnating and decelerating growth, Defendants implemented a two-pronged plan to achieve their objective of completing Palantir's Offering and pocketing billions of dollars before the truth about Palantir's operations and modest growth prospects reached the market. Defendants' plan involved: (i) implementing a carefully crafted scheme to create a public

market in Palantir shares so that the Individual Defendants could sell billions of dollars of their own Palantir stock; and (ii) disseminating false and misleading statements and omissions designed to mislead investors about Palantir, the strength of its operations, and its prospects.

10. Defendants' scheme created a high-growth, high-margin illusion. As part of their scheme, Defendants launched an unorthodox "investment" program in which Palantir entered into roundtrip deals with early-stage companies, infusing those companies with millions of dollars in exchange for immediate payments to Palantir for software subscriptions the nascent companies did not need and could not afford. This, in turn, allowed Defendants to mislead investors by inflating Palantir's reported revenue growth and margins. Defendants' scheme also involved obfuscating Palantir's actual operating performance by changing how Palantir reported key metrics to conceal the negative trends then impacting Palantir. For certain metrics, including those relating to Palantir's entire business model for acquiring and growing customer accounts that Defendants touted as the litmus test for the Company's performance, ***they stopped reporting the metrics altogether*** when consistent reporting would have exposed the negative trends in Palantir's business.

11. The truth about Defendants' high-growth, high-margin story began to reach the market in late 2021 and continued thereafter in 2022. By the time the extent of Defendants' misconduct had leaked into the market, Palantir's Class A common stock price had fallen from a Class Period high of $45 per share to less than $8 per share, representing a decline of ***more than 80%***. Before the collapse in the trading of Palantir shares, however, the Individual Defendants successfully capitalized on their scheme by selling substantial percentages of their Palantir shares at prices as high as $33.89 per share for ***more than $2.2 billion***.

## II. SUMMARY OF THE ALLEGATIONS

12. In 2003, Karp, Cohen, and Chairman Peter Thiel cofounded Palantir in Palo Alto, California. Palantir began as a software development firm serving the U.S. intelligence community in counterterrorism investigations and operations. The Company's initial software platform, named Gotham, is used to find patterns and organize data in large and complex datasets. Palantir uses the Gotham platform to design tailor-made software for its clients, which historically consisted of government agencies and related entities.

13. In 2016, Palantir launched a new product, named Foundry, to attract more commercial clients. According to Palantir, Foundry is designed to link disparate and largely incompatible data sources into a central operating system.

14. Palantir reports in two business segments: government and commercial. Initially, Palantir generated most of its revenue from government clients. With the launch of Foundry, however, Palantir grew its commercial client base, and by 2020 the Company generated about 47% of its revenue from commercial clients and 53% from public sector clients.

15. Just prior to the start of the Class Period, Karp held 68.9 million options to purchase Palantir Class B common stock, which were set to expire on December 3, 2021. Karp had to exercise the options before their expiration date, otherwise he would "lose all the shares." But Palantir was a longtime private company due to Karp's staunch opposition to going public. Thus, Palantir common stock was illiquid and correspondingly traded at prices below what Defendants believed it would have had there been a public market for Palantir shares.

16. By July 2020, with the expiration date on Karp's options quickly approaching, Karp and the other Individual Defendants arranged to take Palantir public through a direct listing, which would allow them to exercise their stock options and quickly dump their shareholdings before

December 3, 2021. Defendants implemented their plan via a two-pronged approach. ***First***, Defendants devised and executed a scheme to concoct an illusory high-growth, high-margin story which would conceal Palantir's actual tepid growth and margins. To create the appearance of continued robust high-margin growth in the face of downward trends, Defendants devised a plan to launch an unorthodox investment program in which Palantir invested in early-stage companies in exchange for these companies signing contracts for Palantir's products and services (the "SPAC Scheme"), a move a Citibank analyst would later describe as "nefarious." And to further mask Palantir's actual declining performance, Defendants continually altered how they reported key metrics when consistent reporting would have exposed Palantir's negative operating trends. ***Second***, Defendants issued a series of false and misleading statements about Palantir, its operations, and its prospects.

17. In July 2020, Defendants first announced their intent to take Palantir public. In furtherance of the scheme, a month later in August 2020, Palantir sweetened the pot for Karp, Cohen, and Sankar by awarding the highest-ranking Company officers additional stock and options, which Thiel advocated for and facilitated. These awards were substantial, with Karp's alone valued at the time at ***$1.1 billion***. To unlock these awards Defendants had only to take Palantir public.

18. Defendants' timing was impeccable – Palantir had just posted an abnormally good 1H20 due to short-term contracts for Palantir's products and services to help customers with their COVID-19 responses. As a result, the Company reported a stellar 49% YoY growth, which Defendants underscored as indicative of the growth investors could expect from Palantir as a public company.

19. Defendants' story of continued high growth and eventual profitability was critical to the success of their scheme. As a private company, Palantir boasted a 17-year-long record of losing money, culminating with a reported $580 million net loss for FY19. To successfully take Palantir public and secure a high valuation for the shares they planned to sell, Defendants needed to demonstrate to investors that Palantir was on the fast track to profitability and that its recent revenue growth and improving operating efficiencies were sustainable.

20. Unlike a traditional initial public offering ("IPO") in which an issuing company itself raises capital through an underwriting syndicate at a set price, in a direct listing, shares are sold by Company insiders at whatever price the market bears without underwriting. By taking Palantir public through a direct listing, Defendants were able to avoid the inherent scrutiny that takes place in connection with a traditional IPO. Pursuant to the Registration Statement, the Company registered for resale over 257 million shares of its Class A common stock held by Company insiders, including several of the Individual Defendants.[6]

21. On September 9, 2020, just prior to the Registration Statement being declared effective, Karp, Glazer, Sankar, and Global Head of Business Development Kevin Kawasaki participated in an "Investor Day" to generate interest in and solicit investments in the Offering. During his prepared remarks, Karp emphasized that "revenue has grown dramatically" and that the quality of Palantir's revenue was nothing short of "astonishing."

22. Based on the tremendous (and, unbeknownst to investors, misleading, unrealistic, and unsustainable) growth story Defendants pitched in connection with the Offering, Palantir shares traded between $9 and $10 per share on the first day of trading, a 40%-120% premium over

---

6 "Registration Statement" is defined *infra* in ¶90.

the $4.50 to $6.50 per share range at which Palantir shares traded privately in 2019 and 1H20. Within three business days, the Individual Defendants took advantage – collectively dumping nearly 48.7 million shares at these artificially inflated prices, pocketing more than $483 million. None of the proceeds from the Offering went to Palantir.

23. The Individual Defendants were just getting started. They had millions of shares left to unload and therefore needed to drive the price of Palantir shares even higher. So following the initial Offering, Defendants amplified Palantir's growth story. On November 12, 2020, Defendants assured investors that both of Palantir's business segments "are performing quite well," and that "growth and momentum across [Palantir's] business have continued." They continued this narrative on February 16, 2021 when they reported Palantir's 2020 financial results, stating, "***we believe we are just at the tip of the iceberg***," and "[o]ur pipeline is substantial and growing." On May 11, 2021, Defendants reported Palantir's 1Q21 results and reiterated that "[w]e see strength in forward-looking indicators and customer interest" on the commercial side, while "momentum in our government business ***continues unabated***." In short, Defendants repeatedly assured investors that all was going according to plan and Palantir's business was experiencing strong and sustainable growth.

24. Building on the foundation of their (mis)representations about Palantir's quarterly performance and pipeline, Defendants also told investors that Palantir would generate annual revenue growth of more than 30% throughout the Class Period, in each of the next five years, such that Palantir would break $4 billion in revenue by 2025.

25. Fundamental to Palantir's story was accelerating high-margin growth in Palantir's commercial business. Defendants claimed in the Registration Statement that Palantir's potential for growth was essentially limitless, with an untapped "total addressable market" ("TAM") of $56

billion in the commercial space. This TAM comprised large "potential customers around the world" with more than $500 million in recurring annual revenue. Defendants repeatedly emphasized this commercial growth potential during the Class Period, along with the supposed operational efficiencies that Palantir was experiencing.

26. Defendants also repeated throughout the Class Period that Palantir was "[b]ecom[ing] the default operating system for data across the U.S. government." As with the commercial business, Defendants exalted the government segment's purportedly unlimited growth potential with a TAM of $63 billion. Defendants also assured investors that the government segment's recent performance was not a one-off revenue spike due to COVID-19 but rather reflected a permanent sea change from which Palantir would continue to profit.

27. Defendants' misrepresentations, together with the scheme to complete the direct listing, buy revenue and margin growth, and manipulate key metrics – in order to sell billions of dollars of their own Palantir shares at artificially inflated prices – caused Palantir's stock price to soar to $45 per share by late January 2021. But as Karp told *CNBC*'s Andrew Ross Sorkin in a January 17, 2023 interview, "***I never thought we were that good when the share price was 40, whatever***." Nevertheless, throughout 2021, Defendants offloaded their shares while continuing to represent to investors that Palantir would continue to experience tremendous high-quality revenue growth.

28. In reality, Palantir's strong results reflected a temporary boost to the Company's government business – its growth rate previously propped up by COVID-19-related short-term contracts quickly peaked in 4Q20 (the quarter that began ***the day after*** Palantir went public) and declined thereafter. Further, due to its highly customized nature and high cost, Palantir's software could not, as Defendants represented, "easily" or cost-effectively "accommodate new users,

workflows, and use cases" in the commercial market. This meant that obtaining new commercial customers was much more difficult, and much less profitable, than Defendants represented. Nor was Palantir's commercial pipeline substantial and growing, as Palantir's commercial segment was experiencing paltry 4% YoY 4Q20 revenue growth.

29. To grow at the rate Defendants publicly touted, Palantir had to expand to industries in which it had never operated. And to close deals organically, Palantir had to provide prospective clients with its software at low- or no-cost in a pilot deployment, during which the Company invested substantial time, money, and manpower finding a use for its software and then building a bespoke platform to suit the use, which included reworking or adapting a preexisting product for customers, and/or requiring the engineering team to design and build completely new features. As a result, Defendants' statements concerning Palantir's current business and potential for growth were misleading.

30. Defendants were well aware of the problems and trends impacting Palantir and frequently touted their "strong visibility into future revenues across [Palantir's] customer base." Palantir's customer base was very narrow, with its software used by just 125 customers at the start of the Class Period, each of which signed contracts worth millions. Given the importance of each customer and the size of each contract, coupled with Palantir's limited sales force, the Company's "sales efforts ha[d] historically depended on the significant direct involvement of [its] senior management team, including Mr. Karp."[7] As Karp later admitted on January 17, 2023: "***I run this business, for better or worse. I know how the business is doing***." In addition, the average duration of each customer contract was reported to be at least 3.5 years during the Class Period,

[7] Palantir's senior management team also included Cohen, Glazer, Sankar, and Kawasaki.

providing Defendants with clear visibility into future periods. Moreover, the way the Company recognized revenue from its ratable contracts meant that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [they] recognize for that quarter," and "such a decline would negatively affect [their] revenue in future quarters." That is, Defendants were aware of negative trends in their business ***at least*** two quarters before the Company's operating results reflected the effects of those trends. Thus, when Defendants spoke, they knew contemporaneously about the negative trends impacting the growth, profitability, and pipelines of Palantir's ***entire business***.

31. Instead of coming clean to investors and disclosing the truth, Defendants actively worked to conceal the truth throughout the Class Period. Their motive – Company insiders were permitted to sell only 20% of their Palantir holdings during the first 180 days after the Company went public. To consummate their scheme and finish unloading their shares at artificially inflated prices, Defendants needed to prop up Palantir's stock price and did so by propagating the growth story they invented less than a year before. Defendants' scheme was effectuated through two basic mechanisms: (i) causing Palantir to purchase high-margin revenue in roundtrip transactions; and (ii) obfuscating Palantir's deteriorating performance by manipulating its reporting of key metrics.

32. Following the commercial segment's poor performance in 4Q20, Defendants executed their SPAC Scheme, abruptly pivoting away from Palantir's publicly stated business model. Instead of expanding the commercial segment by selling to its targeted "potential customers" (companies with more than $500 million in recurring annual revenue), Palantir began purchasing high-margin commercial revenue via roundtrip transactions. Defendants would give money to early-stage, low- to no-revenue companies usually too nascent commercially to need or afford Palantir. In exchange for Palantir's cash infusion, however, these revenue-challenged

startups readily signed multimillion-dollar, lengthy contracts for Palantir software. The companies' payments to Palantir under these contracts often dwarfed their revenue. And some of the contracts even required the fledgling companies to make immediate and substantial upfront payments to Palantir of $10-$15 million (as much as 75% of the contract's value).

33. The vast majority of these companies needed the money from Palantir because they were in the process of being acquired, or looking to be acquired, by special purpose acquisition companies ("SPACs"). SPACs are blank check companies that raise cash in an IPO, the proceeds of which are used to acquire a private company and bring that company public. SPACs typically need to raise money through the private placement of additional equity securities in order to complete the acquisition, fund operations post-closing, and/or to serve as a backstop to shareholder redemptions. These private investments in public equity are known as "PIPE" financing. The SPACs' need for PIPE financing created an opportunity for Palantir to buy the growth and revenue Defendants were promising the market.

34. By the end of 2021, Palantir had "invested" or committed to "invest" approximately $400 million in these early-stage companies. And because these contracts were obtained outside of Palantir's normal business model, the sales and engineering costs associated with landing them were *de minimis* compared to traditionally acquired customers. In contrast to the expenses incurred when closing a deal with an ordinary customer, the SPAC deals involved no salespeople and could be supported by a fraction of the Palantir engineers required in an ordinary commercial pilot because the SPACs received an off-the-rack, partial version of Foundry. Thus, the SPAC deals were designed to appear more lucrative and of a higher quality than ordinary commercial deals

and, importantly, allowed Palantir to report ***far, far higher*** contribution margins.[8] Not coincidentally, contribution margin is the metric that Defendants emphasized in the Registration Statement as fundamental to the strength of Palantir's operations, that is, the "***key*** non-GAAP business measure to help [Defendants] evaluate [their] business, identify trends affecting [their] business, formulate business plans and financial projections, and make strategic decisions."

35. As a result of the SPAC Scheme, the Company claimed to have procured over $767 million in the "total deal value" of commercial contracts with these companies, representing nearly 30% of Palantir's claimed $2.6 billion in total remaining deal value with its commercial clients. The SPAC Scheme also allowed Defendants to supercharge Palantir's claimed operational efficiencies by artificially inflating Palantir's reported margins.

36. Publicly, Defendants spun these roundtrip transactions as "winning deals" and "long-term" investments in promising young companies that were cutting edge and embodied "innovation in the west." They also publicly claimed the partnerships made sense for the SPACs because Palantir's products and services would help them "radically accelerate production ramps and time to market," "shave[] years and mountains of risk off their road map," and "build their operations."

37. In truth, these "partnerships" were short-term, roundtrip transactions – that is, *quid pro quo* swaps with mostly nonviable companies. Palantir would provide the SPACs with desperately needed investment funding. In exchange for Palantir's "investments," the SPACs signed lengthy, multimillion-dollar software contracts that often required them to pay Palantir multiples of their annual revenues for products and services that the SPACs were typically too

[8] Palantir defines contribution margin as revenue less cost of revenue and sales and marketing expenses, excluding stock-based compensation, divided by revenue.

nascent to need or afford. Defendants used these deals to artificially inflate Palantir's commercial growth (and its stock price).

38. When some SPACs signed contracts to pay Palantir as much as $10 million a year over five years, they had no or negligible revenue and were far from having commercially viable products. Essentially, many had no production to ramp or operations to scale. In other words, under the guise of "partnerships," Palantir gave fledgling startups millions of dollars of badly needed cash in exchange for their agreements to immediately start paying money back to Palantir for software they did not need and could not afford, allowing the Company to post strong revenue and margin growth. Not surprisingly, virtually ***all*** of the 20+ early-stage companies Palantir "partnered" with have since floundered. The majority are teetering on the brink of bankruptcy (with one bankrupt nine months after Palantir provided it $20 million), have been issued "going-concern" opinions from their auditors, and/or are suffering tremendous losses, further confirming their inability to pay Palantir the contracted revenue. In short, to mask Palantir's deteriorating growth, buoy Palantir's stock price, and enrich themselves, Defendants used the SPACs to buy and report unsustainable high-margin revenue and growth, which they knew Palantir would not fully realize, using money Defendants knew Palantir would almost certainly lose.

39. The other aspect of Defendants' scheme was to further obfuscate Palantir's declining performance by changing how Palantir reported its key operations metrics when consistent reporting would have exposed the truth. This included: (i) metrics and financial results related to the Company's core business model; (ii) the metrics that provided "strong visibility into future revenues across [Palantir's] customer base," *i.e.*, total remaining deal value and average contract duration; and (iii) the very way in which Palantir defined a "customer." In 1Q22, ***Defendants stopped reporting altogether*** key metrics relating to Palantir's business model, which

they had previously pointed to as the litmus test for investors to assess the Company's growth, allowing Defendants to conceal negative trends in Palantir's operational and business pipeline from investors.

40. Beginning on November 9, 2021, and continuing through a series of partial disclosures concluding on August 9, 2022, the market began to understand that the SPAC Scheme had propped up the Company's year-over-year revenue growth rates and margins and that, despite the scheme, growth in both business segments had abruptly slowed down. Ultimately, Defendants were forced to abandon Palantir's 5-year 30% revenue growth guidance just 18 months after first issuing it and only 3 months after last reaffirming it.

41. By the time Defendants' scheme unraveled, the price of Palantir Class A common stock had fallen ***more than 80%*** from its Class Period high of $45 per share to less than $8 per share, bringing Palantir's stock price back to the level at which it was trading before the Company went public (a decline from which, to this day, it has not recovered).

42. By then, however, the Individual Defendants had already profited handsomely from their misconduct. All told, by the end of the Class Period, the Individual Defendants had offloaded ***more than $2.2 billion*** worth of Palantir stock at prices as high as $33.89 per share, with Karp and Thiel personally selling over ***$1 billion*** and over ***$780 million***, respectively. Their Class Period sales represented a substantial percentage of their shareholdings, with Thiel dumping 27%, Glazer 72%, Sankar 77%, Karp 89%, and Cohen 99.99% of their personally held Palantir shares. The Individual Defendants made their Class Period sales while the scheme was ongoing, while they possessed material adverse nonpublic information, and contemporaneously with Plaintiffs' and/or other Class members' (defined herein) purchases of Palantir Class A common stock.




43. As a result of Defendants' scheme and wrongful course of business, Defendants' dissemination of false and/or misleading statements and omissions, and the precipitous decline in the value of the Palantir Class A common stock as the true conditions were disclosed, Plaintiffs and other Class members have suffered significant losses and damages.

## III. JURISDICTION AND VENUE

44. The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k and 77o), §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b), 78t(a), and 78t-1), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

45. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the Securities Act (15 U.S.C. §77v), and §27 of the Exchange Act (15 U.S.C. §78aa).

46. Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) because Palantir is headquartered in this District, and the statements by Defendants alleged herein to be actionable were prepared and reviewed in and disseminated from this District and were received by Palantir shareholders in this District. As such, substantial acts in furtherance of the alleged misconduct have occurred in this District.

47. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

48. Lead Plaintiff California Public Employees' Retirement System is the largest state public pension fund in the United States, with more than 2 million members and more than $400 billion in assets under management. CalPERS purchased Palantir Class A common stock on the New York Stock Exchange ("NYSE") during the Class Period, as set forth in the Certification previously filed with the Court (ECF 12-4) and incorporated herein by reference, including shares pursuant and/or traceable to the Registration Statement used in connection with the Offering, and was damaged thereby.

49. Plaintiff Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019, purchased Palantir Class A common stock during the Class Period as set forth in the Certification previously filed with the Court (*Shijun Liu, Individually and as Trustee of The Liu Family Trust*

*2019 v. Palantir Techs. Inc.*, No. 1:22-cv-02893-PAB-KLM (D. Colo. Nov. 2, 2022) (ECF 1-1)) and incorporated herein by reference, including shares pursuant and/or traceable to the Registration Statement used in connection with the Offering, and was damaged thereby.

50. Defendant Palantir is a software and data analytics company incorporated in Delaware, and has been headquartered in Denver, Colorado since August 2020. In September 2020, the Company consummated the Offering utilizing the Registration Statement through which Palantir Class A shares became publicly listed on the NYSE under the ticker symbol "PLTR."

51. Defendant Alexander C. Karp ("Karp") is one of Palantir's cofounders. Karp is and was, at all relevant times, Palantir's CEO and a member of Palantir's Board of Directors (the "Board"). Karp served on the Board when the Registration Statement was issued, and as Palantir's CEO and a director, he had the opportunity to review and did approve and sign the Registration Statement used in the Offering. Karp registered over 20.5 million Palantir shares for sale to the public via the Offering. All told, Karp sold nearly 53 million shares for more than $1 billion in proceeds during the Class Period.

52. Defendant Peter Thiel ("Thiel") is one of Palantir's cofounders. Thiel is and was, at all relevant times, Palantir's Chairman of the Board. Thiel served on Palantir's Board when the Registration Statement was issued, and as Chairman of the Board, he had the opportunity to review and did approve and sign the Registration Statement used in the Offering. Thiel registered over 62 million Palantir shares for sale to the public via the Offering. All told, Thiel sold nearly 47.4 million shares for more than $780 million in proceeds during the Class Period.

53. Defendant Stephen Cohen ("Cohen") is one of Palantir's cofounders. Cohen is and was, at all relevant times, Palantir's President and Secretary and a member of Palantir's Board. Cohen served on Palantir's Board when the Registration Statement was issued, and as Palantir's

President, Secretary, and a director, he had the opportunity to review and did approve and sign the Registration Statement used in the Offering. Cohen registered over 6.4 million Palantir shares for sale to the public via the Offering. All told, Cohen sold over 11 million shares for more than $188 million in proceeds during the Class Period.

54. Defendant David Glazer ("Glazer") is and was, at all relevant times, Palantir's CFO and Treasurer. As Palantir's CFO, he had the opportunity to review and did approve and sign the Registration Statement used in the Offering. All told, Glazer sold nearly 4.2 million shares for more than $63 million in proceeds during the Class Period.

55. Defendant Shyam Sankar ("Sankar") is and was, at all relevant times, Palantir's COO and Executive Vice President. Sankar registered over 3.2 million Palantir shares for sale to the public via the Offering. All told, Sankar sold more than 6.4 million shares for more than $117 million in proceeds during the Class Period.

56. Defendant Kevin Kawasaki ("Kawasaki") is and was, at all relevant times, Palantir's Global Head of Business Development.

57. Karp, Cohen, Thiel, Glazer, Sankar, and Kawasaki are collectively referred to herein as the "Individual Defendants."

58. Palantir and the Individual Defendants are collectively referred to herein as the "Defendants."

59. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Palantir's quarterly reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability

and opportunity to prevent their issuance or cause them to be corrected. They participated in Company-wide town hall meetings that took place approximately every other month, wherein they provided updates on Palantir's new contract wins, and they disseminated and received monthly email updates that were widely disseminated within Palantir and included metrics on the state of the Company's business. Because of their positions with the Company and their access to material nonpublic information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew that the positive representations being made were then materially false and misleading.

## V. BACKGROUND

60. Karp, Thiel, and Cohen founded Palantir in 2003 in Palo Alto, California. Named for the crystal seeing spheres in J.R.R. Tolkien's *The Lord of the Rings* saga, Palantir's original mission was to develop data-mining software for the U.S. intelligence and defense industries. While the Company's name evokes fantasy, Palantir also borrows from the world of comic books and science fiction in marketing its data analytics products. Its principal software platform is named Gotham (the dystopian hometown of Batman), and its executives have described the artificial intelligence ("AI") capabilities of its software as akin to Jarvis (the AI assistant to Iron Man) and Skynet (the AI system that became self-aware and destroyed most of humanity in the *Terminator* movies).

### A. Palantir's Business Segments

61. Palantir's first software platform, Gotham, organizes and evaluates large, complex, and disparate datasets. Palantir uses Gotham to design tailor-made software for its clients, which historically consisted of government agencies.

62. In 2016, Palantir launched its second software product, Foundry, to attract more commercial clients. Similar to Gotham, Foundry is designed to link disparate and largely incompatible data sources into a central operating system. Both products require bespoke customization of specific capabilities to match a particular client's needs and industry. Accordingly, creating a Gotham or Foundry platform for each customer is time-intensive and expensive – more closely akin to a consultancy service than ready-made, out-of-the-box software (or software as a service ("SaaS")).[9]

63. Palantir reports in two distinct business segments: commercial and government. The commercial segment primarily serves non-government industries. The government segment primarily serves U.S. federal government agencies and foreign governments. Historically, the vast majority of Palantir's customer base was comprised of clients in the government segment. Following the launch of Foundry, however, Palantir grew its commercial client base such that, by 2020, the Company generated about 47% of its revenue from commercial clients and 53% from government clients.

64. Palantir has a concentrated client base and relies on large contracts to generate revenue. As of early 2020, only 125 customers used Palantir software. And just three customers generated approximately 30% of Palantir's revenue in 1H20. The large size and protracted procurement process of Palantir's contracts, and the need for the Company to work closely with its relatively concentrated client base, provide the Company and its management with substantial visibility into future revenue.

[9] Palantir has a third product, Apollo, which the Company describes as a continuous delivery and production infrastructure. Apollo is not a user-facing platform.

**B. Palantir's Acquire, Expand, Scale Business Model**

65. In the Registration Statement filed in connection with the Offering, Defendants explained that Palantir's business model with respect to acquiring and growing customer accounts has three phases: (i) Acquire; (ii) Expand; and (iii) Scale. Each customer is categorized into one of these three "cohorts" on December 31st each year.

66. ***Acquire***. Acquire (or customer acquisition) is the first phase of Palantir's three-phase business model presented to investors. During this phase, Palantir acquires new customers with minimal risk to the customer through short-term pilot deployments of Palantir's software at no- or low-cost to the customer to provide Palantir with an opportunity to prove the value of its platforms to its customers. These pilots typically last three months, though for large clients they can run longer. A Palantir team working on a typical pilot comprised 7 or 8 employees, but it could be as large as 50 people. During a pilot, the team builds the product the customer had agreed to try. At minimum, this consisted of reworking or adapting a preexisting product for the client. Other times, the engineering team had to design and build completely new features. The product was built on Foundry's foundation and was essentially a number of bricks where each brick was a different product that Palantir had built. It was the engineering team's job to try to rearrange these bricks to fit the customer's specific needs.

67. Given the significant investment of time, effort, and money in the pilots, customer accounts are operated at a loss during the Acquire phase. Customers are cohorted into the Acquire phase if, as of the end of a calendar year, Palantir has recognized less than $100,000 in revenue from the customer that respective year. Palantir "evaluate[s] the success of customer accounts in the Acquire phase based on the revenue such accounts generate in the ***following*** year." In other

words, Palantir "believe[s] that [its] investments during this phase will drive future revenue growth."

68. ***Expand***. Expand (or account growth) is the second phase of Palantir's business model presented to investors. During this phase, Palantir seeks to understand the principal challenges faced by its customers and ensure that its software delivers value and results. Accordingly, as with the Acquire phase, the Company's investment in this phase is often significant, and accounts are operated at a loss to drive future revenue growth and margin expansion. Customers are cohorted into the Expand phase when: (i) the Company has recognized more than $100,000 in revenue in a calendar year; and (ii) the account has a negative contribution margin during the year at issue, as determined as of the end of the year.

69. ***Scale***. Scale is the third and final phase of the business model presented to investors. During this phase, Palantir's investment costs relative to revenue generally decrease, while the value its software provides to the customer increases, often significantly, as usage of the platform increases across the customer's operations. Palantir represented that after having installed and configured the software across an entire enterprise, customers become more self-sufficient in their use of its platforms, including developing software and applications that run on top of the platforms, while still continuing to benefit from the support of Palantir's operations and maintenance ("O&M") services. Customers are cohorted into the Scale phase when: (i) the Company has recognized more than $100,000 in revenue in a calendar year; and (ii) the account has a positive contribution margin during the year at issue, as determined as of the end of the year.

70. ***Palantir's Business Model***. Palantir's "approach to sales and marketing is built around the first two phases of our business model." According to Defendants at Investor Day, Palantir's business model is built around growing customers such that they are moving from one

cohort to the next. As customers move from Acquire to Expand to Scale, Palantir's costs decrease and revenue increases. Thus, Defendants' "objective is to make the Acquire and Expand phases as short as possible" so that they quickly get to the Scale phase, which accounted for 76% of Palantir's revenue in 2019. In other words, the number of customers in each cohort, and how those customers were moving between each cohort, were key indicators of Palantir's growth. But throughout the Class Period, Palantir's new customers were failing to advance through the cohorts and reach the Scale phase. Tellingly, when the Company's business prospects deteriorated, Defendants stopped reporting these metrics altogether in 1Q22. Yet in connection with the Offering, Defendants had stressed that "[w]e believe that ***all*** of our customers will move into the Scale phase over the long term."

**C. Palantir's Financial Metrics**

71. In addition to the Company's Acquire, Expand, Scale business model, Palantir identified several key metrics in the Registration Statement indicative of its financial performance, both current and future.

72. ***Year-over-Year Revenue Growth***. Throughout the Class Period, Defendants reported and highlighted Palantir's YoY revenue growth rates in its investor presentations, earnings calls, and SEC filings. Defendants reported these growth rates for both its commercial and government segments, and on a combined Company-wide basis. To secure and maintain a high valuation in the market, Palantir needed to demonstrate to investors that the Company was poised to eventually turn a profit by sustaining or increasing its recent revenue growth. For this reason, just months after the Offering, Defendants informed investors that they expected to achieve greater than 30% annual revenue growth in each of the next five years – guidance they would abandon just 18 months later.

73. ***Contribution Margin***. Defendants defined contribution margin as gross profit less sales and marketing expenses, excluding stock-based compensation, divided by revenue. Contribution margin is a measure of the Company's efficiency in selling and delivering its software to customers; thus, as a customer moves from the Acquire and Expand phases to the Scale phase, the contribution margin is expected to increase exponentially. Palantir deemed this metric as the "***key*** non-GAAP business measure to help us evaluate our business, identify trends affecting our business, formulate business plans and financial projections, and make strategic decisions."

74. ***Total Remaining Deal Value***. Palantir's customer contracts are typically lengthy, multiyear agreements, and the Company recognized revenue over the life of the contract. Total remaining deal value ("TRDV") represented the value of Palantir's customer contracts that had not yet been recognized as revenue. Throughout the Class Period, Defendants routinely cited TRDV as a key metric for measuring future revenue visibility.

75. ***Average Contract Duration and Average Revenue per Customer***. Average contract duration informed investors of the additional number of years Defendants expected to generate revenue under existing customer contracts. Along with TRDV, Defendants repeatedly cited average contract duration as a measure of revenue visibility. Average revenue per customer represented the average amount of revenue Palantir recognized for customers during a certain period.

## VI. DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF BUSINESS

76. During the Class Period, Defendants engaged in a scheme and wrongful course of business that operated as a deception on the investing public concerning Palantir's actual and prospective growth, revenue, and profitability. The purpose of the scheme was to take Palantir

public through a direct listing, artificially pump up the price of Palantir stock, and allow the Individual Defendants to cash out billions of dollars of their own Palantir shares.

### A. With Tens of Millions of Options in Palantir Stock Set to Expire, the Individual Defendants Devise a Scheme to Take Palantir Public

77. For much of Palantir's existence, Karp vehemently opposed taking the Company public, even decrying an IPO in a May 31, 2014 *New York Times* article as "'corrosive to our culture, corrosive to our outcomes.'" According to 2014 Karp, as reported by a March 19, 2014 *CNBC* article entitled "Free Advice: Don't go public, says Palantir's CEO," "'[t]he minute companies go public, they are less competitive. . . . You need a lot of creative, wacky people that maybe Wall Street won't understand. They might say the wrong thing all the way through an interview . . . . You really want your people to be focused on solving the problem, not on cashing in.'"

78. Karp had long-held options allowing him to buy 68.9 million Palantir shares for well below market prices, granted to him in 2009 and 2011. When he spoke in 2014, those options were set to expire in the then-distant future – December 3, 2021. But as that expiration date on his tens of millions of stock options crept closer, Karp's attitude toward going public abruptly reversed, and by 2020 Karp arranged for Palantir to go public within a year. To exercise their options for top dollar, Karp and the other Individual Defendants needed access to liquidity, and the shortest path to that goal was taking Palantir public. Karp, Cohen, Sankar, and Glazer were further incentivized to undertake the direct listing so that they could capitalize on newly established stock awards – worth well over $1 billion – for taking Palantir public.

79. A privately held company does not have a centralized market for its securities, and owners of such assets generally must accept a steep discount of the asset's value if they wish to sell. A purchaser of a privately held firm's securities will generally require such a discount to

accept opportunity costs and risks associated with ownership of an illiquid asset. Many factors affect the illiquidity discount that sellers must accept, including: (i) the liquidity of assets owned by the company; (ii) the company's financial health and cash flows; (iii) the transparency of the Company's business operations; (iv) the possibility of going public in the future; (v) the size of the company; and (vi) whether the assets entitle the owner to control of the company.

80. As a private company, Palantir had a perfect track record of reporting net losses, having never turned a profit since its 2003 inception. Indeed, in 2019, the year before it went public, the Company recorded a net loss of $580 million, despite revenue of $742.5 million and nearly 25% YoY revenue growth. Accounting for such risks, the private markets reflected a steep illiquidity discount for Palantir securities: In 2019 and 2020, Palantir shares traded in the range of $4.50 to $6.50 per share.[10]

81. To exercise their options and sell their shares at lucrative prices, Defendants needed a liquid market. The solution – a direct public offering. As Karp himself put it in a September 30, 2020 interview with *CNBC*'s Andrew Ross Sorkin: "***[Q]uite frankly I believe the people at Palantir who built this company over 17 years deserve access to liquidity***." Sankar agreed, stating the same day that one of the reasons Defendants chose to go public via a direct listing was to give Palantir's longtime employees a way to monetize their Palantir holdings. However, for Palantir's founders, selling their shares would also necessarily dilute their ownership and control of the Company because they would be both selling Class A shares (entitling the holder to one vote per share) and converting Class B shares (entitling the holder to ten votes per share) to Class A shares

[10] Following Palantir's July 2020 announcement that it would go public, the Company saw its share prices increase to $11.50 per share during 3Q20 (through September 1, 2020).

to sell them. Karp, Thiel, and Cohen hatched a plan that would allow them to balance these competing concerns.

82. To ensure their control of Palantir regardless of the number of Class B shares they converted or Class A shares they sold pursuant to their scheme, in connection with taking Palantir public, Karp, Thiel, and Cohen implemented one of the most aggressive governance structures ever devised. To enshrine their control and influence over Palantir, the Company created a special class of stock – Class F for "founders." The Class F shares, owned by Thiel, Karp, and Cohen through a trust, guarantee the founders at least 49.99999% of the total votes, effectively giving them full control over the Company's most important decisions – even if their collective ownership of Palantir fell to just 6%. As the cofounders die, control of the Class F shares is consolidated with the remaining founders. Thus, Cohen (the youngest founder at just 37 years old in 2020) could effectively control Palantir by owning just 0.5% of the shares. The provision ends only when the last of Palantir's founders dies. This structure could not have been implemented without the consent of Karp, Thiel, and Cohen.

83. The Individual Defendants' scheme was in full motion by July 2020, with Palantir announcing it had confidentially submitted a draft registration statement with the SEC for a proposed public offering of its Class A common stock via direct listing. Thiel advocated on behalf of granting the generous stock awards to his two cofounders and longtime executives. A month later, in August 2020, Defendants took the next step in their scheme and awarded the highest-ranking Company officers (Karp, Cohen, and Sankar) stock awards. Accordingly, the Special Compensation Committee granted the following Executive Options and Executive Restricted Stock Units ("RSUs"):

| Named Executive Officer | Number of Shares of Class B Common Stock Covered by Award | Type of Award |
|---|---|---|
| Alexander Karp | 141,000,000 | Stock Option |
| Alexander Karp | 39,000,000 | RSU Award |
| Stephen Cohen | 13,500,000 | Stock Option |
| Stephen Cohen | 13,500,000 | RSU Award |
| Shyam Sankar | 7,500,000 | Stock Option |
| Shyam Sankar | 7,500,000 | RSU Award |

At the time of the award, Karp's portion alone was valued at ***$1.1 billion***. *The Wall Street Journal* has described the stock and option awards as one of "the biggest compensation packages ever awarded to corporate leaders."

84. CFO Glazer also received a RSU award covering more than 4 million Palantir Class A shares. To unlock these awards, Defendants were required to complete a single task – take Palantir public, which was satisfied with the direct listing on September 30, 2020.

**B. Palantir Profits Handsomely from the COVID-19 Pandemic, Setting the Stage for Taking the Company Public**

85. COVID-19 evolved into a global pandemic in early 2020. Almost overnight, the pandemic shuttered businesses and forced their employees to pivot to remote work. Many businesses found themselves ill-prepared for the transition, including state and local health departments that still relied heavily on faxes, email, and spreadsheets to gather infectious disease data and share it with federal authorities.

86. As Defendants acknowledged in the Registration Statement, however, "the COVID-19 pandemic . . . provided certain new opportunities for [Palantir's] business to expand." This included a significant increase in work with partners across the U.S. federal government in responding to the COVID-19 pandemic, "a lot of new 2020 U.S. defense opportunities [that] started as [a] crisis response to COVID," and an "enormous acceleration for a part of a business that was pretty small 18 months [prior] in health care." This was because, according to Defendants:

> The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new

software solutions is not an option during a crisis. As a result, customers are increasingly adopting our software, which can be ready in days, over internal software development efforts, which may take months or years.

87. During Investor Day, Sankar explained that "periods of macro instability or crisis have been a huge tailwind for us, the global financial crisis, ISIS attacks in Europe in 2015, and 2016, the present day COVID." This COVID-19-induced tailwind included work with: (i) the Air Force to support its COVID-19 testing, PPE availability, vaccine distribution, and personnel availability planning; (ii) the Centers for Disease Control and Prevention to track the spread of the coronavirus; and (iii) the U.S. Department of Health and Human Services to help manage the U.S. COVID-19 vaccine distribution strategy, enable international distribution, and improve the equity and efficacy of vaccine programs. This boost in Palantir's business due to the pandemic also included commercial clients, as the Company ultimately reported in its FY20 earnings presentation that in 2020 it had "helped 100 commercial organizations and 10 national governments respond to the COVID crisis," including Merck, Sanofi, and Japanese insurance company Sompo.

88. This business, borne of COVID-19, was a windfall to Palantir. In 1H20, the Company "generated $481.2 million in revenue, reflecting a growth rate of 49% over the same period last year." Defendants emphasized this growth as exceptional at Investor Day because it was "on an extremely large base." They also underscored the Company's gross margin expansion to 78% as something "[we] don't see anyone else doing."

89. By 2020, Palantir had grown into one of the highest-valued startups in the world with a valuation approaching $20 billion. Aware that the 1H20 boon to Palantir's business from short-term contracts related to the COVID-19 pandemic was a one-off, Defendants accelerated Palantir's public listing. As one former Palantir employee later admitted, "COVID really accelerated the growth of the company" so the direct listing "got brought forward," and the

"growth spurt is what drove [the] decision to list so much sooner." While the corresponding growth of Palantir's revenue was temporary, short-term, and unsustainable, on September 30, 2020, Karp falsely extolled Palantir's "49% [growth] off of a $743 [million] base" during 1H20 as "***a pretty strong indication of what the future could hold***, and we're super proud of that."

### C. Defendants Announce in July 2020 that Palantir Is Going Public and Prime the Market with a High-Margin Growth Story

90. In July 2020 Palantir announced it had confidentially submitted a draft registration statement with the SEC for a proposed public offering of its Class A common stock via direct listing. In a traditional IPO, a company raises capital through an underwriting syndicate and the offering is completed at a set price. But in a direct listing, existing shares are sold at whatever price the market bears without being underwritten, meaning there are no underwriters to conduct due diligence of the issuer. On August 25, 2020, Palantir filed with the SEC a registration statement for the Offering on Form S-1, which was followed by several amendments, the last of which was filed with the SEC on September 21, 2020 (the "Final Registration Statement"). The Final Registration Statement became effective on September 22, 2020. That same day, Palantir also filed with the SEC a registration statement on Form S-8 (the "Form S-8"). On September 30, 2020, the first day of the Class Period, the Company filed with the SEC a final prospectus on Form 424B4 (the "Prospectus"), which was updated via a prospectus supplement filed with the SEC on November 13, 2020 (the "Prospectus Supplement"). The Form S-8, Prospectus and Prospectus Supplement were each incorporated into and formed part of the Final Registration Statement. The Final Registration Statement, Form S-8, Prospectus, and Prospectus Supplement are collectively referred to herein as the "Registration Statement."

91. To ensure substantial investor interest in Palantir's shares, Defendants knew they had to demonstrate to investors that Palantir was poised to turn a profit by sustaining its recent

revenue growth and improving its operating efficiencies. To do so, they embarked upon a carefully orchestrated scheme.

### 1. Defendants Begin Promoting the Offering at Investor Day

92. Defendants rolled out their misleading growth story on September 9, 2020, when they hosted an Investor Day to foment investor interest in purchasing the Individual Defendants' Palantir shares in the planned direct listing. Several Palantir insiders participated in Investor Day, including Karp, Sankar, Glazer, and Kawasaki.

93. Karp emphasized the "dramatic" size and "astonishing" quality of Palantir's recent growth, stating:

> [W]hat's interesting about what we're showing you today is that you're going to get to take a look at our financial history. And one of the things that I think people have already noticed is that the revenue has grown dramatically, but the quality of the revenue is, in my view, astonishing. And then the combination of quality of revenue and growth, it's a very unique company.

Karp then asked rhetorically: "[W]ell, how did you get this revenue growth off of a large scale late in the history of . . . a tech company? And how did this happen?" He answered himself by stating that Palantir was ahead of its competitors, building its software "five years before anyone believed that they were things that were necessary for our survival, either commercially, or in the context of data protection our way of life, or on the anti-terror battlefield." Karp also assured investors this "magic" wasn't a one-off but rather was "special" because "we've done it not just once but many times, and that we will do it again in the future."

94. During Investor Day, Defendants strained to portray Palantir as a SaaS-like company with high margins (in order to command a higher valuation multiple), rather than a service company with low margins (which would command a lower valuation multiple). For example, Sankar told investors that Palantir had "SaaS-like economics regardless of the

deployment target." Defendants also claimed that Palantir "can do in three days to three weeks" what would otherwise take its customers "three years," and that it could "now onboard customers in less than two hours." However, this was false, as pilot deployments typically lasted months, during which time Palantir engineers had to rework or adapt a preexisting product, or build something new altogether (*supra* §V.B.; *infra* VI.C.3.). That is, Foundry is not a SaaS-like software product, but rather a set of tools with which engineers can build something themselves.

95. Each person who spoke emphasized Defendants' core narrative – Palantir's high-margin growth story. Both Kawasaki and Glazer reiterated the Company's 1H20 performance, including on the first slide shared:




96. Kawasaki also touted the growth each segment experienced in 1H20, with the government segment experiencing 76% YoY growth (compared to 35% in 1H19) and the commercial segment experiencing 27% YoY growth (compared to 17% in 1H19), amounting to a

115% increase in the rate of growth in the government segment and a 60% increase in the rate of growth in the commercial segment between 1H20 and 1H19:




97. This narrative was misleading because Defendants omitted that Palantir was able to report a high 1H20 rate of growth due to one-off, short-term, and temporary contracts Palantir entered into with its customers as they responded to the COVID-19 pandemic. Notwithstanding that Palantir's 1H20 revenue was not a sustainable benchmark against which to measure future performance, Karp and the other Individual Defendants portrayed Palantir's 49% growth during 1H20 as "***a pretty strong indication of what the future could hold***."




### 2. Defendants Repeatedly Emphasize Palantir's Strong Contribution Margin as Key to Its Success

98. Kawasaki also highlighted growth in Palantir's contribution margin, a "key metric" and "a way to think about the cost that we bear to generate revenue." According to Kawasaki, "we're getting much more efficient, our contribution margins have increased nearly four times since the first quarter of 2019":



99. Kawasaki also discussed Palantir's Acquire, Expand, Scale business model and stated that "***all customers should be Scale phase over time***." Kawasaki stressed the Scale phase as "the majority of our revenue, about 76% of our revenue last year, and generating the bulk of the contribution margin." In 2019, Palantir realized 55% contribution margin for Scale phase customers, which grew to 68% in 1H20. Kawasaki asked, "but how high can this go?" He answered this question by pointing to the top 25% of Scale phase customers, which generated 87% and 89% contribution margin in 2019 and 1H20, respectively.

100. Glazer, too, assured investors of Palantir's growth potential. At Investor Day, Glazer stated the Company's "total addressable market [is] approximately 120 billion . . . read roughly equally between our two business segments." On the commercial side, Defendants calculated Palantir's TAM "based on 6000 of the largest companies in the world" and "excluding those that are based in China and Russia." According to Glazer, the growth potential for the commercial segment was significant, as Palantir had "currently penetrat[ed] less than 3% of the global 2000." As to the government segment, Glazer stated: "[W]e see similar opportunity for expansion both in the US and abroad. And given the growing instability in the world today, our products will be needed more than ever."

101. In truth, Palantir knew its success with its top clients would not translate to new customers. That is because Palantir's top clients had been with Palantir for years and fit into its "established use" case of government entities and a limited number of unique, large commercial applications – like the Skywise program used by the airline industry.

102. "Continue[d] expansion into the commercial sector" was key to Palantir's growth story and required the Company to venture into entirely ***new*** industries for ***new*** clients. Yet, Palantir's software was not easily adaptable outside of its established use cases, and Company

employees had to create reasons why potential clients in these new industries needed Palantir's software. Further, the Company's software was expensive and required substantial customization for each client. Accordingly, these new customers were harder to sign, and closing these deals was far more costly for Palantir than expenses associated with its existing commercial customers. And when deals were closed, the resulting contracts were smaller. All of this resulted in lower-quality revenue. Accordingly, Defendants had no basis to conclude that the success Palantir achieved with its established use clients would translate to new customers, or that its total addressable market included the "6000 of the largest companies in the world" only "excluding those that are based in China and Russia," or 97% of the Global 2000.

103. In short, on Investor Day, Defendants described Palantir taking over the world with a product that could address client needs in a matter of "hours" or "days" and with a total addressable market encompassing every large company and government entity outside of China and Russia. This matched early Palantir employees' description of their mission as "'saving the shire'" and Karp's lofty view of Palantir as having been "'built . . . to support the West.'" Unfortunately, this story was as fictional as the world J.R.R. Tolkien created in *The Lord of the Rings* and would, "coincidentally," fall apart mere months after the Individual Defendants completed their $2.2 billion of insider sales.

### 3. Defendants Continue to Tout a Stellar Growth Story in the Registration Statement

104. The Registration Statement became effective on September 22, 2020. On September 30, 2020, the first day of the Class Period, the Company filed the Prospectus with the SEC, which was updated via the Prospectus Supplement filed with the SEC on November 13, 2020 – and both of which were incorporated in and formed part of the Registration Statement.

105. The Registration Statement depicted Palantir's purportedly accelerating revenue growth trend with the following chart:




106. Defendants informed investors that the Company's customers were spending more, with the average revenue per customer increasing from $5.2 million in 2018 to $5.6 million by 2019 and to $5.8 million by September 30, 2019. This was paramount to the success of Palantir's growth story, as the Company "derive[d] a significant portion of [its] revenue from existing customers that expand their relationship with [Palantir]." Defendants also reiterated the claims from Investor Day that they "believe[d] that all of our customers will move into the Scale phase over the long term" and that "contribution margin for Scale phase accounts will increase further as we become more efficient at deploying our software platforms across the entirety of our customers' operations and at managing and operating our software." Once again, Defendants attributed Palantir's strong pre-Offering operating results to increasing revenue and efficiencies in installing and deploying its software platforms.

107. Investors took Defendants at their word. For instance, a September 22, 2020 *Seeking Alpha* article titled "Bullish On Palantir As It Is Just Beginning To Monetize Its Platforms" parroted Defendants' provided statistics, highlighting that: (1) "[***t]he first thing to point out is that Palantir's revenue growth is actually accelerating***" with 49% YoY revenue growth for 1H20; and (2) "the numbers tell a positive story, with ***contribution margins rising sharply and consistently every quarter***, from 15% in 3Q19 to 55% in 2Q20 as customers reach a more mature stage."

108. However, Palantir's software was not the plug-and-play technology Defendants claimed. Gotham and Foundry rarely fit into its customers' workplaces straight out of the box. Instead, Palantir had to undertake a lengthy process to secure client contracts: create a need for the product, convince a client they needed Palantir's expensive software, build it to the identified use, and close a deal, all at low- or no-cost to the prospective client.

109. A typical pilot began with initial conversations between leadership at the potential client and a Palantir "Leverage" staff member. Leverage staff members were responsible for bringing in potential clients, convincing them to do a pilot, and closing the deal by getting the contract signed – the closest Palantir came to having a sales staff. Either before or after these conversations, a c-suite Palantir executive would also speak with a member of the potential client's leadership, including about the client's software needs. These initial conversations with the prospective client could last months and involve dozens of meetings, during which the Palantir employees had to find a reason why a potential client needed Palantir's software. Moreover, to even begin conducting a pilot and building out "use cases," Palantir would need access to a potential client's data. This would often require the negotiation of non-disclosure agreements, and

often companies would decline going forward with a pilot simply because they did not wish to share their data.

110. If a provisional contract was signed, however, Palantir went to work on a pilot. Pilots generally lasted three months but could last much longer if the client was very large. The Palantir team working on a pilot typically comprised 7 or 8 employees, but it could be as large as 50 people. This team included two leads, one from business development and one from product development. Once the contract was signed, the team would get to work on the product the prospective client had agreed to try. At minimum, this consisted of reworking or adapting a preexisting product for the client. Other times, the engineering team had to design and build completely new features. The product, built on Foundry's foundation, was essentially a number of bricks. Each brick was a different Palantir product. It was the engineering team's job to try to rearrange the bricks into the shape the customer wants. Whereas Palantir pitched its Foundry platform as a cloud-based SaaS solution (akin to Salesforce), in reality Foundry was less a platform and more of a set of tools on which engineers could build something themselves.

111. During the pilot, business development team members would frequently meet with data scientists working for the client company and perform check-ins with the client. Leverage team members would also meet with high-level partners on the client side to learn their needs and concerns both before and during the pilot on a monthly and quarterly basis. At the end of a pilot, the Leverage member was responsible for convincing the client to sign a contract.

112. Closing a deal at Palantir was challenging because the products Palantir sold were expensive to purchase and difficult to understand. Contrary to Defendants' public representations, you could not throw someone the keys to a Palantir product and say "drive." In addition, the pilot deployment process was both time-consuming and expensive. In many instances, even after the

expensive and time-consuming pilot process, Palantir would fail to convert customers from the pilot stage to longer-term contracts.

113. In the Registration Statement, Defendants also highlighted the recent growth in Palantir's government contracts and further represented that Palantir was both "working towards becoming the default operating system across the U.S. government" and would "[c]ontinue expansion into the commercial sector." As detailed above, Defendants claimed that Palantir's growth opportunity was enormous, estimating Palantir's TAM "to be approximately $119 billion across the commercial and government sectors." Of this amount, $56 billion was Palantir's estimated TAM in the commercial sector. The other $63 billion was the Company's estimated TAM in the government sector.

114. In truth, the TAM for Palantir products was far smaller. Because the software was expensive and required substantial customization for nearly every client, Palantir identified its addressable market of prospective clients as companies with established annual revenue of more than $500 million. For smaller companies, the subscription fee attached to Palantir's products was not financially feasible. Nor were the products readily transferable in the commercial context. The Company's established use case was therefore essentially confined to government entities and a narrow subset of the commercial market. In fact, at the time of the Offering, Palantir relied heavily on a narrow client base comprising just 125 customers. And the Company's top three customers comprised one third of Palantir's total revenue:

> Our top three customers together accounted for 33% and 28% of our revenue for the years ended December 31, 2018 and 2019, respectively, and 31% and 29% of our revenue for the six months ended June 30, 2019 and 2020, respectively.

Beyond its established use, much of Palantir's purported "addressable market" in the commercial sector found little use in and/or value from the Company's software, including Home Depot, Coca-

Cola, and American Express, all of whom dropped Palantir after using its software. Thus, Leverage team members were forced to create a reason why a potential client needed Palantir's software.

### D. Palantir Goes Public to Enable Defendants to Sell Billions of Dollars of Their Own Palantir Shares at Prices Inflated by Defendants' Fictional Growth Story

115. On September 30, 2020, Palantir Class A common stock began trading on the NYSE under the ticker symbol "PLTR" (the "Offering"). On the first day of public trading, Karp reiterated the motifs discussed in Palantir's Registration Statement and on Investor Day during an interview with *CNBC*'s Andrew Ross Sorkin. When asked "what the path to profitability looks like" for Palantir, Karp reiterated that "49% [growth] off of a $743 [million] base" during 1H20 is "a pretty strong indication of what the future could hold, and we're super proud of that."

116. Investors bought in. The Company's shares began trading at $10 per share on the first day of trading, representing a 38% increase from a reference price of $7.25 per share set the prior evening, ultimately closing at $9.50 per share.

117. The Individual Defendants moved quickly and within three days of the Offering had sold ***more than $480 million*** worth of their own Palantir shares, with Karp, Thiel, Cohen, Sankar, and Glazer pocketing more than $135 million, $278 million, $37 million, $14 million, and nearly $18 million, respectively.

118. But Defendants weren't done. The structure of a direct listing typically allows existing shareholders and employees to sell most or all of their shares immediately, rather than wait for the 180-day lockup period mandated in most traditional IPOs. But with Palantir's direct public offering, to mollify potential investors and induce further share price growth, Defendants limited the supply of common stock on the market by assuring the market they could only sell 20%

of their shares through February 18, 2021, when the lockup period expired. Thus, a substantial portion of the Company's outstanding Class A shares was subject to the lockup. This scarcity bolstered Palantir's initial stock price, but it also required Defendants to continue their unsupported growth story so they could unload their remaining shares at higher and higher prices.

119. For instance, on November 12, 2020, Palantir filed with the SEC a Form 8-K announcing financial results for 3Q20, which was signed by Karp. In connection with that announcement, Defendants repeated their mantra that "***growth and momentum across [Palantir's] business have continued***" and that the "demand for [Palantir's] software has increased steadily over the past year in the face of significant economic and geopolitical uncertainty in the United States and abroad."

120. Defendants asserted the results were "largely a function of the technology that we've developed over these years" and that the growth was sustainable, not a temporary one-time boost due to COVID-19: "***[I]t may have started there, it's very clear it's not going to end there***."

121. Defendants also told investors that Palantir "continue[d] to pursue [its] vision of powering U.S. and allied defense to fight current and future threats, from space to mud, and in doing so, becoming the default operating system," even going so far as to claim that Palantir's "software is becoming the de facto operating system of US and Allied Defense."

122. Contrary to their representations of continued, accelerating growth, Defendants were aware that Palantir's recent government and commercial growth rates were unsustainable. As Palantir stated in the Registration Statement, the ratable nature of the Company's contracts meant that the "effect of significant downturns in sales or renewals, significant customer terminations, and potential changes in our contracting terms and pricing policies would not be fully reflected in our results of operations until future periods." Coupled with Defendants' "strong

visibility" into future revenue (*infra* §§VI.E.1., IX.B., IX.E.), Defendants knew about negative trends in their business at least two quarters before the Company's operating results reflected the effects of those trends. Thus, while Defendants were reporting their 3Q20 results to investors and touting continued and accelerating momentum and growth, they were aware that Palantir's organic revenue growth rate in the commercial segment would decline in 4Q20 and thereafter fail to meaningfully recover, and that Palantir's YoY revenue growth rate in the government segment would peak in 4Q20 before declining thereafter.

123. With the promise of strong continuing growth, however, the trading price of Palantir's stock continued to rise, with Palantir stock trading as high as $33.50 per share near the end of November 2020. The Individual Defendants took advantage of this to continue selling their shares at elevated prices as follows:

- Sankar sold 1.8 million shares from November 16-27, 2020 at share prices as high as $31.39 per share, for proceeds totaling over $47.6 million;
- On November 16, 2020, Karp dumped nearly 1.3 million shares for nearly $20.3 million;
- Cohen offloaded nearly 2.2 million shares from November 16-19, 2020 for a total value of almost $38.5 million; and
- Glazer sold just under 1 million shares from November 16-23, 2020 for more than $17.6 million.

### E. Just Months After the Direct Listing, Defendants Obscure Palantir's Decelerating Growth and Profitability Trends

124. Palantir's reported revenue growth through the end of FY20 was fueled primarily by existing customers and the short-term COVID-19 contracts described above, enabling Defendants to publicly report Palantir's long-term guidance of greater than 30% yearly revenue growth for five years.

125. Defendants committed to this guidance on February 16, 2021 when reporting on 4Q20 and FY20. During the conference call that day, Sankar stated that the tremendous year Palantir had in 2020 was "***just at the tip of the iceberg, and we are well positioned to capture significant new opportunities in 2021 and beyond***." Sankar assured investors that the Company's "pipeline is substantial and growing":

> ***[I]t's still very clear that we're just at the beginning***. Our customers include only 8 of the Fortune 100, 12 of the Global 100 and only 24 of the Global 300. ***The opportunity in front of us is immense and growing***.

126. When an analyst asked about the sustainability of their long-term guidance, Sankar expressed "confiden[ce] in [Palantir's] long-term growth of being greater than $4 billion in 2025," noting:

> I'll build on what Karp said earlier in the call on long-term guidance. ***We are very much at the beginning here***. We just did . . . 47% growth in 2020. We expect to do 45% growth in Q1 of 2021. And we are only in 24 of the Global 300. But I think looking at that kind of misses the point around the TAM expansion that's currently happening.

When further pressed on "the assumptions that you're making to achieve that target" and the factors that "give[] you the confidence to achieve" $4 billion by 2025, Defendants stressed "the strength of [Palantir's] new account pipeline and how we land and expand."

127. Defendants also emphasized the Company's purported operational efficiencies, claiming that "we're automating the delivery of Foundry" such that "you can have full end-to-end use cases with no code, just drag and drop." This meant that Palantir's software would purportedly be available to a larger set of businesses in varying industries at lower costs, thereby increasing the Company's TAM and expanding Palantir's margins.

128. These representations were false and misleading. Contrary to Defendants' statements, the Company had quickly hit a growth wall in both its government and commercial

segments, with the commercial segment posting a paltry 4% YoY revenue growth rate in 4Q20. And Foundry was not a "drag and drop" software, but rather it required expensive and lengthy client acquisition work and customization for each customer.

129. Although the Individual Defendants dumped the shares they had initially registered in connection with the Offering, the lockup period was not set to expire until February 18, 2021. With that expiration approaching, Defendants continued touting their growth story to boost Palantir's stock price, raising it to as high as $45 per share on January 27, 2021. And as soon as the lockup period expired, the Individual Defendants hastened to offload as many shares as possible. Thiel wasted no time, dumping another ***20 million shares the very day the lockup expired***, pocketing $504.8 million at prices averaging $25.49 per share. Cohen, Sankar, and Glazer also sold more shares, with Cohen selling 2 million shares for $53.6 million on February 18-22, 2021, Sankar over 1 million shares for nearly $30.5 million on February 19-23, 2021, and Glazer 201,190 shares for nearly $5.5 million on February 22-23, 2021.

### 1. Defendants Were Aware of Palantir's Declining Growth and Profitability Trends

130. Little did investors know, but Palantir's government growth rate had actually peaked in 4Q20, ***the quarter that commenced the day after Palantir went public***. Following that peak, Palantir's government business suffered six sequential quarters of decelerating government revenue growth – falling from 85% in 4Q20 to 13% in 2Q22:




131. Given the nature and length of the contracts, and because of their direct involvement in each deal, Defendants had advance insight into this negative trend but maintained their story, repeating positive (and false) statements about success and momentum in the government segment quarter after quarter. In addition, Defendants had ample notice of when government segment revenue would drop off Palantir's books due to the extended nature of the government contracting and procurement process. For example, in April 2021, Palantir was notified that the Navy planned to prematurely end a potential $84 million contract in February 2022, a whole year earlier than the potential end date of February 2023, and pay Palantir only $36 million of the potential $84 million award amount.

132. Nevertheless, quarter after quarter Defendants continued to represent to the market that, *inter alia*, "the momentum in [their] government business continue[d] unabated," their government work was continuing to "accelerate inside the U.S. and outside of the U.S.," and they expected "sustained elevated growth." Even in February 2022, after four successive quarters of

declining government growth rates, Karp continued to deny there was any actual deceleration in the government segment:

> [Analyst:] And just a quick follow up on the government. I know you had a tough comp. It did decelerate pretty materially in Q1 in terms of the growth. Can you give us your perspective on what's happening on the government side?
>
> [Karp:] . . . So there's really a twofold answer to your question. ***One, what will happen this year? Are there – a deceleration in actual one over a long time series? The answer is clearly no***.

133. The Company's commercial segment also stalled significantly in 4Q20 and 1Q21. But to mask further deterioration on the commercial side, Defendants adopted the SPAC Scheme (described below) to buy high-margin revenue that the Company began reporting in 2Q21 to prop up its reported commercial results. Absent this revenue that Palantir bought and paid for in roundtrip transactions, the Company's commercial growth was far bleaker than presented:




134. If not for Defendants' SPAC Scheme artificially (and temporarily) propping up Palantir's declining overall revenue growth rate, it would have fallen below Palantir's 30% long-term annual growth target in 3Q21 – three full quarters before Palantir admitted to falling below the target in 2Q22:




135. Stagnating growth in Palantir's commercial and government business segments coupled with declining profitability trends throughout the Class Period. As Palantir ventured out of its established use industries, new customers became more and more expensive to obtain because Palantir's product was not a good fit for most commercial applications, and it was incredibly expensive for the Company to convince new clients to sign on, requiring teams of engineers, extensive pilot projects, and substantial customization for each client. Even when these efforts did pay off with a customer agreement, the contracts signed were smaller and smaller. As a result, Palantir saw diminishing returns and lower-quality growth – the exact opposite of the Company's Acquire, Expand, Scale business model:



136. As discussed, Defendants had early warning of the ongoing deceleration in their business and early insight into the negative trends that were then impacting Palantir and contradicting their growth story, repeatedly emphasizing their "strong visibility into future revenues across [Palantir's] customer base" in connection with the Offering. This "strong visibility" was the product of Palantir's multiyear customer contracts, with the Company's average contract duration increasing from 3.5 years at the time of the Offering to 3.9 years by the end of 2Q21 (after which the Company stopped reporting this metric altogether).

137. Although Defendants were aware Palantir had hit a growth wall, Palantir's method of recognizing revenue obscured the financial impact of the slowdown from investors until later reporting periods. As explained in the Registration Statement:

> We generally recognize revenue from our platforms and O&M services over the contractual term. As a result, a portion of the revenue we recognize in each quarter is derived from customer contracts generally entered into during previous periods. Consequently, ***a decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that we recognize for that quarter. However, such a decline would negatively affect our revenue in future quarters. Accordingly, the effect of significant downturns in sales or renewals, significant customer terminations, and potential changes in our contracting terms and pricing policies would not be fully reflected in our results of operations until future periods***.

Defendants were therefore aware of negative trends in their business at least two quarters before they reported the effects of those trends fully as reflected in the Company's publicly reported financials. But investors were left to rely on the representations of Defendants, who continued their unabashed, positive high-margin growth story.

138. Since the reality of Palantir's business was quite negative, Defendants needed to bolster their story. To do so, Defendants planned and effectuated the SPAC Scheme to purchase high-margin revenue and inflate the Company's performance metrics via *quid pro quo* arrangements with questionable early-stage companies. The SPAC Scheme was designed to (and

did) conceal Defendants' inability to penetrate the commercial market by creating the illusion of rapid and highly profitable growth. In particular, the SPAC Scheme allowed Palantir to report deals using 10% (or less) of the engineering manpower used in traditional commercial deals and no sales people. Further, the products provided to SPAC customers were off-the-rack and partial Foundry applications, not the bespoke and complete products Palantir provided its genuine, non-SPAC commercial clients,[11] thereby inflating the contribution margin on Palantir's SPAC deals.[12]

139. Thus, the outsized margins recorded on Palantir's SPAC deals not only allowed Defendants to report misleading revenue growth, but they also masked the timing and extent of stagnation and declines in Palantir's commercial contribution margin as the Company struggled to efficiently onboard and expand non-SPAC commercial clients. Indeed, excluding the SPAC customers that the Company bought in 2021 reveals that Palantir was, in fact, operating at a significant loss on its new organic customers:

| | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | FY 2021 |
|---|---|---|---|---|---|
| Avg revenue per commercial customer | $ 2,213,567 | $ 1,816,747 | $ 1,515,739 | $ 1,318,952 | $ 4,384,578 |
| Avg contribution profit (loss) per commercial customer | $ 1,209,050 | $ 950,899 | $ 853,713 | $ 759,898 | $ 2,432,286 |
| | | | | | |
| Avg revenue per new YTD commercial customer | $ 39,455 | $ 272,323 | $ 433,522 | $ 455,228 | $ 830,693 |
| Avg contribution profit (loss) per new YTD commercial customer | $ (570,455) | $ (183,677) | $ 28,269 | $ 269,088 | $ 169,336 |
| | | | | | |
| Avg revenue per new YTD commercial customer (Ex-SPAC) | $ 39,455 | $ 224,769 | $ 196,173 | $ 226,078 | $ 413,932 |
| Avg contribution profit (loss) per new YTD commercial customer (Ex-SPAC) | $ (570,455) | $ (356,971) | $ (310,903) | $ 33,342 | $ (333,567) |

11 Although Palantir charged premium prices in these SPAC deals, these less-than-premium applications were accepted because the primary purpose of the transactions for the SPACs was to obtain much-needed PIPE funding critical for their survival, as opposed to obtaining and using Palantir's software, which the SPACs were mostly too nascent to need or afford.

12 The true expenses associated with Palantir's SPAC Scheme – the PIPE investments that enabled the sales – were not considered an expense under Palantir's contribution margin formula.

140. In short, and as explained below, Defendants used the SPAC Scheme to buy the high-margin growth they couldn't achieve organically.

**2. The SPAC Scheme**

141. At the time of the Offering, Defendants defined Palantir's potential customers in the commercial sector as companies with more than $500 million in recurring annual revenue. This is because most early-stage companies can't afford Palantir, as its products are expensive to purchase and difficult to understand.

142. By early 2021, however, numerous analysts and market participants expressed concern over Palantir's slowing growth from commercial customers, when the Company reported just 4% YoY growth in 4Q20 commercial revenue. This deceleration in revenue growth in Palantir's commercial segment was particularly worrisome because continued expansion into the commercial sector was key to Palantir's growth. As Morningstar succinctly stated in an August 12, 2021 report: "[M]omentum in commercial is key to the long-term opportunity for Palantir."

143. To create the appearance of continued robust client, revenue, and margin growth and thereby maintain the Company's artificially inflated share prices while the Individual Defendants completed their insider selling spree, Defendants employed a comprehensive scheme to create the illusion of sustainable commercial growth and scale (the "SPAC Scheme"). Specifically, Palantir made 20+ unusual *quid pro quo* investments in mostly dubious, revenue-challenged, and/or barely solvent early-stage companies either acquired or looking to be acquired by SPACs.

144. SPACs, also known as blank check companies, raise cash in an IPO and then use those proceeds to then acquire a private company, effectively bringing the target company public. SPACs are popular with SPAC founders and sponsors because they often provide lucrative benefits

to their founders and sponsors. SPACs also often expedite the timeline to becoming a public company. For example, SPACs can incorporate and go public in 8-12 weeks compared to traditional IPOs, which can take a year or more to bring to market. SPACs also provide quicker access to public funding and a faster exit for insiders who want to cash out. Thus, there are clear cost and time benefits to SPAC founders and sponsors compared to a traditional IPO.

145. Because of these incentives, SPAC founders and sponsors are eager to procure the hefty private investments in public equity deals ("PIPES") often required to make the SPACs work. But PIPE investors are often difficult to find. PIPES are private placements of a company's shares to a select group of investors and a way for such companies to raise a large amount of money quickly. The purpose of a PIPE is for the issuer of the stock to raise capital for the public company. This financing technique is faster than secondary offerings due to fewer regulatory issues with the SEC. PIPE deals are common in SPAC transactions because sponsors often need to raise more money than they obtain in an IPO to complete a SPAC's acquisition of a target company, so the companies have cash to fund their operations post-merger. As part of the process, PIPE investors are often given material nonpublic information from the SPAC about the target they're looking to acquire.

146. That is where Palantir came in. In exchange for its cash, Palantir was able to extract from the SPACs multiyear, multimillion dollar contracts for Foundry software. The value of these deals often exceeded the potential SPAC's annual revenue. And some contracts that Palantir executed during 1Q21 and 2Q21 ***required the SPACs to immediately return up to 75% of Palantir's investment to Palantir at deal close***. On November 24, 2021, *Fortune.com* published a story describing the deals as reminiscent of so-called "Barney deals" prevalent during the dotcom bubble, "when companies relied on the practice of buying software and services from one another

to generate more impressive-looking growth numbers . . . premised on the same principle that the children's character sings about: I love you, you love me."

147. Thus, Defendants used Palantir's cash to create Palantir's high-margin revenue growth and manufacture the façade of growth – in its commercial division, deal value, revenue, margins, and number of customers metrics. Effectively, Palantir bought illusory and unsustainable revenue and margin growth through these roundtrip transactions.

148. These SPAC transactions also helped mask the Company's deteriorating margin profile, as they had distinct profit margin characteristics from Palantir's traditional commercial contracts. Palantir's SPAC deals had a much lower cost to obtain and implement than its typical commercial contracts, inflating Palantir's contribution margin significantly. For example, whereas a single non-SPAC commercial client usually required about eight Palantir employees' support to create a bespoke Foundry platform, eight Palantir employees could support ten SPACs. Furthermore, unlike typical commercial deals, there were no salespeople involved in the SPAC deals. And unlike Palantir's typical commercial accounts, Palantir did not create bespoke products for its SPAC clients or give them the full Foundry treatment. Instead, Palantir gave the SPACs only parts of Foundry basically out of the box and delivered the product to them all at once. Because SPAC deals cost Palantir approximately one-tenth as much as its traditional commercial contracts, the SPAC contribution margins were designed to (and did) materially distort and inflate Palantir's reported margins in its commercial segment.

149. The following table illustrates how the SPAC deals inflated Palantir's contribution margin compared to its non-SPAC commercial deals, estimating conservatively that a 90% contribution margin from the SPACs would have inflated Palantir's contribution margin in 2021 and 2022 by as much as 18.4% per quarter:

| | 2021 | | | | 2022 | | |
|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| **Commercial revenue** | $ 132,814,000 | $ 143,523,000 | $ 174,310,000 | $ 193,886,000 | $ 204,567,000 | $ 210,012,000 | $ 204,046,000 |
| **Contribution margin (reported)** | 54.6% | 52.3% | 56.3% | 57.6% | 55.0% | 51.8% | 45.7% |
| | | | | | | | |
| **SPAC Revenue** | $ - | $ 3,000,000 | $ 19,000,000 | $ 26,300,000 | $ 39,200,000 | $ 31,400,000 | $ 28,100,000 |
| | | | | | | | |
| **Contribution margin ex-SPAC (at 90% CM)** | - | 51.5% | 52.2% | 52.5% | 46.8% | 45.1% | 38.6% |
| **Reported contribution margin inflated by:** | - | 1.6% | 7.9% | 9.7% | 17.7% | 14.9% | 18.4% |

Thus, the SPAC Scheme not only allowed Defendants to report misleading revenue growth but also masked the timing and extent of stagnation and declines in Palantir's commercial contribution margin as the Company struggled to efficiently onboard and expand non-SPAC commercial clients. As a result, Defendants' SPAC Scheme misled investors about the Company's operations and prospects and artificially inflated the price of Palantir stock. As the market gradually pieced together the SPAC Scheme and learned that Palantir's business was not as Defendants represented, Palantir's stock price collapsed.

150. To effectuate the SPAC Scheme and manufacture commercial growth and scale, Palantir invested or committed to invest approximately $400 million in 20+ companies in 2021. These *quid pro quo* investments allowed the Company to report total deal value of $767.9 million, creating the illusion of sustainable high-margin growth in the Company's commercial segment. These SPAC contracts thus represented over 20% of the Company's $3.8 billion total deal value by December 31, 2021 (over 76% of the year-over-year increase in total deal value), at least a quarter of the $925 million in contracts Palantir signed in 2Q21, and roughly one-third of its Class Period revenue growth by early 2022. These unsustainable and illusory SPAC deals also represented approximately 35% of Palantir's new commercial customers in 2Q21 and inflated its contribution margin by an estimated 9.7% in 4Q21, 17.7% in 1Q22, 14.9% in 2Q22, and 18.4% in 3Q22.

151. Palantir defined its potential commercial customers as those companies large and secure enough to afford Palantir's hefty software and services bills. By comparison, many of

Palantir's SPACs lacked the revenue or commercial ability to even continue as going concerns,[13] let alone afford the "longer duration" Palantir subscription contracts, which cost up to $10 million a year for 5-6 years (excluding any short-term repayment of Palantir's "investment"). Moreover, many of the SPACs which engaged in roundtrip transactions had scant and sometimes no production or operations to optimize with Foundry.

152. In other words, because many of these SPACs lacked revenue or a clear path to commercial production or operations on the scale Defendants represented, they were too nascent to need or afford Palantir's software. Nonetheless, the SPACs entered into contracts with Palantir just so they could obtain PIPE funding. Thus, Palantir had no reasonable expectation of "long-term" revenue, growth, or equity from the SPACs – especially over the length of their contracts.

153. Defendants knew these facts when they executed the SPAC Scheme and made related public statements. Not only did Palantir complete due diligence of each SPAC before closing the individual investments, the Company had as much information about the SPACs as the SPACs themselves. Foundry was, in Defendants' own words on the February 16, 2021 earnings call, the "single source of truth" for its customers immediately. In fact, on that and other calls, including on May 11, 2021 and November 9, 2021, Defendants said Foundry would "unlock" all customer data, presumably including financial data, in "hours," even "minutes," after installation and in "real time." Sankar boasted: "[A]s a consequence of simply integrating your data into foundry, you now have a digital twin of your entire enterprise."

[13] "Going concern" is an accounting term used to indicate the belief that a company has the resources needed to continue operating. Auditors of public companies are responsible for evaluating whether there is substantial doubt as to the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited. The auditors or management for approximately 15 of the 20 Palantir SPACs have raised going concern doubts, and one (Fast Radius) is bankrupt.

154. Thus, Defendants knowingly misled investors by telling them the SPAC Scheme was a sustainable "***long-term strategy***" with "long-term" contracts that would provide revenue over a "***longer duration***," and by describing the SPACs as "compelling businesses" that would work with Palantir "***for a very long time***" and use Foundry "***from Day 0***" to "***accelerate production***" and "***shav[e] years and mountains of risk off their road map***."

155. Not surprisingly, Defendants went to great lengths to hide the details and even the names of some SPACs from investors. For example, in its SEC filings, Palantir identified some SPACs generically as an "[a]utonomous vehicle company," an "[a]utonomous aerial vehicle company," an "[e]lectrical [v]ehicle [c]harging [c]ompany," and a "[m]obility company." Palantir also delayed announcing the names of SPACs associated with approximately $70 million of deals in September 2021 (Rubicon, Allego) and October 2021 (Starry Group) until 4-8 months later in February 2022 (Rubicon) and May 2022 (Allego, Starry Group).

### 3. Defendants Mislead by Saying the SPACs Used Foundry "from Day 0" for "Production," "Manufacturing," and "Execution"

156. Before Palantir's May 11, 2021 earnings call, Palantir closed at least four roundtrip SPAC deals, buying four new commercial clients, that is approximately $171 million in unsustainable, roundtrip future revenue from dubious SPACs in exchange for $112 million in PIPE funding:

- ***Lilium*** (flying taxi company): $41 million on or around March 28, 2021, in exchange for a 5-year, $50 million Foundry subscription (approximately 1,000 times Lilium's 2021 revenue);
- ***Sarcos*** (building an "Iron Man" suit): $21 million on or around April 4, 2021 in exchange for a 6-year, $42 million Foundry subscription (over 8 times Sarcos's 2021 revenue);
- ***Roivant Sciences*** (holding company for abandoned drugs): $30 million on or around May 1, 2021 in exchange for a 5-year, $39 million Foundry subscription (nearly double Roivant's 2021 revenue); and

- ***Celularity*** (purporting to turn placentas into medicine): $20 million on or around May 5, 2021, in exchange for 5-year, $40 million Foundry subscription (nearly double Celularity's 2021 revenue).

157. Defendants knew when they made these conflicted deals that Palantir's first four SPACs were too nascent to need Palantir's software and/or lacked the revenue or commercial prospects to afford the "longer duration" Palantir subscription contracts, which in total exceeded each SPAC's annual revenue and would cost each SPAC from $7 million-$10 million a year for 5-6 years. For example, Lilium (and thus Palantir) knew the Lilium jet was unlikely ever to reach the operational or manufacturing stage. *See infra* §IX.C.3. Similarly, Sarcos had not sold or manufactured its Iron Man suits for mass commercial use even by the end of the Class Period.[14] And Celularity acknowledged less than two weeks after the Palantir deal that its "cellular medicine" was "***in its infancy***."

158. Not only were these SPACs not positioned to meaningfully utilize Palantir's Foundry software commercially, they were all suffering huge operating losses in 2021, when the PIPE deals were signed, with Roivant losing a staggering $1 billion, Lilium losing over €400 million, Celularity losing over $109 million, and Sarcos losing approximately $81 million. Palantir was ultimately forced to sell approximately 90% of its $40 million Lilium investment at a 50%-80% loss.

159. On its May 11, 2021 earnings call, Palantir discussed Lilium, Sarcos, Roivant, and Celularity while emphasizing that Palantir's "commercial business is gaining more and more

---

[14] In its November 8, 2022 Form 10-Q, Sarcos stated: "***We have no experience to date in high volume manufacture of our products, nor do we have the facility, employees or equipment needed to manufacture our products in high volumes***," and that "we currently do not anticipate high-volume production by a contract manufacturing partner to be in place until at least the end of 2023."

momentum," with "incredible traction," and "grew 72% in the U.S." Defendants exalted SPACs as "***the first salvo*** in expanding distribution of Foundry to broader markets and a broader set of customers." They also told investors the SPACs were "build[ing] . . . operations around Foundry from day 0, using Foundry for . . . CRM [customer relationship management], [and] ***manufacturing execution***," creating "***production***" and "***manufacturing use***" benefits, and thereby "***shaving years and mountains of risk off their road map***." Defendants also said the SPACs would "accelerate our business" and claimed the deals demonstrated the Company "executing on our ability to move down market," "win[ning] deals," and "accelerat[ing] our distribution." Analysts noted Palantir's May 11, 2021 SPAC statements, with Morgan Stanley reporting in its May 12, 2021 analyst report that Palantir added "11 new commercial customers" and thus had a "more durable growth profile" that indicated "durable 30% growth ahead."

160. But Defendants' May 11, 2021 statements misrepresented Palantir's commercial segment growth, the reasons for Palantir's investments in the individual SPACs, and the scope of its SPAC investments. Because most of these SPACs were too nascent to need or afford Foundry, let alone manufacture, produce, scale, execute, or build at the scale represented, Defendants' statements about Foundry's purported "use" benefits were misleading. For example, Lilium could not use Foundry for "manufacturing execution," because its jet was years away from the operational or manufacturing stage and ***unlikely ever to get there***. Likewise, Sarcos could not "leverage Foundry for all of Palantir's well-understood industrials and manufacturing use cases" because its "physical Iron Man suit" was, as Sarcos later stated in its 3Q21 Form 10-Q, still a "prototype" and "not yet commercially available." Accordingly, Foundry could not "radically accelerate production ramps" for these products or "get [them] to scale on dramatically shorter time horizons" because there was simply no meaningful production to ramp or scale. If anything,

the exorbitant Palantir subscriptions impaired Lilium's and Sarcos's commercial development by spending most of their modest resources on unnecessary software.

161. Defendants' May 11, 2021 SPAC statements further misled investors by telling them Palantir's SPAC investments were "win[ning] deals" that demonstrated Palantir "accelerat[ing their] distribution" and "executing . . . down market." Palantir knew but concealed that they were not winning but rather buying these deals through *quid pro quo* exchanges whereby the SPACs received PIPE funding in exchange for Palantir being able to buy illusory high-margin growth and revenue.

### 4. Defendants Conceal Their Expansion of the SPAC Scheme to Further Inflate Commercial Growth

162. When Defendants spoke about the SPACs on May 11, 2021, they concealed that Palantir had massively expanded the scope of its SPAC Scheme by "investing" in more dubious companies to manufacture Palantir's illusory high-margin revenue and growth. Indeed, right after its May 11, 2021 earnings call, ***Palantir bought at least nine different commercial clients and approximately $212 million in unsustainable, roundtrip revenue from SPACs in exchange for about $200 million in PIPE funding*** (collectively the "Second Stage SPACs"):

- ***Wejo***: $35 million on or around May 28, 2021 in exchange for a 6-year, $50 million Foundry subscription;
- ***Babylon Health***: $35 million on or around June 3, 2021 (Foundry subscription commitment undisclosed);
- ***Boxed***: $20 million to Boxed on or around June 13, 2021 in exchange for a $20 million, 5-year Foundry subscription with $15 million payable within 30 days of closing;
- ***Pear Therapeutics***: $10 million on or around June 21, 2021 in exchange for a 3-year, $9.3 million Foundry subscription;
- ***Embark Trucks***: $18 million in or around June 22, 2021 (Foundry subscription commitment undisclosed);

- ***Fast Radius***: $20 million on or around July 18, 2021 in exchange for a 6-year, $45 million Foundry subscription ***signed*** in May 2021 with nearly $10 million paid at SPAC close in February 2022;

- ***Tritium***: $15 million on or around July 27, 2021 in exchange for a 5-year, $21 million Foundry subscription;

- ***AdTheorent***: $15 million on or around July 27, 2021 in exchange for a 5-year, $20 million Foundry subscription; and

- ***Faraday Future***: $25 million in or around July 2021 in exchange for a 6-year, $47 million Foundry subscription;

- ***FinAccel***: $10 million on or around August 2, 2021 (SPAC cancelled).[15]

163. Given the nature of these high-dollar transactions in which both sides were typically assisted by bankers and/or lawyers, negotiations over the roundtrip investments usually were conducted over an approximate 3-4 month period. Defendants were therefore negotiating most, if not all, of the Second Stage SPAC deals when they discussed SPACs on the May 11, 2021 earnings call. Indeed, some of the deals were just days or weeks from closing. Yet, Defendants concealed this massive expansion of the SPAC Scheme by obliquely referring to "prospects in our pipeline."

164. Not only did Palantir's Second Stage SPACs not have the revenue to justify their lavish Foundry subscriptions, they were teetering on insolvency, as some publicly stated soon thereafter. For example, Fast Radius declared bankruptcy in 2022 after its auditors reiterated going concern doubts. And FinAccel cancelled its SPAC in March 2022. Of the remaining eight SPACs, auditors or company management for all but one (Embark Trucks) subsequently raised and/or

[15] Palantir also invested $5 million in Astrocast, a Swiss company listed directly on a European exchange, on or around July 20, 2021, in exchange for a 5-year Foundry subscription with an undisclosed "step up" payment schedule. Palantir disclosed its Astrocast investment by name in its 2Q21 Form 10-Q but not the exact value of Astrocast's Foundry subscription. Palantir also invested $3 million in Skydweller, a private non-SPAC company, on or around June, 22, 2021, in exchange for an unknown sum. Palantir's 2Q21 Form 10-Q disclosed what appears to be the Company's investment in Skydweller, listed only as an "autonomous aerial vehicle company" without disclosing the exact value of Skydweller's Foundry subscription.

reiterated doubts whether the companies could continue as going concerns. Moreover, the Second Stage SPACs suffered catastrophic declines in stock price during the Class Period, falling on average approximately 80% from their IPO prices. All currently trade as penny stocks except Babylon Health, whose stock price is down approximately 95% from its June 3, 2021 closing price, and Fast Radius, which is bankrupt.

#### 5. Defendants Reject Questions About Whether Palantir Was Buying Revenue and Call the SPACs a "Long-Term Strategy"

165. When Defendants discussed the SPACs on the August 12, 2021 conference call, analysts began to ask more questions about the deals. And when asked directly on its August 12, 2021 earnings call if Palantir was buying revenue, Defendants avoided answering the question and instead misled investors yet again. Referring to the SPACs as "companies that we think we will be working with for a very long time," Defendants misrepresented the SPAC Scheme as "a long-term strategy" and "strategic investment program" that would provide $543 million in total contract value ("TCV") through "long term" deals with "longer duration and time to revenue recognition." Defendants also said it was "[t]he innovation in our distribution" that was "enabling us to partner with these organizations . . . as they build their offerings on Foundry." Analysts understood Defendants' statements to mean, as an August 12, 2021 Jefferies analyst report stated, that Palantir's "***partnership investments are paying off as net new logo growth accelerates***."

166. In truth, Defendants knew but concealed that their purportedly increased distribution was not the result of "innovation" but was the product of the SPAC Scheme – buying revenue to create the illusion of high-margin growth. Defendants also knew but concealed that Palantir had no reasonable expectation of long-term revenue or growth from these SPACs, which were too nascent to need Palantir in the manner and scale Defendants represented and lacked the

revenue to afford their lengthy and expensive Foundry contracts.[16] Defendants also knew many of the SPACs were not "companies that we think we will be working with for a very long time" but instead basically ephemeral shell companies Defendants used to implement and execute their scheme.

167. For example, Palantir's Second Stage SPACs included $88 million of investments in no-or-nearly-no-revenue companies in exchange for at least ***$107 million*** in software subscriptions: ***Embark Trucks*** (no revenue in 2021), ***Faraday Future*** (no revenue in 2021 but $47 million Foundry subscription), ***Wejo*** (only $2.57 million in 2021 revenue but $50 million Foundry subscription), and ***Pear Therapeutics*** (only $4.2 million in 2021 revenue but $9.3 million Foundry subscription). Tellingly, Palantir required front-loaded payments from Boxed ($15 million of its $20 million Foundry subscription due 30 days after close) and Fast Radius ($9.4 million of its $45 million Foundry subscription due at close). These payments further confirm Palantir did not believe that Boxed or Fast Radius were part of a "long-term strategy," much less "companies . . . we think we will be working with for a very long time." Palantir's condition that Fast Radius return $9.4 million of Palantir's $20 million investment at deal close – just nine months before Fast Radius's bankruptcy – likewise undermines any purported "long term" purpose.

168. Palantir also misleadingly told investors on the August 12, 2021 call that the companies "need [Palantir] software today" and that Palantir was "delivering ***the full power of Foundry*** to small companies through a subscription model." But unlike Palantir's typical commercial accounts, Palantir did not provide its SPAC clients "the full power of Foundry."

[16] Defendants mentioned Wejo and Boxed by name on the August 12, 2021 earnings call. Palantir's Form 10-Q, released the same day, disclosed Babylon Health, Boxed, Pear Therapeutics, AdTheorent, FinAccel, Tritium, and Fast Radius by name, but it dissembled Embark Trucks as an "[a]utonomous vehicle company" and Faraday Future as an "[e]lectric vehicle company."

Instead, ***Palantir gave the SPACs only parts of Foundry and delivered the product to them all at once*** without the bespoke setup its non-SPAC commercial customers received.

169. Moreover, Defendants knew from Palantir's due diligence and the complete data it "unlocked" from customers (minutes after installing Foundry) that most of the Second Stage SPACs were too nascent commercially to "need [Palantir] software today," let alone afford it. For example, as disclosed by a January 6, 2022 market report, Embark Trucks held "'no patents'" and had "'only a dozen or so test trucks.'" Likewise, Faraday Future was revealed in an October 7, 2021 short seller report as an "EV scam" that would likely never sell a car.

### 6. Defendants' August 12, 2021 Statements Concealed Their Last-Gasp Expansion of the SPAC Scheme

170. When Defendants discussed Palantir's SPAC investments on August 12, 2021, they not only continued to conceal and misrepresent facts about individual SPACs, but they also concealed their ongoing and last-gasp expansion of the SPAC Scheme. Indeed, within months of its August 12, 2021 earnings call and Form 10-Q, ***Palantir purchased approximately seven more commercial clients, including three that provided Palantir with $65.2 million in unsustainable, high-margin roundtrip revenue*** and $17 million in front-loaded payments, in exchange for $51.5 million in PIPE funding (the "Third Stage SPACs"):

- ***BlackSky***: $8 million on or around September 1, 2021 in exchange for $8 million Foundry subscription payable "over multiple years";
- ***Energy Vault***: $8.5 million on or around September 8, 2021 in exchange for $7.5 million Foundry subscription payable at $3 million a year over two and a half years; and
- ***Rubicon Technologies***: $35 million on or around December 15, 2021 (negotiated in September 2021 but amended in December 2021) in exchange for at least $17 million in Palantir services payable within 12 months and $30 million thereafter through October 2024 (a total commitment of $49.7 million).

171. The remaining four of these Third Stage SPACs provided Palantir with unknown payments, estimated to be at least $26 million, in exchange for approximately $66 million in PIPE funding:

- ***Allego***: $20 million on or around September 9, 2021 for unknown exchange ("Allego is a customer of Palantir");
- ***Starry Group***: $16 million on or around October 6, 2021 in exchange for what appears to be an estimated $16 million Palantir subscription agreement over 3 or 4 years;
- ***Rigetti***: $10 million on or around October 6, 2021 in exchange for what appears to be an estimated $10 million Palantir subscription agreement over 3 or 4 years; and
- ***Bird Global***: $20 million on or around November 29, 2021 for unknown exchange ("We are a customer of Palantir.").[17]

172. There was no "long term" or legitimate purpose for these deals except to manufacture for Palantir unsustainable high-margin growth and illusory roundtrip revenue in exchange for PIPE funding. Subsequent to these deals (or immediately before them, as with Bird Global), the auditors or management of almost ***all*** these Third Stage SPACs expressed going concern doubts. And all lost over 50% of their listing stock price by the end of the Class Period.

173. Defendants knew from Palantir's due diligence and the complete data it "unlocked" from customers minutes after installing Foundry that most of these SPACs could not afford Foundry and were either insolvent or nearly so. Indeed, as reported by *WasteDive* on November 21, 2022, Rubicon attributed its subsequent layoffs and restructuring to "'higher software subscription costs'" from its Palantir agreement. Moreover, it was obvious to Defendants at the time of the deals from the data Palantir collected that these SPACs were operating at substantial losses in 2021: Rubicon ($915,000 net loss); Bird Global ($279 million net operating loss); Starry

[17] Palantir also invested $20 million in Hyundai Oilbank on or around December 9, 2021, but the SPAC was cancelled.

Group ($166.5 million net loss); BlackSky ($120 million operating loss); Allego (€126 million net loss); Rigetti ($23.2 million net loss); and Energy Vault ($3.3 million net loss).

174. Palantir also knew from its close relationships with some of its Third Stage SPACs that these companies could not afford Foundry except as *quid pro quo* to obtain PIPE funding. For example, Rigetti executive Spencer Raskoff is on Palantir's Board, and Rigetti is also connected to the Thiel-founded Y Combinator. Likewise, Thiel's friend and fellow PayPal alumnus Roelof Botha is on the Bird Global Board. And Thiel Capital Managing Director and former PayPal executive Jack Selby, who facilitated several investments in Palantir, was on the Board of Founder SPAC, which merged with Rubicon in Rubicon's SPAC, and subsequently joined Rubicon's Board.

175. That Defendants went to great lengths to hide the details and even the names of some of the Third Stage SPACs from investors further confirms Defendants' desire to conceal the true state of these SPACs and the scope and purpose of the SPAC Scheme. For example, in its SEC filings, Palantir concealed Starry Group as a "[t]elecommunications company," Allego as an "[e]lectric vehicle charging company," and Bird Global as a "[m]obility company." Moreover, the Allego, Starry Group, Rigetti, and Bird Global deals are still shrouded in mystery with scant public details. Further concealing the scope of its SPAC Scheme and the nonviability of the individual SPACs, Palantir concealed from the market the names of approximately $70 million of deals in September 2021 (Rubicon, Allego) and October 2021 (Starry Group) – until 4-8 months later in February 2022 (Rubicon) and May 2022 (Allego, Starry Group).

**F. Defendants' Scheme Unravels**

176. On Palantir's November 9, 2021 earnings call, Palantir reported disappointing 3Q21 results, which implied a significant slowdown in overall revenue growth and government

sector revenue growth. Despite Sankar's claims only two months before that Palantir was "continu[ing] to see a broadening of scope of opportunities and expansion," government segment revenue actually declined by 6% sequentially from $232 million to $218 million during the quarter. Sankar knew at the time he spoke (two months earlier) that this news was forthcoming given Defendants' "strong visibility into future revenues across [their] customer base" from the concentrated nature of that base and the large, multiyear customer agreements. Pursuant to Defendants' scheme, in 3Q21 the Individual Defendants caused Palantir to abruptly stop providing the key "revenue visibility" metric that it had previously provided to investors with each of its quarterly earnings results – *i.e.*, average overall contract duration – further obscuring investors' ability to discern the stability and sustainability of future revenues.

177. November 9, 2021 was also when investors first learned of "[c]racks [e]merging in the [SPAC] [s]tory," as RBC Capital Markets reported that day. Glazer disclosed that Palantir's SPAC investments were responsible for "about $640 million of total revenue long term from this program at the end of the quarter" and about "2% of revenue for the year through Q3." In its Form 10-Q released the same day, which was signed by Karp and Glazer, Palantir disclosed additional investment and financial details that permitted market analysts such as William Blair's Kamil Mielczarek and Louie DiPalma to "estimate" that Palantir's commercial revenue without the SPACs "likely" had decelerated; that revenue from the SPACs was, in their view, unsustainable; and that overall total deal value was down sequentially excluding SPACs. On this news, the price of Palantir stock fell 16% over two trading days to $22.52 per share. But many analysts still believed that revenue from Palantir's SPACs would "continue to ramp up gradually going forward."

178. The 3Q21 fiscal quarter ended on September 30, 2021. The Individual Defendants were well aware then on September 30, 2021, that Palantir would be reporting disappointing quarterly results with the 3Q21 earnings release scheduled for the second week of November 2021. In the intervening five-and-a-half weeks, Karp, Cohen, and Glazer took advantage of Palantir's artificially inflated stock price and collectively dumped more than $150 million in stock before that news hit the market.

179. Palantir convened the scheduled conference call with analysts and investors on November 9, 2021 to discuss Palantir's 3Q21 results. On that call, Defendants attempted to avoid a complete collapse in the price of Palantir shares by continuing to conceal the full truth, instead claiming that Palantir was still experiencing robust growth across its government and commercial segments and reaffirming the Company's 30% long-term annual revenue guidance, stating: "[W]e are continuing to deliver high growth with very strong cash flow result and we remain focused on expansion."

180. In reality, Defendants' SPAC Scheme had artificially inflated the reported revenue growth and margins for Palantir's commercial segment specifically and the overall Company generally beginning in 2Q21. And, at a minimum, six of Palantir's new commercial customers were bought and paid for via the SPAC Scheme (BlackSky, Energy Vault, Rubicon, Allego, Starry Group, and Rigetti). Defendants also continued to conceal the truth about the state of the SPACs and the true reason for Palantir's SPAC strategy – to fabricate the façade of high-quality growth and pump revenue margins short term in exchange for PIPE funding. Further, Defendants knew at the time they emphasized that the government "pipeline in aggregate is big and building" that Palantir's government business growth had decelerated beginning in 1Q21 and the Company would be reporting those disappointing results in the immediately next quarters. These facts were

all known to Defendants, given their "strong visibility into future revenues across [Palantir's] customer base" at the time they spoke on November 9, 2021, but were concealed from investors.

181. Furthermore, investors did not know that when Palantir spoke about its SPAC Scheme on November 9, 2021, the Company was expanding it. Within a few weeks of the call, on November 29, 2021, Palantir invested an additional $20 million in the Bird Global SPAC. But Palantir concealed Bird Global until February 2022, along with its $35 million Rubicon investment, which was signed in September 2021, according to Rubicon's SEC filings.

182. On February 17, 2022, Palantir issued a release containing the Company's financial results for the fourth quarter and full year ended December 31, 2021 (the "FY21 Release"). The FY21 Release revealed that Palantir's government business continued to quickly decelerate to just 26% YoY growth during the quarter, compared to a 76% YoY growth rate earlier in the year. The same day, on its website, Palantir issued FY 2021 Business Update (the "FY21 Business Update"). The FY21 Business Update revealed declining YoY contribution margins, declining from 62% in 4Q20 to 58% in 4Q21. That same day, Palantir released accompanying remarks revealing that Palantir's total deal value at quarter's end was $3.8 billion, which also signaled significant business deceleration. Factoring out Palantir's SPAC Scheme, Palantir's total deal value was essentially ***flat*** YoY. Although Palantir did not break out government sector total deal value in the accompanying remarks, Palantir's total remaining deal value with its government customers had actually ***declined*** by $100 million by year end, as was later revealed. The price of Palantir stock declined again on this news, falling nearly 16% over a single trading day to $11.77 per share by market close on February 17, 2022 on abnormally high trading volume.

183. Defendants, however, continued to make materially false and misleading statements that artificially inflated Palantir's stock price. For instance, the FY21 Release stated

that Palantir had added 34 net new customers 4Q21 and that the Company's U.S. commercial revenue had grown 132% year-over-year during the quarter. It also reiterated that per the Company's "long-term guidance policy, as provided by our Chief Executive Officer, Alex Karp, ***we continue to expect . . . [a]nnual revenue growth of 30% or greater through 2025***." On the earnings call later that day, Karp claimed that Palantir was on track to "double" its U.S. commercial growth in 2022, stating:

> Obviously, to the extent we get this to work, you could expect even higher growth than what we have, although I'm very happy with. It was like we've doubled USG U.S. commercial now from 50 to 100, 100 to 200. I believe we will double it again this year.

Karp also reassured investors that Palantir's commercial growth did not depend on SPAC investments. The opposite was true: Not only did revenue growth in Palantir's commercial segment rely on the SPAC Scheme, but without the scheme, the growth rate in the commercial segment had declined from 2Q21 to 3Q21.

184. Then, on May 9, 2022, Palantir issued a release providing the Company's financial results for the first quarter ended March 31, 2022 (the "1Q22 Release"). The 1Q22 Release revealed that Palantir expected only $470 million in revenue for 2Q22, which would represent 25% YoY growth – substantially below the Company's purported long-term revenue growth rate. That same day, Palantir filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 1Q22 Form 10-Q disclosed Palantir's Starry Group and Allego SPAC investments. It also revealed that Palantir had received over $39 million in revenue from its SPAC Scheme during the quarter, meaning that without Defendants' SPAC Scheme, revenue growth would have been ***only 19%*** during 1Q22.

185. The same day Defendants convened a conference call, on which they disclosed that the Company's total deal value had actually ***declined by $300 million*** during the quarter, that

Palantir had "***wound the [SPAC] program down***," and the Company was reporting "negative $0.02 impact on earnings per share from the marketable securities." Defendants also disclosed that the strategic investment's contribution to total deal value was $755 million in the quarter, down from $965 million in 4Q21. However, Palantir continued to conceal that an additional $400 million in SPAC-related TCV was still at risk. Defendants further misled investors about SPAC-related revenue by telling them to "expect about $30 million of revenue ***per quarter*** from these customers."

186. On this news, the price of Palantir stock fell 21% over a single trading day to $7.46 per share by market close on May 9, 2022 on abnormally high trading volume. However, the price of Palantir stock remained artificially inflated as Defendants continued to make false and misleading statements.

187. For instance, the 1Q22 Release stated that Palantir's customer count grew 86% year-over-year and that the Company's U.S. commercial revenue had grown 136% year-over-year during the quarter. Defendants also reiterated the Company's long-term guidance. In addition, the 1Q22 Form 10-Q reported a contribution margin of 57% for the quarter. These assurances were false and misleading, however, as the reported growth and high contribution margins were all dependent upon Defendants' unsustainable SPAC Scheme.

188. Further, despite the partial disclosures of SPAC-related problems, analysts saw the winding down of the program as the right move, but they also noted that they lacked the ability to calculate the strength of the underlying business. Analysts such as William Blair and RBC Capital Markets noted they were "disappointed with fewer disclosures in the 10-Q" and were forced to guess about the state of some of Palantir's individual SPAC investments, without knowing some had already been terminated.

189. On August 9, 2022, Palantir disclosed that it had terminated several SPAC contracts, further reducing TCV, and that its growth had further decelerated without SPACs. The same day, Palantir released its 2Q22 Form 10-Q, which disclosed additional SPAC-related information. After analyzing the Form 10-Q, analysts determined that "Palantir's SPAC revenue stream (~$30M per quarter) could be at-risk due to the financial profile of these customers – as noted above, we estimate $406M of TCV which might not fully materialize into future revenue." In addition, analysts at RBC Capital Markets published an analyst report that provided a deep dive into Palantir's SPAC Scheme, stating: "Most importantly, we estimate the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is ***$406M*** (note some of this may have already been recognized) and count ***at least 15 SPAC customers that have substantial doubt as going concerns*** (based on their respective filings)." The report continued: "21 of these companies are now publicly listed; none of the 20 listed SPACs are trading above their $10 reference price (***the vast majority are now trading in the <$5 penny stock range***)."

190. As the market gradually learned what Defendants knew – that the SPACs Palantir had contracted with were not sources of long-term revenue, growth, or equity, and they had scant operational or manufacturing prospects – both the SPACs and Palantir lost most of their stock value. Currently, the SPACs Palantir contracted with are down more than 80% on average, with one bankrupt, another delisted from the NYSE, and almost all warning they may go bust. As a result of Defendants' revelations, the price of Palantir stock fell to a low of less than $7 per share, 80% below recent highs, causing investors to suffer billions of dollars in losses.

191. As the artificial inflation dissipated from Palantir's stock price, the Individual Defendants finally slowed their selling spree, with their sales between the November 9, 2021 3Q21 Release and the end of the Class Period representing a mere 4.7% of total Class Period sales of

Palantir shares. But by that point, the purpose of the scheme architected by Karp, Thiel, and Cohen had already been realized.

192. ***The Individual Defendants dumped more than $2.2 billion*** worth of Palantir stock during the Class Period, which sales represented a substantial percentage of Thiel's Class Period shareholdings and the vast majority of Karp's, Cohen's, Glazer's, and Sankar's, with Cohen offloading ***99.99%*** of his shares. Karp and Thiel in particular personally sold over ***$1 billion*** and over ***$780 million***, respectively.

### G. To Obscure Investor Scrutiny, Defendants Repeatedly Changed the Metrics They Reported to the Public and Stopped Reporting Others Altogether

193. *The Wall Street Journal* reported on April 21, 2020, that in Palantir's time as a private company, one "subject of persistent gripes from investors and employees is that Palantir has wrapped its financial performance in a mix of selective disclosures and unconventional accounting." This practice re-emerged after the Company went public, as Defendants sought to conceal the slowing growth in Palantir's government and commercial segments by carefully manipulating and then frequently changing the key operating metrics Palantir disclosed to investors in its quarterly earnings materials. As the Company experienced decelerated growth and profitability in 2021, in furtherance of their scheme, Defendants began altering or wholesale abandoning certain metrics that were key to understanding the state of its business: (i) metrics and financial results related to the Company's much touted Acquire, Expand, Scale business model; (ii) the metrics that provided "strong visibility into future revenues across [their] customer base," *i.e.*, total remaining deal value and average contract duration; (iii) the very definition of "customer"; and (iv) average revenue per customer.

194. ***Acquire, Expand, Scale***. Defendants claimed in the Registration Statement and subsequent quarterly SEC filings that Palantir's entire business model with respect to acquiring and growing its customer accounts had three phases: (1) Acquire, (2) Expand, and (3) Scale. As discussed above, all of Palantir's customers were cohorted into one of these phases on December 31st of each year based on the amount of revenue and profitability Palantir has experienced with them. *Supra* §V.B. When Defendants were soliciting investor interest in Palantir stock leading up to the Company's Offering, they touted the business model as the litmus test against which to judge Palantir's operations and prospects. According to Defendants, the objective was to quickly move customers through the first two phases to get them to Scale and therefore profitability.

195. To this end, Palantir presented investors with detailed information regarding these Acquire, Expand, Scale customer phases of its business model in all of its quarterly SEC filings from the start of the Class Period up until the FY21 Form 10-K. Each quarterly filing provided investors with updates on the amount of revenue and contribution margins each cohort from the prior year had earned the Company. Thus, these Acquire, Expand, and Scale disclosures were critical for investors' ability to gauge the Company's commercial segment growth prospects, as Palantir admitted that its entire approach to sales and marketing was built around the first two phases of its business model, and its ability to turn a profit hinged on the third phase. Indeed, in its SEC filings, Palantir told investors that it "evaluate[s] the success of customer accounts in the Acquire phase based on the revenue such accounts generate in the following year." Moreover, Defendants repeatedly told investors that "[w]e believe that ***all*** of our customers will move into the Scale phase over the long term," *i.e.*, that all of their customers would recognize more than $100,000 in revenue and have a positive contribution margin.

196. In the FY21 Form 10-K, Defendants claimed they had assigned new cohorts to all of the new customers the Company acquired in FY21. Nevertheless, despite the critical importance of these disclosures to the Company's self-professed business model, Palantir abruptly eliminated all disclosures related to the Company's Acquire, Expand, and Scale phases in all subsequent filings – beginning with the 1Q22 Form 10-Q. That is, ***Defendants decided to simply stop reporting data and metrics for the three customer phases on which it had built its entire business model to go public***. Eliminating the detailed cohort information tracking the performance of the new customers the Company signed on in FY21, obscured the full extent of the Company's diminishing business prospects, including the revenues and contribution margins associated with each of the Acquire, Expand, and Scale cohorts for new customers acquired in FY21, the rate at which Palantir's new customers signed in 2021 failed to advance through the cohorts, and the effect of the SPAC Scheme in temporarily masking this downward trend.

197. ***Total Remaining Deal Value (TRDV)***. Another important indicator of the Company's future growth prospects was "total remaining deal value," which measures the amount of contracted revenue that has not yet been received by the Company and thus purportedly provides management and investors significant visibility into future expected revenue. In fact, TRDV was the key metric that Defendants repeatedly cited as a measure of future revenue visibility.

198. Up until 4Q21, the Company would break down and disclose the TRDV in both the government and commercial sectors separately, although it would often report these figures inconsistently. For instance, while the Registration Statement, 3Q20 Form 10-Q, and FY20 Form 10-K all provided updates on government segment TRDV for 2Q20, 3Q20, and FY20, the Company's Forms 10-Q for 1Q21, 2Q21, and 3Q21 all stopped providing quarterly TRDV information and instead referred back to government TRDV as of the end of FY20. Beginning in

1Q22, the Company began only to report TRDV across the entire enterprise and concealed the split between government and commercial sectors. This change further obscured the distinction in growth trends between the government and commercial sectors. This prevented investors from gleaning the negative trends affecting the government segment, as they were masked by the commercial segment's revenue, margins, and TRDV, which were artificially inflated by the SPAC Scheme.

199. ***Average Contract Duration***. Along with the TRDV, the metric that Defendants repeatedly cited as providing them with "strong visibility into future revenues across [Palantir's] customer base" was the Company's average contract duration. Because Palantir recognized revenue on a ratable basis, the average length of its contracts was another important indicator of expected future revenue. Accordingly, they regularly reported the lengthening of the average duration of Palantir's customer contracts, reporting an average of 3.6 years at the end of FY20, up to 3.7 years in 1Q21, and then to 3.9 years in 2Q21, after which they stopped reporting the metric. This change further obscured the deteriorating quality of Palantir's operations and prospects, and prevented investors from assessing the stability and sustainability of future revenue growth.

200. ***Definition of "Customer***." For purposes of its quarterly earnings reports, Palantir originally defined a "customer" as one might expect, *i.e.*, "an organization from which we have recognized revenue in a reporting period." But starting with its 1Q21 earnings – just several months after going public – Defendants altered the definition of "customer" to include "an[y] organization from which we have recognized revenue during ***the trailing twelve month period***." That is, instead of reporting the number of customers from whom Palantir received revenue during the current quarter, Palantir manipulated its "customer" reporting beginning in 1Q21 to report the total number of customers from whom it received revenue during any of the ***four prior quarters***.

By doing so, Defendants were able to artificially inflate the reported number of Palantir customers in 1Q21 and thereafter, as well as the revenue recognized from each of those customers by including the temporarily boosted financial performance experienced in 4Q20, 3Q20, and 2Q20, which was driven by the COVID-19-related contracts Palantir entered into during 2020.

201. ***Average Revenue Per Customer***. In the Registration Statement, Palantir cited average revenue per customer to claim that the "scale of [Palantir's] partnerships with customers, in revenue terms, has also grown over time." For the following year, quarter after quarter, Palantir emphasized its increasing average revenue per customer as proof that the Company was continuing to demonstrate its "ability to grow customer relationships at scale." When the metric began to decrease in 3Q21 and 4Q21, Palantir shifted, claiming that the lower average revenue per customer was just the "result of [their] growing customer count." Then in 1Q22, Defendants attempted to conceal the deceleration by not reporting the figure altogether – at the same time they also stopped reporting on the Acquire, Expand, and Scale phases. By ditching this metric at the same time they dumped the Acquire, Expand, and Scale metrics, Defendants concealed that Palantir's newest customers were not scaling up in size or profitability.

## VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. The Offering

#### 1. Investor Day

202. On September 9, 2020, Palantir hosted an "Investor Day" intended to encourage investors to purchase shares in connection with the planned Offering. Several Palantir insiders participated in the Company's presentation, including Karp, Sankar, Glazer, and Kawasaki.

203. Software company valuations are typically based on a company's revenue, with a valuation multiple applied depending on the particular company's profit margin. If a company's

margins are low, which is typical in a company which requires a lot of high-cost customization and professional services, its valuation is more akin to a services/consulting company – and commands a lower valuation multiple. But software companies with high margins that provide SaaS to each customer with little additional marginal cost – *i.e.*, a preconfigured "plug and play" system – command the highest valuation multiples. Thus, throughout Investor Day, Defendants sought to cast Palantir as an SaaS-like company (in order to command a higher valuation multiple), rather than a service company (which would command a lower valuation multiple). For instance, as part of his Investor Day presentation, Sankar claimed that Palantir's production infrastructure, Apollo, allowed the Company "***to have SAAS like economics regardless of [their] deployment target***." Sankar also sought to portray the Company's days as a bespoke service company as far behind it, and he emphasized that Palantir's Foundry baseline platform had positioned Palantir for further accelerated growth:

> And so in that period from 2012 to 2015, we were plugging the gap. You know, ***we were doing lots of custom software development***, lots of exploration and experimentation. And as a result, ***there are parts of the commercial segment at that time that started [to] take on characteristics that resembled a services company***. . . . In 2016, we released that product, it became Foundry. 2017, with the benefit of hindsight is probably the most successful and important year in the history of the company. So on its face, as Kevin mentioned, it actually looks bombastically bad revenue only grew 11%. But that belies the accomplishment in that year, which was that ***we were able to migrate our customers who were on these custom applications, over to Foundry. Over this rock solid platform baseline, upon which we've been able to accelerate revenue growth every year since***.

Glazer reiterated the same talking point in his presentation, and he claimed that the Company was continuing to build efficiencies and improve margins:

> ***So while it's true in the past that we did custom development work, and built bespoke applications, we aren't doing that today***. We're exclusively deploying these two software platforms across all of our customers. Our contracts are generally fixed fee our customers pay us for the all in cost to deliver, maintain and service these platforms. And ***we continue to do this more and more efficiently as***

> ***our products have matured***, and adoption across our customer base has increased. To measure this efficiency, we look to our margins. Let's now take a look at our gross margin, contribution margin. And finally, our operating margin. Gross margin and contribution margin measure how efficiently we're generating our revenue growth.

204. Sankar repeatedly stressed that the Company was increasing its operating efficiencies, as the Company could "now onboard customers ***in less than two hours***," and "continue[d] to see significant reductions in the intensity of the[ir] deployments." According to Sankar, Palantir's primary competition was its own customers' desire to build internal IT solutions, and "***what we can do in three days to three weeks they promised to do in three years***."

205. Numerous Defendants pointed to the Company's improving contribution margin as proof of their improving "efficiency in delivering and selling [their] product." For instance, Glazer maintained that Palantir's "***contribution margin is also improving***" and that the Company had a "long range target model" of "contribution margin in excess of 70%." Glazer further explained that:

> ***In Q2 2020, our contribution margin was 55%. This represents an improvement from 18%, in Q2 2019***. Our Q2 operating margin, excluding stock based compensation was 11%. This was our first quarter with an adjusted operating profit. At this exciting juncture, ***with accelerating revenue and margin growth***, we also have a very strong balance sheet, our cache at the end of Q2 was $1.5 billion.

206. Kawasaki made the same point, stating:

> And as you can see, here, ***we're getting much more efficient, our contribution margins have increased nearly four times since the first quarter of 2019***. And at the limit, we think these margins should converge with gross margins as we continue to invest in things like Apollo platforms generally, which will bring our cost down.

207. Kawasaki also maintained that the Company would be able to move all of its customers to the "Scale" phase, thereby improving contribution margin:

> ***The scale phase is the majority of our revenue, about 76% of our revenue last year, and generating the bulk of the contribution margin***. This is where we should be constantly getting better. And you're seeing this from 2019 to today. 55% contribution margin in 2019. 68% contribution margin in the first half of this year.
>
> ***But how high can this go***. . . . Our objective is to make the acquire and expand phases, as short as possible. So we can grow the scale phase accounts. When we look at this as a whole, ***all customers should be scale phase over time***.

208. Glazer also stressed that Palantir's "revenue has been accelerating since 2017" and that "this acceleration has really continued into the first half of this year."

### 2. The Registration Statement

209. In the Registration Statement filed with the SEC, which was signed by Karp, Cohen, Thiel, and Glazer, Defendants claimed Palantir was experiencing accelerating growth at the time of the Offering, stating: "***Our growth this year has accelerated***." The Registration Statement continued:

> We generated $742.6 million in revenue in 2019, reflecting an increase of 25% from our revenue in 2018, which was $595.4 million.
>
> In the first half of this year alone, during a period of significant geopolitical instability and economic contraction, we generated $481.2 million in revenue, reflecting a growth rate of 49% over the same period last year.

210. The Registration Statement contained the following graph, which illustrated Palantir's purportedly accelerating revenue growth trend:



211. In particular, the Registration Statement highlighted the recent growth in Palantir's government contracts, stating:

> ***As of June 30, 2020, the total remaining deal value of the contracts that we had been awarded by government agencies in the United States and allied countries around the world***, including existing contractual obligations and contractual options available to those government agencies, ***was $1.2 billion, up 74% from December 31, 2018***, when the total value of such contracts was $670.6 million.

212. The Registration Statement further represented that Palantir's operating results were improving, which indicated to investors that the Company was on the path to profitability. For example, the Registration Statement stated:

> ***Our operating results have improved significantly in recent years***. In 2019, we incurred a net loss of $579.6 million, or a net loss of $337.7 million when excluding stock-based compensation. In H1 2020, our net loss decreased to $164.7 million, or net income of $17.2 million when excluding stock-based compensation, down from a loss of $280.5 million in H1 2019, or a loss of $167.6 million when excluding stock-based compensation.

The Registration Statement further claimed that:

> The improvements in our operating results have principally been driven by increasing revenue and a significant decrease in the time and number of software engineers required to install and deploy our software platforms.
>
> In particular, the time required to install our software and begin working with a customer has decreased more than five-fold since Q2 2019 to an average of 14 days in Q2 2020. In some cases, our customers can now be up and running in six hours. We have also invested heavily in developing the infrastructure used to deliver software updates to our customers. As a result, the number of upgrades our engineers can manage across installations more than doubled from an average of 20,000 per week in Q2 2019 to more than 41,000 per week in Q2 2020.

213. Repeating the claim made at Investor Day, the Registration Statement also stated: "***We believe that all of our customers will move into the Scale phase over the long term***." The Registration Statement described the three customer phases of its "Acquire, Expand and Scale business model":

> ***We believe that all of our customers will move into the Scale phase over the long term. We also believe that contribution margin for Scale phase accounts will increase further as we become more efficient at deploying our software platforms across the entirety of our customers' operations and at managing and operating our software.***

Thus, the Registration Statement represented that, over time, all of Palantir's customers were expected to enter the "Scale phase," which indicated improved margins across Palantir's customer base.

214. Without disclosing the true facts about Defendants' plan to engage in roundtrip transactions with early-stage businesses to manufacture high-margin growth, the Registration Statement identified a "number of strategies to continue to grow the company," including a strategy to engage in "additional partnerships," "strategic transactions," and "relationships with other businesses" to expand Palantir products:

> (a) ***Pursue new methods of customer acquisition and partnership***. We are pursuing specific channel-selling opportunities with leading cloud hosting providers that have existing relationships with prospective customers. ***As we consider entering and growing in new markets, we may enter into additional partnerships, joint ventures, and alliances***.
>
> * * *
>
> (b) As part of our business strategy, we have engaged in strategic transactions in the past and expect to evaluate and consider potential ***strategic transactions***, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services.

215. The Registration Statement asserted that Palantir's growth opportunity was enormous, estimating Palantir's TAM "to be approximately $119 billion across the commercial and government sectors." Defendants broke down this purported $119 billion TAM as follows:

> - Our estimate of the TAM in the commercial sector is $56 billion. This estimate is arrived at by multiplying the number of potential customers around the world – ***defined broadly as approximately 6,000 companies with more than $500 million in annual revenue*** – by an assumed annual

contract value for each potential commercial customer based on organization size and our internal data of existing customer spending.

- ***We estimate the TAM in the government sector, including government agencies in the United States, its allies, and in other countries abroad whose values align with liberal democracies, is $63 billion*** *. . . .* Our estimate of the TAM in the U.S. government sector is $26 billion. We estimate the TAM in the international government sector to be $37 billion, using the same methodology that we used to estimate our opportunity in the U.S. government sector.

216. The Registration Statement also claimed that the COVID-19 pandemic had resulted in customers increasingly adopting Palantir's software:

> The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

217. Between September 30, 2020 (the date the Registration Statement was declared effective by the SEC), and October 2, 2020, Defendants sold nearly 48.7 million shares of their own Palantir common stock for proceeds of more than $483.4 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Karp | 14,100,000 | $9.76 | $135,249,000 |
| Cohen | 4,000,000 | $9.50 | $37,600,000 |
| Thiel | 27,384,682 | $10.55 | $278,435,445 |
| Sankar | 1,405,715 | $10.54 | $14,220,926 |
| Glazer | 1,801,621 | $10.07 | $17,912,090 |

218. The statements detailed in ¶¶203-216 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶203-207, 212-213, 216 emphasizing Palantir's operational efficiencies, Palantir was, in fact, still engaged in "custom development work" and did not "have SaaS like economics regardless of the[ir] deployment target." Landing new customers required Palantir to search for and find a reason why a potential

client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Further, the process for acquiring and onboarding new customers was, in fact, lengthy, time-consuming, and costly, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, as Palantir had moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C.);

(b) that, contrary to Defendants' statements in ¶¶203, 205, 212 that margins, revenues, and operational results were improving and accelerating, Defendants understood that Palantir's recent revenue and deal value growth rates were unsustainable as Defendants were aware at the time these statements were made that: (1) the government segment's growth performance would begin a sequential deceleration in 1Q21 because Defendants had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of Defendants' contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [Palantir] recognize[d] for that quarter," but "such a decline would negatively affect [Palantir's] revenue in future quarters" (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.); (2) Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.); (3) Defendants also had "strong visibility" into the

commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth rates in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) would decline in 4Q20 and thereafter fail to meaningfully recover (*supra* §§VI.D., VI.E.1; *infra* §§IX.B, IX.E.); (4) the Company's growth plan on the commercial side was dependent on the SPAC Scheme, which involved investing in early-stage SPACs with little or no revenue, and far less than $500 million in recurring annual revenue, on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§IX.C., IX.E.); (5) that to obtain and onboard new customers, Palantir had to incur far greater costs per dollar of revenue than those associated with already-existing customers (*supra* §§V.B., VI.C., VI.E.1); and (6) as a result of (1)-(5) herein, Defendants overstated Palantir's government and commercial businesses' growth trends and addressable markets;

(c) that Defendants had no good faith basis to believe, and did not actually believe, their statements in ¶¶207, 213 that "all of [Palantir's] customers will move into to the Scale phase over the long term," as that was historically not the case and had become even more difficult as the Company expanded into new markets (*supra* §§VI.C.2., VI.G.; *infra* §VIII.B.);

(d) that, contrary to Defendants' statements in ¶216 that COVID-19 was a source of long-term growth in new areas, Palantir's growth in government revenue was set to peak in 4Q20 and begin a sequential deceleration in 1Q21 which Defendants were aware of given their admitted "strong visibility into future revenues across [their] customer base." Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient

to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.);

(e) that, contrary to Defendants' statements in ¶214, Defendants' growth plan was dependent on the SPAC Scheme, which was designed to offset declines Defendants expected in Palantir's government and commercial business segments by artificially inflating Palantir's reported growth, total deal value, commercial client base, revenue and margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(f) that, contrary Defendants' statements in ¶214, Defendants' growth plan was not centered on investing in "new methods of customer acquisition and partnership," "additional partnerships, joint ventures, and alliances," or "strategic transactions," but instead depended on the SPAC Scheme; and

(g) that, as a result of ¶218(a)-(f) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶203-216 about the Company's business, operations, and prospects were false and misleading at all relevant times.

219. Each of the Defendants sold Palantir shares between September 30, 2020 and October 2, 2020, as detailed in ¶217, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶218(a)-(g) above.

**B. 3Q20 Earnings Report**

220. On November 12, 2020, Palantir issued a release containing the Company's financial results for the third quarter ended September 30, 2020 (the "3Q20 Release"). The 3Q20

Release stated that Palantir had $289.4 million in revenue for the quarter, up 52% year-over-year, and raised annual 2020 revenue guidance to a range of $1.07 billion to $1.072 billion. The release stated that "***growth and momentum across [Palantir's] business have continued***" and that the "***demand for [Palantir's] software has increased steadily over the past year***." The 3Q20 Release further stated that Defendants were "***continuing to see significant momentum in [their] business across the commercial sector this year, both in the United States and abroad***," and that the "***lead time for customers to begin using their software ha[d] fallen sharply this year***, and organizations continue[d] to expand access to [Palantir] platforms to users across their operations."

221. Also on November 12, 2020, Palantir convened a conference call with analysts and investors, led by Glazer, Kawasaki, and Sankar, to discuss the Company's 3Q20 results. During his prepared remarks, Sankar stated that, for the quarter: "Revenue grew 52% year-over-year, driven by continued expansion within our install base and initial wins at net new 2020 customers." Sankar further represented that Palantir's "business is just getting started," confirming that the recent growth in the Company's business was indeed sustainable, as "the pandemic is leading to lasting and systemic transformation of health care." Sankar continued: "It may have started with COVID, but it's not going to end there . . . ."

222. During his prepared remarks, Glazer highlighted the recent growth in government revenue, stating: "Total government revenue rose 68% year-over-year to $163 million, driven primarily by growth in our U.S. government business." Glazer further stated: "At the end of the third quarter, our government deal value, including contracted amounts and contractual options, totaled $1.3 billion." Glazer represented that revenue from existing customers would continue to grow, stating: "Taken together with continued revenue growth from our acquire phase customers, we believe the rapid growth in revenue from new customers creates a strong basis for future growth

to augment the consistent expansion we are generating from our install base of customers in the expand and scale basis." Glazer reiterated that Palantir would post 30%+ YoY revenue growth for FY21 from existing customers, stating:

> For the full year 2021, we remain encouraged by the pace of growth we are seeing in our subscription base and the acceleration we are seeing in revenue from acquire phase and new customers that provide solid foundation for future growth. As a result, we continue to expect full year 2021 year-over-year revenue growth to be greater than 30%.

223. During a question-and-answer portion of the conference call, Sankar was asked "about the pipeline and the residual kind of carryover from the government business," to which Sankar responded that the opportunities were "enormous" and "very clear[ly]" were not going to end following the COVID-19 pandemic:

> Yes, the government business had a great quarter. ***I'd say both segments are performing quite well***. We're excited about the pipeline of the government business. Of course, there's the contract that we just closed with the U.S. Army. There's a number of big capture pursuits in the pipeline, things that we've mentioned previously, opportunities like DCGS, Capability Drop 2. There's a lot more behind that, that we expect. There are a couple of more programs of record that we're up for potentially in 2021. And we're investing far beyond just the Army, Space Force, the Navy, Air Force, so very robust pipeline, but that's just DoD. ***Like honestly, there's been enormous acceleration for a part of a business that was pretty small 18 months ago in health care. The work that we've done with the FDA, CDC, HHS, the NIH has really accelerated. And it's created enormous opportunities for us***.
>
> ***And while many of those opportunities certainly accelerated because of COVID, it may have started there, it's very clear it's not going to end there. We're seeing opportunities for large systemic transformation in health care in the U.S. but also abroad, COVID-exposed opportunities for improvement, and I think governments are going to invest there***.

224. In response to a question about the Company's operating margins, Glazer maintained that the changes brought about by COVID would allow Palantir's top-line growth to outpace its expense growth and thereby improve margins, stating:

> So I'll sort of just revisit our long-term targets for margins, ***retargeting adjusted gross margin of [35%] plus contribution margin by 70% plus and adjusted operating margin of 35% plus***. In terms of adjusted operating margin – adjusted operating income, we raised our 2020 full year guidance to $133 million at the midpoint. And when you're looking at sort of our adjusted operating income, you can see that COVID accelerated a lot of change across the company. And this is – it really resulted us in leveraging a lot of our previous R&D investments in things like Apollo.
>
> ***And so while there was a lot of change that happened with COVID, and you're going to see a lot of that sticking***, and – but with that said, we're going to continue to invest. As Kevin talked about, we're going to continue to invest in our direct sales force, continue to build out products, sort of like Apollo, continue to get that operating leverage. And ***we'll continue to see top line growth continue to outpace expense growth***.

225. On November 13, 2020, Palantir filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 3Q20 Form 10-Q stated that Palantir's government deal value had continued to increase, stating:

> ***As of September 30, 2020, the total remaining deal value of the contracts that we had been awarded by government agencies in the United States and allied countries around the world***, including existing contractual obligations and contractual options available to those government agencies, ***was $1.3 billion, up 14% from December 31, 2019, when the total value of such contracts was $1.1 billion***.

226. The 3Q20 Form 10-Q maintained that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

> The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

227. The 3Q20 Form 10-Q also repeated the Company's strategy to engage in "strategic transactions" and "enter into relationships with other businesses" to expand Palantir products:

> As part of our business strategy, we have engaged in strategic transactions in the past and expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services,

products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services.

228. Between October 3, 2020 and December 31, 2020, Defendants sold more than 7.5 million of their own Palantir shares for proceeds of more than $138 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Karp | 2,570,246 | $19.27 | $49,054,811 |
| Cohen | 2,199,000 | $17.52 | $38,479,869 |
| Sankar | 1,823,649 | $20.01 | $33,413,564 |
| Glazer | 999,872 | $18.65 | $17,610,174 |

229. The statements detailed in ¶¶220-227 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶220, 226 exalting Palantir's operational efficiencies, acquiring and onboarding new customers was not a process that took only "days" but instead was a lengthy, time-consuming, and costly process, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. In addition, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶220-225 that margins, revenues, and operational results were improving and accelerating, Defendants understood that Palantir's recent revenue and deal value growth rates were unsustainable as Defendants were aware at the time these statements were made that: (1) the government segment's growth performance

was set to begin a sequential deceleration in 1Q21 because Defendants had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of Defendants' contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue [Palantir] recognize[d] for that quarter," but "such a decline would negatively affect [Palantir's] revenue in future quarters" (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.); (2) Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.); (3) Defendants also had "strong visibility" into the commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) was set to decline in 4Q20 and thereafter fail to meaningfully recover (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.); (4) the Company's growth plan on the commercial side was dependent on the SPAC Scheme, which involved investing in early-stage SPACs with little or no revenue, and far less than $500 million in recurring annual revenue, on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§IX.C., IX.E.); (5) that to obtain and onboard new customers Palantir had to incur far greater costs per dollar of revenue than those associated with already existing customers (*supra* §§V.B., VI.C., VI.E.1); and (6) as a result of (1)-(5) herein, Defendants overstated Palantir's government and commercial businesses' growth trends and addressable markets;

(c) that, contrary to Defendants' statements in ¶¶221, 223-224, 226 that COVID-19 was a source of long-term growth in new areas, Palantir's growth in government revenue was set to peak in 4Q20 and begin a sequential deceleration in 1Q21, which Defendants were aware of given their admitted "strong visibility into future revenues across [their] customer base." Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.);

(d) that, contrary to Defendant's statements in ¶227, Defendants' growth plan was dependent on the SPAC Scheme, which was designed to offset declines expected by Defendants in Palantir's government and commercial business segments by artificially inflating Palantir's reported growth, total deal value, commercial client base, revenue and margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(e) that, contrary Defendants' statements in ¶227, Defendants' growth plan was not centered on investing in "strategic transactions," but instead depended on the SPAC Scheme; and

(f) that, as a result of ¶229(a)-(e) above, Palantir's historical revenue, deal value, and client metrics and statements made by Defendants in ¶¶220-227 about the Company's business, operations, and prospects were false and misleading at all relevant times.

230. Each of the Defendants sold Palantir shares between October 3, 2020 and December 31, 2020, as detailed in ¶228, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶229(a)-(f) above.

## C. FY20 Earnings Report

231. On February 16, 2021, Palantir issued a release containing the Company's financial results for the fourth quarter and full year ended December 31, 2020 (the "FY20 Release"). The FY20 Release reported that Palantir had $322 million in revenue for 4Q20, up 40% year-over-year and informed investors that Palantir was on track to post full year 2021 revenue growth of "greater than 30%."

232. Also on February 16, 2021, Palantir convened a conference call with analysts and investors, which was led by Karp, Glazer, Kawasaki, and Sankar, to discuss the Company's fourth quarter and full year 2020 results. During his prepared remarks, Karp committed to Palantir providing greater than 30% growth for the next five years: "***[W]e are providing long-term guidance, pretty radical in the sense that we are committing to keeping a growth threshold of above 30% for the next 5 years***."

233. Sankar's prepared remarks stated that "our business grew significantly in 2020, resulting in 47% revenue growth on a full year" and that Palantir had "created and continue[s] to create substantial opportunities for growth over the next year and beyond."

234. Sankar went on to emphasize Palantir's ostensibly robust growth in government revenue, claiming that 91% year-over-year growth in U.S. government revenue was "***just at the tip of the iceberg***," and further noting:

> The full year government revenue rose 77%, led by ongoing momentum in the U.S., which grew 91%. As tremendous of a year as 2020 was for the government segment, we believe we are just at the tip of the iceberg, and we are well positioned to capture significant new opportunities in 2021 and beyond.
>
> * * *
>
> ***And while a lot of new 2020 U.S. defense opportunities started as crisis response to COVID, almost all of it is relevant to enduring problems and needs***.
>
> * * *
>
> ***Our pipeline is substantial and growing***. These deals, they start in the Acquire phase of our 3-phase model and with new customers who were acquired in the year that had yet to even join a phase. Both of these groups performed exceptionally, ***a very positive forward-looking indicator***.
>
> Additionally, the intensive growth of existing customers continued with average revenue per customer growing 41% to $7.9 million. We grew the number of accounts with $10 million of annual revenue or more by 50%. ***We're continuing to demonstrate our ability to grow customer relationships at scale as we add ever-increasing value to our customers' enterprises***.
>
> ***And it's still very clear that we're just at the beginning. Our customers include only 8 of the Fortune 100, 12 of the Global 100 and only 24 of the Global 300. The opportunity in front of us is immense and growing***.

235. During the same call, Glazer emphasized that: "Government revenue accelerated in the fourth quarter, growing 85% year-over-year to $190 million." Glazer also confirmed that Palantir had significant visibility into its future revenue due to the large, contract-based nature of the Company's business, stating:

> We measure revenue visibility across several metrics. ***First, we ended 2020 with total deal value across the business of $2.8 billion***, while year-end dollar-weighted average contract duration was 3.6 years. ***This growth rate is particularly strong when considering government customers entered into shorter-than-usual contracts in 2020 to accelerate procurement as they responded to the COVID crisis and moved quickly on various modernization efforts across both defense***

> ***and civilian agencies. We expect a tailwind for government as these customers renew and expand***.
>
> ***In 2020, the dollar-weighted annualized contract value we closed increased 49% year-over-year, providing a strong foundation for fueling growth in 2021 and beyond across both our commercial and government segments***.
>
> Looking at the business through the lens of our 3-phase model, we ended the year with strong performance across all 3 cohorts. Our Acquire phase customers ended 2020 generating $77 million in revenue with 17% contribution margin, with nearly half of the revenue from these customers coming in the fourth quarter. ***This rapid scaling and expanding contribution margin demonstrates the increasing efficiency of our customer acquisition and onboarding process, which we believe will help fuel an expanding pipeline into 2021 and beyond***.

236. Glazer echoed Karp's 5-year revenue guidance and stated that, starting in 2021, Palantir was expected to achieve "***greater than 30% annual revenue growth each year for the next 5 years***."

237. During the question-and-answer portion of the call, Sankar emphasized that the Company was "just at the beginning" in terms of its growth prospects and that the total addressable market for Palantir was expanding:

> [Nelson – Head of Palantir IR:] Now Shyam, I'll start with you on this first question. Palantir is guiding for double-digit percentage growth this year. Can Palantir sustain such a compound growth rate, barring any unforeseen negative economic impacts? Or should investors expect choppy yearly growth numbers? Can you comment on the long-term expected growth rate?
>
> [Sankar:] I'll build on what Karp said earlier in the call on long-term guidance. ***We are very much at the beginning here***. We just did . . . 47% growth in 2020. We expect to do 45% growth in Q1 of 2021. And we are only in 24 of the Global 300. But I think looking at that kind of misses the point around the TAM expansion that's currently happening.
>
> * * *
>
> And our product investment mean that we are uniquely positioned to seize those opportunities. Broadening the market is not about Palantir. Life is about Palantir automated. It's about the power of Apollo, it's about software that manages itself. Look at our archetypes investments. ***Like this means with a few clicks you can deploy end-to-end powerful use cases. Use cases that would have cost millions of dollars and taken many months can now be deployed in minutes***.

> ***It's about software-defined data integration and modularity***. That means that you get 100% of the power of Palantir, but with the ease of self-managing software. And these are examples of why we're confident in our long-term growth of being greater than $4 billion in 2025.

238. Kawasaki followed up on this point in answering a subsequent question about whether Palantir's software products would become more widely available to commercial customers:

> [Nelson – Head of Palantir IR:] Will big company deals, such as the IBM announcement, become more common as Foundry's products become more apparent to the public? Also, is there any time frame or chance for widely available but less technical, medium-sized businesses or consumer-level software?
>
> [Kawasaki:] Thank you, Rodney. So yes, we're excited about this partnership as well. I'll start with the small and medium-sized businesses. In short, yes, Shyam just talked about how ***our TAM is expanding***. But ***we're automating the delivery of Foundry. This means you can have full end-to-end use cases with no code, just drag and drop***. And the result of this is that we can deliver the full power of our products, the small, medium and, of course, large institutions. And I think important to note here is that the unit economics really allow for us to do this: ***84% adjusted gross margin in Q4 last year, 62% contribution margin in Q4***. So of course, partnerships, like IBM, adding salespeople to scale our distribution just makes a lot of sense for us.

239. With respect to the government side of the business, Sankar similarly states that Palantir would be "***inside of every missile, inside of every drone . . . inside of every sensor and every shooter***":

> [Nelson – Head of Palantir IR:] It seems like the bulk of your channel partnerships are focused on the enterprise or the commercial segment. Where are the near-term opportunities to broaden the channel on the government side? Or will growth there need to be directly sourced?
>
> [Sankar:] We are aggressively pursuing partnerships with large primes, but these partnerships, they're specifically focused on partnering with the divisions that build hardware platforms, the folks that build aircraft, submarines, land vehicles, space-based platforms, drones, ships and other weapon systems. And the focus of these partnerships is to explore putting Palantir's unique AI capabilities, capabilities that have already been proven in the field, and retrofitting them onto existing programs of record and baking them in from inception into future programs. And so ***this is going to manifest in something that looks like Palantir***

> ***inside of every missile, inside of every drone. Palantir at the edge, inside of every sensor and every shooter***.

240. In response to a further question from an analyst about the Company's confidence in achieving its $4 billion revenue target for 2025, Kawasaki stressed that Palantir's new account pipeline was thriving: "Revenues from new accounts, as Dave mentioned, in Q4 grew 375%. Our Acquire phase customers were over 200% in the second half of 2020 alone. The Expand phase customers were 100%. So that's showing a lot about the strength of our new account pipeline and how we land and expand."

241. On February 26, 2021, Palantir filed with the SEC its annual report on Form 10-K, which was signed by Karp, Glazer, Cohen, and Thiel. The Form 10-K further highlighted Palantir's deal value, stating:

> ***As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers***, including existing contractual obligations and contractual options available to those customers, ***was $2.8 billion. Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers***.

242. The FY20 Form 10-K stated that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

> The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

243. The FY20 Form 10-K also repeated the Company's strategy to engage in "strategic transactions" and "enter into relationships with other businesses" to expand Palantir products:

> As part of our business strategy, we have engaged in strategic transactions in the past and expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services,

products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services.

244. Between January 1, 2021 and March 31, 2021, the Individual Defendants sold more than 26.6 million shares for proceeds of more than $683 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| Karp | 3,031,780 | $26.71 | $81,246,182 |
| Cohen | 2,314,050 | $25.48 | $61,168,995 |
| Thiel | 20,003,915 | $25.49 | $504,819,396 |
| Sankar | 1,057,510 | $27.95 | $30,469,332 |
| Glazer | 201,190 | $27.26 | $5,497,830 |

245. The statements detailed in ¶¶231-243 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶235, 237-238, 242 emphasizing Palantir's operational efficiencies, acquiring and onboarding new customers was not a matter of a "few clicks" but instead was a lengthy, time-consuming, and costly process, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. In addition, as Palantir had moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶231, 233-241 that margins, revenues, and operational results were improving and accelerating, Defendants understood that Palantir's recent revenue and deal value growth rates were unsustainable as Defendants were aware

at the time these statements were made that: (1) the government segment's growth performance had already peaked in 4Q20 and would begin a sequential deceleration in 1Q21, as Defendants had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of Defendants' contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue [Palantir] recognize[d] for that quarter," but "such a decline would negatively affect [Palantir's] revenue in future quarters" (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.); (2) Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.); (3) Defendants also had "strong visibility" into the commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth rates in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) would not meaningfully recover from their 4Q20 decline (*supra* §§VI.D., E.1.; *infra* §§IX.B., IX.E.); (4) the Company's growth plan on the commercial side was dependent on the SPAC Scheme, which involved investing in early-stage SPACs with little or no revenue, and far less than $500 million in recurring annual revenue, on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§IX.C., IX.E.); (5) that to obtain and onboard new customers Palantir had to incur far greater costs per dollar of revenue than those associated with already existing customers (*supra* §§V.B.,

VI.C., VI.E.1.); and (6) as a result of (1)-(5) herein, Defendants overstated Palantir's government and commercial businesses' growth trends and addressable markets;

(c) that, contrary to Defendants' statements in ¶¶234-235, 237, 242 that COVID-19 had created a "tailwind" in the government segment and provided a "strong foundation" for growth, Defendants were aware that Palantir's growth in government revenue had peaked in 4Q20 and would begin a sequential deceleration in 1Q21 given their admitted "strong visibility into future revenues across [their] customer base." Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.);

(d) that, contrary to Defendants' statements in ¶243, Defendants' growth plan was dependent on the SPAC Scheme, which was designed to offset declines expected by Defendants in Palantir's government and commercial business segments by artificially inflating Palantir's reported growth, total deal value, commercial client base, revenue and margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(e) that, contrary to Defendants' statements in ¶243, Defendants' growth plan was not centered on investing in "strategic transactions," but instead depended on the SPAC Scheme;

(f) that, contrary to Defendants' statements in ¶243, Defendants had already expanded the SPAC Scheme by arranging to manufacture high-margin revenue and illusory growth shortly after Palantir's February 16, 2021 earnings call and release as demonstrated by, *inter alia*, Palantir's buying in 1Q21 and 2Q21 approximately nine commercial clients and approximately $250 million in unsustainable, *quid pro quo* revenue from dubious SPACs in exchange for approximately $230 million in PIPE funding (*supra* §VI.E.3.-4.; *infra* §IX.C.3.-4.);

(g) that, as a result of ¶245(a)-(f) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶231-243 about the Company's business, operations, and prospects were false and misleading at all relevant times; and

(h) that, as a result of ¶245(a)-(g) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth every year from 2021 to 2025.

246. Each of the Defendants sold Palantir shares between January 1, 2021 and March 31, 2021, as detailed in ¶244, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶245(a)-(h) above.

**D. 1Q21 Earnings Report**

247. On May 11, 2021, Palantir issued a release containing the Company's financial results for the first quarter ended March 31, 2021 (the "1Q21 Release"). The 1Q21 Release stated that Palantir had $341 million in revenue for the quarter, up 49% year-over-year, and that Palantir's U.S. commercial revenue and its U.S. government revenue had risen 72% and 83%, respectively,



4887-3633-1341.v3

during the quarter. The release stated that, for 2Q21, Palantir expected $360 million in revenue and, "[p]er long-term guidance policy, as provided by . . . Karp," annual revenue growth of 30% or greater for 2021 through 2025.

248. Also on May 11, 2021, Palantir convened a conference call with analysts and investors, led by Glazer, Kawasaki, and Sankar, to discuss the Company's 1Q21 results. In his prepared remarks, Sankar stated that Palantir was continuing to see a "commercial tailwind" that would propel the Company's growth:

> Where the government response to the pandemic has been efficacious, ***we are seeing a commercial tailwind***. In the U.S., in particular, we continue to generate exceptional results, where revenue grew 83% in the U.S. government and 72% in commercial. And we have a lot of headroom for growth in these markets. We only have a handful of Fortune 500 customers and less than 0.1% of annual defense spending.
>
> We have widened and are continuing to widen our capability to distribute our product. ***We see strength in forward-looking indicators and customer interest***. Since the beginning of February, qualified commercial opportunities in the U.S. and the U.K. are up 2.5x. Active commercial pilots across the business have more than doubled, and opportunities across the U.S. and U.K. government continue to develop at pace.

In particular, Sankar highlighted the purported durability of Palantir's government revenue growth, stating:

> In parallel, ***the momentum in our government business continues unabated***. First quarter government revenue increased 76% year-over-year, fueled in large part by the 83% year-over-year growth we generated in the U.S. government. We continue to play a critical role in helping governments respond to the pandemic and further our mission to become the central operating system for defense. The scope of our government work is broadening on the back of cutting-edge product like Apollo for Edge AI and investments in distribution.
>
> In the first quarter, we were awarded a 5-year contract worth up to $90 million with the National Nuclear Security Administration to provide the operating platform to safeguard America's nuclear stockpile. Of course, our nation's nuclear assets are of crucial importance to the future of our nations and broader western security, and we are proud to partner on this. ***As we look forward, over the balance***

> ***of the year, we continue to have tailwinds as we pursue opportunities across both defense and civilian agencies in our government business***.
>
> In Q1, our software was leveraged in the global information dominance experiment, enabling all 11 DoD combatant commands to generate globally integrated strategic decision advantage from intelligence, operations, logistics and supply data, all advanced by AI. ***This work dovetails with the strong pipeline we see in our government business across a variety of defense initiatives, and we expect deal activity to increase over the course of the year***.

249. Sankar claimed that channel partners on both the government and commercial side were delivering continued results with "customer wins" occurring at "blinding pace":

> Really our successful channel partners across government and commercial are the ones that are realizing that they're going to draft off our software's world-class performance that has always met its movement. ***The blinding pace*** of both cutting-edge product development ***and customer wins*** that drove these results, they are delivered because every hobbit's unquestionable resolve in the face of adversity and categorical dedication to our customers and their mission. Thank you, all Palantirians.

250. In the commercial segment, Sankar claimed that recent investments that Palantir had made in and partnerships with early-stage companies, including companies like Lilium and Sarcos which were going public via SPACs, offered tremendous opportunities to grow Palantir's client base and expand the use of its products. Sankar stated:

> And it's not just established industry players where we are winning, we are ***seeing opportunities for companies to build their digital infrastructure around Foundry from day 0 where they can shave years off their ramps and mountains of risk off their road maps by cost efficiently standing on the shoulders of 15 years and more than $2 billion of R&D. And we see this as the first salvo in expanding distribution of Foundry to broader markets and a broader set of customers***.
>
> In Q1, we entered into a partnership with Lilium, a revolutionary eVTOL transportation company ***that will use Foundry to build an integrated business from the ground up, incorporating design and engineering, procurement, testing, production, quality, logistics and in-service operations***. We have also partnered with Sarcos.
>
> We have always talked about Gotham as the digital Iron Man suit. Well, these guys, they're building the physical Iron Man suit. ***Sarcos will leverage Foundry for all of Palantir's well-understood industrials and manufacturing use cases***. But you can see how Sarcos can leverage all the capabilities of Apollo for

> Edge AI to push AI into their exoskeletons. This is Jarvis, Tony Stark's digital assistant, but in real life. ***These customers and even more prospects in our pipeline are at the forefront of the next major sea change software, architecting an entire organization around a common operating picture to deliver a connected company from the very beginning, eliminating the chains of silo data systems***.
>
> ***We are investing in innovation in the west, backing companies with ambitious goals and executing on our ability to move down market. And the fit is natural, our software can radically accelerate production ramps and time to market and help these companies get to scale on dramatically shorter time horizons***.

251. Later in the call, Glazer again highlighted the purported strength and durability of Palantir's government segment, stating: "First quarter government revenue was $208 million, up 76%. U.S. government revenue increased 83% year-over-year in the first quarter, and international government revenue increased 57% year-over-year." Glazer continued: "We expect this momentum to continue as we have a significant pipeline of government deals building in Q2 and beyond that we believe will fuel durable, elevated growth in our government segment." Glazer further stated: "We ended the first quarter with total remaining value of $2.8 billion, up 40% year-over-year." Glazer also stated: "Moving through 2021, we expect these deals to renew and expand, which we believe will create tailwinds for both duration and deal value." Glazer also reiterated the Company's long-term 30% revenue guidance: "***Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and will continue to provide revenue guidance of greater than 30% for this year and the next 4 years at each earnings call***."

252. During the question-and-answer portion of the call, Sankar maintained that the Company's SPAC investments were a compelling opportunity to accelerate their commercial business:

> [Nelson – Head of Palantir IR:] So Jackson K. asks, why is Palantir choosing to invest in companies such as Lilium and Sarcos Robotics? Can you speak to the

> motivation behind these decisions and if investors can anticipate future corresponding investments? How do you view risk, investment size and potential return?
>
> [Sankar:] Thanks, Jackson, for the question. As I mentioned throughout the call, we are relentlessly focused on increasing distribution. And here, ***we see a unique opportunity with ambitious companies to invest in both compelling management teams and compelling businesses and to partner with them on using our software from day 0***. These are folks that are focused on winning. There is no entrenched IT bureaucracy that wants to build their own toy like solution.
>
> They viscerally understand the value of buying the best operating system for their enterprise, shaving years and mountains of risk off their road map. That's not even to make mention of all the money they would have otherwise wasted buying traditionally siloed systems from CRM to ERP to ***manufacturing execution*** systems to some homegrown mini monster. Overall, we think this is a really compelling opportunity to accelerate our business, to accelerate our distribution and to bet on our customers.

253. When asked directly whether Palantir had "seen an increase in the interest from smaller companies," Kawasaki claimed that Palantir was able to increase its distribution by reaching small and medium sized businesses:

> [Kawasaki:] ***I mean short answer is yes, we signed up a number of great small and medium-sized businesses recently***. And I expect to see more of this because we're widening our distribution. A big driver of our Q1 results, that's 72% commercial growth in the United States and what's contributing to the revenue guide for Q2 is our increasing efficiencies of distribution. ***Our sales cycle is [h]eating up***.
>
> * * *
>
> We mentioned that our qualified pipeline has increased by 2.5x in the U.S. and U.K. And active commercial pilots across the business have more than doubled. And I think one of the most exciting things is that our shareholders are showing up in customer meetings. Of the 1.5 million individual shareholders, some are calling so they could bring Foundry to their day-to-day job.

254. When an analyst later asked Sankar about the sustainability of Palantir's government growth "post-COVID" and whether he still believed that "there's a considerable amount of long tail" for that segment, Sankar responded by stating that Palantir's government business was "accelerat[ing]" and would remain robust long after the pandemic ended:

[Analyst:] On the government business, there's a lot of questions about the sustainable strength post-COVID. And what you're seeing, I think you said in the past that COVID has opened the door to many conversations, but there's a considerable amount of long tail of that. If you could just talk to what you're seeing as you look out?

* * *

***We've seen work across health care, DoD, civilian agencies, accelerate inside the U.S. and outside of the U.S. We've also seen that the pipeline is continuing to build there. We're expecting a lot of defense-related activity to build over the back half of the year and into next year***. We participate in the global information dominance experiment with 11 combat command, that was not even visible during the contact that we build here. So quite excited about the pace at which these things are building. And if you think about Apollo for Edge AI, most of the capabilities we're looking at, they didn't even exist around the time of the listing, like the pace at which we are innovating on the product is probably one of the most exciting things, and that is what is creating these opportunities that are compounding.

255. In response to a further analyst question regarding the "confidence in the commercial revenue growth," Kawasaki maintained that Palantir was building a "bigger and bigger pipeline":

[Analyst:] I wanted to ask, clearly, the confidence in the commercial revenue growth is high given the rep hiring that you guys are putting up. Can you talk about the divergence in pilots in the commercial sector versus the stated revenue growth? And when will those pilots convert to revenues? How visible is that conversion time line, et cetera?

* * *

[Kawasaki:] [W]hen I just think about the 2.5x qualified pipeline that's been created since February 1, and then I think about the doubling of the pilot we're seeing about 1/3 of those have already turned into something. And so as we build ***bigger and bigger pipeline*** here, we're feeling good about how that funnel is flowing through. And if you combine that with the additional product investments, the road map that we're executing on, we have every reason to believe that we're going to continue to see acceleration across all these dimensions.

256. And in response to an analyst question about Foundry, how it "was resonating with customers," and customer add, Kawasaki stated there was "incredible traction" in commercial, pointing expressly to Lilium:

> [Analyst:] I wanted to ask about the commercial business. It looks like growth improved from last quarter, still below 20%, but I know there's a lot that you've been working on there, including the modularization of Foundry and wanted to hear how that was resonating with customers. And then just the second part of the question would be around the customer add. It looks like you added 11 new customers on the commercial side in the quarter. Did most of this come from IBM? Or are those through your direct sales force?
>
> [Kawasaki:] . . . Yes, ***the commercial business is gaining more and more momentum***. As we mentioned, it grew 72% in the U.S. So what we're seeing is where economies are opening, ***there's just incredible traction there***. We've hired 50 sales folks in the last quarter. ***You're starting to see that translate through in terms of activity***, 2.5x the number of qualified opportunities in the U.S. and the U.K., double the number of commercial pilots, the product investments that we've made around modularization and archetypes, those are what are translating also into increased activity. ***It's what's fueling our ability to do substantially more pilots here***.
>
> The channel strategy is also helping us source more customers. The IBM partnership generated its first deal within 16 days of being launched there. So lots of momentum there, a place that we'll continue investing in. Overall, we're quite excited. ***We continue to win deals in Europe. [Faurecia], Lilium in Europe***, Fuzhou, Engie. So a bunch of momentum there. And as Europe starts to open and manage through the pandemic, we're also expecting the same sort of tailwind that we've seen in the U.S. in Europe.

257. On May 12, 2021, Palantir filed with the SEC its quarterly 1Q21 report on Form 10-Q, which was signed by Karp and Glazer. The Form 10-Q discussed several "investments" that Palantir had recently made, including a $21 million investment in Rotor Acquisition Corp. (Sarcos), a $30 million investment in Montes Archimedes Acquisition Corp. (Roivant), a $20 million investment in GX Acquisition Corp. (Celularity), a $41 million investment in Quell Acquisition Corp. (Lilium), and a $20 million investment in an undisclosed SPAC. In each case, Palantir entered into a multiyear subscription agreement with the entity involved pursuant to which the entity paid Palantir millions of dollars to use the Company's products and services. The Form 10-Q further highlighted Palantir's deal value, stating:

> ***As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government***

> ***customers, including existing contractual obligations and contractual options available to those customers, was $2.8 billion. Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers.***

258. The 1Q21 Form 10-Q stated that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

> The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

259. The 1Q21 Form 10-Q also repeated the Company's strategy to engage in "strategic transactions" and "enter into relationships with other businesses" to expand Palantir products:

> As part of our business strategy, we have engaged in strategic transactions in the past and expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services.

260. The 1Q21 Form 10-Q also failed to disclose material information required under Item 303 of SEC Regulation S-K, as described below *infra* §VIII.

261. At the June 8, 2021 Annual Shareholders Meeting, Sankar maintained that the "day zero" SPACs were "choosing to build their offerings" on top of Palantir software:

> [Nelson – Head of IR:] We also received a lot of questions that revolve around the western innovation and day zero topics we referred to on our last earnings call. Can you elaborate further on those concepts?
>
> [Sankar:] Certainly, one of the most humbling and exciting things we are seeing right now is that a bunch of day zero, hyper growth start-ups, free of legacy are ***choosing to build their offerings on top of our software***. These days zero opportunities, as I've been calling them, they are incredibly motivated.
>
> These companies have huge ambition, no bureaucracy, and they move at pace. They see the way for them to accomplish these ambitions is to build on top of foundries. To me, that's literally what an operating system is, it is very validating of our end-to-end approach. It's allowed us to add extreme value over the do-it-

> yourself custom build approaches. Or really, should I say, customers are realizing that they can build on top of what they are buying with foundry, and we expect to continue to make product investments here.

262. Between April 1, 2021 and June 30, 2021, Defendants sold nearly 12.8 million shares for proceeds of more than $290 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Karp | 12,165,657 | $22.60 | $277,446,498 |
| Cohen | 240,621 | $22.43 | $5,602,670 |
| Sankar | 148,614 | $19.75 | $3,071,505 |
| Glazer | 210,672 | $21.17 | $4,414,646 |

263. The statements detailed in ¶¶247-261 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶248, 253-254, 256, 258 touting Palantir's operational efficiencies, acquiring and onboarding new customers was a lengthy and time-consuming process that required Palantir to incur substantial costs. In addition, landing new customers required Palantir to search for and find a reason why each potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Also, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶247-249, 251, 253-257 that margins, revenues, and operational results were improving and accelerating, Defendants understood that Palantir's recent revenue and deal value growth rates were unsustainable and had already begun to decelerate beginning in 4Q20 as Defendants were aware at the time these

statements were made that: (1) the government segment's growth performance had peaked in 4Q20 and had begun a sequential deceleration in 1Q21 because Defendants had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of Defendants' contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue [Palantir] recognize[d] for that quarter," but "such a decline would negatively affect [Palantir's] revenue in future quarters," (*supra* §VI.E.1.; *infra* §IX.B.); (2) Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.); (3) Defendants also had "strong visibility" into the commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth rates in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) would not meaningfully recover from their 4Q20 decline; (4) the Company's growth plan on the commercial side was dependent on the SPAC Scheme, which involved investing in early-stage SPACs with little or no revenue, and far less than $500 million in recurring annual revenue, on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford; (5) that to obtain and onboard new customers Palantir had to incur far greater costs per dollar of revenue than those associated with already existing customers; and (6) as a result of (1)-(5) herein, Defendants overstated Palantir's government and commercial businesses growth trends and addressable markets;

(c) that the "momentum in [Palantir's] government business" did not "continue[] unabated" and Palantir's government business pipeline was not "strong," as detailed in ¶¶248, 251, 254 above, for the additional reason that in April 2021 Palantir was notified the Navy planned to end an $84 million contract in February 2022 – a year earlier than the potential end date of February 2023 – and pay Palantir only $36 million or less than one-half the potential $84 million award amount (*supra* §VI.E.1.);

(d) that, contrary to Defendants' statements in ¶¶254, 258 that COVID-19 was a source of long-term growth in new areas, Palantir's growth in government revenue had already peaked in 4Q20 and begun a sequential deceleration in 1Q21 which Defendants were aware of given their admitted "strong visibility into future revenues across [their] customer base." Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.);

(e) that, contrary Defendants' statements in ¶259, Defendants' growth plan was not centered on investing in "strategic transactions," but instead depended on the SPAC Scheme, which Defendants designed to offset declines Defendants expected in Palantir's government and commercial business segments by artificially inflating Palantir's reported growth, total deal value, commercial client base, revenue and margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too

nascent to afford or need in the manner and scope that Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(f) that, contrary to Defendants' statements in ¶¶250, 252, 255-256, 261, the purported "incredible traction" and "more and more momentum" in Palantir's commercial business depended not on "win[ing deals]," "executing on our ability to move down market," "increasing distribution," or companies "choosing to build their offerings" on top of Palantir software but on Defendants executing the SPAC Scheme, which was designed to and did artificially inflate Palantir's reported commercial growth, total deal value, commercial client base, revenue and margins (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(g) that, contrary to Defendants' statements in ¶¶250, 252-253, 255-257, 261, Defendants had already expanded the SPAC Scheme by arranging to manufacture more high-margin revenue and illusory growth shortly after Palantir's May 11, 2021 earnings call as demonstrated by, *inter alia*, Palantir's buying approximately nine additional commercial clients and approximately $212 million in unsustainable, *quid pro quo* revenue from dubious SPACs in exchange for approximately $200 million in PIPE funding, prior to the Company's next earnings call on August 12, 2021 (*supra* §VI.E.4.; *infra* §IX.C.4.);

(h) that, contrary to Defendants' statements in ¶¶250, 252-253, 256-257, 261 characterizing their SPAC investments as legitimate growth-enhancing investments in, and partnerships with, startups, in fact they were *quid pro quo* transactions undertaken for the purpose of concealing Palantir's stagnating growth by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins (*supra* §§VI.E.-F; *infra* §§VIII.A., IX.C.);

(i) that, contrary to Defendants' statements in ¶¶250, 252-253, 255-257, 261, Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under Defendants' SPAC Scheme, as the SPAC customers were largely early-stage businesses with little or no revenue and thus unable to pay for Palantir's products and services for the duration of the relevant contract periods and too nascent to need or use Foundry in the manner and scope that Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(j) that, contrary to Defendants' statements in ¶¶250, 252, many of the SPACs Palantir contracted with were too nascent to use Foundry in the manner and scope that Defendants represented and thus not "compelling businesses" ready to "build their operations around Foundry from day 0, using Foundry for . . . CRM [customer relationship management], [and] manufacturing execution," or to obtain "production" and "manufacturing use" benefits," or to "shave years off their ramps and mountains of risk off their road maps," or to "accelerate production ramps and time to market and help these companies get to scale on dramatically shorter time horizons" (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(k) that, as a result of ¶263(a)-(j) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶247-261 about the Company's business, operations, and prospects were false and misleading at all relevant times; and

(l) that, as a result of ¶263(a)-(k) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth every year from 2021 to 2025.

264. Each of the Defendants sold Palantir shares between April 1, 2021 and June 30, 2021, as detailed in ¶262, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶263(a)-(l) above.

**E. 2Q21 Earnings Report**

265. On August 12, 2021, Palantir issued a release containing the Company's financial results for the second quarter ended June 30, 2021 (the "2Q21 Release"). Palantir's 2Q21 revenue of $376 million was up 49% year-over-year. The release stated that during 2Q21 Palantir's U.S. commercial revenue had risen 90%, that Palantir had closed 62 deals worth $1 million or more, and that the Company had grown its commercial customer count by 32%. The release reaffirmed the Company's long-term revenue guidance of 30% and stated that Palantir expected 3Q21 revenue of $385 million.

266. Also on August 12, 2021, Palantir convened a conference call with analysts and investors, led by Glazer, Kawasaki, and Sankar, to discuss the Company's 2Q21 results. During his prepared remarks, Sankar highlighted the Company's partnerships with purportedly promising early-stage companies, which he referred to as "young guns," that were purportedly making great use of the Company's software, stating:

> And these young guns, they see Foundry as an ***alternative to building bespoke*** solutions in AWS or Azure or any other cloud. ***They need software today that is ready for any tomorrow. Our software is that enabling platform***, and a growing number of companies from early stage to newly public companies, they're pursuing that vision on Foundry. We refer to these organizations as day 0 companies.
>
> ***The innovation in our distribution is enabling us to partner with these organizations across many industries*** as they build their offerings on Foundry. For example, in biotech, Celularity is leveraging our experience in both pharma R&D and manufacturing to accelerate drug development and set a new standard for cell-based therapies. Roivant is drawing on the work that we've done, spanning pharma companies like Sanofi and Merck Group and public health platforms like N3C UNITE to pool and share trial data with development partners and build out real-world evidence capabilities to support key disease areas.
>
> In automotive, Wejo is building a SaaS ecosystem connected vehicle data spanning use cases across OEMs, suppliers, insurers and government authorities on top of foundry. In logistics, Box is building a digital twin, incorporating both shipment and sales operations, spanning raw materials all the way through to end customers, and just so much more.

We are making Foundry accessible to even more day 0 companies with Foundry for Builders, a program which supports early-stage companies with access to Foundry, allowing these companies to build their operations on Foundry from the outset, enabling them not just to efficiently manage, but actually to wield the increasing complexity of their growing businesses to disrupt incumbents and to win in the marketplace.

And while competitors are bogged down by legacy IT investments and an obsession with reinventing every wheel internally, these companies, they have no IT catalog. They are just founders, entrepreneurs and engineers focused on winning, and they see Foundry as the best way to do that.

This program includes companies like Chapter, who is revolutionizing the consumer experience in Medicare plan selection and enrollment; or Gecko Robotics, who is building bada** robots for industrial inspections; and Origin Materials, which is helping companies decarbonize their supply chains to achieve net 0 and really, net negative carbon footprints. And we plan to extend this offering to more early-stage companies in a variety of industries over time. ***We see substantial opportunity to grow our business and push the ambition of our product with these day 0 companies, and we couldn't be more excited to power the next generation of builders***.

267. Sankar went on to emphasize Palantir's "tremendous growth" in its commercial customer count, claiming that new customer growth that the Company was experiencing was proof that "Foundry is for everyone":

More broadly, what we've really proven over the last few quarters, and that's really reflected in the tremendous growth of the commercial customer count, 32% growth in Q2, is that Foundry is for everyone. The market is changing. I've talked about how COVID really showed where the emperor had no clothes. It isn't just the big established companies that took notice of his bare assets. The young guns did, too.

268. During his prepared remarks, Glazer stated: "We ended the second quarter with total remaining deal value of $3.4 billion, up 63% year-over-year, while commercial deal value was up 122% year-over-year to $2.1 billion." Glazer also stated that the Company had experienced an adjusted operating "margin of 31%, our third straight quarter with adjusted operating margins above 30%." Reiterating the points made by Sankar, Glazer also reported that the Company expected elevated growth in both its government and commercial segments:

> Second quarter government revenue was $232 million, up 66% year-over-year. The strength in our government business was driven by new deals with the U.S. Army, Air Force, Coast Guard, HHS, CDC as well as milestone revenue for an international government customer. ***We continue to build a strong pipeline of opportunities within our government segment, and we expect these deals to drive sustained, elevated growth in our government business moving forward***.
>
> Second quarter commercial revenue growth accelerated to $144 million, up 28% year-over-year compared with 19% growth in the first quarter. ***Speed and innovation are driving strong results in our commercial business***, particularly in the U.S., where commercial revenue growth accelerated to 90% year-over-year in Q2, up from 72% in Q1. We're also seeing growth in our international business as economies abroad continue to reopen.

269. Glazer also stated that the Company planned to continue investing in "day zero" companies (*i.e.*, SPACs), but (mis)characterized them as having a minimal impact on revenue:

> With our balance sheet and a strengthening cash flow profile, we plan to continue to invest in both product innovation and ***broadening distribution as well as partnering with day 0 companies to help them rapidly scale their businesses*** while leveraging our software platforms.
>
> In the first half of the year, we committed to invest $250 million, and we funded approximately $20 million of those commitments to date. We have and expect to continue to make additional strategic investments in the future. ***In the second quarter, $3 million or less than 1% of our quarterly revenue was from companies we invested in as part of the strategic investment program we launched earlier this year***.

270. Glazer also reiterated the Company's long-term 30% revenue guidance: "Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and will continue to provide guidance of greater than 30% revenue growth for this year and the next 4 years at each earnings call."

271. In the question-and-answer portion of the call, Kawasaki rejected questions about whether the Company might simply be "buying revenue," insisting these were companies that Palantir would be "working with for a very long time":

> [Nelson – Head of Palantir IR:] (inaudible) asks, can you guys describe your long-term vision with your pipe investments into pre-revenue companies? ***The talk is Palantir's buying revenue***, but I believe it is a clever, high-risk, high-reward strategy, enhancing network effects.
>
> [Kawasaki:] Thank you. This is a huge opportunity for us to invest in our customers. And that's something we feel we've always done. Now we can do it with our balance sheet. ***These are companies that we think we will be working with for a very long time. Further, we think that using our product is going to help them win***.
>
> One thing we've always looked for in our customer relationships is the founder mentality. That is where we're most aligned, no bureaucracy, high speed, quality execution. So that's something that we're looking for in these deals, that founder mentality.
>
> So I'll also break down the numbers a little bit here. ***Dave already mentioned that less than 1% of our revenue came from this program in Q2. Additionally, of the $925 million of total TCV in Q2, $543 million from this program. This is a long-term strategy, and the deal is a long term as well. So we expect longer duration and time to revenue recognition***.

272. In response to further questioning about the "overall strategy" behind the SPAC investments, Kawasaki downplayed concerns with their relative magnitude and emphasized that they fit the long-term strategy:

> [Analyst:] I guess, Shyam, maybe just first, can you talk about revisiting the question around the percentage of TCV that's coming from the strategic partnerships? How do you expect that to evolve? ***What are the duration of some of these contracts? That was a pretty striking metric that I think it was 50% of your TCV was from these strategic partnerships***. So just want to get a better understanding of what the overall strategy is for the company there.
>
> [Kawasaki:] Yes. Sure. So we break down the numbers a little bit here, and Dave mentioned less than 1% of the revenue came from this program in Q2. Additionally, of the $925 million of total TCV in Q2, $543 million from the program.
>
> ***To your question, the long-term strategy, the deals are very long term as well***. So we expect some longer duration and time to revenue recognition. I talked about this a little bit, but just to reiterate, the portion of TCV outside of the strategic investment is also very strong, totaling $382 million. This grew at a sequential rate of 33% quarter-over-quarter. So in other words, without the investment program, TCV grows 33% sequentially.

> And then I think just a little bit more on sort of like the long-term vision here. Dr. Karp has discussed how we're building software for the future in the present. And Foundry is the operating system for the modern enterprise. And we're bringing Foundry to people who have the ambition to transform industries and create new ones.
>
> We've talked about this, but we're looking at companies in cell-based therapeutics, biomedical health care delivery, quantum computing satellites, electric vehicles, delivering worldwide intelligence from space and a lot more. Now these are companies that have cutting-edge technology of their own, and they're choosing Foundry to help drive their vision forward. And we think many will follow and our strategic investment program accelerates this.

273. Similarly, in response to an analyst question about "the number of new customers added in the last quarter," Kawasaki stated that "[c]ustomer count is accelerating," especially in commercial, and that Palantir is delivering the full power of Foundry to small companies through a subscription model:

> [Nelson – Head of Palantir IR:] Avi asks, are you satisfied with the number of new customers added in the last quarter?
>
> [Kawasaki:] . . . ***The numbers are strong. Customer count is accelerating, especially if you look at the commercial space, where we grew our customer count 32% quarter-over-quarter and up 61% for the first half of the year. So on track to more than double our commercial customer base by end of year***.
>
> ***Deal volume was also up. We closed 62 deals of $1 million or more. That is a 72% increase from last quarter***, second quarter TCV grew 175% to $925 million year-over-year.
>
> * * *
>
> So I'll finish by reiterating what Shyam just discussed. ***We are now delivering the full power of Foundry to small companies through a subscription model***, and we're doing this across many sectors, ranging from health care to robotics to software companies, SaaS businesses ***using Foundry to build their offerings***.

274. Later in the call, Sankar answered a question about what gave "management confidence" that Palantir could improve shareholder returns over time. Sankar responded by

saying that the changes from the pandemic that had led to Palantir's recent growth were "not going away," stating:

> Look, Humpty Dumpty had a great fall. ***The world has changed and it isn't going back***. We built software for the world we are in now and the world we will continue to be in. We saw that coming. We anticipated the future needs. Supply chains will never be the same. It isn't just about today's shortages. The old world is fixated on the accuracy of the forecast. The new world is all about how well you manage the error in your forecast. The error is the signal. The error is the opportunity to win.
>
> * * *
>
> ***The reality is that shocks will be more frequent. This isn't a one-off. It's the new normal. Years of investing mindlessly in efficiency has resulted in enormous fragility. We are the resilient operating system for the future champions***.

275. On August 12, 2021, Palantir filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 2Q21 Form 10-Q reported a contribution margin of 58% for the quarter.

276. The 2Q21 Form 10-Q also discussed $250 million in "investments" that Palantir had made with various early-stage companies, as well as up to $428 million worth of contracts that Palantir had entered into with these same companies to allow them to use the Company's products and services, stating:

> The Company approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, or commitments to purchase, the "Investments"). ***As of June 30, 2021, the Company had outstanding commitments, subject to the applicable terms and conditions, to purchase a total of 25.0 million shares for an aggregate purchase price of $250.0 million***. The closings of certain of such Investments are contingent upon the completion of a proposed business combination between the applicable Investee and other applicable parties. As of June 30, 2021, none of such Investments had closed.
>
> ***Additionally, in connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial***

> ***contract for access to the Company's products and services. The maximum potential revenue from these commercial contracts is $428 million, which is inclusive of $73 million from contractual options, and the terms of such contracts, including these contractual options, range from three to ten years***. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.
>
> The Company assessed the concurrent agreements under the non-monetary guidance within Accounting Standards Codification ("ASC") 606 – *Revenue from Contracts with Customers* and ***the total revenue recognized from such commercial contracts during the three and six months ended June 30, 2021 was $3.0 million***.

277. The 2Q21 Form 10-Q similarly revealed that, after the close of 2Q21, Palantir had subsequently committed to provide $113 million in additional PIPE funding in exchange for $162 million in commercial contracts, stating:

> The Company approved and entered into additional Investment Agreements from July 1, 2021 through the date of this filing. As of the date of this filing, the Company had additional outstanding investment commitments, subject to applicable terms and conditions, to purchase a total of 6.0 million shares for an aggregate purchase price of $60.0 million. The closings of certain of such Investments are contingent upon the completion of a proposed business combination between the applicable Investee and other applicable parties.
>
> * * *
>
> Additionally, during July 1, 2021 through the date of this filing, the Company purchased 9.0 million shares for an aggregate purchase price of $53.0 million, as set forth in the following table (in thousands).
>
> * * *
>
> In connection with the signing of the Investment Agreements entered into between July 1, 2021 and the date of this filing, each Investee or an associated entity and the Company entered into a commercial contract for the Company's products and services. The maximum potential revenue from these commercial contracts is $162 million, and the terms of such contracts range from four to six years. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.

278. The 2Q21 Form 10-Q also stated that the Company's SPAC investments would accelerate Palantir's reach "to the broadest possible set of customers":

We have recently begun to expand access to our platforms to earlier stage companies, including startups, as we continue our outreach efforts to an increasingly broad swath of the potential market.

***Our software platforms can now be installed and ready for use within hours. The speed with which our platforms can be deployed has significantly expanded the range of potential customers with which we plan on partnering over the long term***. We anticipate that our reach among ***an increasingly broad set of customers***, in both the commercial and government sectors, will accelerate moving forward. We believe that as these new partners grow, we will grow with them.

We have also made a number of investments in companies whose businesses rely on the ability of their organizations to manage and analyze data effectively at scale. The companies in which we are investing include some of the most innovative organizations in their fields.

Our proximity to these businesses and the industries in which they are operating has enhanced, and is expected to continue enhancing, our own product and business development efforts, as we continue expanding access to our platforms to ***the broadest possible set of customers***.

279. The 2Q21 Form 10-Q further highlighted Palantir's deal value, stating:

***As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers***, including existing contractual obligations and contractual options available to those customers, ***was $2.8 billion. Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers***.

280. The 2Q21 Form 10-Q also maintained that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

The pandemic has made clear to many of our customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

281. The 2Q21 Form 10-Q also failed to disclose material information required under Item 303 of SEC Regulation S-K, as described below *infra* §VIII.

282. Between July 1, 2021 and September 30, 2021, the Individual Defendants sold more than 14.6 million shares for proceeds of more than $352 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| Karp | 12,470,322 | $24.21 | $298,844,847 |
| Cohen | 1,026,383 | $25.93 | $26,347,603 |
| Thiel | 3,262 | $25.00 | $81,550 |
| Sankar | 757,870 | $23.34 | $18,027,217 |
| Glazer | 363,190 | $26.07 | $9,114,484 |

283. The statements detailed in ¶¶265-280 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants were:

(a) that, contrary to Defendants' statements in ¶¶266, 268, 278, 280 touting Palantir's operational efficiencies, including that Palantir's software platforms could "be installed and ready for use within hours," acquiring and onboarding new customers was a lengthy, time-consuming, and costly process, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Further, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶265-268, 273, 275-276, 279 that margins, revenues, and operational results were improving and accelerating, Defendants understood that Palantir's recent revenue and deal value growth rates were unsustainable as Defendants were aware at the time these statements were made that: (1) the government segment's growth performance had peaked in 4Q20 and had begun a sequential deceleration in 1Q21 because

Defendants had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of Defendants' contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue [Palantir] recognize[d] for that quarter," but "such a decline would negatively affect [Palantir's] revenue in future quarters," (*supra* §§VI.E.1.; *infra* §IX.B.); (2) Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-C., VI.E.1.; *infra* §VIII.C.); (3) Defendants also had "strong visibility" into the commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth rates in the commercial segment (*i.e.*, growth achieved outside of the SPAC Scheme) had stagnated and would not meaningfully recover (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.); (4) the Company's growth plan on the commercial side was dependent on the SPAC Scheme, which involved investing in early-stage SPACs with little or no revenue, and far less than $500 million in recurring annual revenue, on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford; (5) that to obtain and onboard new customers Palantir had to incur far greater costs per dollar of revenue than those associated with already existing customers; and (6) as a result of (1)-(5) herein, Defendants overstated Palantir's government and commercial businesses' growth trends and addressable markets;

(c) that, contrary to statements in ¶268, Defendants were not expecting "sustained, elevated growth in [the] government business," for the additional reason that in April

2021, Palantir was notified that the Navy planned to end an $84 million contract in February 2022 – a year earlier than the potential end date of February 2023 – and was paying Palantir only $36 million or less than one-half the potential $84 million award amount (*supra* §VI.E.1.);

(d) that, contrary to Defendants' statements in ¶¶274, 280 that COVID-19 was a source of long-term growth in new areas, Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts, and as a result thereof, Palantir's growth in government revenue had peaked in 4Q20 and had begun a sequential deceleration in 1Q21 (*supra* §§VI.B.-D., VI.E.1.; *infra* §VIII.C.), which Defendants were aware of given their admitted "strong visibility into future revenues across [their] customer base" (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.);

(e) that, contrary to Defendants' statements in ¶¶265-269, 271-273, 275-279, Defendants had implemented the SPAC Scheme to offset declining growth rates Defendants expected in Palantir's government and commercial business segments by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to afford or need in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(f) that the purported acceleration in Palantir's commercial customer count and customer base, deal volume, and average revenue per customer detailed in ¶¶265, 268, 273 above were the product of the SPAC Scheme, which was designed to and did artificially inflate reported commercial growth, total deal value, commercial client base, revenue and margins by causing Palantir to "invest" in early-stage businesses (consisting primarily of SPAC target companies that had little or no revenue, and far less than $500 million in recurring annual revenue), in exchange for these businesses entering into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to afford or need in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(g) that, contrary to Defendants' statements in ¶¶266, 269, 271-273, 275-278, Defendants had already expanded the SPAC Scheme by arranging to manufacture more high-margin revenue and illusory growth shortly after Palantir's August 12, 2021 earnings call as demonstrated by, *inter alia*, Palantir's buying in the next few months approximately seven additional commercial clients and at least $65 million in unsustainable, *quid pro quo* revenue from dubious SPACs in exchange for approximately $117 million in PIPE funding (*supra* §VI.E.6.; *infra* §IX.C.5.);

(h) that, contrary to Defendants' statements in ¶¶266, 269, 271-273, 275-278 characterizing their SPAC investments as legitimate growth-enhancing investments in, and partnerships with, startups, in fact they were *quid pro quo* transactions undertaken for the purpose of concealing Palantir's stagnating growth by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(i) that it was neither speed nor innovation driving Palantir's 2Q21 reported results in its commercial business, as detailed in ¶268 above, but rather Palantir's willingness to sign up almost any potential commercial client willing to agree to engage in a roundtrip transaction without regard to customer viability or customer ability to satisfy its obligations to Palantir (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(j) that, contrary to Defendants' statements in ¶¶271-272, the SPACs or "day 0" companies Palantir was contracting with were not companies that Palantir expected to be "working with for a very long time," or part of a "long-term strategy" that would provide $543 million in TCV, but instead, Defendants were using these companies as short-term devices designed to mask Palantir's stagnating growth and deteriorating margins and to enable Palantir to post TCV which Defendants neither expected nor believed would actually manifest (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(k) that Defendants were not "delivering the full power of Foundry to small companies through a subscription model" as detailed in ¶273 above, but instead supporting the SPAC customers with a fraction of the engineers required for typical commercial contracts and no salespeople, and unlike Palantir's typical commercial accounts, providing the SPACs only parts of Foundry and delivering the product to them all at once without the bespoke setup its non-SPAC commercial customers received, and even then not as part of a "subscription model" but as *quid pro quo* exchanges for Palantir's PIPE funding (*supra* §VI.E.; *infra* §IX.C.);

(l) that Palantir was unlikely to ever receive a substantial portion of the revenue contracted for by the SPACs, as the companies involved were largely businesses with little or no revenue and thus were unable to pay for Palantir's products and services for the duration of the

relevant contract periods, and were too nascent to need or use Foundry in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §IX.C.);

(m) that Palantir's reported 2Q21 contribution margins were inflated by the SPAC Scheme (*supra* §§VI.E.2., VI.F.; *infra* §§VIII.A., IX.C.);

(n) that, as a result of ¶283(a)-(m) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶265-280 about the Company's business, operations, and prospects were false and misleading; and

(o) that, as a result of ¶283(a)-(n) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth each year from 2021 to 2025.

284. Each of the Defendants sold Palantir shares between July 1, 2021 and September 30, 2021, as detailed in ¶282, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶283(a)-(o) above.

### F. 3Q21 Earnings Report

285. On November 9, 2021, Palantir issued a release containing the Company's financial results for the third quarter ended September 30, 2021 (the "3Q21 Release"). The 3Q21 Release signaled a significant deceleration in Palantir's revenue growth, including quarterly revenue of $392 million, or 36% year-over-year revenue growth, and projected fourth quarter revenue of $418 million, which represented 30% year-over-year revenue growth, a decline from 2Q21's 49% year-over-year revenue growth. That same day, Palantir also filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 3Q21 Form 10-Q revealed that Palantir's government revenue had actually ***declined*** on a sequential basis to $218 million for the quarter.

286. The price of Palantir Class A common stock fell on this news by nearly 16% over two trading days to just over $22.50 per share by market close on November 10, 2021, on abnormally high trading volume. However, the price of Palantir stock continued to trade at artificially inflated levels because Defendants continued to conceal the truth about Palantir's operations and prospects, and reiterated that Palantir was on track to post annual revenue growth of 30% or greater through 2025.

287. The 3Q21 Release stated that Palantir's commercial customer count had grown 46% over 2Q21 and that its U.S. commercial revenue had grown 103% year-over-year during the quarter. It also reported that the Company's remaining deal value grew 50% year-over-year to $3.6 billion and that per "long-term guidance policy, as provided by our Chief Executive Officer, Alex Karp, ***we continue to expect . . . [a]nnual revenue growth of 30% or greater for 2021 through 2025***."

288. The 3Q21 Form 10-Q released that day reported a 57% contribution margin. It also stated that Palantir had entered into various commercial contracts with early-stage companies in which it had invested worth up to $640.2 million, stating:

> The Company approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, as further discussed in *Note 8. Commitments and Contingencies – Investment Commitments*, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, and commitments to purchase, the "Investments"). ***In connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products and services. The maximum potential revenue from all of these commercial contracts is $640.2 million, which is inclusive of $82.9 million of contractual options***. The terms of such contracts, including such contractual options, range from three to ten years. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.

> During 2021, the Company assessed the concurrent agreements under the non-monetary guidance within Accounting Standards Codification ("ASC") 606 – *Revenue from Contracts with Customers* and ***the total revenue recognized from the commercial contracts during the three and nine months ended September 30, 2021 was $19.0 million and $22.0 million, respectively***.

289. The 3Q21 Form 10-Q similarly revealed that, after the close of 3Q21, Palantir had subsequently committed to provide $26 million in PIPE funding in exchange for precisely $26 million in commercial contracts, stating:

> The Company approved and entered into additional Investment Agreements from October 1, 2021 through the date of this filing. As of the date of this filing, the Company had additional outstanding investment commitments, subject to applicable terms and conditions, to purchase a total of 2.6 million shares for an aggregate purchase price of $26.0 million.
>
> * * *
>
> In connection with signing each of the Investment Agreements entered into between October 1, 2021 and the date of this filing, each Investee or an associated entity and the Company entered into a commercial contract for the Company's products and services. The maximum potential revenue from these commercial contracts, including option years, is $26.0 million, and the terms of such agreements range from three to four years.

290. The 3Q21 Form 10-Q stated the claim that the Company's SPAC investments would accelerate Palantir's reach "to the broadest possible set of customers":

> We have recently begun to expand access to our platforms to earlier stage companies, including startups, as we continue our outreach efforts to an increasingly broad swath of the potential market.
>
> ***Our software platforms can now be installed and ready for use within hours. The speed with which our platforms can be deployed has significantly expanded the range of potential customers with which we plan on partnering over the long term***. We anticipate that our reach among an increasingly broad set of customers, in both the commercial and government sectors, will accelerate moving forward. We believe that as these new partners grow, we will grow with them.
>
> We have also made a number of investments in companies whose businesses rely on the ability of their organizations to manage and analyze data effectively at scale. The companies in which we are investing include some of the most innovative organizations in their fields.

Our proximity to these businesses and the industries in which they are operating has enhanced, and is expected to continue enhancing, our own product and business development efforts, as we continue expanding access to our platforms to the broadest possible set of customers.

291. The 3Q21 Form 10-Q further highlighted Palantir's deal value, stating:

***As of December 31, 2020, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers***, including existing contractual obligations and contractual options available to those customers, ***was $2.8 billion. Of our total remaining deal value, as of December 31, 2020, $1.5 billion was the remaining deal value of our contracts with commercial customers and $1.3 billion was the remaining deal value of our contracts with government customers***.

292. The 3Q21 Form 10-Q also stated that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

The pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

293. The 3Q21 Form 10-Q also failed to disclose material information required under Item 303 of SEC Regulation S-K, as described below *infra* §VIII.

294. Also on November 9, 2021, Palantir convened a conference call with analysts and investors, led by Glazer, Kawasaki, and Sankar, to discuss the Company's 3Q21 results. During his prepared remarks, Sankar reported that it was "a fantastic quarter across the board," as "[t]otal deal value grew 50% to $3.6 billion" and "[c]ommercial deal value more than doubled to $2.2 billion." Sankar also lauded the Company's purported commercial client and revenue growth, stating:

***It was a fantastic quarter across the board***. In Q3, total revenue grew 36%. Commercial revenue growth has accelerated in every quarter over the last year from 4% in Q4 2020 to 19% in Q1 to 28% in Q2 now 37% in Q3. At this scale, acceleration like this is gravity defined. ***U.S. commercial revenue growth accelerated once again to 103% year-over-year. We added 34 net new customers***

***in Q3. To put this in perspective, our commercial customer count grew by 46% sequentially. We have more than doubled our commercial customer count at the beginning of the year. We closed 54 deals of $1 million or more, 33 of which were $5 million or more and 18 of which were $10 million or more***.

295. Sankar also highlighted Palantir's commercial business client procurement, stating:

> ***Cutting-edge product and continued innovation and distribution drove these exceptional results in Q3. And you can really see that in the consistently accelerating commercial business***. We are seeing a profound pull on Foundry in the market as organizations digest and synthesize lessons from the shocks of COVID and subsequent events. There is a canonical spot for Foundry in the enterprise architecture that the market has synthesized. Foundry is the nervous system and the cardiovascular system of the enterprise. It is the connective tissue that connects your analytics to your operational systems. Such an architecture marries a digital twin of the enterprise with action APIs that allow you to first model and simulate, and second, orchestrate and execute complex cross-functional transactions.
>
> As the COVID-19 crisis pulled the tide out, that's exactly what was revealed as missing. Companies needed to move beyond visibility, beyond analytical insights, to having the technical infrastructure, to translate that into coordinated, orchestrated actions in the operations of their business. And one of the coolest places to see this working is with our Day 0 companies. These companies have enormous ambition and deeply value the step change in speed and the reduction of expenses Foundry delivers when consumed as Infrastructure as a Service. Wejo is able to develop market-ready applications in as little as 6 weeks on Foundry. Sarcos is integrating 0.5 trillion data points per month to accelerate design, maintenance and commercialization of their Iron Man suits. Lilium is flying through ground and flight testing [wielding] the vast data generated by every sensor streaming from the aircraft.
>
> * * *
>
> ***We started this program to supercharge earlier-stage companies, enabling them to create a central operating system for their data and to scale rapidly from Day 0. These companies, they're not just managing their data and their operations, they are wielding them to blitz, scale and win***.

296. During the call, Glazer discussed results in Palantir's government business and emphasized the purported "101%" increase in Palantir's remaining deal value, stating:

> Government revenue increased 34% as we signed new deals with the Air Force, HHS and NIH, and we were recently down selected by the U.S. Army to provide its Intelligence Data Fabric and Analytics solution under CD-2. In the third quarter, we closed 54 deals of $1 million or more in total contract value, including

> 33 deals of $5 million or more and 18 deals of $10 million or more. ***Third quarter billings increased 56% year-over-year and remaining performance obligation increased 172% year-over-year as we continue to improve contracting, push out or remove termination for convenience clauses and move to shorter duration billing cycles***.
>
> ***Total remaining deal value increased 50% year-over-year to $3.6 billion, with commercial remaining deal value increasing 101%***. Third quarter trailing 12-month revenue per customer was $7 million, down sequentially and reflecting continued acceleration in customer acquisition as we added 34 net new customers in the quarter.
>
> ***We continue to expect rapid expansion in our customer base moving forward as we invest in our sales teams and channel partners, and we would expect average revenue per customer to continue to taper as a result of our growing customer count***. When excluding new customers added in the quarter, average revenue per customer was $8.8 million, up 26% year-over-year. And we continue to generate strong growth with our largest customers. Trailing 12-month revenue per top 20 customers was $41.3 million, up 35% year-over-year.

297. Glazer also represented that Palantir had achieved an adjusted operating "margin of 30%, our fourth consecutive quarter with adjusted operating margin of 30% or greater," and reiterated the Company's long-term revenue guidance: "***Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and will continue to provide guidance of 30% or greater revenue growth for this year and the next 4 years at each earnings call***."

298. During the question-and-answer portion of the call, when asked about the "opportunity for Palantir and small businesses and consumer use down the line," Kawasaki highlighted the commercial deal value: "Total commercial deal value is up $2.2 billion. That's more than doubling since last year."

299. Later in the call, when Sankar was asked to comment on Palantir's government business, he claimed that the "pipeline in aggregate is big and building":

> [Nelson – Head of Palantir IR:] Aaron and Avi asked, what is the future of Palantir's public sector business, including if there are any billion-dollar contracts like the latest U.S. Army wins in the pipeline?
>
> * * *
>
> [Sankar:] ***This pipeline in aggregate is big and building***. And all of this is happening despite the macro headwinds that we've all heard about across government services, COVID's impact on delaying the pace of awards. . . .
>
> ***We are just at the beginning of big secular trends here, trends that we anticipated and have invested in for years***. We are uniquely positioned, cutting-edge product ready to meet at the moment.

300. Similarly, Glazer highlighted the purported strength in Palantir's commercial business, stating:

> ***We mentioned we've more than doubled our commercial customer count this year, and those numbers are accelerating, growing our installation base is really great because we expand in places where we are***. If you look at our top customers, average over $40 million a year of revenue. That's up 35% year-over-year. Our average revenue per customer was $8.8 million when excluding new customers. So lot of room to expand as we expand our customer base.
>
> ***Another big driver, U.S. commercial revenue, where we've seen acceleration, we mentioned up to 103% growth, doubling in Q3***.
>
> ***Our forward indicators also really strong. Total deal value up 50% to $3.6 billion. Total deal value in commercial doubled to $2.2 billion. Our third straight quarter of accelerating commercial revenue. And just to wrap up, commercial revenue up 21% sequentially quarter-over-quarter***.

301. Glazer further emphasized that the Company remained excited about its SPAC investments and that there was approximately $640 million in future revenue that Palantir expected from these arrangements, noting:

> [Analyst:] [J]ust had maybe 2 quick numbers, questions. ***Roughly, if we think about Q4 guidance, how much revenue do you expect to come from commercial contracts with investment arrangements in the quarter***? And then if it is possible to get what percentage of the total RPO would be recognized over the next 12 months?

> [Glazer:] So on the investment program, we're really excited about the opportunity here. Just to repeat some numbers and get some context with our Q4 guide, we're expecting 40% revenue growth for the year in 2021. That's over 1.5 billion for the year. We raised our cash flow guidance to an excess of $400 million. We've invested about – invested about $150 million through Q3.
>
> Total revenue from the program is about 2% of revenue for the year through Q3, ***and there's about $640 million of total revenue long term from this program at the end of the quarter***.

302. Between October 1, 2021 and December 31, 2021, the Individual Defendants sold nearly 10 million shares for proceeds of more than $237 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Karp | 8,638,548 | $23.43 | $208,170,411 |
| Cohen | 556,826 | $23.52 | $12,467,822 |
| Sankar | 585,330 | $20.90 | $12,209,945 |
| Glazer | 210,190 | $21.90 | $4,430,420 |

303. The statements detailed in ¶¶285-301 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶290, 292, 295 touting Palantir's operational efficiencies, the process for acquiring and onboarding new customers was, in fact, lengthy, time-consuming, and costly, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Further, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶285, 287-288, 291, 294, 301 that "it was a fantastic quarter across the board" and that margins, revenues, and operational results were improving and accelerating, Defendants understood that the growth rates of Palantir's revenue and deal value were declining and that but for Defendants' use of the SPAC Scheme to temporarily prop up their declining overall revenue growth rate, Palantir's growth rate would have fallen below the 30% annual growth Defendants disseminated to the market. Defendants knew at the time these statements were made that the organic commercial stagnation and government sequential deceleration were set to continue as they had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of their contracts and the fact that Palantir recognized revenue ratably, such that while a "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [they] recognize for that quarter, . . . such a decline would negatively affect [their] revenue in future quarters" (*supra* §§V.B., VI.C., VI.E.1.; *infra* §§VIII.C., IX.B.);

(c) that the Company's government segment was not "building" and "just at the beginning of big secular trends" as detailed in ¶299 above for the additional reason that in April 2021, Palantir was notified that the Navy planned to end an $84 million contract in February 2022 – a year earlier than the potential end date of February 2023 – and pay Palantir only $36 million or less than one-half the potential $84 million award amount (*supra* §VI.E.1.);

(d) that, contrary to Defendants' statements in ¶292 that COVID-19 was a source of long-term growth in new areas, Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure additional government contracts sufficient to offset the expected loss of the temporary increases

in government revenue from these contracts, and as a result thereof, Palantir's growth in government revenue had peaked in 4Q20 and had begun a sequential deceleration in 1Q21 (*supra* §§VI.B.-D., VI.E.1.; *infra* §VIII.C.), which Defendants were aware of given their admitted "strong visibility into future revenues across [their] customer base" (*supra* §§VI.D., VI.E.1.; *infra* §§IX.B., IX.E.);

(e) that it was not "[c]utting-edge product and continued innovation and distribution" that were driving Palantir's prospects and operations, as detailed in ¶295 above, but rather Defendants' SPAC Scheme was artificially inflating Palantir's financial and growth metrics (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(f) that the purported acceleration in Palantir's commercial customer count and customer base, deal volume, and average revenue per customer detailed in ¶¶287, 294, 298, 300 above were the product of the SPAC Scheme, which was designed to and did artificially inflate reported commercial growth, total deal value, commercial client base, revenue and margins by causing Palantir to "invest" in early-stage businesses (consisting primarily of SPAC target companies that had little or no revenue, and far less than $500 million in recurring annual revenue), in exchange for these businesses entering into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to afford or need in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(g) that, contrary to Defendants' statements in ¶301, Defendants' SPACs Scheme was expanding even beyond the inflated $640 million of total "long-term" revenue Defendants cited in their 3Q21 statistics (reaching $767.9 million as of December 31, 2021) (*supra* §§VI.E.2., VI.F.; *infra* §IX.C.);

(h) that, contrary to Defendants' statements in ¶¶288-290, 295, 298, 300-301 characterizing their SPAC investments as legitimate growth-enhancing investments in, and partnerships with, startups, in fact they were *quid pro quo* transactions undertaken for the purpose of concealing Palantir's stagnating growth by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins, with Defendants going so far as to conceal from Palantir's Form 10-Q the identity of various SPACs because they were early-stage businesses too nascent to afford or need Foundry in the manner and scope Defendants represented, including: (i) Starry Group (identified only as a "Telecommunications Company"); (ii) Allego (identified as an "Electric Vehicle Charging Company"); and (iii) Bird Global (identified as a "Mobility Company") (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.5.);

(i) that, contrary to Defendants' statements in ¶¶288-290, 295, 298, 300-301, Palantir was unlikely to ever receive a substantial portion of the SPAC-related revenue contracted for, as the involved companies were largely early-stage businesses with little to no revenue and thus were unable to pay for Palantir's products and services for the duration of the relevant contract periods and were too nascent to need or use Foundry in the manner and scale Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(j) that many of the SPACs, including several identified on the earnings call, were not able to reap the purported "commercialization" or "operations" benefits Defendants touted, or "scale rapidly from Day 0" using Foundry, contrary to Defendants' statements in ¶295, because they were too nascent to use Foundry in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(k) that Defendants did not "start[]" making SPAC investments to "supercharge earlier-stage companies" or "scale rapidly from Day 0," as detailed in ¶295 above, but instead

implemented the SPAC Scheme to buy revenue in roundtrip transactions so that Palantir could post artificially inflated growth (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(l) that Palantir's reported contribution margins for 3Q21 were inflated by the SPAC Scheme (*supra* §§VI.E.2., VI.F.; *infra* §§VIII.A., IX.C.);

(m) that, as a result of ¶303(a)-(l) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir would experience "rapid expansion in our customer base moving forward," as detailed in ¶296 above;

(n) that, as a result of ¶303(a)-(m) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶285-301 about the Company's business, operations, and prospects were false and misleading at all relevant times; and

(o) that, as a result of ¶303(a)-(n) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth every year from 2021 to 2025.

304. Each of the Defendants sold Palantir shares between October 1, 2021 and December 31, 2021, as detailed in ¶302, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶303(a)-(o) above.

**G. FY21 Earnings Report**

305. On February 17, 2022, Palantir issued a release containing the Company's fourth quarter and full year ended December 31, 2021 financial results (the "FY21 Release"). The FY21 Release revealed that Palantir's government business decelerated to just 26% year-over-year growth during the quarter, compared to a 76% year-over-year growth rate earlier in the year. The same day, on its website, Palantir issued FY 2021 Business Update (the "FY21 Business Update"). The FY21 Business Update revealed declining YoY contribution margins, falling from 62% in

4Q20 to 58% in 4Q21. That same day, Palantir released accompanying remarks which revealed that Palantir's total deal value at quarter's end was $3.8 billion, which also signaled significant business deceleration. In fact, absent Defendants' SPAC Scheme, Palantir's total deal value would have effectively shown no year-over-year growth at all. To conceal the true extent of Palantir's declining government prospects, Palantir entirely omitted government sector total deal value in Defendants' accompanying remarks. And, as later revealed, Palantir's total remaining deal value with its government customers had actually ***declined*** by $100 million year-over-year from FY20 to FY21.

306. The price of Palantir Class A common stock declined on this news, falling nearly 16% over a single trading day to $11.77 per share by market close on February 17, 2022, on abnormally high trading volume. However, the price of Palantir stock continued to trade at artificially inflated levels as Defendants failed to disclose the truth about Palantir's growth and prospects and reiterated that Palantir was on track to post annual revenue growth of 30% or greater through 2025.

307. The FY21 Release stated that Palantir had added 34 net new customers and that the Company's U.S. commercial revenue had grown 132% in 4Q21 as compared to 4Q20. It also reiterated the Company's "long-term guidance policy, as provided by our Chief Executive Officer, Alex Karp, ***we continue to expect . . . [a]nnual revenue growth of 30% or greater through 2025***."

308. That same day, Palantir also convened a conference call led by Karp with analysts and investors to discuss the Company's fourth quarter and full year 2021 results. During the call, Karp claimed that Palantir was on track to "double" its U.S. commercial growth in 2022, stating: "Obviously, to the extent we get this to work, you could expect even higher growth than what we have, although I'm very happy with. It was like we've doubled USG U.S. commercial now from

50 to 100, 100 to 200. ***I believe we will double it again this year***." Karp also touted that the SPAC-inflated "average sale price for Palantir Foundry across our business, I think last year, it was like $6.5 million."

309. To allay increasing concerns about Palantir's reliance on SPAC transactions, Karp also claimed that Palantir's commercial growth was not dependent on SPAC investments, stating:

> [Analyst:] Talk through your overall view on what you need to do on the sales force to get that building in the right direction. And what your plans for capacity are at in 2022?
>
> * * *
>
> [Karp:] So you see – even if you adjust for SPAC organic growth in commercial last year, U.S. was 80% or just under 80%, it's like 76%, 77%. But to your point, so – and you see dollar – net dollar retention numbers that you financial people like, how much is it growing? What I would call actually organically, I guess you guys call it net dollar retention. Very, very strong like in the 150% range. We have Glazer here, he'll pipe in with the – but it's roughly in that range.
>
> * * *
>
> So we will layer that. I think it's way too early to know exactly the impact. Obviously, to the extent we get this to work, you could expect even higher growth than what we have, although I'm very happy with. It was like we've doubled USG U.S. commercial now from 50 to 100, 100 to 200. ***I believe we will double it again this year***. So any case, these are – some of this is unknown, but we are working very aggressively.

310. Later in the call, when Karp was asked about the deceleration in government revenue, he claimed that the slowdown reflected short-term "lumpiness" that would end, stating: "***One, what will happen this year? Are there – is a deceleration in actual one over a long time series? The answer is clearly no***."

311. On February 24, 2022, Palantir filed with the SEC an annual report on Form 10-K, which contained the financial information provided in the FY21 Release and was signed by Karp, Glazer, Cohen, and Thiel. The FY21 Form 10-K reported a contribution margin of 58% for the year.

312. The FY21 Form 10-K also noted that Palantir had entered into various commercial contracts with early-stage companies in which it had invested worth up to $767.9 million, stating:

> During 2021, the Company approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, as further discussed in *Note 9. Commitments and Contingencies – Investment Commitments*, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, and commitments to purchase, the "Investments"). In connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products and services. ***The total value of such commercial contracts was $767.9 million as of December 31, 2021, which is inclusive of $116.2 million of contractual options***. The terms of such contracts, including contractual options, range from three to ten years. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.
>
> During 2021, the Company assessed the concurrent agreements under the non-monetary guidance within ASC 606 – *Revenue from Contracts with Customers* as well as the commercial substance of each arrangement considering the customer's ability and intention to pay as well as the Company's obligation to perform under each contract. ***The total revenue recognized from these commercial contracts during the year ended December 31, 2021 was $48.3 million***.

313. The FY21 Form 10-K also disclosed that the Company also had $134 million in outstanding PIPE commitments:

> As of December 31, 2021, we had outstanding approved investment commitments, subject to the applicable terms and conditions, to purchase a total of 13.5 million shares for an aggregate purchase price of $134.5 million. The closings of certain of such investments are contingent upon the completion of a proposed business combination between the applicable Investee and other applicable parties, and are subject to numerous terms and conditions, including approvals of the stockholders of applicable parties and regulatory review, which are inherently uncertain. . . .

314. The FY21 Form 10-K reiterated the claim that the Company's SPAC transactions would accelerate Palantir's reach "to the broadest possible set of customers," stating:

> We have recently begun to expand access to our platforms to early- and growth-stage companies, including startups, as we continue our outreach efforts to an increasingly broad swath of the potential market.

> ***The speed with which our platforms can be deployed has significantly expanded the range of potential customers with which we plan on partnering over the long term***. We anticipate that our reach among an increasingly broad set of customers, in both the commercial and government sectors, will accelerate moving forward. We believe that as these new partners grow, we will grow with them.
>
> We have also made a number of investments in companies whose businesses rely on the ability of their organizations to manage and analyze data effectively at scale.
>
> Our proximity to these businesses and the industries in which they are operating has enhanced, and is expected to continue enhancing, our own product and business development efforts, as we continue expanding access to our platforms to ***the broadest possible set of customers***.

315. The FY21 Form 10-K further highlighted Palantir's deal value, stating:

> ***As of December 31, 2021, the total remaining deal value of the contracts that we had been awarded by, or entered into with, commercial and government customers***, including existing contractual obligations and contractual options available to those customers, ***was $3.8 billion***. Of our total remaining deal value, as of December 31, 2021, $2.6 billion was the remaining deal value of our contracts with commercial customers and $1.2 billion was the remaining deal value of our contracts with government customers.

316. The FY21 Form 10-K stated that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software, stating:

> The COVID-19 pandemic has made clear to many of our customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

317. The FY21 Form 10-K also failed to disclose material information required under Item 303 of SEC Regulation S-K, as described below *infra* §VIII.

318. Several weeks later, at the March 10, 2022 Morgan Stanley Conference, Sankar stated that the Company was able to offer a more modular product and, as a result, was seeing an "acceleration in the sales cycle":

> [Analyst:] Right. ***That's a great transition to the next kind of part of the equation I want to talk to, which is the evolution of the go-to-market strategy***.

That monolithic platform solving the solution end-to-end, that's how the federal government pictures technology, right? They have a problem, they want you to come in and solve it. And what we found when we were talking to, like, commercial entities is, hey, listen, if I have a $200 million problem, Palantir makes a lot of sense. If I have a $20 million problem, it's hard to fit it into my architecture. And ***one of the things that I heard from Palantir, particularly on the most recent conference call, and I upgraded the stock on the back of it was, you're changing that dynamic. And you've been seeing it in terms of the product, you've been creating a more modular product on a go-forward basis***, but also the go-to-market is less adversarial with the IT department. We're not trying to replace. We're trying to augment and help you out with what you're trying to do.

[Sankar:] ***That's right***. I mean, I think, look, we've kind of screwed this up historically. I'd say we were really focused on creating extraordinary business value, selling to business users, avoiding IT. And what we've really pivoted the sales force to is sell to IT first. I don't even want you to have a business conversation until you understand what is IT trying to accomplish? What is the architecture that they have in place? How – what are the modules that we have that we even apply there? And then let's take that knowledge and then go find how we can create business value and bring it together in a way that both sides are really going to like.

***And we're seeing that acceleration in the sales cycle where the monolithic sale could happen really fast in the context of a crisis***. But absent that, you might be talking about a year or longer. And with a modular approach, the product that we have around HyperAuto, that's the software-defined data integration for ERP products, it's a 3-month sales cycle, it's a 1-day pilot. It's a price point IT can make a unilateral local decision on, and it creates an up-sell motion for us. It is the land that allows us to then expand as we go to the business, we solve more problems. We're already part of the [blessed] architecture, and it's a win for everyone.

319. Between January 1, 2022 and March 31, 2022, the Individual Defendants sold 813,080 shares for proceeds of nearly $8.8 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Cohen | 345,018 | $10.76 | $3,690,175 |
| Sankar | 266,872 | $10.76 | $2,854,356 |
| Glazer | 201,190 | $10.96 | $2,228,299 |

320. The statements detailed in ¶¶305-318 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants were:

(a) that, contrary to Defendants' statements in ¶¶314, 316, 318 touting Palantir's operational efficiencies and "acceleration in the sales cycle," acquiring and onboarding new customers was a lengthy, time-consuming, and costly process, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Further, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶305, 308, 311, 315 that margins, revenues, and operational results were improving and accelerating, Defendants understood that the growth rates of Palantir's revenue and deal value were declining and that but for Defendants' use of the SPAC Scheme to temporarily prop up their declining overall revenue growth rate, Palantir's growth rate would have fallen below the 30% annual growth Defendants disseminated to the market. Defendants knew at the time these statements were made that the organic commercial stagnation and government sequential deceleration were set to continue as they had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of their contracts and the fact that Palantir recognized revenue ratably, such that while a "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [they] recognize for that quarter, . . . such a decline would negatively affect [their] revenue in future quarters" (*supra* §§V.B., VI.C., VI.E.1.; *infra* §§VIII.C., IX.B.);

(c) that Defendants' statement of "what will happen this year? Are there – is a deceleration in actual one over a long time series? ***The answer is clearly no***," detailed in ¶310 above, was false and misleading because the government segment's growth rate already had been decelerating for more than a year and was expected by Defendants to continue for several quarters (*supra* §VI.E.1.);

(d) that the Company's government segment performance as detailed in ¶¶305, 308, 310, 315 above was materially false and misleading for the additional reason that in April 2021, Palantir was notified that the Navy planned to end an $84 million contract in February 2022 – a year earlier than the potential end date of February 2023 – and pay Palantir only $36 million or less than one-half the potential $84 million award amount (*supra* §VI.E.1.);

(e) that, contrary to Defendants' statements in ¶316 that COVID-19 was a source of long-term growth in new areas, Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure additional government contracts sufficient to offset the expected loss of the temporary increases in government revenue from these contracts, such that government TRDV had actually ***declined*** by $100 million year-over-year from FY20 to FY21 (*supra* §§VI.B.-G.; *infra* §§VIII.C., IX.B., IX.E.);

(f) that the purported acceleration in Palantir's commercial customer count and customer base, deal volume, and average revenue per customer detailed in ¶¶307-309 above were the product of the SPAC Scheme, which was designed to and did artificially inflate reported commercial growth, total deal value, commercial client base, revenue and margins by causing Palantir to "invest" in early-stage businesses (consisting primarily of SPAC target companies that

had little or no revenue, and far less than $500 million in recurring annual revenue), in exchange for these businesses entering into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to afford or need in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(g) that it was not the "speed with which [Palantir's] platforms can be deployed" that had "significantly expanded the range of potential customers with which [Palantir] plan[ned] on partnering over the long term," as detailed in ¶314 above, but rather it was Palantir's willingness to buy revenue through roundtrip transactions as part of Defendants' SPAC Scheme that was artificially inflating Palantir's posted financial metrics (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(h) that, contrary to Defendants' statements in ¶¶309, 312-314 characterizing their SPAC investments as legitimate growth-enhancing investments in, and partnerships with, start-ups to reach "to the broadest possible set of customers," in fact they were roundtrip transactions undertaken for the purpose of concealing Palantir's decelerating growth by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins, as demonstrated by, *inter alia*, Defendants' ongoing concealment of Allego and Starry Group by name until May 2022 (*supra* §§VI.E.6., VI.F.; *infra* §§VIII.A., IX.C.5.);

(i) that, contrary to Defendants' statements in ¶¶309, 312-314, Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Scheme, as the involved companies were largely early-stage businesses with little or no revenue and were thus unable to pay for Palantir's products and services for the duration of the relevant contract periods, and were too nascent to need or use Foundry in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §IX.C.);

(j) that Palantir's reported contribution margins for 4Q21 and FY21 were inflated by the SPAC Scheme (*supra* §§VI.E.2., VI.F.; *infra* §§VIII.A., IX.C.);

(k) that, as a result of ¶320(a)-(j) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶305-318 about the Company's business, operations, and prospects were false and misleading at all relevant times;

(l) that, as a result of ¶320(a)-(k) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report "double" growth in the commercial segment "again this year" as detailed in ¶¶308-309; and

(m) that, as a result of ¶320(a)-(l) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth every year from 2021 to 2025.

321. Each of the Defendants sold Palantir shares between January 1, 2022 and March 31, 2022, as detailed in ¶319, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶320(a)-(m) above.

**H. 1Q22 Earnings Report**

322. On May 9, 2022, Palantir issued a release containing the Company's financial results for the first quarter ended March 31, 2022. The 1Q22 Release revealed that Palantir expected only $470 million in revenue for the 2Q22, which would represent only 25% year-over-year growth – substantially below the Company's purported long-term revenue growth rate. The 1Q22 Release also revealed that Palantir's government revenue grew only 16% year-over-year.

323. That same day, Palantir filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 1Q22 Form 10-Q revealed that Palantir had received over $39 million in revenue from its SPAC Scheme during the quarter, meaning that without this

program, standalone revenue growth would have been ***only 19%*** during the 1Q22. Palantir convened a related earnings call with analysts and investors on May 9, 2022, and on the call Palantir executives further revealed that the Company's total deal value had actually ***declined by $300 million*** during the quarter to $3.5 billion and that the Company would be winding down its SPAC Scheme.

324. The price of Palantir Class A common stock declined on this news, falling 21% over a single trading day to $7.46 per share by market close on May 9, 2022, on abnormally high trading volume. However, the price of Palantir stock continued to trade at artificially inflated levels as Defendants continued to conceal the truth about Palantir's growth and prospects and reiterated that Palantir remained on track to post annual revenue growth of 30% or greater through 2025.

325. The 1Q22 Release stated that Palantir's customer count grew 86% year-over-year and that the Company's U.S. commercial revenue had grown 136% year-over-year during the quarter. It also reported that per the Company's "long-term guidance policy, as provided by our Chief Executive Officer, Alex Karp, ***we continue to expect . . . [a]nnual revenue growth of 30% or greater through 2025***."

326. Similarly, the 1Q22 Form 10-Q reported a contribution margin of 57% for the quarter, and stated that Palantir had entered into various commercial contracts with early-stage companies in which it had invested worth up to $754.9 million, stating:

> Since 2021, the Company has approved and entered into certain agreements ("Investment Agreements") to purchase, or commit to purchase, as further discussed in Note 7. Commitments and Contingencies – Investment Commitments, shares of various entities, including special purpose acquisition companies and/or other privately-held or publicly-traded entities (each, an "Investee," and such purchases, and commitments to purchase, the "Investments"). In connection with signing the Investment Agreements, each Investee or an associated entity and the Company entered into a commercial contract for access to the Company's products

> and services. ***The total value of such commercial contracts was $754.9 million as of March 31, 2022, which is inclusive of $116.2 million of contractual options***. The terms of such contracts, including contractual options, range from three to ten years. The majority of these commercial contracts are subject to various termination provisions, including for convenience in the event a proposed business combination is not completed.
>
> The Company assesses the concurrent agreements under the non-monetary guidance within ASC 606 – Revenue from Contracts with Customers as well as the commercial substance of each arrangement considering the customer's ability and intention to pay as well as the Company's obligation to perform under each contract. ***The total revenue recognized from these commercial contracts during the three months ended March 31, 2022 was $39.2 million***.

327. The 1Q22 Form 10-Q also reiterated the claim that the Company's SPAC transactions would accelerate Palantir's reach "to the broadest possible set of customers":

> We have recently begun to expand access to our platforms to early- and growth-stage companies, including startups, as we continue our outreach efforts to an increasingly broad swath of the potential market.
>
> ***The speed with which our platforms can be deployed has significantly expanded the range of potential customers with which we plan on partnering over the long term***. We anticipate that our reach among an increasingly broad set of customers, in both the commercial and government sectors, will accelerate moving forward. We believe that as these new partners grow, we will grow with them.
>
> We have also made a number of investments in companies whose businesses rely on the ability of their organizations to manage and analyze data effectively at scale.
>
> Our proximity to these businesses and the industries in which they are operating has enhanced, and is expected to continue enhancing, our own product and business development efforts, as we continue expanding access to our platforms to the ***broadest possible set of customers***.

328. The 1Q22 Form 10-Q also maintained that the COVID-19 pandemic continued to result in customers increasingly adopting Palantir's software:

> The COVID-19 pandemic has made clear to many customers that accommodating the extended timelines ordinarily required to realize results from implementing new software solutions is not an option during a crisis. ***As a result, customers are increasingly adopting our software, which can be ready in days***, over internal software development efforts, which may take months or years.

329. The 1Q22 Form 10-Q also failed to disclose material information required under Item 303 of SEC Regulation S-K, as described below *infra* §VIII.

330. On May 9, 2022, Palantir convened a conference call with analysts and investors, led by Karp, Glazer, Kawasaki, and Sankar, to discuss the Company's 1Q22 results. During his prepared remarks, Sankar claimed that "world events ha[d] accelerated [Palantir's] opportunity in Western and Northern Europe." Glazer similarly highlighted the purported durability and reacceleration of the Company's revenue growth trends in both its commercial and government segments, stating:

> As Alex and Shyam highlighted, we're uniquely positioned for unstable times. We work with some of the most crucial and important institutions in the world. ***The U.S. government was 42% of our first quarter revenue and has been a leading driver of growth for 8 years, with a 30% CAGR from 2013 to 2021, which we view as a long-term trend***.
>
> More fundamentally, we believe supplying our products to the U.S. government and her allies is a core pillar of our business. As Alex mentioned, in the face of substantial macroeconomic and geopolitical challenges and uncertainty, ***the quality of our revenue as viewed through growth, margin performance and durability and especially resilience is unique to Palantir***.
>
> As Alex wrote in his letter, we combine the resilience of the defense industrial sector with the growth of a software company. In the face of our customers' challenges, we have and will continue to incur expenses prior to having contracts in the delivery of mission-critical capabilities. Following these investments, ***we expect acceleration of our U.S. government revenue into the second half of the year. In Q2 to date, we've already seen the reacceleration of U.S. government revenue and expect acceleration of the overall government segment to follow in the next quarter or shortly thereafter***.
>
> I'll now review our first quarter performance, followed by our outlook. First quarter revenue grew 31% year-over-year ahead of our prior guidance to $446 million. Overall net dollar retention was 124%. ***Commercial revenue growth accelerated for the fifth consecutive quarter***. First quarter commercial revenue increased 54% year-over-year to $205 million, up from a 47% increase in the fourth quarter. ***Commercial growth continues to be driven by our U.S. business as U.S. commercial revenue growth accelerated to 136% in the first quarter, up from 132% in Q4***.

331. Glazer also reaffirmed the Company's long-term revenue guidance, stating:

> Continuing to execute the guidance strategy set forth by our CEO, Alex Karp, in our year-end 2020 earnings call with regard to long-term revenue guidance, we are providing and ***will continue to provide guidance of 30% or greater revenue growth for this year and the next 3 years at each earnings call***.

332. During the question-and-answer portion of the call, Sankar was asked about the "reacceleration" Palantir was purportedly experiencing in its U.S. government business:

> [Analyst:] Regarding the government business, can you talk to the acceleration that you're seeing in the business? And I think you called out the United States as where you're seeing the reacceleration. Can you also speak to the rest of the world and what you're seeing there?"
>
> [Sankar:] . . . We've been working with the U.S. government for 15 years. And over the last decade, we've seen a 30% CAGR, and that covers times at peace and times of conflict. And I've already talked about our involvement with current events and the role that we're playing there. ***And you can kind of see the reacceleration starting to happen with the wins***.
>
> * * *
>
> ***And so the end result of this is that in Q2, we've started to see the U.S. government business reaccelerate***. We're doing a substantial amount of work right now where we are investing in our customers, and we expect that work to have both short term but also longer-term payouts. We're doing work now that matters and will likely be contracted. But we're also doing work that is defining the requirements for defense procurements over the decades to come here.

333. Kawasaki similarly claimed that there was ongoing acceleration in both the commercial and government segments:

> [Analyst:] I'm hoping that you can. I think you guys might have come cut out on me. But I wanted to double-click on the range of upside that you referred to in your Q2 guidance. How much of that variability is coming from commercial versus government? And how should we think about the variability and what it means for your 30% revenue and 27% margin guide for the full year?
>
> [Kawasaki:] . . . So in this macro environment, ***we feel very well positioned for the full year and beyond***. Our U.S. government revenue represented 42% of our Q1 revenue, and a significant amount of this is in the defense space. ***Our commercial business has been outpacing the government business, accelerating in each of the last 5 quarters to a 54% growth rate in Q1***. And as Shyam just mentioned, in Q2, we've already seen some reacceleration in the U.S. government business, which we think is a long-term trend and ***expect acceleration of the overall government segment this quarter or shortly after***.

334. During the call, Kawasaki further maintained that Palantir's commercial growth was not dependent on its SPAC Scheme:

> [Nelson – Head of Palantir IR:] [C]an you comment on the SPAC partnership strategy and its impact on the financials?
>
> [Kawasaki:] . . . Revenue from these contracts has peaked in Q1 at around $39 million. And we will not have additional new customers from this program as we've wound the program down. Going forward, expect about $30 million of revenue per quarter from these customers, revenue in Q1 is higher as a result of some catch-up of about $9 million recognized in the quarter, reflecting work we started last year. We also saw roughly a negative $0.02 impact on earnings per share from the marketable securities.
>
> ***When you look at this by geography, you'll see continued strength and growth in the U.S. business, ex SPACs, growing at 65% year-over-year and 9% sequentially quarter-over-quarter. We had our strongest quarter for winning new commercial customers overall. Commercial customer count up 25% sequentially and up 207% from a year ago. And in the United States, commercial customer count grew 368%. We expect continued growth in commercial customer acquisition. And as Alex mentioned, we see a path to double our U.S. commercial revenue again***.

335. Between April 1, 2022 and June 30, 2022, Defendants sold 724,550 shares for proceeds of nearly $5.8 million:

| Defendant | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---:|---:|---:|
| Cohen | 354,493 | $7.89 | $2,831,002 |
| Sankar | 274,390 | $7.89 | $2,191,294 |
| Glazer | 95,637 | $7.89 | $763,762 |

336. The statements detailed in ¶¶322-334 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by Defendants included:

(a) that, contrary to Defendants' statements in ¶¶327-328 touting operational efficiencies and the "speed with which [their] platforms can be deployed," acquiring and onboarding new customers was a lengthy, time-consuming, and costly process, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, landing new customers required Palantir to search for and find a reason why a potential

client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Also, as Palantir moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C.; *infra* §§VIII.C., IX.B.);

(b) that, contrary to Defendants' statements in ¶¶325-326, 330, 332-334 that "the quality of our revenue as viewed through growth, margin performance and durability and especially resilience is unique to Palantir" and that margins, revenues, and operational results were improving and accelerating, Defendants understood that the growth rates of Palantir's revenue and deal value were declining and that but for Defendants' use of the SPAC Scheme to temporarily prop up their declining overall revenue growth rate, Palantir's growth rate would have fallen below the 30% annual growth Defendants disseminated to the market. Defendants knew at the time these statements were made that the organic commercial stagnation and government sequential deceleration were set to continue as they had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of their contracts and the fact that Palantir recognized revenue ratably, such that while a "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [they] recognize for that quarter, . . . such a decline would negatively affect [their] revenue in future quarters" (*supra* §§VI.C., VI.E.1.; *infra* §§VIII.C., IX.B.);

(c) that, contrary to Defendants' statement in ¶334 that "[w]hen you look at this by geography, you'll see continued strength and growth in the U.S. business, ex SPACs, growing at 65% year-over-year and 9% sequentially quarter-over-quarter," Defendants' statement was



4887-3633-1341.v3

materially false and misleading for the additional reason that but for Defendants' use of the SPAC Scheme to temporarily prop up the Company's declining overall revenue growth rate, Palantir would have fallen farther below the Company's 30% long-term annual growth target. In addition, for the same reasons discussed above in (b), Defendants also had "strong visibility" into the commercial segment's revenue growth performance and therefore knew at the time they spoke that organic growth had stagnated over a year later and would not meaningfully recover (*supra* §§V.B., VI.C.-D., VI.E.1.; *infra* §§VIII.C., IX.B.);

(d) that Defendants' statement in ¶332 that they could "see the reacceleration starting to happen with the wins" in the U.S. government business was false and misleading for the additional reason that it failed to disclose that the Navy had ended an $84 million contract on February 9, 2022 – a whole year earlier than the potential end date of February 2023 – paying Palantir only $36 million of the potential $84 million award amount (*supra* §VI.E.1.);

(e) that, contrary to Defendants' statements in ¶328 that COVID-19 had created a tailwind for Palantir by virtue of customers "increasingly adopting [its] software," Palantir's government segment's revenue and deal value had in fact been temporarily inflated by short-term contracts entered into by government agencies in connection with their responses to the COVID-19 pandemic, and Palantir had failed to secure sufficient additional government contracts to offset the expected loss of the temporary increases in government revenue from these contracts (*supra* §§VI.B.-D., VI.E.1.; *infra* §§VIII.C., IX.B., IX.E.);

(f) that the purported acceleration in Palantir's commercial customer count and customer base, deal volume, and average revenue per customer detailed in ¶¶325, 330, 333-334 above were the product of the SPAC Scheme, which was designed to and did artificially inflate reported commercial growth, total deal value, commercial client base, revenue and margins by

causing Palantir to "invest" in early-stage businesses (consisting primarily of SPAC target companies that had little or no revenue, and far less than $500 million in recurring annual revenue), in exchange for these businesses entering into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to afford or need in the manner and scope Defendants represented (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(g) that, contrary to Defendants' statements in ¶¶326-327, 334 characterizing their SPAC investments as legitimate growth-enhancing investments in, and partnerships with, start-ups, in fact they were roundtrip transactions undertaken for the purpose of concealing Palantir's stagnating growth by artificially inflating the Company's reported growth, total deal value, commercial client base, revenue and margins (*supra* §§VI.E.-F.; *infra* §§VIII.A., IX.C.);

(h) that, contrary to Defendants' statements in ¶¶325-327, 330, 333-334, Palantir was unlikely to ever receive a substantial portion of the revenue contracted for under the Company's SPAC Scheme, as the involved companies were largely early-stage businesses with little or no revenue and were thus unable to pay for Palantir's products and services for the duration of the relevant contract periods, and were too nascent to need or use Foundry in the manner and scale Defendants represented (*supra* §§VI.E.-F.; *infra* §IX.C.);

(i) that Palantir's reported contribution margins for 1Q22 were inflated by the SPAC Scheme (*supra* §§VI.E.2., VI.F.; *infra* §§VIII.A., IX.C.);

(j) that, as a result of ¶336(a)-(i) above, Palantir's historical revenue, deal value, and client metrics and Defendants' statements in ¶¶322-334 about the Company's business, operations, and prospects were false and misleading at all relevant times;

(k) that, as a result of ¶336(a)-(j) above, Defendants had no reasonable basis to expect and did not in fact expect "acceleration of [Palantir's] U.S. government revenue into the second half of the year" as detailed in ¶330 above;

(l) that, as a result of ¶336(a)-(k) above, Defendants had no reasonable basis to expect and did not in fact expect that Palantir would post "continued strength and growth in the U.S. business, ex SPACs, growing at 65% year-over-year and 9% sequentially quarter-over-quarter" as detailed in ¶334 above; and

(m) that, as a result of ¶336(a)-(l) above, Defendants had no reasonable basis to believe and did not in fact believe that Palantir was positioned to report greater than 30% annual revenue growth each year from 2022 to 2025.

337. Each of the Defendants sold Palantir shares between April 1, 2022 and June 30, 2022, as detailed in ¶335, notwithstanding each Defendant's duty to abstain from insider selling or disclose the adverse information detailed in ¶336(a)-(m) above.

338. On August 8, 2022, Palantir issued a release containing the Company's financial results for the second quarter ended June 30, 2022 (the "2Q22 Release"). The 2Q22 Release stated Palantir expected 2022 revenues to be in a range of $1.9 billion to $1.902 billion and stated "revised guidance excludes ***any*** new major U.S. government awards."

339. Notably, Palantir's 2022 expected revenues represented an annual YoY revenue growth rate of only 23%, substantially below the Company's long-term guidance of at least 30% growth annually, and despite Defendants reaffirming this figure nearly halfway through the quarter. The release did not state that this growth rate was achievable for subsequent years.

340. The next day, on August 9, 2022, analysts at RBC Capital Markets published an analyst report that provided a deep dive into Palantir's SPAC Scheme. The report stated: "Most

importantly, we estimate the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is ***$406M*** (note some of this may have already been recognized) and count ***at least 15 SPAC customers that have substantial doubt as going concerns*** (based on their respective filings)." The report continued: "21 of these companies are now publicly listed; none of the 20 listed SPACs are trading above their $10 reference price (***the vast majority are now trading in the <$5 penny stock range***)."

341. The price of Palantir Class A common stock declined again on this news, falling 19% over two trading days (-14.2% on August 8, 2022 and -5.8% on August 9, 2022) to $9.25 per share by market close on August 9, 2022, on abnormally high trading volume, while the S&P 500 Index fell only 0.5%.

## VIII. DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS" AND OTHER MATERIAL INFORMATION IN VIOLATION OF ITEM 303 OF REGULATION S-K

342. By 2Q21, Palantir's SEC filings, including its Forms 10-Q filed with the SEC on May 12, 2021, August 12, 2021, November 9, 2021, and May 9, 2022 and Form 10-K filed February 24, 2022, failed to disclose material information required pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303"). Item 303 requires disclosure of information relevant to assessing a registrant's financial condition, changes in financial condition, and results of operations in a section of SEC filings referred to as "Management's Discussion and Analysis of Financial Condition and Results of Operations," or "MD&A." The SEC created specific rules governing the content of MD&A disclosures to provide material historical and prospective disclosures that enable investors to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future. Regarding the objectives of MD&A disclosures, the SEC has stated:

> [O]ne of the principal objectives of MD&A is to give readers a view of the company through the eyes of management. . . .
>
> * * *
>
> ***One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends***, demands, commitments, events and uncertainties.
>
> * * *
>
> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ***ascertain the likelihood that past performance is indicative of future performance***. Ascertaining this indicative value depends to a significant degree on the quality of disclosure about the facts and circumstances surrounding known material trends and uncertainties in MD&A.

343. Among other things, Item 303 requires the following disclosures in the MD&A section of SEC filings:[18]

> (i) Material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;
>
> (ii) Any known trends or uncertainties that have had or the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;

---

[18] In November 2020, the SEC adopted certain amendments to simplify and enhance the financial disclosure requirements in Regulation S-K, including Item 303. The November 2020 release (No. 33-10890) formalizes the MD&A objectives from the SEC's 2003 and 1989 interpretive releases as 303(a), requiring that a registrant must provide a discussion and analysis that allows an investor to see the company "from management's perspective." Such disclosure must, on the basis of "management's assessment," address matters that are reasonably likely to have a material impact on future operations. The November 2020 release also formalizes Item 303(b)(2)(ii) which requires a registrant to disclose (i) any known trends or uncertainties that have had or are reasonably likely to have a material impact on revenues or income and (ii) any known events that are "reasonably likely to cause a material change in the relationship between costs and revenues." Under the "reasonably likely" requirement, the registrant must disclose a known trend or uncertainty if it (i) is reasonably likely to occur; and (ii) would be material to the registrant if it did occur.

(iii) Unusual or infrequent transactions that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on the relationship between revenue and the costs of the revenue;

(iv) Significant components of revenues and expenses that are necessary in order to understand the results of operations; and

(v) Key performance indicators and other metrics necessary for an understanding and evaluation of a company.

344. As detailed below, Palantir violated Item 303 by failing to disclose the following material information in the MD&A section of its Class Period SEC filings:

(a) Palantir failed to disclose the impact of the SPAC Scheme on its commercial segment profit margins;

(b) Palantir failed to disclose key performance indicators and other metrics that were necessary to understand and evaluate the Company's stated business model; and

(c) Palantir failed to disclose material segment-level information with respect to commercial segment expenses and profit margins.

### A. Palantir Concealed the Impact of the SPAC Scheme on Its Commercial Segment Profit Margins

345. As described herein, in an effort to conceal decelerating revenue growth and declining profitability during the Class Period, Palantir artificially inflated its commercial segment revenues and profits by engaging in roundtrip revenue transactions with certain SPAC companies that it had also invested in. *Supra* §§VI.E.-F.; *infra* §IX.C.

346. The SPAC Scheme had a material impact on Palantir's reported results during the Class Period. For example, as shown in the chart below, SPAC-based revenue represented a significant percentage of Palantir's reported commercial segment revenue growth during the Class Period. Adjusting for the SPAC revenue, the actual revenue growth rate in Palantir's commercial segment was materially lower than what Palantir reported each quarter.

| | 2021 | | | 2022 | |
|---|---|---|---|---|---|
| | Q2 | Q3 | Q4 | Q1 | Q2 |
| **Commercial Revenue** | $ 143,523,000 | $ 174,310,000 | $ 193,886,000 | $ 204,567,000 | $ 210,012,000 |
| **Reported y/y growth** | **28%** | **37%** | **47%** | **54%** | **46%** |
| | | | | | |
| **SPAC-based revenue** | $ 3,000,000 | $ 19,000,000 | $ 26,300,000 | $ 39,200,000 | $ 31,400,000 |
| **as % of total growth** | 10% | 40% | 43% | 55% | 43% |
| | | | | | |
| **Revenue growth ex-SPAC** | **25%** | **22%** | **27%** | **25%** | **27%** |

347. In addition to inflating Palantir's reported revenue growth, the SPAC Scheme, which involved revenue contracts with distinctly different margin characteristics than Palantir's existing commercial revenue contracts, also artificially boosted the Company's reported commercial segment profit margins. Palantir's traditional sales cycle involved comprehensive pilot projects for prospective customers in which Palantir incurred significant upfront costs while earning little to no revenue. Conversely, the SPAC contracts were entered into with smaller customers as part of a roundtrip equity investment arrangement, and the sales and engineering costs associated with landing the contracts were *de minimis* compared to organically acquired commercial customers. In contrast to the expenses incurred when closing a deal with an ordinary customer, the SPAC deals involved no salespeople and could be supported by a small fraction of the Palantir engineers called for in an ordinary commercial pilot because the SPACs received an off-the-rack, partial version of Foundry. Thus, the SPAC deals were designed to appear to be more lucrative and higher quality than ordinary commercial deals and, importantly, allowed Palantir to report far higher contribution margins. As a result, the increase in the volume of SPAC revenue contracts was designed to, and did, materially distort and inflate Palantir's reported profit margins for the commercial segment.

348. As shown in the chart below, this allowed Palantir to report commercial segment profit margins greater than 50% during the Class Period despite the difficulties it was having reaching new commercial customers.

| | 2021 | | | 2022 | |
|---|---|---|---|---|---|
| | Q2 | Q3 | Q4 | Q1 | Q2 |
| Commercial Contribution Margin | 52.3% | 56.3% | 57.6% | 55.0% | 51.8% |

349. Failing to disclose the significant impact of SPAC revenue contracts on reported commercial segment contribution margins was a material omission and violated Item 303. Palantir considered contribution margin to be a "Key Business Measure" during the Class Period, stating in the FY21 Form 10-K that "we believe that it also provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management team." Palantir also stated that management analyzed and viewed contribution margin as an important measure "across the business ***and on specific customer accounts***." Palantir further acknowledged that a significant component affecting contribution margin was "sales and marketing expenses involved in acquiring and expanding our partnerships with those customers." Because SPAC revenue contracts were signed outside the traditional sales cycle, without the need for cost-intensive pilot projects, the sales and marketing and engineering expenses incurred by Palantir were significantly lower, and the contribution margin was thereby significantly higher, than with ordinary commercial customers. Despite the admittedly critical importance of the contribution margin metric to management and investors, Palantir did not disclose the SPAC Scheme's significant impact on its reported contribution margins in the MD&A of its SEC filings beginning with the 2Q21 Form 10-Q.

350. SEC MD&A disclosure rules explicitly required Palantir to disclose the material information, described above, regarding the impact of the SPAC revenue transactions on profit margins. For example, an authoritative SEC Staff Accounting Bulletin requires registrants to make certain MD&A disclosures with respect to revenue, including:

> ***An increasing trend toward sales to a different class of customer***, such as a reseller distribution channel that has a ***lower gross profit margin than existing sales*** that

> are principally made to end users. Also, increasing service revenue that has ***a higher profit margin*** than product sales.[19]

The increase in SPAC customers represented an ***increasing trend toward sales to a different class of customer***, with distinctly different margin characteristics than Palantir's existing customer base, as contemplated by the SEC disclosure requirements. Palantir was also required to address the impact of the SPAC revenue transactions in terms of the relationship between reported revenues and costs. Item 303 requires: "If the registrant knows of events that are ***reasonably likely to cause a material change in the relationship between costs and revenues*** . . . , the change in the relationship must be disclosed."[20] The significant increase in SPAC revenue contracts impacted the relationship between Palantir's commercial segment revenue and costs. Tellingly, Defendants explicitly acknowledged the importance of this revenue and cost relationship in the FY21 Form 10-K but failed to disclose how SPAC contracts affected it: "We believe that the revenue we generate relative to the costs we incur in order to generate such revenue is an important measure of the efficiency of our business."

### B. Palantir Concealed Key Performance Indicators and Other Metrics that Were Necessary to Understand and Evaluate the Company's Business Model

351. As described herein, in an effort to conceal decelerating growth and profitability trends during the Class Period, Palantir frequently changed the key operating metrics it disclosed to investors. *Supra* §VI.G. This included eliminating key metrics in the MD&A section of its Class Period SEC filings. The key metrics that were eliminated were central to Palantir's stated business model and critical to understanding and evaluating the Company's performance.

---

19 SEC Codification of Staff Accounting Bulletins, Topic 13: Revenue Recognition.

20 SEC Regulation S-K Item 303(b)(2)(i).

352. In the Registration Statement, Palantir identified its business model with respect to acquiring and growing customer accounts as "Acquire, Expand, Scale." The model and its three phases are described *supra* §V.B.

353. From the start of the Class Period through December 31, 2021, Palantir presented detailed quantitative disclosures regarding its business model and the "Acquire, Expand, Scale" customer phases in its SEC filings, including the amount of revenue generated from customers and the contribution margins in each phase. The "Acquire, Expand, Scale" disclosures were critical to investors during the Class Period to gauge the Company's growth prospects of its commercial segment. As described above in §V.B., Palantir's traditional sales cycle involved comprehensive pilot projects for prospective new commercial customers in which Palantir incurred significant upfront costs without earning any revenue. Palantir stated that its entire business model hinged on successfully transitioning customers from one phase to the next and assured investors that "[w]e believe that all of our customers will move into the Scale phase over the long term." Thus, the "Acquire, Expand, Scale" disclosures were the only way for investors to evaluate Palantir's stated business model and growth prospects.

354. Despite the critical importance of these disclosures, Palantir abruptly eliminated all disclosures related to the Company's "Acquire, Expand, and Scale" phases beginning with the Form 10-Q for the period ended March 31, 2022, as depicted in the chart below.

| | 2020 | | 2021 | | | | 2022 | |
|---|---|---|---|---|---|---|---|---|
| (in millions) | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| Current YTD revenue from customers in the Acquire phase at the end of the prior FY | $ 41.1 | $ 77.1 | $ 3.6 | $ 8.0 | $ 15.6 | $ 45.1 | Not Disclosed | |
| Current YTD contribution margin from customers in the Acquire phase at the end of the prior FY | $ (4.2) | $ 13.2 | $ (4.3) | $ (7.5) | $ (7.1) | $ 7.2 | | |
| Current YTD revenue from customers in the Expand phase at the end of the prior FY | $ 254.4 | $ 360.4 | $ 12.4 | $ 48.9 | $ 62.1 | $ 83.3 | Not Disclosed | |
| Current YTD contribution margin from customers in the Expand phase at the end of the prior FY | $ 104.3 | $ 169.4 | $ 0.5 | $ 25.4 | $ 27.9 | $ 37.5 | | |
| Current YTD revenue from customers in the Scale phase at the end of the prior FY | $ 452.2 | $ 613.4 | $ 324.8 | $ 651.1 | $ 993.4 | $ 1,300.0 | Not Disclosed | |
| Current YTD contribution margin from customers in the Scale phase at the end of the prior FY | $ 312.0 | $ 429.4 | $ 214.4 | $ 416.7 | $ 635.8 | $ 819.0 | | |

355. SEC MD&A disclosure rules explicitly required Palantir to disclose the Company's key performance indicators and other metrics used internally by management. In particular, the SEC required disclosures concerning the Company's "Acquire, Expand and Scale" phases that were critical to the Company's stated business model and were undeniably closely tracked and utilized by Defendants to manage the business, as described above. The SEC issued guidance on Key Performance Indicators and Metrics in February 2020, stating:

> When proposing the current MD&A framework, the Commission noted that "***[f]or each business, there is a limited set of critical variables which presents the pulse of the business***." . . . The Commission also previously stated that companies should identify and address those key variables and other qualitative and quantitative factors that are peculiar to and necessary for an understanding and evaluation of the individual company. ***Such information could constitute key performance indicators and other metrics***.[21]

* * *

[21] SEC Release Nos. 33-10751; 34-88094; FR-87; Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operations.

> The company should provide a narrative that enables investors to see a company "through the eyes of management," so these ***metrics should not deviate materially from metrics used to manage operations or make strategic decisions***.

356. The SEC has also stated:

> [O]ne of the principal objectives of MD&A is to give readers a view of the company through the eyes of management. . . . [C]ompanies should "identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."
>
> Financial measures generally are the starting point in ascertaining these key variables and other factors. However, financial measures often tell only part of how a company manages its business. Therefore, when preparing MD&A, ***companies should consider whether disclosure of all key variables and other factors that management uses to manage the business would be material to investors, and therefore required***.[22]

357. With respect to Palantir abruptly changing the metrics it provided to describe its own business model, it was also required to disclose the reason for the change. According to SEC guidance:

> ***If a company changes the method by which it calculates or presents the metric from one period to another or otherwise, the company should consider the need to disclose, to the extent material***: (1) the differences in the way the metric is calculated or presented compared to prior periods, (2) the reasons for such changes, (3) the effects of any such change on the amounts or other information being disclosed and on amounts or other information previously reported, and (4) such other differences in methodology and results that would reasonably be expected to be relevant to an understanding of the company's performance or prospects.[23]

---

[22] SEC Release 33-8350; 34-48960; FR-72; Interpretive guidance regarding the disclosure commonly known as Management's Discussion and Analysis of Financial Condition and Results of Operations, or MD&A, which is required by Item 303 of Regulation S-K, Items 303.

[23] SEC Release Nos. 33-10751; 34-88094; FR-87; Commission Guidance on Management's Discussion and Analysis of Financial Condition and Results of Operations.

### C. Palantir Failed to Disclose Material Segment-Level Information Including Commercial Segment Expenses and Profit Margins

358. To further conceal slowing revenue growth and declining profits within the commercial segment, Palantir omitted material segment-level information, including commercial segment expenses, margins, and profits. It is widely understood that Palantir's business consists of two distinct segments: government and commercial. Segment-level financial information was, at all times, critical for investors to understand and evaluate the Company's results. Segment-level financial information was also undeniably closely tracked and utilized by Defendants to manage the business. For example, Palantir frequently discussed "segment profitability" and acknowledged that "we use [segment profitability], in part, to evaluate the performance of, and allocate resources to, each of our segments" such as in its FY20 Form 10-K. As described below, this information was critical to investors in assessing the standalone profitability and growth prospects of Palantir's two segments, and the commercial segment in particular. And Palantir disclosed certain high-level, segment-level information to investors, including revenue, while concealing other readily available and material information, such as segment-level gross margins, cost of sales, and selling and marketing expenses.

359. At the start of the Class Period, Palantir's two segments had different growth strategies, employed different approaches to the sales cycle and acquiring new customers, and, as a result, had distinctly different expense and profit margin characteristics. As the Company acknowledged in the Registration Statement, the growth strategy for the commercial segment included: "Continue[d] expansion . . . pursu[ing] new methods of customer acquisition and partnership . . . [including] specific channel-selling opportunities . . . [and] investing in an account-based sales force to identify new customers and opportunities." As described herein, Palantir's business model, particularly in the commercial segment, centered around identifying potential

customers and conducting cost-intensive pilot projects, at no cost to the potential customers, in an attempt to close a new subscription revenue contract. The costs associated with commercial pilot projects were a significant component affecting the segment's profitability (segment profitability is impacted by "sales and marketing expenses involved in acquiring and expanding our partnerships with those customers"). However, Palantir did not disclose sales and marketing expenses, or cost of sales, for the commercial segment. Thus, investors had no way of evaluating the Company's success in operating its stated business model of acquiring new commercial customers through costly pilot projects that may or may not lead to revenue contracts. Instead, Palantir only disclosed sales and marketing expense as a combined total Company-wide expense, *i.e.*, a total expense for both the commercial and government segments combined. This obscured the underlying financial results of each respective segment and was inconsistent with how Defendants analyzed the two distinct segments internally.

360. Early in the Class Period, Palantir reported a trend of declining Company-wide sales and marketing expenses, excluding stock-based compensation. This decline was primarily due to reduced travel costs related to the COVID-19 pandemic. The decline in selling costs, when combined with strong revenue growth in both the commercial and government segments, was viewed as a positive trend by analysts and investors.

361. Palantir itself acknowledged the importance of the relationship between selling costs and profit margins on the one hand and revenue growth on the other: "[O]ur financial performance relies heavily on an effective balance between driving continued growth and improving margins across the business." Palantir's reported results, at a Company-wide level, appeared to indicate that Palantir's go-to-market strategy, including its reliance on costly customer pilot projects, was effective at reaching new cohorts of commercial customers, and growing the

business profitably. However, the underlying results in the commercial segment were just the opposite. As shown in the chart below, by 2Q21, the reported Company-wide selling costs started spiking and the relationship between revenue growth and the costs incurred to achieve that revenue growth significantly deteriorated. Palantir's failure to disclose a complete picture of segment-level results allowed the Company to conceal the growth difficulties, deterioration in customer demand, and the spike in selling costs it was experiencing in its commercial segment.

| | 2020 | | 2021 | | | | 2022 | |
|---|---|---|---|---|---|---|---|---|
| | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| **Sales & Marketing Expense** | $ 70,953,000 | $ 71,767,000 | $ 78,811,000 | $ 90,371,000 | $ 96,319,000 | $ 106,101,000 | $ 111,213,000 | $ 119,470,000 |
| **y/y increase (decrease)** | -32% | -20% | -2% | **44%** | **36%** | **48%** | **41%** | **32%** |

362. SEC MD&A disclosure rules explicitly required Palantir to disclose the material segment-level information described above. In particular, the SEC requires disclosures concerning the Company's gross margins and selling and marketing costs at the segment level. The SEC has described segment disclosures as "arguably one of the most important disclosures in the financial statements."[24] Item 303 states:

> Where in the registrant's judgment ***a discussion of segment information*** and/or of other subdivisions . . . of the registrant's business ***would be necessary to an understanding of such business***, the discussion must focus on each relevant reportable segment and/or other subdivision of the business and on the registrant as a whole.

363. The disclosure of selling expenses and margins at the commercial segment level were also required under SEC guidance on Key Performance Indicators and Metrics, as described above in §VIII.B. For example, the SEC has stated: "The company should provide a narrative that enables investors to see a company '***through the eyes of management***,'' so these ***metrics should***

[24] Dan Murdock, Deputy Chief Accountant, Office of the Chief Accountant, *Remarks before the 2014 AICPA Conference on Current SEC and PCAOB Developments*, Washington, D.C., Dec. 8, 2014.

***not deviate materially from metrics used to manage operations or make strategic decisions***." As described herein, Defendants undeniably monitored and utilized commercial segment selling expenses, costs of revenue, gross margins, and profitability to manage the business.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

364. As described above, Defendants devised a scheme to take Palantir public and cause Palantir shares to trade at artificially inflated prices so that Defendants could sell billions of dollars of their own Palantir shares. *Supra* §§VI., VII. This section further details Defendants' scienter.

### A. The Scheme Required the Participation and Approval of Karp, Thiel, and Cohen

365. Defendants' scheme could not have been conceived nor could it have been implemented without Palantir's cofounders – Individual Defendants Karp, Cohen, and Thiel. While the Company's Board comprised six directors at the time of the Offering, it was only expanded to that number of seats two months earlier in July 2020, the same month the plan to take Palantir public was put in motion when the Company announced it had confidentially submitted a draft registration statement with the SEC for a proposed public offering of its Class A common stock via direct listing. Thiel (Chairman), Karp, and Cohen filled three of the four Board seats.

366. A facet of the scheme was sweetening the pot for Karp and Cohen. The same month the announcement to take Palantir public was made, Palantir's Board (of which the cofounders comprised half) established a Special Compensation Committee to assess the propriety of Karp's, Cohen's, and Sankar's compensation given that their previous individual equity grants would largely vest by 2022 (*i.e.*, Karp's 68.9 million stock options, which were set to expire in December 2021). Thiel advocated to the Special Compensation Committee in support of awards to his longtime friends. Ultimately, the Special Compensation Committee granted the following Executive Options and Executive RSUs:

| Named Executive Officer | Number of Shares of Class B Common Stock Covered by Award | Type of Award |
|---|---|---|
| Alexander Karp | 141,000,000 | Stock Option |
| Alexander Karp | 39,000,000 | RSU Award |
| Stephen Cohen | 13,500,000 | Stock Option |
| Stephen Cohen | 13,500,000 | RSU Award |
| Shyam Sankar | 7,500,000 | Stock Option |
| Shyam Sankar | 7,500,000 | RSU Award |

367. These awards were hefty, with Karp's alone valued at the time at ***$1.1 billion***, which *The Wall Street Journal* called one of "the biggest compensation packages ever awarded to corporate leaders." To unlock the awards, Defendants had only to take Palantir public.

368. In addition to options to purchase 163 million Palantir shares and 61 million RSUs given to Karp, Cohen, and Sankar to ensure these three Individual Defendants consummated the Offering and reward them for doing so, the Individual Defendants collectively pocketed more than $2 billion via their propitiously timed insider selling. *See infra* §IX.F. However, while Karp, Thiel, and Cohen wanted to sell their shares and maximize their profits, they didn't want to lose control of the Company. They solved this conundrum by implementing a radical voting structure that ensured they would retain control of Palantir regardless of how much stock they sold as part of their scheme, further demonstrating the cofounding Individual Defendants' scienter.

369. Palantir common stock is split into three classes: Class A common stock, Class B common stock, and Class F common stock. The Registration Statement described this structure as "novel" and "differ[ing] significantly from those of other companies that have dual or multiple class capital structures." In truth, Defendants put in place a highly unusual and ultra-aggressive governance structure designed to concentrate power in the hands of Palantir's three founders through a special class of Class F shares.

370. While Class A and Class B common stock entitling holders to one vote and ten votes, respectively, are typical, Palantir's Class F common stock is uniquely designed to consolidate power in the hands of the Company's three cofounders for life. Owned through a trust,

the Class F shares guarantee Karp, Thiel, and Cohen at least 49.99999% of the total votes, "***notwithstanding*** the number of outstanding shares of Class A common stock and Class B common stock or ***the Founders' relative ownership*** of shares of Class A common stock and Class B common stock," so long as they retained a collective, miniscule "Ownership Threshold" that equaled about 6%.

371. This controversial governance arrangement has been criticized by shareholder representative groups and corporate governance watchdogs alike. For instance, Anita Dorett, associate program director at the Interfaith Center on Corporate Responsibility, faulted the structure as "'tak[ing] it to another level with concentrating power with the founders.'" Similarly, Amy Borrus, head of the Council of Institutional Investors, described the arrangement as "'not substantially dissimilar from the unequal structures found at the companies from which Mr. Karp passionately seeks to distance Palantir'" and called for a seven-year limit on the structure.

372. In short, Karp, Thiel, and Cohen were motivated to unlock stock awards worth billions and sell off hundreds of millions of personally held Palantir shares while "***effectively [retaining] control [of] all matters submitted to a vote of the stockholders for the foreseeable future***." Further, as they die, control of the Class F shares is consolidated with the remaining cofounders meaning Cohen (who was just 37 years old in 2020) could effectively control Palantir by owning just 0.5% of the shares. The provision ends only when the last of the founders dies. In other words, Cohen could effectively control Palantir by owning just 0.5% of the shares.

## B. The Fraud Involved Palantir's Entire Business and Executives at Palantir's Highest Levels, Who Had "Strong Visibility" into the Company's Future Revenue, Were Directly Involved in Palantir's Sales Efforts, and Received Regular Company-Wide Updates

373. The fraud alleged herein involved the operations and prospects of Palantir's two products and two business segments. In other words, Defendants' fraudulent scheme and wrongful

course of business involved the misrepresentation and concealment of the performance of ***Palantir's entire business*** by its cofounders, founding employees, and some of Palantir's most senior executives. As Karp has made clear: "***I run this business, for better or worse. I know how the business is doing***."

374. Entering into and during the Class Period, the Individual Defendants assured investors they possessed "strong visibility into future revenues across [their] customer base" in light of the concentrated nature of that base and the large, multiyear customer agreements. As of early 2020, Palantir software was used by only 125 customers. Approximately 30% of Palantir's revenue was generated by just ***three*** customers in the first half of 2020. Given the importance of each customer and the protracted contract procurement process, "***sales efforts have historically depended on the significant direct involvement of our senior management team, including Mr. Karp***." The senior management team included Karp, Cohen, Glazer, Sankar, and Kawasaki. Thiel also has had heavy involvement in seeking to secure deals for the Company, from facilitating Palantir's government business to negotiating for commercial sector projects. Indeed, the involvement of Palantir's c-suite executives and Thiel in the customer acquisition process was necessary given the Company's "limited direct sales force."

375. Senior executive involvement continued even after Palantir began to build a traditional sales force. The typical workflow for a client contract included a member of Palantir's c-suite speaking to a member of a potential client company's leadership during initial conversations to discuss the client's needs and the number of Palantir engineers and business development consultants that would be required for the pilot.

376. Defendants themselves have confirmed that the lengthy duration of the customer contracts provided the Individual Defendants with uniquely "strong visibility into future revenues

across our customer base." During the beginning of the Class Period, a key metric Defendants provided investors (until 2Q21) was average contract duration, which "measure[s] revenue visibility" – the longer the contract, the greater the visibility. During the Class Period, average contract duration increased from 3.5 years in the Registration Statement up to 3.9 years at the end of 2Q21. According to Kawasaki on the November 12, 2020 conference call, the increasing duration of customer contracts provided them with "additional visibility on the revenue here." This is because Palantir recognized revenue ratably from customer contracts over the multiyear contractual term. As a result, negative sales developments in the current quarter (and therefore known to Defendants at the time they spoke) would be not reflected in revenue until later quarters. As Palantir stated in the Registration Statement and reiterated in each Form 10-Q and 10-K filed during the Class Period:

> We generally recognize revenue from our platforms and O&M services over the contractual term. ***As a result, a portion of the revenue we recognize in each quarter is derived from customer contracts generally entered into during previous periods. Consequently, a decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that we recognize for that quarter. However, such a decline would negatively affect our revenue in future quarters***. Accordingly, the effect of significant downturns in sales or renewals, significant customer terminations, and potential changes in our contracting terms and pricing policies ***would not be fully reflected in our results of operations until future periods***. The timing of our revenue recognition model also makes it difficult for us to rapidly increase our revenue through additional sales in any given period, as revenue is generally recognized over the applicable contractual term.

377. In other words, Defendants' "strong visibility into future revenues" provided them with early warning of the ongoing deceleration in Palantir's business, as they were aware of negative trends affecting future quarters at the same time they were publicly representing to investors that Palantir's margins, revenue, and operational results were improving and accelerating.

378. The Individual Defendants' knowledge of ongoing sales and business trends is further evidenced by their participation in regular Palantir meetings. For instance, there were Company-wide town hall meetings that took place approximately every other month and annual all-hands meetings, where updates on new contract wins were provided. Regular meetings for members of the "sales ops" team also took place at Palantir, which were usually attended by Karp, Cohen, or Sankar. In addition to meetings, monthly emails were also widely circulated within the Company that included metrics on, *inter alia*, the number of pilots started, converted, and cancelled, and the number of contracts cancelled.

### C. The Individual Defendants' Knowledge of the SPAC Scheme Further Supports a Strong Inference of Scienter

#### 1. The Individual Defendants Implemented the SPAC Scheme to Buy Illusory Revenue and Growth, Knowing It Was Unsustainable

379. The Individual Defendants created and implemented the SPAC Scheme to buy illusory revenue and growth so Palantir could report misleading commercial growth, including in key growth metrics such as total deal value, revenue, contribution margins, and number of customers. In addition, Defendants knew or recklessly disregarded that the SPAC deals were unreliable and unsustainable sources of growth and revenue.

380. For example, Defendants knew Palantir was unlikely to collect on the full terms of the SPAC contracts because most SPACs could not afford the expensive Foundry subscriptions and many SPACs were not viable businesses or too nascent to need Palantir. Moreover, Defendants knew Palantir could not sustain the practice of buying revenue and growth by trading cash for SPAC software contracts. Hence, the SPAC Scheme's investment stage lasted only nine months, and when the SPAC market collapsed in 2022, Palantir's ability to continue to buy growth and revenue evaporated.

### 2. The Individual Defendants Knew Their SPAC-Related Statements Were Misleading from Palantir's Due Diligence and the Complete Customer Data They Unlocked by Installing Foundry

381. Palantir completed extensive due diligence before investing in each SPAC. The Individual Defendants were personally involved in negotiating the SPACs. Sankar also confirmed that Palantir would "unlock" all customer data through its software, creating a "digital twin" of each company's "entire enterprise" within hours or even minutes of installing Foundry. That is, Palantir had access to its customer's entire digital footprint, including business-critical information. Thus, when Defendants spoke publicly about the SPACs (individually or generally), they knew, or recklessly disregarded, but concealed that:

- the SPACs were not "winning deals" or "bet[s] on our customers" but rather *quid pro quo* transactions by which Palantir bought illusory and unsustainable revenue and growth;
- because most SPACs were too nascent to need Palantir software, Foundry could not help them "radically accelerate production ramps and time to market," "shave[] years and mountains of risk off their road map," or "build their operations";
- most of the SPACs lacked the revenue or commercial prospects to afford the longer duration Palantir subscription contracts, which cost as much as $10 million a year;
- SPACs could not apply "the full power of Foundry" because Palantir provided them only a portion of Foundry out of the box, all at once, and without the normal bespoke Foundry setup its typical commercial clients received; and
- because the SPAC deals involved no salespeople and could be supported by a small fraction of the Palantir engineers called for in an ordinary commercial pilot, SPAC deals appeared more lucrative than ordinary commercial deals and allowed Palantir to report misleadingly high contribution margins.

382. Concerning the SPAC Scheme itself, Defendants also knew, or were reckless in not knowing that: (i) they were not investing in "companies that we think we will be working with for a very long time"; (ii) these investments were ***not*** "a long-term strategy" or "strategic investment program"; (iii) the SPACs were not evidence that "the commercial business is gaining more and

more momentum"; and (iv) the SPACs would ***not*** provide sustainable growth and revenue through "long term deals" with "longer duration and time to revenue recognition." Instead, Defendants knew these were roundtrip transactions designed to purchase temporary high-margin revenue growth, orchestrated by the Individual Defendants because they knew Palantir could not achieve material organic growth in the commercial market, and even the organic growth they did achieve was unsustainably expensive.

### 3. The Individual Defendants Knew Most of the First Stage SPACs Could Not Afford Foundry and Lacked Viable Products or Commercial Operations

383. On March 28, 2021, Palantir executed a deal with ***Lilium*** which gave the German flying taxi company $41 million in exchange for Lilium agreeing to buy a $50 million Foundry subscription over 5 years (***1,063 times Lilium's 2021 revenue***). Lilium lost over €400 million in 2021. And as of November 2022, Palantir sold approximately 90% of its $40 million Lilium investment at a huge loss – at prices 50%-80% lower than Lilium's initial price.

384. Lilium had asserted it could make a battery-powered aircraft fly longer and with heavier payloads than its many competitors. But in truth, Lilium could not accomplish its stated manufacturing goals until there was a major breakthrough in battery technology and it achieved difficult aviation certifications; thus, ***Lilium was years away from any revenue***. In other words, Lilium is an engineering company without a product and thus without any operations to optimize. Palantir had access to all of Lilium's systems and any other software system that the company uses, and therefore knew or recklessly disregarded how (un)healthy the Lilium business was. Market analyst reports and a complaint filed in federal court confirm that Lilium's jet had severe design and capability flaws, the jet was unlikely to be certified to fly, and the SPAC did not generate enough cash to commercially launch the jet.

385. Accordingly, from Palantir's due diligence and data "unlock," Defendants knew or recklessly disregarded that: (i) Lilium was not a "compelling business" because its jet was not then positioned to ever reach the mass operational or manufacturing stage; and (ii) Lilium was too nascent to use Foundry to "build [its] operations," "radically accelerate production ramps," or "get to scale on dramatically shorter time horizons," let alone to help with "ERP [enterprise resource planning], CRM [customer relationship planning], manufacturing execution, [or] for quality"; and (iii) that Lilium's contract was not collectable over its full course due to Lilium's lack of revenue and dim commercial prospects. Simply stated, Palantir bought the Lilium revenue by exchanging Palantir cash for Lilium's $50 million Foundry subscription.

386. ***Sarcos***. On or around April 4, 2021, Palantir executed an agreement which provided Sarcos (a robotic suit company with purported commercial applications) with $21 million (an amount equal to four times Sarcos's 2021 revenue) in exchange for Sarcos's agreement to purchase $42 million in Foundry software over the next six years (or eight times Sarcos's 2021 revenue). Defendants had no reasonable expectation of obtaining the full value of the Sarcos contract given that the annual Foundry costs exceed Sarcos's annual revenue. Sarcos lost $81 million in 2021 and was not a viable business. Even by the end of the Class Period, Sarcos was not able to manufacture its "Iron Man" suit for mass use.

387. From Palantir's due diligence and data "unlock," Defendants knew or recklessly disregarded that Sarcos was not a "compelling business" because, among other things: (i) its "Iron Man" suit was unlikely to reach the mass commercial or manufacturing stage; (ii) Sarcos was too nascent to use Foundry to "radically accelerate production ramps," "build [its] operations," or "get to scale on dramatically shorter time horizons," let alone to help with "ERP [enterprise resource planning], CRM [customer relationship planning], manufacturing execution, [or] for quality"; and

(iii) Sarcos's contract was not collectable over its full course due to its lack of revenue and dim commercial prospects.

388. ***Celularity***. On May 5, 2021, Palantir finalized an agreement with ***Celularity***, a company purporting to turn placentas into medicine. Palantir gave Celularity $20 million in exchange for Celularity's 5-year, $40 million commitment to use Foundry. But as with Sarcos and Lilium, Defendants had no reasonable expectation of obtaining the full value of the Celularity contract because its annual Palantir subscription was nearly double Celularity's 2021 total revenue and Celularity was not otherwise a viable business. As Celularity founder Bob Hariri acknowledged – less than two weeks after the deal – Celularity and its "cellular medicine" was "***to be quite candid, in its infancy***." Celularity subsequently lost $100 million in 2021.

389. From Palantir's due diligence and data "unlock," Defendants knew or recklessly disregarded that Celularity was not yet a "compelling business," but rather it was in its "infancy" and therefore too nascent to use Foundry to "accelerate production ramps and time to market," to "accelerate science," or to help with "manufacturing execution"; and that Celularity's contract was not collectable over its full course due its lack of revenue and dim commercial prospects.

### 4. The Individual Defendants Knew They Were Expanding the Scope of the SPAC Scheme

390. Subsequent to its May 11, 2021 earnings call, but prior to its August 12, 2021 earnings call, Palantir purchased at least ***$212 million*** of additional illusory high-margin revenue, swapping approximately ***$200 million*** in pipe funding for nine more commercial clients: Wejo, Babylon Health, Boxed, Pear Therapeutics, Embark Trucks, Fast Radius, Tritium, AdTheorent,

and Faraday Future (Second Stage SPACs).[25] That the Individual Defendants concealed their efforts in expanding the SPAC Scheme following the May 11, 2021 call further confirms their deliberate effort to conceal from investors both the scope of the SPAC Scheme and the identity/status of the individual SPACs.

391. From Palantir's due diligence and data "unlock," the Individual Defendants knew or recklessly disregarded that most of these Second Stage SPACs, including Fast Radius, were teetering on the edge of insolvency; and thus that the SPACs' Palantir contracts were likely not collectable over their full course due to the companies' lack of revenue and meager commercial prospects, which paled when compared to the cost of the software. Four of the nine surviving Second Stage SPACs Palantir invested in were no-or-nearly-no-revenue companies and the tenth never completed its SPAC process.[26] Not surprisingly, the auditors for all the Second Stage SPACs except one (Embark Trucks) raised going concern doubts following Palantir's investment. Fast Radius's insolvency was formally confirmed when it filed bankruptcy just nine months after Palantir funded its investment.

392. Additionally, from Palantir's due diligence and the data unlocked after installing Foundry, Defendants knew or recklessly disregarded that ***Embark Trucks*** and ***Faraday Future*** essentially had no commercially viable product and were therefore were too nascent to effectively use Foundry to "radically accelerate production ramps," "build [their] operations," or "get to scale

---

[25] Technically, Defendants agreed to buy a tenth additional customer, but Palantir's $10 million deal with FinAccel on or around August 2, 2021 fell through when the SPAC was canceled.

[26] $18 million to ***Embark Trucks*** (no revenue in 2021); $35 million to ***Wejo*** ($2.56 million revenue in 2021) in exchange for Wejo's 6-year, $50 million Foundry subscription; $10 million to ***Pear Therapeutics*** ($4.2 million in 2021 revenue) in exchange for Pear's 3-year, $9.3 million Foundry subscription; and $25 million to ***Faraday Future*** (no revenue in 2021) in exchange for Faraday's 6-year, $47 million Foundry subscription.

on dramatically shorter time horizons," let alone to help with "ERP [enterprise resource planning], CRM [customer relationship planning], manufacturing execution, [or] for quality."

393. Only three months after Palantir's investment, ***Faraday Future*** was revealed to be an "***EV scam***" that would never sell a car; that of the 14,000 reservations for the FF91 vehicle Faraday reported, only several hundred were paid, while the others were unpaid indications of interest; and that China's infamous securities fraudster Jia Yueting was involved in managing the Company post-SPAC. Similarly, a January 6, 2022 short-seller report and subsequent securities fraud lawsuit disclosed that ***Embark Trucks*** had more limited operational and technological capabilities than publicly disclosed, held "***no patents, [and] has only a dozen or so test trucks***." Defendants' efforts to conceal Embark Trucks from investors – describing it only as an "[a]utonomous vehicle company" in Palantir's 2Q21 Form 10-Q – further confirms their deliberate efforts to conceal the SPAC Scheme.

394. Defendants' knowledge of the Second Stage SPACs' precarious financial state is further evidenced by Palantir's insistence that Boxed and Fast Radius make front-loaded payments immediately following Palantir's PIPE investments. For example, in exchange for $20 million from Palantir – ***the precise amount Fast Radius needed to complete its PIPE funding – Fast Radius*** signed a $45 million, 6-year Foundry subscription in May 2021. Consistent with its extensive due diligence into Fast Radius before the closing, which Glazer participated in, and which focused on Fast Radius's financing and cash positions for the coming 12 months, Palantir insisted on an immediate $9.4 million upfront payment from Fast Radius and another provision permitting Fast Radius out of the deal if it paid $19.5 million total within a certain time (less than half the total deal). Fast Radius declared bankruptcy approximately nine months after Palantir funded its investment.

395. Similarly, Palantir demanded $15 million of Boxed's $20 million Foundry subscription (*75%*) paid upfront in exchange for providing Boxed $20 million. These swaps are further evidence that Defendants did not believe, as they told investors, that Fast Radius or Boxed were part of "a long-term strategy," or "long term deal[s]" with "longer duration and time to revenue recognition" – but instead knew or recklessly disregarded these were *quid pro quo* transactions consummated for the purpose of obtaining much-needed funding on the SPAC side and an immediate high-margin revenue injection on the Palantir side.

#### 5. Defendants Further Concealed More SPACs and Their Deal Terms

396. On Palantir's August 12, 2021 earnings call, Defendants concealed their expansion of the ongoing SPAC Scheme. Within the next few months, Palantir completed deals for the purchase of at least seven more commercial clients and at least ***$65.2*** million (and likely ***$91.2*** million) in unsustainable, roundtrip revenue, including at least $17 million in front-loaded payments, in exchange for providing ***$117.5*** million in PIPE funding (Third Stage SPACs):

- ***BlackSky*** ($8 million in exchange for $8 million Foundry subscription);
- ***Energy Vault*** ($8.5 million in exchange for $7.5 million Foundry subscription);
- ***Allego*** ($20 million);
- ***Starry Group*** ($16 million) in exchange for what appears to be an estimated $16 million Foundry subscription;
- ***Rigetti*** ($10 million) in exchange for what appears to be an estimated $10 million Foundry subscription;
- ***Bird Global*** ($20 million) for unknown exchange; and

- ***Rubicon Technologies*** ($35 million on December 15, 2021, according to Palantir, but in September 2021 according to Rubicon, in exchange for a Foundry subscription of $49.7 million, including $17 million in front-loaded payments).[27]

397. From Palantir's due diligence and data "unlock," Defendants knew or recklessly disregarded that these Third Stage SPAC contracts were not reasonably collectable over their full course due to the companies' poor financial condition:

- Rubicon announced in November of 2022 that it was nearly bankrupt because of "subscription costs" from its "2021 subscription agreement with Palantir Technologies." Rubicon stated it owed Palantir $15.5 million in payments by the end of September 2023 (of the $34.3 million total remaining it owes through October 2024) but had only $4.46 million in cash on hand;
- All the SPACs were operating at a loss in 2021: Bird Global ($279 million net operating loss), Starry Group ($166.5 million net loss), BlackSky ($120 million operating loss), Allego (€126 million net loss), Rigetti ($23.2 million net loss), Energy Vault ($3.3 million net loss), Rubicon ($915,000 net loss);
- After BlackSky's merger and listing, it missed the forecast in the merger proxy for full-year net profit by approximately $200 million; and
- The auditors or management for almost ***all*** the Third Stage SPACs have since expressed going concern doubts.

398. Apart from Palantir's due diligence and unlocked data, Defendants' knowledge of the Third Stage SPACs' distressed finances and thus the doubtful collectability of their Palantir contracts may be inferred from their close business relationships with some of these companies. For example, Rigetti executive Spencer Raskoff is on the Palantir Board. Thiel's friend and fellow PayPal alumnus Roelof Botha is on the Bird Global Board. And Thiel Capital Managing Director and former PayPal executive Jack Selby, who facilitated several Palantir investments, was on the Board of Founder SPAC, which merged with Rubicon in Rubicon's SPAC, and subsequently joined Rubicon's Board.

---

[27] Palantir also gave $5 million to Astrocast in exchange for a 5-year software contract with a "step-up" payment schedule, as part of an August 25, 2021 direct listing.

399. That Defendants went to great lengths to hide the details and even the names of some of the Third Stage SPACs from investors further indicates that they knowingly concealed the SPAC Scheme and the true financial condition of these SPACs. For example, in its SEC filings, Palantir concealed the identity of some, referring to Starry Group as a "Telecommunications Company," Allego as an "Electric Vehicle Charging Company," and Bird Global as a "Mobility Company." Moreover, the Allego, Starry Group, Rigetti, and Bird Global deals were hidden from public view in particular concerning the SPACs' Palantir subscriptions. Palantir also delayed announcing the names of SPACs associated with approximately $70 million of deals in September 2021 (Rubicon, Allego) and October 2021 (Starry Group) until 4-8 months later in February 2022 (Rubicon) and May 2022 (Allego, Starry Group).

400. Indeed, many of the SPACs involved in Defendants' SPAC Scheme have declined to worthless or near-worthless status: Fast Radius is bankrupt, Starry Group currently trades at $0.03, Bird Global at $0.20, Sarcos at $0.63, Wejo at $0.68, Faraday at $0.69, Celularity $0.73, Lilium at $1.17, Rigetti at $1.19, Rubicon at $1.22 (delisted), Tritium at $1.39, BlackSky at $1.77, and Embark Trucks at $4.78 (just over 1% of its Class Period high).

### D. The Individual Defendants' Obfuscation of Negative Trends by Changing the Metrics Palantir Reported Further Supports a Strong Inference of Scienter

401. In connection with the direct listing, Defendants touted several "key" metrics that provided investors with insight into Palantir's financial health, including, *inter alia*: (i) the Company's Acquire, Expand, Scale business model and the revenue and contribution margins recognized therefrom; (ii) government segment and commercial segment TRDV; (iii) average duration of their customer contracts; and (iv) average revenue per customer. As discussed above, however, as Palantir's growth rapidly decelerated during the Class Period, Defendants sought to

conceal the negative trends that clashed with their 30% YoY growth story by manipulating the Company's metric disclosures and changing the key operating metrics they disclosed to investors. *Supra* §§VI.G., VIII. Indeed, Defendants went as far as changing the definition of "customer" and wholesale abandoning the Acquire, Expand, and Scale metrics around which they had advised investors Palantir's entire business model was built. *Id.*

402. By doing so, Defendants continued a practice from Palantir's time as a private company and "wrapped its financial performance in a mix of selective disclosures and unconventional accounting." This shell-game of shifting disclosure of key metrics to investors further evidences Defendants' efforts to mislead and conceal the truth of the deceleration in Palantir's business from investors.

### E. Analysts and Investors Frequently Asked Questions About, and Defendants Frequently Evinced Personal Knowledge by Commenting on, Palantir's Key Metrics and SPAC Transactions

403. Defendants repeatedly stressed that Palantir's path to profitability centered on "execut[ing] the guidance strategy set forth by our CEO, Alex Karp," *i.e.*, greater than 30% YoY revenue growth for the first five years culminating in generating "in excess of $4 billion in revenue in 2025." During earnings calls, Glazer, Kawasaki, and Sankar frequently spoke about the key metrics discussed above in terms that evinced personal knowledge. For instance, Glazer assured investors in a November 12, 2020 call that "[w]e continue to have strong visibility into future revenues across our customer base" given the lengthy, multiyear nature of Palantir's customer agreements. And in response to an analyst's question on the same call about positive trends with respect to contract duration, Kawasaki claimed "we're pretty happy with sort of getting additional visibility on the revenue here." On February 16, 2021, Sankar spoke about the "several metrics" across which "[w]e measure revenue visibility."

404. And after some of their "partnerships" with early-stage companies became public, Defendants knew the strategy was a key concern for investors because they had to repeatedly field questions from analysts on the SPAC Scheme on nearly every conference call during the Class Period. Analysts asked Defendants to speak to everything from "the motivation behind these decisions" to invest in early-stage companies and how they "view risk, investment size and potential return" to their "long-term vision with your pipe investments into pre-revenue companies" because "***[t]he talk is Palantir's buying revenue***." As explained *supra* §VI.E.2., Defendants knew that Palantir was, in fact, buying revenue and artificially inflating its reported contribution margins. They also knew from Palantir's SPAC due diligence and installation data that the SPACs were unlikely sources of long-term revenue and overwhelmingly nonviable businesses. Nonetheless, Sankar, Glazer, and Kawasaki repeatedly provided false assurances in response to analysts' inquiries. Sankar emphasized that the SPACs presented "a really compelling opportunity to accelerate our business, to accelerate our distribution and to bet on our customers." Kawasaki exalted the SPACs as "a huge opportunity for us to invest in our customers" and said Palantir partnered with them because they "are companies that we think we will be working with for a very long time" and "we think that using our product is going to help them win." Glazer stated in a November 9, 2021 call that as to "the investment program, we're really excited about the opportunity here. Just to repeat some numbers and get some context with our Q4 guide, we're expecting 40% revenue growth for the year in 2021. That's over 1.5 billion for the year."

### F. The Individual Defendants' Motivation to Take Palantir Public and Massive Insider Selling Further Support a Strong Inference of Scienter

405. As described *supra* §VI., the Individual Defendants executed their scheme to take Palantir public and pocket billions of dollars because, according to Karp: "***[Q]uite frankly, I***

***believe the people at Palantir, who have helped build this company over 17 years, deserve access to liquidity***." Their Class Period sales of more than 122 million of their own Palantir shares at artificially inflated prices as high as $33.89 per share were calculated to maximize personal benefit from the fraud and allowed the Individual Defendants to cash out ***over $2.2 billion***. As demonstrated below and in Appendix 1, the Individual Defendants' sales were not just unusual in timing and amount; they were extraordinary and calculated to maximize personal benefit from the fraud. Their Class Period sales also represented significant proportions of each of their total shares:[28]

| Defendant | Shares Sold | Proceeds | % Sold |
|---|---|---|---|
| Alexander Karp | 52,976,553 | $1,050,011,752 | 89% |
| Peter Thiel | 47,391,859 | $783,336,392 | 27% |
| Stephen Cohen | 11,036,391 | $188,188,139 | 99.99% |
| Shyam Sankar | 6,444,950 | $117,701,892 | 77% |
| David Glazer | 4,189,115 | $63,134,903 | 72% |

406. The highly suspicious amount and timing of the Individual Defendants' insider trading supports a strong inference that the Individual Defendants timed their respective trading with knowledge of the alleged fraud and sought to capture the stock's artificially inflated trading price before the market could absorb the truth regarding Palantir's revenue and margin growth.

407. In particular, Karp received over $135 million from his sale of more than 14 million shares in the first three days of the Offering for proceeds at the lowest prices he would sell during the Class Period (but still representing a substantial premium of more than 50% over private market prices at which Palantir stock was selling prior to the Offering). He continued to offload shares throughout 2020 and 2021, making 45 separate sales of batches of 638,629 shares between April 7, 2021 and November 18, 2021. Defendants did not publicly report Palantir's disappointing 3Q21

[28] Total shares represent the sum of shares sold during and held on the last day of the Class Period.

performance for the quarter ended September 30, 2021 until November 9, 2021. Karp took advantage of the time lag between the end of 3Q21 and the public announcement of Palantir's disappointing 3Q21 financial results to quickly sell almost $145 million in stock before Palantir's stock price dropped following the 3Q21 disclosure. Investors took notice of Karp's sales and, on the May 11, 2021 and November 9, 2021 earnings calls, questioned whether the insider selling would continue. In response, Glazer stated that Karp was motivated by the "2 large option grants that are expiring at the end of December that can't be extended." Ultimately, Karp would dump ***nearly 90%*** of his shares during the Class Period. Karp's stock sales yielded him ***95,200% more than*** his 2021 compensation.

408. Cohen sold 4 million shares in the first three days of the Offering for over $37 million in proceeds. Following the lockup expiration on February 18, 2021, Cohen wasted no time selling off more of his Palantir shares close to the all-time high in Palantir's trading price. In the first 3 business days following the lockup period's expiration, Cohen sold 2 million shares at average share prices as high as $30.03, reaping $53.6 million in proceeds. The sales on these three days constituted the largest volumes he would sell during the Class Period. Similar to Karp, Cohen also offloaded an additional 210,000 shares for proceeds of more than $5 million between the close of 3Q21 on September 30, 2021 and the November 9, 2021 announcement of disappointing 3Q21 results. Cohen's stock sales yielded ***15,200% more than*** his 2021 compensation.

409. Thiel sold over 27 million shares in the first three days of the Offering for over $278 million in proceeds. Thiel then went dormant, waiting for the lockup period to expire and Palantir's stock price to increase before offloading additional shares. On February 18, 2021, the very first day he was permitted to sell after the lockup period expired, he dumped over 20 million shares for proceeds in excess of $504 million at more than $25 per share.

410. Sankar sold about 1.4 million shares in the first three days of the Offering for over $14 million in proceeds. He sold an additional 1.8 million shares in the last 2 weeks of November 2020 for over $33.4 million in proceeds. Shortly after the lockup period expired, from February 19-23, 2021, Sankar sold off over 1 million additional shares for another $30.5 million in proceeds. He continued selling large sums throughout 2021, but as the truth began to be revealed, the size of Sankar's sales became smaller, selling 266,872 shares, 274,390 shares, and 125,000 shares from February 22-24, 2022, from May 20-24, 2022, and on July 22, 2022, respectively. These sales grossed just under $6.3 million for the insider. Compared to his salary earned in 2021, Sankar made ***23,000% more than*** his compensation by offloading stock.

411. Glazer sold over 1.8 million shares in the first three days of the Offering for proceeds of nearly $18 million. As Palantir's stock price declined, Glazer began selling at slower intervals. Indeed, he refrained from selling between February 24, 2022 and May 20, 2022, and he conducted his final Class Period sale on August 2, 2022. On that date, Glazer sold 105,553 shares for total proceeds of nearly $1.2 million. Less than a week later, the Company reported disappointing year-over-year growth of only 23% for the quarter ended June 30, 2022, far below Glazer's previously advertised growth expectation of at least 30% continuing for the next 4 years. Glazer made ***13,900% more than*** his 2021 compensation via stock sales.

412. In addition, the rates at which each Individual Defendant sold his Palantir Class A common stock after the Class Period are dramatically out of line with their Class Period insider sales and thus further support a strong inference of scienter.[29] The below table depicts the Individual Defendants' sales on an average monthly basis. Notably, Karp stopped selling

[29] The Individual Defendants' stock sales before the Class Period (if any) are not publicly reported, as Palantir was not publicly listed until September 30, 2020.

immediately after the first partial corrective disclosure in November 2021 and sold ***no shares for an entire year*** (until December 6-7, 2022). And Thiel stopped selling altogether after the Class Period, though he had been selling at a rate of 2.1 million shares per month.

| | Number of Shares Sold | | Rate (shares/month) | | |
|---|---|---|---|---|---|
| **Defendant** | **Class Period** | **Post-CP** | **Class Period** | **Post-CP** | **CP vs. Post-CP** |
| Karp | 52,976,553 | 1,618,796 | 2,358,006 | 285,670 | 725% greater |
| Thiel | 47,391,859 | 0 | 2,109,429 | 0 | ∞ |
| Cohen | 11,036,391 | 714,219 | 491,234 | 126,039 | 290% greater |
| Sankar | 6,444,950 | 652,810 | 286,867 | 115,202 | 150% greater |
| Glazer | 4,189,115 | 192,338 | 186,459 | 33,942 | 450% greater |

413. In sum, the magnitude of the Individual Defendants' Class Period sales (122,038,868 shares sold), total proceeds realized ($2,202,373,077.94), the timing of the Individual Defendants' sales to take advantage of high trading prices, the substantial amount each Individual Defendant made from insider trading compared to his compensation, and the dramatic difference between the Individual Defendants' Class Period and post-Class Period sales (including the fact that Karp and Thiel stopped selling once the truth started to be disclosed) all support a strong inference that the Individual Defendants' acted with scienter.

### G. The Individual Defendants Occupied High-Ranking Positions and Signed SOX Certifications Attesting that They Personally Supervised Palantir's Controls and Procedures

414. As its three founders, Karp, Cohen, and Thiel occupied some of Palantir's highest positions as CEO, President and Secretary, and Chairman, respectively. The other Individual Defendants were also high-ranking executives, as CFO (Glazer), COO (Sankar), and Global Head of Business Development (Kawasaki). Karp, Cohen, Thiel, and Glazer all signed the Registration Statement. In addition, throughout the Class Period, Karp and Glazer repeatedly certified that they personally supervised and participated in evaluating of Palantir's financial controls and procedures, and that the Company's financial disclosures fairly and accurately presented its

financial condition. Further, Palantir's misleading Form 10-Q and 10-K reports were always accompanied by earnings calls during which the Individual Defendants described the favorable, but inaccurate, financial results.

## X. LOSS CAUSATION

415. The market for Palantir Class A common stock was open, well-developed, and efficient during the Class Period. Throughout the Class Period, Palantir common stock traded at artificially inflated prices as a direct result of Defendants' scheme and materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired Palantir common stock relying upon the integrity of the market price of Palantir common stock and market information relating to Palantir, and have been damaged thereby.

416. When the relevant truth and its impact on Palantir's financial results and prospects entered the market through a series of partial disclosures, the price of Palantir stock significantly dropped, as the artificial inflation came out of the stock price over time. As a result of their purchases of Palantir stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

417. The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' ongoing scheme as well as the misleading statements and omissions that continued to conceal the true nature of Defendants' fraud. Each partial disclosure did not on its own fully remove the inflation from Palantir's stock price because it only partially revealed the nature and extent of the fallout from Defendants' previously concealed misconduct. Defendants' ongoing scheme, misrepresentations, and omissions maintained the

price of Palantir Class A common stock at artificially inflated levels, inducing members of the Class to continue purchasing artificially inflated shares in Palantir even after Defendants' partial disclosures.

418. The disclosures that corrected the market price of Palantir shares are detailed below. These stock price declines were due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

419. On November 9, 2021, before the market opened, Palantir issued a release containing the Company's financial results for the third quarter ended September 30, 2021. The 3Q21 Release signaled a significant deceleration in Palantir's revenue growth, including quarterly revenue of $392 million, or 36% year-over-year revenue growth, and projected fourth quarter revenue of $418 million, which would represent 30% year-over-year revenue growth, compared to 49% year-over-year revenue growth in the prior quarter. That same day, Palantir also filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 3Q21 Form 10-Q revealed that Palantir's government revenue had actually ***declined*** on a sequential basis from $232 million to $218 million for the quarter and that contribution margins had declined. The price of Palantir Class A common stock declined on this news, falling 9.3% to $24.25 per share on November 9, 2021, on abnormally high volume, as compared to a 0.4% decline in the S&P 500 Index.

420. Following the close of the market on November 9, 2021, RBC analyst Rishi Jaluria published a report which downgraded Palantir stock from "sector perform" to "underperform." Jaluria cited "govt deceleration" as one reason for the downgrade, noting "we believe Palantir got direct benefits from COVID-19-related spending and those benefits have already faded." Jaluria also cited "commercial deceleration" and commented that "[w]e do not believe revenue from

SPAC investments is sustainable." Finally, Jaluria cited "lowered confidence in 30%+ growth" in light of the deceleration in both the commercial and government businesses. Similarly, Deutsche Bank analysts Brad Zelnick and Bhavin Shaw published a report after the market closed on November 9, 2021, calling the quarter "Thesis Challenging" and citing "Surprising Govt Decel, SPAC Investments and Margins." In particular, Deutsche Bank noted Palantir's "Government business decelerating significantly" and that, "excluding related party revenue, [Commercial] actually decelerated." Furthermore, the November 9, 2021 Deutsche Bank report stated: "Gross margins continue to compress and contribution margins declined, all raising questions around the mix and [long-term] profitability of the business." Following the analysts' downgrade and negative report, Palantir's stock price declined another 7.1%, again on unusually high volume, to close at $22.52 per share on November 10, 2021, while the S&P 500 Index declined only 0.8%. All told, Palantir's two-day stock price decline totaled nearly 16%, as compared to a 1.2%, two-day decline in the S&P 500 Index. However, the price of Palantir stock remained artificially inflated as Defendants continued to mislead the market, causing Palantir's Class A common stock to continue to trade at artificially inflated prices throughout the remainder of the Class Period.

421. On February 17, 2022, Palantir issued a release containing the Company's financial results for the fourth quarter and full year ended December 31, 2021. The FY21 Release revealed that Palantir's government business continued to quickly decelerate to just 26% year-over-year growth during the quarter, compared to a 76% year-over-year growth rate earlier in the year. The same day, on its website, Palantir issued FY 2021 Business Update (the "FY21 Business Update"). The FY21 Business Update revealed declining YoY contribution margins, falling from 62% in 4Q20 to 58% in 4Q21. That same day, Palantir released accompanying remarks that revealed Palantir's total deal value at quarter's end was $3.8 billion, which also indicated significant

business deceleration. Furthermore, factoring out Palantir's SPAC Scheme, Palantir's total deal value was essentially ***flat*** year-over-year. Additionally, although Defendants provided strong revenue guidance for 2022, they gave 1Q22 guidance for operating margins of 23%, which was below analysts' consensus of 28%.

422. RBC analyst Jaluria published a report on February 17, 2022, reiterating an underperform rating while reducing RBC's price target by 40% to $9 from $15. Highlighting that "[t]he company continues to see a broad-based deceleration, led by a slowdown in Total Deal Value and Government revenue," the February 17, 2022 RBC report further emphasized "light margin guidance" and that "[c]ommercial growth excluding investment agreements continues to be lackluster in our view, especially given an easier compare." William Blair's February 17, 2022 report by analysts Kamil Mielczarek and Louie DiPalma similarly highlighted that "[r]evenue growth excluding strategic investments is 26% in the December quarter and likely in the low-20% range in 2022" and that "[t]otal deal value, excluding strategic investments, was approximately $2.8 billion, effectively unchanged over the last 5 quarters," calling the SPACs a "Key Tailwind." Deutsche Bank's February 17, 2022 report, published after the market closed, included a "Forecast Change," reducing its price target because "total deal value (cancelable backlog) excluding related party contributions decelerated to 1% y/y growth compared to 14% in 2Q and 33% in 1Q" and "[c]ontribution margin of 58% in 4Q declined y/y."

423. The price of Palantir Class A common stock declined on this news, falling nearly 16% over a single trading day to close at $11.77 per share on February 17, 2022 on abnormally high trading volume, while the S&P 500 Index declined on 2.1%. Palantir's stock price continued to decline on February 18, 2022 as the market digested and reacted to the adverse information, dropping another 6.4% as compared to the S&P 500 Index, which declined 0.7%. However, the

price of Palantir stock remained artificially inflated as Defendants continued to mislead the market, causing Palantir's Class A common stock to continue to trade at artificially inflated prices throughout the remainder of the Class Period.

424. On May 9, 2022, before the market opened, Palantir issued a release containing the Company's financial results for the first quarter ended March 31, 2022. The 1Q22 Release revealed that Palantir expected only $470 million in revenue for the second quarter of 2022, which would represent only 25% year-over-year growth – substantially below the Company's purported long-term revenue growth rate. Analysts noted that while Palantir's 1Q22 adjusted operating margin of 26% was better than expected, it was down from 34% the prior year and 29% the prior quarter. Further, Palantir's 2Q22 guidance of 25.1% year-over-year revenue growth and 20% year-over-year operating margin growth was approximately one-third below consensus estimates of 28.8% and 26.5%, respectively. Also on May 9, 2022, after the market closed, Palantir filed with the SEC a quarterly report on Form 10-Q, which was signed by Karp and Glazer. The 1Q22 Form 10-Q also revealed that Palantir had received over $39 million in revenue from its SPAC Scheme during the quarter, meaning that without this program standalone revenue growth would have been ***only 19%*** during 1Q22. During a related earnings call, Palantir executives further revealed that the Company's total deal value had actually declined by $300 million during the quarter to $3.5 billion and that the Company would be winding down its SPAC Scheme.

425. RBC analyst Jaluria published a May 9, 2022 report downgrading Palantir, citing as "disappointing" that "1Q topline lacked upside to consensus," that "2Q guide missed consensus on both revenue growth & profitability," and that "Total Deal Value growth ex 'investment agreements' declined both Y/Y and Q/Q." Likewise, a May 9, 2022 Credit Suisse analyst report decreased its target price citing as "negatives" the news that "excluding ~$39M of SPAC

investments, standalone growth was 19.4% y/y in Q1 vs. 26.3% y/y in Q4" and that "[r]eported total remaining deal value of $3.5 billion (26% y/y) compared to $3.8 billion (35% y/y) in Q4, declining $300 million sequentially."

426. The price of Palantir Class A common stock declined on this news, falling 21% over a single trading day to $7.46 per share by market close on May 9, 2022, on abnormally high trading volume, while the S&P 500 Index fell just 3.2%. Palantir's stock price fell another 10% over the next two days, again on high trading volume, as the 1Q22 Form 10-Q was released and analysts further downgraded Palantir stock, to close at $6.71 per share on May 11, 2022. By contrast, the S&P 500 Index declined only 1.4%. However, the price of Palantir stock remained artificially inflated because Defendants failed to disclose the whole truth. Moreover, Defendants continued to make materially false and misleading statements that artificially inflated the price of Palantir Class A common stock.

427. On August 8, 2022, Palantir issued a release containing the Company's financial results for the second quarter ended June 30, 2022. The 2Q22 Release stated Palantir expected 2022 revenues to be in a range of $1.9 billion to $1.902 billion, which would represent an annual year-over-year revenue growth rate of only 23%. The release further stated that the "revised guidance excludes ***any*** new major U.S. government awards." Notably, the revised guidance was substantially below the Company's long-term annual revenue guidance of at least 30%, despite Defendants reaffirming this figure nearly halfway through the quarter, and the release did not state that this growth rate was achievable for subsequent years. According to an analyst report issued by Morgan Stanley, the failure to reiterate the Company's heavily touted long-term revenue growth rate "suggests that management believes the sales environment could prove challenging not just for the next few quarters but potentially beyond." In a related earnings call, Palantir executives

admitted that the Company's deal value remained "roughly ***flat*** quarter-over-quarter" at $3.5 billion.

428. Analyst and market commentators reacted negatively to this news. For instance, on August 9, 2022, RBC analyst Jaluria published a report that provided a deep dive into Palantir's SPAC-related misconduct. The report stated: "Most importantly, we estimate the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is ***$406M*** (note some of this may have already been recognized) and count ***at least 15 SPAC customers that have substantial doubt as going concerns*** (based on their respective filings)." The report continued: "21 of these companies are now publicly listed; none of the 20 listed SPACs are trading above their $10 reference price (***the vast majority are now trading in the <$5 penny stock range***)."

429. The price of Palantir Class A common stock plunged again on this news, falling 19% over two trading days (-14.2% on August 8 and -5.8% on August 9) to $9.25 per share by market close on August 9, 2022, on abnormally high trading volume, while the S&P 500 Index fell only 0.5%.

## XI. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

430. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Palantir Class A common stock is traded in an efficient market;
- the Company's Class A common stock is liquid and was heavily traded during the Class Period;



4887-3633-1341.v3

- the Company's Class A common stock was traded on the NYSE and was covered by multiple analysts; and
- Plaintiffs and members of the Class purchased, acquired, and/or sold Palantir Class A common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

431. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

432. Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XII. CLASS ACTION ALLEGATIONS

433. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Palantir Class A common stock during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants, officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

434. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Palantir Class A common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Palantir or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

435. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

436. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

437. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether Defendants engaged in a scheme to defraud;
- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Palantir;
- whether Defendants acted knowingly or with reckless disregard for the truth;
- whether the prices of Palantir Class A common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

438. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

439. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

440. This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.

441. During the Class Period, Defendants engaged in a scheme and wrongful course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed a scheme to defraud in connection with the purchase and sale of securities. Defendants' scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Palantir Class A common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Palantir Class A common stock at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, Defendants, and each of them, took the actions set forth herein.

442. Pursuant to the above wrongful course of conduct, each of the Defendants participated directly or indirectly in: (i) a scheme to complete the Offering, unlock their options awards, and then offload their Palantir shares at artificially inflated prices; and (ii) the preparation and/or issuance of the quarterly and annual reports, SEC filings, releases, and other statements described above, including statements made to securities analysts and the media that were designed to influence the market for Palantir Class A common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Palantir's finances and business prospects.

443. By virtue of their positions at Palantir, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions were committed willfully or with reckless disregard for the truth.

444. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Palantir, Defendants had knowledge of the details of Palantir's internal affairs.

445. Defendants are directly and indirectly liable for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Palantir. As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Palantir's businesses, operations, future financial condition, and future

prospects. As a result of Defendants' misconduct, the market price of Palantir Class A common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Palantir's business and financial condition which were concealed by the Individual Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Palantir Class A common stock at artificially inflated prices and in doing so relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by the Individual Defendants, and were damaged thereby.

446. During the Class Period, Palantir Class A common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Palantir Class A common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said Class A common stock, or would not have purchased or otherwise acquired them at the inflated prices paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Palantir Class A common stock was substantially lower than the prices paid by members of the Class. The market price of Palantir Class A common stock declined upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

447. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

448. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and/or sales of the Company's Class A common stock during the Class Period, as the truth about Palantir's operations and prospects began to be disclosed to the investing public.

**COUNT II**

**For Violations of §20(a) of the Exchange Act**

449. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

450. During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Palantir, and conducted and participated, directly and indirectly, in the conduct of Palantir's business affairs.

451. Each of the Individual Defendants, therefore, acted as a controlling person of Palantir. By reason of their senior management positions and/or being directors of Palantir, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Palantir to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over Palantir's operations and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain. In addition, Karp, Thiel, and Cohen owned all of Palantir's Class F shares through a trust, which shares guarantee Karp, Thiel, and Cohen at least 49.99999% of the total votes, effectively giving them full control over Palantir, even if their collective ownership of Palantir fell to just 6%. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Palantir to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Palantir within the

meaning of §20(a) of the Exchange Act. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Palantir.

452. Palantir had the power to control and influence the other Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Palantir had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of their public statements. By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Palantir.

## COUNT III

## For Violations of §20A of the Exchange Act

453. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. Count III is brought pursuant to §20A of the Exchange Act against Karp, Cohen, Thiel, Sankar, and Glazer, on behalf of Plaintiff and members of the Class who were damaged by each of these Defendants' insider trading.

454. As detailed herein, Karp, Cohen, Thiel, Sankar and Glazer were in possession of material nonpublic information concerning Palantir. They took advantage of their possession of material nonpublic information regarding Palantir to obtain millions of dollars in insider trading profits during the Class Period.

455. Defendants' sales of Palantir common stock (set forth below and in Appendix 1 hereto) were made contemporaneously with Plaintiffs' purchases of Palantir common stock (set

forth below and in Plaintiffs' certification (ECF 12-4; *Shijun Liu, Individually and as Trustee of The Liu Family Trust 2019 v. Palantir Techs. Inc.*, No. 1:22-cv-02893-PAB-KLM (D. Colo. Nov. 2, 2022) (ECF 1-1)) during the Class Period as follows:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Cohen | 2/18/2021 | 225,622 | $25.93 |
| Cohen | 2/18/2021 | 924,378 | $25.07 |
| Thiel | 2/18/2021 | 600 | $25.93 |
| Thiel | 2/18/2021 | 4,346,459 | $25.87 |
| Thiel | 2/18/2021 | 3,315 | $25.10 |
| Thiel | 2/18/2021 | 15,653,541 | $25.06 |
| Cohen | 2/19/2021 | 250,000 | $29.04 |
| Cohen | 2/19/2021 | 300,000 | $27.71 |
| Sankar | 2/19/2021 | 300,000 | $29.00 |
| Sankar | 2/19/2021 | 300,000 | $28.00 |
| Cohen | 2/22/2021 | 300,000 | $30.03 |
| Glazer | 2/22/2021 | 3,617 | $29.85 |
| Glazer | 2/22/2021 | 26,080 | $28.94 |
| Glazer | 2/22/2021 | 65,333 | $28.17 |
| Sankar | 2/22/2021 | 300,000 | $30.00 |
| Sankar | 2/22/2021 | 4,092 | $29.85 |
| Sankar | 2/22/2021 | 29,505 | $28.94 |
| Sankar | 2/22/2021 | 73,913 | $28.17 |
| Glazer | 2/23/2021 | 4,819 | $27.18 |
| Glazer | 2/23/2021 | 84,373 | $26.46 |
| Glazer | 2/23/2021 | 13,068 | $25.66 |
| Glazer | 2/23/2021 | 3,900 | $24.58 |
| Sankar | 2/23/2021 | 9,855 | $26.79 |
| Sankar | 2/23/2021 | 37,737 | $26.18 |
| Sankar | 2/23/2021 | 2,408 | $24.59 |
| Cohen | 3/30/2021 | 28,611 | $21.96 |
| Cohen | 3/30/2021 | 60,800 | $21.55 |
| Karp | 3/30/2021 | 76,180 | $21.96 |
| Karp | 3/30/2021 | 161,599 | $21.55 |
| Cohen | 3/31/2021 | 38,309 | $23.54 |
| Cohen | 3/31/2021 | 45,875 | $23.12 |
| Karp | 3/31/2021 | 101,821 | $23.54 |
| Karp | 3/31/2021 | 121,934 | $23.12 |

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Cohen | 4/6/2021 | 60,000 | $23.16 |
| Karp | 4/6/2021 | 1,308,465 | $23.15 |
| Karp | 4/7/2021 | 638,629 | $23.08 |
| Karp | 4/8/2021 | 638,629 | $23.19 |
| Karp | 4/20/2021 | 65,436 | $22.36 |
| Karp | 4/20/2021 | 573,193 | $21.68 |
| Karp | 4/21/2021 | 244,636 | $22.54 |
| Karp | 4/21/2021 | 393,993 | $22.26 |
| Cohen | 6/2/2021 | 30,000 | $24.39 |
| Karp | 6/7/2021 | 638,629 | $24.42 |
| Karp | 6/8/2021 | 26,483 | $25.05 |
| Karp | 6/8/2021 | 612,146 | $24.45 |
| Karp | 6/9/2021 | 638,629 | $24.49 |
| Glazer | 6/28/2021 | 9,000 | $27.00 |
| Karp | 8/2/2021 | 638,629 | $22.05 |
| Cohen | 8/3/2021 | 45,000 | $22.04 |
| Karp | 8/3/2021 | 638,629 | $21.96 |
| Karp | 8/4/2021 | 638,629 | $22.27 |
| Glazer | 8/12/2021 | 54,000 | $24.72 |
| Thiel | 8/13/2021 | 3,262 | $25.00 |
| Cohen | 8/17/2021 | 15,000 | $24.07 |
| Cohen | 8/18/2021 | 22,900 | $25.45 |
| Glazer | 8/18/2021 | 9,000 | $25.90 |
| Glazer | 9/16/2021 | 9,000 | $27.90 |
| Glazer | 9/20/2021 | 10,539 | $27.53 |
| Glazer | 9/20/2021 | 7,461 | $26.25 |
| Cohen | 9/21/2021 | 6,000 | $27.02 |
| Glazer | 9/21/2021 | 314 | $27.11 |
| Glazer | 9/21/2021 | 71,686 | $26.62 |
| Karp | 11/4/2021 | 638,629 | $26.39 |
| Karp | 11/5/2021 | 638,629 | $26.06 |
| Sankar | 7/22/2022 | 125,000 | $9.95 |
| Glazer | 8/2/2022 | 105,553 | $11.02 |

456. During the Class Period, Plaintiffs purchased the following shares of Palantir common stock contemporaneously with each Defendant's stock sales listed above:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Liu | 2/22/2021 | 1,000 | $28.00 |
| Liu | 2/22/2021 | 351 | $28.05 |
| Liu | 2/22/2021 | 21 | $28.00 |
| Liu | 2/22/2021 | 120 | $27.63 |
| Liu | 2/22/2021 | 158 | $27.83 |
| Liu | 2/22/2021 | 621 | $28.05 |
| Liu | 2/22/2021 | 568 | $28.05 |
| Liu | 2/22/2021 | 568 | $28.05 |
| Liu | 2/22/2021 | 134 | $28.05 |
| Liu | 2/22/2021 | 208 | $28.05 |
| Liu | 2/22/2021 | 100 | $28.00 |
| Liu | 2/23/2021 | 28 | $26.47 |
| Liu | 2/23/2021 | 680 | $25.57 |
| Liu | 2/23/2021 | 40 | $25.73 |
| Liu | 2/23/2021 | 97 | $25.75 |
| Liu | 2/23/2021 | 3 | $25.74 |
| Liu | 2/23/2021 | 5 | $25.40 |
| Liu | 4/9/2021 | 29 | $24.00 |
| Liu | 4/13/2021 | 400 | $24.88 |
| Liu | 4/26/2021 | 10 | $24.14 |
| Liu | 6/8/2021 | 30 | $24.34 |
| Liu | 6/9/2021 | 18 | $24.66 |
| Liu | 6/10/2021 | 40 | $24.00 |
| Liu | 6/10/2021 | 2 | $24.24 |
| Liu | 7/2/2021 | 400 | $24.45 |
| Liu | 8/6/2021 | 306 | $21.95 |
| Liu | 8/13/2021 | 2 | $24.89 |
| Liu | 8/13/2021 | 2 | $24.98 |
| Liu | 8/13/2021 | 1 | $25.18 |
| Liu | 8/13/2021 | 1 | $25.18 |
| CalPERS | 9/17/2021 | 13,738 | $28.71 |
| CalPERS | 9/17/2021 | 324,885 | $28.71 |
| CalPERS | 9/17/2021 | 3,246,621 | $28.71 |
| Liu | 9/20/2021 | 3,088 | $26.52 |
| Liu | 9/20/2021 | 3,087 | $26.56 |
| Liu | 9/20/2021 | 1 | $26.56 |
| Liu | 9/21/2021 | 1,200 | $26.58 |
| Liu | 9/21/2021 | 320 | $26.54 |

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Liu | 9/21/2021 | 240 | $26.58 |
| Liu | 11/10/2021 | 2,400 | $22.58 |
| Liu | 11/11/2021 | 3,200 | $22.83 |
| Liu | 11/11/2021 | 3,000 | $22.88 |
| Liu | 11/11/2021 | 1,250 | $22.87 |
| Liu | 11/11/2021 | 1,330 | $22.85 |
| Liu | 11/11/2021 | 2 | $22.86 |
| Liu | 11/11/2021 | 1,330 | $22.84 |
| Liu | 11/11/2021 | 1,335 | $22.81 |
| Liu | 7/22/2022 | 1,800 | $10.35 |
| Liu | 7/25/2022 | 5,720 | $9.85 |
| Liu | 7/25/2022 | 4,442 | $9.85 |
| CalPERS | 7/28/2022 | 94,569 | $10.13 |
| Liu | 7/28/2022 | 200 | $10.06 |
| CalPERS | 8/4/2022 | 54,074 | $11.30 |

457. Plaintiffs and members of the Class who purchased shares of Palantir common stock contemporaneously with sales by Defendants suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased Palantir common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## XIV. SECURITIES ACT ALLEGATIONS

### A. Securities Act Parties

458. Plaintiffs purchased shares of Palantir's Class A common stock in the Offering traceable to the Registration Statement and were damaged thereby.

459. Defendants Karp, Cohen, Thiel, Glazer, Rascoff, Schiff, and Moore are collectively referred to herein as the "Securities Act Individual Defendants." Each of the Securities Act

Individual Defendants signed the Registration Statement, and caused the Registration Statement to be filed with, and declared effective by, the SEC.

460. Palantir is subject to liability for violations of the Securities Act as an issuer and control person, and all the statements herein made by Palantir's officers and directors were on behalf, and at the behest, of the Company.

461. Palantir and the Securities Act Individual Defendants are collectively referred to herein as the "Securities Act Defendants."

**B. The False and Misleading Registration Statement**

462. The Registration Statement contained untrue statements of material fact and omitted facts necessary to make the statements made therein not false or misleading about Palantir's: (i) growth rates, sustainability of growth, and TAM; (ii) operational efficiencies and margins; and (iii) strategic partnerships.

**1. Misleading Statements About Growth Rates, Sustainability of Growth, and TAM**

463. The Registration Statement stated that Palantir was experiencing accelerating growth at the time of the Offering, stating: "***Our growth this year has accelerated***." The Registration Statement continued as follows:

> We generated $742.6 million in revenue in 2019, reflecting an increase of 25% from our revenue in 2018, which was $595.4 million.
>
> In the first half of this year alone, during a period of significant geopolitical instability and economic contraction, we generated $481.2 million in revenue, reflecting a growth rate of 49% over the same period last year.

464. The Registration Statement contained the following graph which illustrated Palantir's purportedly accelerating revenue growth trend:




465. In particular, the Registration Statement highlighted the recent growth in Palantir's government contracts, stating:

> ***As of June 30, 2020, the total remaining deal value of the contracts that we had been awarded by government agencies in the United States and allied countries around the world***, including existing contractual obligations and contractual options available to those government agencies, ***was $1.2 billion, up 74% from December 31, 2018***, when the total value of such contracts was $670.6 million.

466. The Registration Statement claimed that Palantir's growth opportunity was enormous, estimating Palantir's TAM "to be approximately $119 billion across the commercial and government sectors." Defendants broke down this purported $119 billion TAM as follows:

> Our estimate of the TAM in the commercial sector is $56 billion. This estimate is arrived at by multiplying the number of potential customers around the world – defined broadly as approximately 6,000 companies with more than $500 million in annual revenue – by an assumed annual contract value for each potential commercial customer based on organization size and our internal data of existing customer spending.
>
> We estimate the TAM in the government sector, including government agencies in the United States, its allies, and in other countries abroad whose values align with liberal democracies, is $63 billion. . . . Our estimate of the TAM in the U.S. government sector is $26 billion. We estimate the TAM in the international



4887-3633-1341.v3

> government sector to be $37 billion, using the same methodology that we used to estimate our opportunity in the U.S. government sector.

With respect to the Company's TAM in the government sector, the Registration Statement stated that Palantir's recent win in federal court had fostered a "shift in government acquisition" that would allow Palantir to become "the central operating system for all U.S. defense programs":

> The Army, as it works to ensure its service members have what they need to do their jobs, has begun evaluating commercially available products, such as our software, before turning to custom-built alternatives. Other government agencies have begun to follow suit.
>
> Our victory in federal court is transforming the procurement of goods and services across the U.S. federal government.
>
> For us, this shift in government acquisition represents a significant expansion of our TAM with the U.S. federal government. We are working towards becoming the central operating system for all U.S. defense programs.

467. The Registration Statement further identified a "number of strategies to continue to grow the company," including:

> ***Become the default operating system for data across the U.S. government***. Our successful lawsuit against the U.S. Army, brought in 2016, is transforming the way the entire U.S. government buys software, not just the military. ***We are working towards becoming the default operating system across the U.S. government. Our victory in federal court now makes that possible***.

468. On November 13, 2020, Palantir supplemented the Registration Statement via the filing of the Prospectus Supplement, which was incorporated by reference into and formed part of the Registration Statement. This November Prospectus Supplement bolstered Defendants' growth story with Palantir's 3Q20 results, reporting:

> For the three months ended September 30, 2020, we generated $289.4 million in revenue, reflecting a 52% growth rate from the three months ended September 30, 2019, when we generated $190.5 million in revenue. In the nine months ended September 30, 2020, we generated $770.6 million in revenue, reflecting a 50% growth rate from the nine months ended September 30, 2019, when we generated $513.2 million in revenue.

469. The November Prospectus Supplement further highlighted growth in government contracts during 3Q20, stating:

> ***As of September 30, 2020, the total remaining deal value of the contracts that we had been awarded by government agencies in the United States and allied countries around the world***, including existing contractual obligations and contractual options available to those government agencies, ***was $1.3 billion, up 14% from December 31, 2019***, when the total value of such contracts was $1.1 billion.

470. The statements in ¶¶463-469 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

(a) Palantir's reported revenue and deal value growth rates were not sustainable and instead were set to decelerate beginning in 4Q20. At the time these statements were made, Defendants were aware that the government segment's growth performance was going to peak in 4Q20 and begin a sequential deceleration in 1Q21 as they had "strong visibility into future revenues across [their] customer base" due to the lengthy, multiyear nature of their contracts and the fact that Palantir recognized revenue ratably, such that any "decline in new or renewed contracts in any single quarter may have an immaterial impact on the revenue that [they] recognize for that quarter," but "such a decline would negatively affect our revenue in future quarters";

(b) Defendants also had "strong visibility" into the commercial segment's revenue growth performance for the reasons detailed in (a) above and, therefore, were aware that Palantir's revenue growth rate was set to stagnate in 4Q20;

(c) the Company's commercial segment growth plan was dependent on investing in early-stage SPACs with far less than $500 million in recurring annual revenue;

(d) Palantir's government segment's revenue and deal value had been temporarily inflated by short-term contracts which government agencies had entered into with Palantir in connection with their responses to the COVID-19 pandemic; and

(e) as a result of (a)-(d) above, the Registration Statement's statements about government and commercial businesses' growth trends and addressable markets were overstated and misleading.

**2. False and Misleading Statements About Palantir's Operational Efficiencies and Margins**

471. The Registration Statement represented that Palantir's operating results were improving, indicating that the Company was on the path to eventual profitability. For example, the Registration Statement stated:

> The improvements in our operating results have principally been driven by increasing revenue and a significant decrease in the time and number of software engineers required to install and deploy our software platforms.
>
> In particular, the time required to install our software and begin working with a customer has decreased more than five-fold since Q2 2019 to an average of 14 days in Q2 2020. In some cases, our customers can now be up and running in six hours. We have also invested heavily in developing the infrastructure used to deliver software updates to our customers. As a result, the number of upgrades our engineers can manage across installations more than doubled from an average of 20,000 per week in Q2 2019 to more than 41,000 per week in Q2 2020.

472. The Registration Statement included "[i]ncreas[ing] our reach within existing customers" among the "strategies to continue to grow the company," citing the ease with which Palantir's software platforms could "accommodate new users, workflows, and use cases":

> ***Increase our reach within existing customers***. The value that our software creates is what drives our expansion within individual organizations. Our platforms are designed to ***easily accommodate new users, workflows, and use cases***. This allows us to rapidly scale within an institution.

473. The Registration Statement further stated: "***We believe that all of our customers will move into the Scale phase over the long term***," describing the three customer phases of its "Acquire, Expand and Scale business model":

> ***We believe that all of our customers will move into the Scale phase over the long term. We also believe that contribution margin for Scale phase accounts will increase further as we become more efficient at deploying our software***

> ***platforms across the entirety of our customers' operations and at managing and operating our software*.**

Thus, the Registration Statement represented that, over time, all of Palantir's customers were expected to enter the "Scale phase," which indicated improved margins across Palantir's customer base.

474. The statements in ¶¶471-473 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that:

(a) contrary to the Registration Statement representations emphasizing Palantir's operational efficiencies, Palantir was, in fact, still engaged in "custom development work" and did not "have SAAS like economics regardless of the[ir] deployment target." Landing new customers required Palantir to search for and find a reason why a potential client needed the Company's software and then build a bespoke platform to suit the identified need, which included reworking or adapting a pre-existing product for customers, and/or requiring the engineering team to design and build completely new features. Further, the process for acquiring and onboarding new customers was, in fact, lengthy, time-consuming, and costly, and to close new deals Palantir had to incur far greater costs than it spent on already existing commercial customers. In addition, as Palantir had moved into industries in which it had not previously operated, its pilot deployments failed more frequently, and the expenses associated therewith further deteriorated Palantir's margins (*supra* §§V.B., VI.C., VIII.C., IX.B.);

(b) Palantir's software platforms did not "easily accommodate new users, workflows, and use cases," but instead required extensive and time-consuming engineering and customization; and

(c) the Securities Act Defendants had no reasonable basis to believe and did not, in fact, believe, that "all of [their] customers will move into the Scale phase over the long

term," as that was historically not the case and was more difficult as the Company expanded into new markets.

### 3. False and Misleading Statements About Strategic Partnerships

475. The Registration Statement identified pursuit of new partnerships among the "number of strategies to continue to grow the company":

> ***Pursue new methods of customer acquisition and partnership***. We are pursuing specific channel-selling opportunities with leading cloud hosting providers that have existing relationships with prospective customers. As we consider entering and growing in new markets, we may enter into additional partnerships, joint ventures, and alliances.

476. The Registration Statement also identified a strategy to engage in "strategic transactions" and "enter into relationships with other businesses" to expand Palantir products:

> As part of our business strategy, we have engaged in strategic transactions in the past and expect to evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future. We also may enter into relationships with other businesses to expand our products or our ability to provide services.

477. The statements in ¶¶475-476 were untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that the Securities Act Defendants' growth plan was not centered on "pursuing specific channel-selling opportunities with leading cloud hosting providers" or other "strategic transactions," but instead was dependent on an undisclosed scheme to offset expected declines in Palantir's government and commercial business segments by artificially inflating their total deal value, commercial client base, short-term commercial client revenue, and profit margins by "investing" in early-stage businesses consisting primarily of SPAC target companies (that had little or no revenue, and far less than $500 million in recurring annual revenue), on the condition that these businesses enter

into multiyear, multimillion dollar contracts for Palantir's products and services that the companies were too nascent to need or afford (*supra* §§VI.E.-F., VIII.A., IX.C.).

478. Defendants' failure to disclose the material information described herein in the Registration Statement violated independent duties to disclose, as described *supra* §VIII.; ¶¶219, 230, 246, 264, 284, 304, 321, 338.

## XV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT IV

### For Violations of §11 of the Securities Act

479. Plaintiffs repeat and reallege each and every allegation contained in ¶¶44-58, 458-478 as if fully set forth herein.

480. This claim is brought against each of the Securities Act Defendants pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of members of the Class who purchased Palantir Class A common stock traceable to the Registration Statement.

481. This claim is based on strict liability and does not sound in fraud. Plaintiffs do not assert in this Count that any Securities Act Defendant committed intentional or reckless misconduct or that any Securities Act Defendant acted with scienter or fraudulent intent. While Plaintiffs disclaim any allegations of scienter or fraudulent intent in these non-fraud claims, challenged statements of opinion or belief in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

482. The Registration Statement contained untrue statements of material fact, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

483. The Company is the issuer of the securities purchased by Plaintiffs and members of the Class who purchased Palantir Class A common stock traceable to the Registration Statement. As such, the Company is strictly liable for the untrue statements of material fact and/or omissions of material fact necessary to make the statements made in the Registration Statement not false or misleading.

484. The Securities Act Defendants each signed the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Securities Act Defendants each had a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and ensure that they were true and that there were no omissions of material fact that were required to be stated therein that rendered the statements made in the Registration Statement not false or misleading. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts. Had they done so, the Securities Act Defendants would have known of the material misstatements and omissions alleged herein.

485. Plaintiffs acquired the Company's common stock traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein.

486. By virtue of the foregoing, each Securities Act Defendant violated §11 of the Securities Act. Plaintiffs and the other members of the Class who purchased Palantir Class A common stock traceable to the Registration Statement are entitled to relief under §11, including

damages as measured by the provisions of §11(e), from Securities Act Defendants and each of them, jointly and severally.

487. This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after the Company's shares were sold in connection with the Offering.

488. By reason of such conduct, the Securities Act Defendants are liable pursuant to §11 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## COUNT V

## For Violations of §15 of the Securities Act

489. Plaintiffs repeat and reallege each and every allegation contained in §§III.-IV. and ¶¶458-488 above as if fully set forth herein.

490. This claim is brought against each of the Securities Act Defendants pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of members of the Class who purchased Palantir Class A common stock traceable to the Registration Statement.

491. This claim does not sound in fraud. Plaintiffs do not assert in this Count that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent.

492. The Securities Act Defendants were each control persons of Palantir by virtue of their positions at Palantir as directors and/or senior officers. The Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Palantir. In addition, Karp, Thiel, and Cohen owned all of Palantir's Class F shares through a trust, which shares guarantee Karp, Thiel, and Cohen at

least 49.99999% of the total votes, effectively giving them full control over Palantir, including whether, when, and how to execute the Offering and the contents of the Registration Statement, even if their collective ownership of Palantir fell to just 6%.

493. The Securities Act Defendants were each critical to effecting the Offering, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the Offering, and by having otherwise directed through their authority the processes leading to execution of the Offering, including registration and sale of the shares in the Offering.

494. Palantir had the power to control and influence the Individual Defendants, and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Palantir had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Individual Defendants, including the content of the Registration Statement.

495. By reason of such conduct, the Securities Act Defendants are liable pursuant to §15 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs rescission or a rescissory measure of damages;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

E. Awarding Plaintiffs and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

DATED: February 10, 2023

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
LUKE O. BROOKS
J. MARCO JANOSKI GRAY
ERIKA L. OLIVER
CHRISTOPHER R. KINNON
SARAH A. FALLON

s/ Luke O. Brooks

LUKE O. BROOKS

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
lukeb@rgrdlaw.com
mjanoski@rgrdlaw.com
eoliver@rgrdlaw.com
ckinnon@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Plaintiffs

JOHNSON FISTEL, LLP
JEFFREY A. BERENS
2373 Central Park Boulevard, Suite 100
Denver, CO 80238-2300
Telephone: 303/861-1764
303/861-1764 (fax)
jeffb@johnsonfistel.com

Local Counsel

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 10, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Luke O. Brooks

LUKE O. BROOKS

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: lukeb@rgrdlaw.com

# Mailing Information for a Case 1:22-cv-02384-CNS-SKC Cupat v. Palantir Technologies Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon Amjed**
  namjed@ktmc.com,rdegnan@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com,bschwartz@ktmc.com
- **Adam Marc Apton**
  aapton@zlk.com
- **Jeffrey Allen Berens**
  jeff@jberenslaw.com,michaelf@johnsonfistel.com,jeffb@johnsonfistel.com,paralegal@johnsonfistel.com
- **Luke Orion Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com
- **Nicholas Angelo Caselli**
  nicholas.caselli@freshfields.com
- **Sarah A. Fallon**
  sfallon@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Boris Feldman**
  boris.feldman@freshfields.com,usmanagingattorneyteam@freshfields.com,6188914420@filings.docketbird.com,michelle.stephens@freshfields.com
- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com
- **Joseph Alexander Hood , II**
  ahood@pomlaw.com,tsayre@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com
- **J. Marco Janoski Gray**
  mjanoski@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Christopher Ryan Kinnon**
  ckinnon@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com
- **David Y. Livshiz**
  david.livshiz@freshfields.com,6188914420@filings.docketbird.com
- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com
- **Erika L. Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Kathryn A. Reilly**
  reilly@wtotrial.com,sanchez@wtotrial.com,CLJones@wtotrial.com
- **Darren Jay Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Holly Stein Sollod**
  hsteinsollod@hollandhart.com,lmlopezvelasquez@hollandhart.com,jdfrerker@hollandhart.com,intaketeam@hollandhart.com
- **Kimberly J. Willis**
  kjwillis@hollandhart.com,brunelle.kim@gmail.com,atupler@hollandhart.com,intaketeam@hollandhart.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`