**Appendix in Support of Plaintiffs' Motion for a
Partial Lift of the PSLRA Discovery Stay**

| Description | Pages |
|---|---|
| Declaration of Professor Joshua Mitts, Ph.D., dated May 24, 2024 (Redacted) | 001-029 |

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| MINCHIE GALOT CUPAT, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-02384-GPG-SBP *Consolidated with Civil Actions 1:22-cv-02805-GPG-SBP and 1:22-cv-02893-GPG-SBP* |
| Plaintiff, | **CLASS ACTION** |
| v. | |
| PALANTIR TECHNOLOGIES INC., ALEXANDER C. KARP, DAVID GLAZER, and SHYAM SANKAR, | |
| Defendants. | |

**DECLARATION OF**

**PROFESSOR JOSHUA MITTS, PH.D.**

**May 24, 2024**

Movants' Appendix 001

## I.  INTRODUCTION

### A.  Qualifications

1.  I am the David J. Greenwald Professor of Law at Columbia University.  I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics.  I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2.  I have published extensively in the fields of economics, finance, and law.  My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3.  I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4.  I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and*

1

*Economics*, *The Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of Empirical Legal Studies*.  My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5.     In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations.  I have extensive experience supporting the U.S. Department of Justice.  My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6.     During this professional experience, I have extensively analyzed trading records. I have reviewed tens of thousands of pages of Daily Participant Activity Statements produced by the Depository Trust Company ("DTC"), as well as other types of DTC-produced records, in connection with my work on certain other litigation matters listed in my *curriculum vitae*.

7.     At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts.  My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

8.     My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my C.V., attached to this Declaration as Appendix A.

2

**B.      Summary of Conclusions**

9.      I have been retained by counsel for Plaintiffs in this matter to opine on the following questions:

    i.   ***First***, whether timestamped transactional records are maintained by DTC and/or broker-dealers that identify individual purchases of Palantir Technologies, Inc. ("Palantir" or the "Company") Class A common stock by DTC participants and their customers, making it possible to establish a reliable "chain of title" using standard accounting methods that do not amount to "statistical tracing"; and

    ii.   ***Second***, whether it is possible, using a limited set of records producible in discovery from DTC and Computershare Trust Company, N.A. ("Computershare") (or, if the records from DTC and Computershare are not sufficient, from Palantir), to trace Plaintiffs' purchases of Palantir Class A common stock to the Registration Statement using the aforementioned standard accounting methods.

10.      In reaching these opinions, I have relied upon various publicly available materials, which are cited in this Declaration.  The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision.  I reserve the right to modify this Declaration and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review. I am being compensated at a rate of $1,600 per hour for my work in this matter.  I have been assisted in this matter by staff at M Analytics LLC working under my

direction, and I receive further compensation based on those billings. M Analytics LLC and my compensation are not dependent on my opinions expressed in this Declaration or the outcome of this matter.

11. Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that: (i) timestamped transactional records are maintained by DTC and broker-dealers that identify individual purchases of Palantir Class A common stock by DTC participants and their customers, making it possible to reconstruct a reliable "chain of title" using standard accounting methods that do not amount to "statistical tracing"; and (ii) only a limited set of readily producible records maintained by DTC and Computershare (or, if the records from DTC and Computershare are not sufficient, by Palantir) are required in discovery to establish that Plaintiffs purchased registered shares of Palantir Class A common stock traceable back to the Registration Statement.

## II.    FACTUAL BACKGROUND

12. In this section, I describe a portion of the facts underlying this case that are relevant to this Declaration as I understand them based on Plaintiffs' Second Amended Complaint (the "Complaint"),[1] the March 31, 2024 Order of the U.S. District Court for the District of Colorado on Defendants' Motion to Dismiss Plaintiffs' Complaint,[2]

---

[1] Second Amended Consolidated Class Action Complaint For Violations of the Federal Securities Laws, *Cupat v. Palantir Techs., Inc., et al.*, Civil Action No. 1:22-cv-02384-GPG-SBP (D. Colo. May 24, 2024) (hereinafter "Compl.").

[2] *Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903 (D. Colo. Mar. 31, 2024).

Movants' Appendix 005

and the Transcript of the April 24, 2024 Status Conference before Judge Gallagher.[3]

13.     In September 2020, Defendant Palantir went public via a direct listing.  In a direct listing, shares are sold by "Company insiders at whatever price the market will bear without underwriting."[4]   Pursuant to the Registration Statement[5] – declared effective on September 22, 2020[6] – Palantir registered for resale over 257 million shares of its Class A common stock held by Company insiders.[7]

14.     On the first day of trading (September 30, 2020), Palantir's shares "traded between $9 and $10 per share,"[8] a 40%-120% premium over the $4.50 to $6.50 per share range at which Palantir shares traded privately in 2019 and the first half of 2020.[9]

---

[3] Rep.'s Tr. Status Conference, Apr. 24, 2024, ECF No. 91.

[4] Compl. at ¶ 29.  Unless otherwise noted, emphasis is in the original.

[5] *See* Compl. at ¶ 29, n.7 for Plaintiffs' collective definition of the "Registration Statement" ("On August 25, 2020, Palantir filed with the SEC a registration statement on Form S-1, which was followed by several amendments, the last of which was filed with the SEC on September 21, 2020 (the "Final Registration Statement"). The Final Registration Statement became effective on September 22, 2020. That same day, Palantir also filed with the SEC a registration statement on Form S-8 (the "Form S-8"). On September 30, 2020, the first day of the Class Period, the Company filed with the SEC a final prospectus on Form 424B4 (the "Prospectus"), which was updated via a prospectus supplement filed with the SEC on November 13, 2020 (the "Prospectus Supplement"). The Form S-8, Prospectus, and Prospectus Supplement were each incorporated into and formed part of the Final Registration Statement. The Final Registration Statement, Form S-8, Prospectus, and Prospectus Supplement are collectively referred to herein as the "Registration Statement.").

[6] *Id.*

[7] Compl. at ¶¶ 234, 238.

[8] Compl. at ¶ 130.

[9] Compl. at ¶ 28.

5

Within three days of the Offering, Individual Defendants had sold more than $483 million worth of their own Palantir shares.[10]

15.   Palantir's direct public offering included a partial lockup whereby Defendants limited the supply of common stock on the market by assuring the market they could only sell 20% of their shares through February 18, 2021.[11]  Similar to the first days of trading, once the lockup period expired, Individual Defendants promptly sold significant quantities of their Palantir stock holdings.[12]

16.   I understand Plaintiffs have brought claims under Sections 10(b), 20A, and 20(a) of the Exchange Act of 1934 as well as under Sections 11 and 15 of the Securities Act of 1933 "on behalf of Plaintiffs and all other persons that purchased Palantir Class A common stock between September 30, 2020 and August 5, 2022 . . . and were damaged thereby" including those who "purchased Palantir stock traceable to the Registration Statement."[13]   I also understand the Court has dismissed Plaintiffs' complaint "without prejudice to amendment,"[14] and that the parties have discussed plans for future briefing in a Status Conference before the Court.[15]

---

[10] Compl. at ¶ 130.

[11] Compl. at ¶ 130, n.31.

[12] *See* Compl. at ¶ 139 (noting that "[t]he lockup period expired two days later on February 18, 2021.  When it did, the Individual Defendants quickly pocketed more than $594 million in insider sales.").

[13] Compl. at ¶¶ 1, 198 & n.42, 245.

[14] *Palantir*, 2024 WL 1374903, at *3.

[15] *See* Rep.'s Tr. Status Conference, Apr. 24, 2024, ECF No. 91.

Movants' Appendix 007

III.   **PURCHASES OF SHARES OF PALANTIR CLASS A COMMON STOCK ARE TRACEABLE TO THE REGISTRATION STATEMENT USING A LIMITED SET OF RECORDS**

17.   In modern securities markets, companies rarely issue paper share certificates.[16] A company's transfer agent records the issuance of shares to specific parties, typically on a "transfer journal."  A transfer journal lists both issuances by the company to a party as well as transfers of shares between parties.  In my experience, transfer journals are generally maintained as electronic book entries rather than physical stock certificates.[17]

---

[16] *See* John C. Coffee & Joshua Mitts, *Slack v. Pirani and the Future of Section 11 Claims* (Dec. 1, 2023) at 10-11, https://ssrn.com/abstract=4644888 ("[A]s late as the early 1970's, [buyers and sellers in] the U.S. securities marketplace . . . [had] to *physically exchange* share certificates whenever they made a trade," but as the daily volume of traded securities continued to rise, "[t]here was simply no practical way for a physical delivery system to keep pace with the speed of the market. The SEC and Congress recognized this fact and took steps to address the so-called 'Paperwork Crisis.' Subsequent to a 1971 SEC Report outlining the issue, Congress amended the Securities Exchange Act to allow the SEC to instantiate a national system of 'prompt and accurate clearance and settlement' that would eliminate the need for a physical system of clearance and settlement. The Depository Trust & Clearing Corporation ("DTCC") – and its wholly owned subsidiaries, the Depository Trust Company ("DTC") and the National Securities Clearing Corporation ("NSCC") – emerged in the wake of the 'Paperwork Crisis' . . . to become the cornerstones of the modern clearing-and-settlement system.").

[17] In the SEC's words: "When securities are referred to as being in 'book-entry' form, it means that the investor does not receive a certificate. Instead, a custodian, usually a broker or transfer agent, maintains electronic records showing that the investor owns the particular security."  SEC, Transfer Agent Regulations, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at *7 n.3 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Apr. 10, 2024); *see also* DTCC, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm (last visited Apr. 10, 2024) (describing how under the Fast Automated Securities Transfer Program ("FAST"), "transfer agents of issuers also act as agents of DTC … [and] electronically reconcile securities holdings daily."; *see also* DTCC, *From Physical to Digital: Advancing the Dematerialization of U.S. Securities*, at *8 (Sept. 2020), https://www.dtcc.com/-/media/Files/PDFs/DTCC-Dematerialization-Whitepaper-

7

18.  For a variety of reasons, it is impractical for purchases of securities on the secondary market to settle through transfer journal entries.[18]  For one, each transfer agent maintains its own system for recording ownership, and these internal records are not standardized.  To make trading possible, the DTC and National Securities Clearing Corporation ("NSCC") developed standardized book-entry custodial recordkeeping and multilateral netting systems, respectively.

19.  Owned by the same parent company – the Depository Trust and Clearing Corporation ("DTCC") – DTC and NSCC provide the infrastructure underlying the U.S. securities markets.  Through these subsidiaries, DTCC enjoys a monopoly in the clearing and settlement of securities transactions in the United States.  At a high level, clearance and settlement is what must happen in order to effectuate a transaction after it has been agreed to.  The core events in that process are the transfers of (a) the traded asset to the buyer and (b) the money for that asset to

---

092020.pdf (last visited Apr. 10, 2024) ("Transfer agents play a central role in driving dematerialization" of the securities marketplace.).

[18] *See* Dan Awrey & Joshua C. Macey, *Open Access, Interoperability, and DTCC's Unexpected Path to Monopoly*, 132 Yale L.J. 96, 105, 125 (2022) ("Securities clearinghouses and depositories … are what make the scale and speed of modern finance possible" whereas "[p]rior to the advent of these clearinghouses, banks typically cleared and settled checks using … correspondent relationships" requiring continual maintenance and settlement for *each individual* relationship. "Clearinghouses replaced this system with a multilateral clearing and settlement process. Rather than periodically calculating and settling net debts on a bilateral basis, multilateral netting contemplates that *each* member bank would settle its net debts with *all other* member banks within a single institution: the clearinghouse itself."). DTC and NSCC introduced that expedited, streamlined clearing and settlement infrastructure to the U.S. securities marketplace in the early-1970s.  Settling through separate, issuer-specific transfer agents would functionally force the U.S. securities marketplace to return to a pre-clearinghouse world, in which the expedited clearance and settlement process made possible by the clearinghouse-centralization model was no longer available.

Movants' Appendix 009

the seller.  NSCC and DTC work in tandem to streamline that process for market participants.  They do so primarily by shoring up (*i.e.*, guaranteeing), keeping track of, and executing payment and asset delivery.

20.     NSCC facilitates this seamless clearance and settlement process by providing a forum for the purchase and sale of securities and serving as counterparty to each side of a transaction.  This counterparty function means that NSCC "interposes itself as the buyer to every seller and the seller to every buyer to guarantee a trade will complete even if an original party to the trade—either the buyer or the seller—goes bankrupt or otherwise defaults."[19]

21.     DTC, meanwhile, "provides depository and book-entry services and operates a securities settlement system."[20]  This means DTC (a) holds all of the securities that are being bought and sold by various parties;[21] (b) keeps track, via its electronic

---

[19] *See* Virginia B. Morris*, Guide to Clearance and Settlement: An Introduction to DTCC* (2021) at 3, https://www.dtcc.com/-/media/Files/Downloads/Press-Room/DTCC-Clearance-Settlement-Interactive-2021.pdf.

[20] DTCC, *What is DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last accessed May 8, 2023).

[21] In a process known as "immobilization," DTCC participants deliver ownership of their securities to DTC.  DTC then holds these immobilized securities and designates legal ownership of them to its partner entity, Cede & Company ("Cede").  Even as these securities are continually bought and sold, their physical certificates remain with DTC, legal title remains with Cede, and DTC simply uses its electronic book-entry system to record changes in beneficial ownership.  *See* Morris*,* at 7.  Equivalently, a transfer agent participating in the DTC's Fast Automated Securities Transfer Program (FAST) program maintains a record of Cede's legal title through a "balance certificate."  This system of ownership is known as an "indirect holding" system.  *See* UCC §§ 8-115; 8-501.  A DTC-participant-holder of securities holds an *entitlement* to those securities.  *See* Br. of the Depository Tr. Co. as *Amicus Curiae* Not in Supp. of Any Party at 18, *In re Petrobras Sec.*, No. 16-1914-cv (2d. Cir. Sep. 16, 2016), ECF No. 293-2.  And legal title for the entire pool of securities is held by the DTC in "fungible bulk" form.  *Id.* at 10 (under fungible bulk ownership model "each Participant to whose DTC account securities of that issue

Movants' Appendix 010

book-entry system, of changes in their custodial holdings; and (c) executes the necessary transfers to settle transactions.[22]  The combination of DTC's custodial, book-entry, and settlement functions makes it possible for clearance and settlement to be a digital rather than physical process.  Due to the frequency and volume of securities transactions that take place on a given day, DTC and NSCC's digital record-keeping has been essential for the reliable and efficient functioning of the modern U.S. securities markets.

22.     For shares to be eligible for clearing and settlement, they must be deposited into DTC participant accounts.[23]  This occurs through two steps.  ***First***, the transfer agent electronically records a book-entry transfer to DTC's "nominee" entity, Cede & Co. for the sale by a participant.  ***Second***, a corresponding electronic "direct deposit" book entry is recorded into the participant account for the benefit of a depositing DTC participant for their purchase.[24]  Prior to, during, and following this process, share ownership remains in electronic book-entry form.

---

have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue").

[22] *See* Morris, at 12 ("DTC transfers securities electronically from the selling firm's account to NSCC's account at DTC, and then from NSCC's account to the buying firm's account. Firms instruct their settling banks to send funds to, or receive funds from, DTC to complete the transaction.").

[23]  DTC participants are registered broker-dealers, pension funds, certain registered investment companies, certain clearing and settlement agents and other financial institutions.    *See* Depository Trust Company, Rule 3(1), https://www.dtcc.com/-/media/Files/Downloads/legal/rules/dtc_rules.pdf.

[24] *See infra* paragraph 42. Transfer agents may also maintain DTC participant accounts and subsequently transfer shares from those accounts to other DTC participants.

Movants' Appendix 011

23.     Individual deposit, withdrawal, and transfer transactions are recorded on Participant Daily Activity Statements, a detailed ledger maintained by DTC for each DTC participant on each settlement day.  Participant Daily Activity Statements are described in multiple DTC publications.  The DTC Settlement Service Guide refers to these statements repeatedly:

"In addition, nothing contained in Information made available to Participants and other authorized users shall relieve them of their responsibility under DTC's Rules and Procedures or other applicable contractual obligations to check the accuracy, where applicable, of Participant Daily Activity Statements and all other statements and reports received from DTC and to notify DTC of any discrepancies."[25]

And again:

"Investment Identification activity is recorded on your Participant Daily Activity Statement. Check your statement to be sure your transactions were properly processed and recorded."[26]

And yet again:

"***Warning!*** Under DTC's Rules and Procedures you are responsible for verifying the accuracy of your Participant Daily Activity Statement. You must report discrepancies to DTC's Reconciliation division as soon as possible after you receive the statement."[27]

24.     Elsewhere, DTC writes: "Your activities and money involving securities are recorded by DTC on your Participant Daily Activity Statement available from the PBS SMART/Search facility as well as the Participant Account Statement in the

---

[25] DTCC, *Settlement: Service Guide*, at *2 (Mar. 7, 2024), https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Settlement.pdf (last visited Apr. 19, 2024).

[26] *Id*. at * 47.

[27] *Id.*

Movants' Appendix 012

Settlement Web."[28]  When describing the software available to DTC participants to access this transactional information, DTC writes: "The Settlement Web provides the ability to monitor transaction activity and research daily position balances at the account and entity level. . . . Typical activities are deliver orders, payment orders, stock loans, pledge inputs and releases, and reclaims of these activities. All activities carry with them Activity codes which describe a DTC service such as deliver orders."[29]

25.   Moreover, broker-dealers, Financial Industry Regulatory Authority ("FINRA"), and exchanges maintain detailed, time-stamped transactional records which can be obtained through discovery.[30]  These records show when securities in one account

---

[28]   DTCC Learning, *Viewing Activity and Position* (Oct. 18, 2021), https://dtcclearning.com/products-and-services/settlement/view-activity-position.html (last visited Apr. 19, 2024).  "PBS" refers to DTCC's Participant Browser Service, a web-based system providing access to the DTC database.  The SMART/Search system provides participants with reporting functionality.  *See, e.g.*, Depository Trust Company, Deposits Service Guide, https://www.dtcc.com/-/media/Files/Downloads/legal/service-guides/Deposits.pdf, at *12.

[29]   DTCC Learning, *Settlement Web*, *Viewing Activity & Position*, https://dtcclearning.com/products-and-services/settlement/settlement-web.html   (last visited Apr. 19, 2024) (emphasis added).

[30]   For example, DTC maintains Participant Daily Activity Statements with individual transactions for each participant. Other examples include records maintained by broker-dealers pursuant to their regulatory reporting obligations.  17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").  As set forth below, I do not presently anticipate that subpoenas for documents from FINRA or exchanges will be necessary to establish that Plaintiffs purchased registered shares of Palantir Class A common stock traceable back to the Registration Statement.

Movants' Appendix 013

are transferred to another account, whether within the same broker-dealer or between different broker-dealers.

26.   As I explain in the following Section, because DTC and broker-dealers maintain records of individual transactions from sellers to purchasers, it is possible to identify transfers of registered shares even though "securities deposited at DTC . . . are maintained in 'fungible bulk;' *i.e.*, each Participant to whose DTC account securities of that issue have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue."[31]   These records make it possible to reconstruct a reliable "chain of title" using standard accounting methods like first in-first out ("FIFO") or last in-first out ("LIFO").[32] The choice of accounting method is a matter of expert judgment informed by the relevant evidence.  However, in my professional experience, records produced in discovery often show that no matter which accounting method is chosen, a given purchaser acquired shares registered under a given Registration Statement.

---

[31] Br. of the Depository Tr. Co. as *Amicus Curiae* Not In Supp. of Any Party at 10, *In re Petrobras Securities Litigation*, No. 16-1914 (2d. Cir. Sep. 16, 2016), ECF No. 293-2.

[32] As I have explained in my academic writing, *see* Coffee & Mitts, *supra* note 16: "[A]s its name indicates, FIFO treats the earliest ('first') incoming security as the first one to go out.  Conversely, LIFO treats the most recent ('last') incoming security as the first one to go out.  A very simple example demonstrates the two methods in actions:  Suppose Broker A received 10 unregistered shares at 9 AM, and then received 10 registered shares at 12 PM.  And that Broker A then sold 10 shares to Broker B at 3 PM.  Using FIFO, we conclude the 10 unregistered shares were the ones sold to Broker B at 3 PM, since the unregistered shares were the first to enter Broker A's account.  And thus Broker A is left holding 10 registered shares, and Broker B holding 10 unregistered shares. Using LIFO, we conclude that the 10 registered shares were the ones sold to Broker B at 3 pm, since the registered shares were the last to enter Broker's account.  And thus Broker A is left holding 10 unregistered shares, and Broker B holding 10 registered shares."

Movants' Appendix 014

27.     It is straightforward to trace purchases of shares from those accounts using records produced in discovery along with an accounting method such as FIFO or LIFO.[33]     Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning.  They do not make inferences regarding specific purchases from statistics about the population as a whole.  Rather, the application of an accounting method yields a single conclusion regarding who owns each share at each point in time.  Nor is it the case that every aftermarket purchaser would have standing for every share—rather, only those who purchased the securities registered under the Registration Statement, as determined by a deterministic tracing analysis, would have standing.

28.     As of the date of this Declaration, I am tracing purchases of securities to registration statements in certain ongoing litigation matters listed on my C.V. by applying these standard methods to records produced in discovery by DTC and broker-dealers.   I have also developed a patent-pending methodology for accelerating the tracing analysis from a computational standpoint.[34]

---

[33] My opinions in this regard are consistent with the Br. for *Amicus Curiae* Law and Business Professors ISO Resp't, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf. Along with Jack C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia University, I served as co-counsel to those amici.  *Id.*; *see also* Decl. of Dr. Jonathan A. Brogaard, Ex. J to Decl. of Matthew S. Kahn ISO Defs.' Opp'n to Pls.' Mot. for Class Certification - Public Redacted Version at 21, *In re Slack Technologies Inc. Stockholder Litigation*, Lead Case No. 19-Civ-05370 (Cal. Sup. Ct., San Mateo Cnty., Jan. 18, 2022), Doc. No. 273 at *21 (conceding that it may be "theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing").

[34] Post Hoc Attribution of Homogenizable Sequential Data, Prov. App. No. 53/561,668 (Oct. 19, 2023).

14

## IV.   THE RECORDS REQUIRED TO TRACE PURCHASES OF PALANTIR SHARES ARE LIMITED AND READILY AVAILABLE WITH LIMITED DISCOVERY

29.     Standard accounting methods can be applied to trace Plaintiffs' purchases of Palantir Class A common stock back to the Registration Statement using records readily available in discovery.  These records consist of (a) the transfer agent's *transfer journal*; (b) *Participant Daily Activity Statements* held by DTC; (c) *transaction records* maintained by broker-dealers; (d) *registration status records* from Palantir.  Thus, at most, only four types of subpoenas are necessary to trace purchases of Palantir shares by Plaintiffs to the Registration Statement.

30.     *Transfer journals*.  Transfer agents record the issuance of shares to specific parties by the issuer and record deposits to Cede & Co. for the benefit of a given DTC participant.  These records are maintained in the issuer's transfer journal.

31.     *Participant Daily Activity Statements.*  DTC produces a daily "Participant Daily Activity Statement" for individual participant accounts, which list individual custodial transfers between accounts as well as to and from the NSCC.[35]  These statements are available from DTC in discovery.

32.     *Transaction records.*  Broker-dealers maintain detailed order records pursuant to their regulatory reporting obligations, including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation."[36]  These time-stamped transactional records,

---

[35]  DTC participants are described *supra* note 23.

[36] 17 CFR § 240.17a-3(a)(6)(i)(A).

Movants' Appendix 016

commonly known as "trade blotters," need only be requested from a small number of broker-dealers.

33.   **_Registration status records._**  An alternative to determining the registration status of certain shares, if the above records are insufficient to do so, is through records held by Palantir concerning the date and amounts of equity awards to employees and other shareholders, Rule 144 opinions, records of sales of unregistered shares by shareholders, and other records—to the extent there are any—concerning the vesting of unregistered shares or eligibility of shareholders to sell unregistered shares.

34.   **_Discovery process: step 1_**.  The first step in the discovery process is to send two subpoenas.  The first subpoena will be sent to the transfer agent for Palantir, Computershare, requesting the production of Palantir's transfer journal and underlying records regarding share registration.  The second subpoena will be sent to DTC requesting all Participant Daily Activity Statements for Palantir prior to and during the Class Period.  I have reviewed transfer journals produced by Computershare and Participant Daily Activity Statements produced by DTC in certain ongoing litigation matters listed on my C.V. and, in my experience, Computershare and DTC produce these records quickly, often within a matter of weeks.

35.   The transfer agent records are likely to give some indication of which shares were registered under the Registration Statement and Participant Daily Activity Statements will identify individual deposits and withdrawals of registered and unregistered shares to and from DTC participant accounts during the Class Period.

16

I will then apply the tracing methodology described herein to the transfer agent records and Participant Daily Activity Statements to evaluate whether it is necessary to request transactional records from individual broker-dealers. I also will determine whether any records are required from Palantir to clarify the registration status of certain shares if transfer agent and DTC records are insufficient to resolve that question.

36. ***Discovery process: step 2.*** If it is necessary to request transaction records from individual broker-dealers, I will identify which broker-dealers formed part of the "chain of transmission" of unregistered shares from whom to seek trade blotters (with a column for client ID). I anticipate that, based on the transfer agent records and Participant Daily Activity Statements, I will be able to identify a narrow subset of broker-dealers to which to send subpoenas.

37. If it is necessary to request records from Palantir to determine the registration status of certain shares sold, I will use those records to inform the other data obtained for purposes of tracing the purchases and sales of Palantir shares.

38. The following figure shows each type of data in the process of tracing the purchase of a share of Palantir Class A common stock by Plaintiffs to the Registration Statement:

Movants' Appendix 018



39.    The records underlying each arrow (*i.e.*, transfer) in the above progression are contained in these discovery requests.  The first step is for Palantir to designate certain shares as registered under the Registration Statement.  The Registration Statement provides for a series of means by which various types of shares are registered, including but not limited to through the exercise of Demand Registration Rights and Piggyback Registration Rights.[37]  Upon the exercise of those rights, certain shares held by various shareholders will be registered.

---

[37] *See* Mark S. Bergman, *Realizing the Value of Holdings in U.S. Companies*, 20 Int'l Fin. L. Rev. 44, 44-46 (2001) ("Any offer or sale of securities in the US must be made pursuant to an effective registration statement under the US Securities Act of 1933, or an available exemption. To register securities under the Securities Act, an issuer files [a registration statement] with the Securities and Exchange Commission (SEC) . . . Because the registration of securities can only be effected by the issuer of such securities, it is typical . . . to contractually obligate an issuer, if such issuer is a public company (or upon such issuer becoming a public company), to register such securities at some specified time or times to facilitate their resale. These rights are called registration rights [and] may include all or a combination of demand registration, piggyback registration and [other registration rights]. . . . A shareholder with demand [registration] rights is entitled to obligate an issuer, upon instruction by such a shareholder, to prepare and file with the SEC a registration statement registering the securities held by such shareholder . . . A shareholder with piggyback registration rights is entitled to obligate an issuer, whenever the issuer proposes (either of its own accord or pursuant to a demand by one or more other investors) to register its securities under the Securities Act and the registration form so permits, to register all or a portion of the securities held by such shareholder, at the issuer's expense.").

Movants' Appendix 019

40.     Following the registration of certain shares, if the shareholder wishes to sell those shares on the open market, those shares are generally transferred to the DTC custodial account of the shareholder's broker-dealer.   In general, in order for transactions to be cleared and settled through DTC, the shares must first be deposited into a DTC participant account.   This occurs through two steps.  **First**, the transfer agent electronically records a book-entry transfer to Cede & Co.  **Second**, a corresponding electronic "Direct Deposit" book entry is recorded into the participant account for the benefit of a depositing DTC participant.[38]

41.     Consider a simplified hypothetical example whereby out of the 257 million shares registered by Palantir in the Direct Listing, Employee A has 347,408 registered shares and sells them to Lead Plaintiff.  This implies that Palantir's transfer agent delivered 347,408 of the newly registered shares to the custodial clearing DTC account of the hypothetical broker-dealer for Palantir Employee A, the seller from which Lead Plaintiff purchased these shares.   Suppose, for example, that this hypothetical broker-dealer was JPMorgan Securities.   This implies that the DTC Participant Daily Activity Statement for JPMorgan Securities would record the

---

[38] The process for FAST transfer agent deposits is given in DTCC publications.  DTCC, *Deposit/Withdrawal At Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited Apr. 19, 2024) ("Participants submit their physical securities and/or transfer instructions for approval directly to their FAST transfer agent. When the transfer agent approves the transfer, the participant enters the transaction via the PDWC function on DTC's Participant Terminal System (PTS), the Part Direct Deposit/Withdrawal function on DTC's Participant Browser System (PBS), or the CF2DWX file protocol. The transfer agent then approves the transaction via the CDWC function on PTS or the TA Direct Deposit/Withdrawal function on PBS.  **For DWAC deposits, the requesting participant's position in its DTC account is increased** as is DTC's FAST balance in the issue.") (emphasis added).

Movants' Appendix 020

delivery of the 347,408 registered securities from the transfer agent as a deposit into to JP Morgan Securities' DTC participant account.

42.   Based on my professional experience reviewing tens of thousands of pages of Participant Daily Activity Statements produced by DTC in certain other litigation matters listed on my C.V., I have prepared an original mockup of a Participant Daily Activity Statement for this scenario that is representative of an actual Statement:

```
                                   THE DEPOSITORY TRUST COMPANY                        PAGE   12,500
PARTICIPANT:    0187               PARTICIPANT DAILY ACTIVITY STATEMENT - 09/30/20
   JPMORGAN SECURITIES LLC                                                      SDFS & NDFS - COMMINGLED

____ACTIVITY_DESCRIPTION_____/___CODE__  __AFFECTED__ACCOUNT__  _QUANTITY_  ($)_DOLLAR_VALUE  OTHER_PARTY    ____OTHER_INFO____
CUSIP___69608A108                                                               PREVIOUS_ACTIVITY__9/29/20____SDFS

   DIRECT DEPOSIT AT CUSTODIAN    (037-000) GENERAL FREE    010       347,408+

        ___ACCOUNT_SUMMARY___        OPENING_BALANCES        LONG_(+)        SHORT_(-)        CLOSING_BALANCES

     GENERAL FREE    (010) **TOTAL**         0              347,408           0                 347,408
```

The above mockup Participant Daily Activity Statement shows the registered shares being deposited into JPMorgan Securities' DTC custodial account by Palantir's transfer agent.

43.   Now suppose, one week later, Employee A sells all 347,408 of their registered securities on the open market to Lead Plaintiff, whose custodian is State Street. DTC records readily producible in discovery will show the DTC account for State Street receiving a deposit of 347,408 securities (marked with Palantir's Class A shares CUSIP identifier):

Movants' Appendix 021

```
                                      THE DEPOSITORY TRUST COMPANY                    PAGE    2,929
PARTICIPANT:   0189              PARTICIPANT DAILY ACTIVITY STATEMENT - 10/05/20
    STATE STREET GLOBAL MARKETS LLC                                              SDFS & NDFS - COMMINGLED

___ACTIVITY_DESCRIPTION_____/___CODE__ __AFFECTED__ACCOUNT__ _QUANTITY_ ($)_DOLLAR_VALUE  OTHER_PARTY    ____OTHER_INFO____

CUSIP___69608A108                                              PREVIOUS_ACTIVITY__10/04/20___SDFS

  DELIVER ORDER          (026-000) GENERAL FREE    010    347,408+                   0187 C
                                                                                    JPMORGAN SECURITIES LLC

      ___ACCOUNT_SUMMARY___     OPENING_BALANCES     LONG_(+)      SHORT_(-)     CLOSING_BALANCES

      GENERAL FREE   (010) **TOTAL**       0         347,408         0            347,408
```

44.  The line in the rectangle shows a "deliver order" transaction for 347,408 shares from JPMorgan Securities to State Street, which reflects the custodial transfer underlying the purchase of these 347,408 shares by Lead Plaintiff from Palantir Employee A.

45.  The above mockup is a simplified scenario in which there is just one transaction, but the same principle applies to more complex transactions, such as cases where purchases and sales are netted or when multiple purchases are included in a single transfer.  Notwithstanding that share ownership is held in "fungible bulk" form, the detail in these Participant Daily Activity Statements make it straightforward to trace deposits within DTC custodial accounts corresponding to individual broker-dealers.

46.  Of course, broker-dealers like State Street provide custodial services for multiple shareholders.  It thus may be necessary to incorporate information contained in broker-dealer records which reflect the transactional activity and holdings of individual customer accounts.  I have already reviewed some of these records maintained by State Street for Lead Plaintiff's transactions.  Below is an excerpt of the custodial activity maintained by State Street for Lead Plaintiff in Palantir shares:

Movants' Appendix 022



47. This short excerpt shows a purchase of 347,408 shares on October 20, 2020, respectively, by one of Lead Plaintiff's executing brokers, ████████████████, which were delivered to State Street's DTC account as custodian for Lead Plaintiff. This reflects a credit of these shares by State Street to the benefit of Lead Plaintiff.

48. In my professional experience, broker-dealers, and custodians like State Street, maintain similar records identifying individual purchases by *all* of their customers. Just like the custodial transfer from JPMorgan Securities to State Street is matched to a credit by State Street to Lead Plaintiff in this example, so also DTC deposits to custodians generally can be credited to customer accounts holding shares at those custodians, with appropriate adjustments for netting and the use of accounting methods when necessary.

49. While this is only a hypothetical example, this same methodology, using just a limited set of documents readily producible in discovery, can show that Lead Plaintiff purchased registered shares of Palantir Class A common stock traceable to the Registration Statement in the Company's Direct Offering.  Thus, records of transactions at each step of the way yield a traceable chain of title for the shares purchased by Plaintiffs.

22

## V.      CONCLUSION

50.      Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that timestamped transactional records are maintained by DTC and broker-dealers that identify individual purchases of Palantir shares by DTC participants and their customers, making it possible to reconstruct a reliable "chain of title" using standard accounting methods like first in-first out (FIFO) or last in-first out (LIFO) that do not amount to "statistical tracing"; and only a limited set of records from DTC and Computershare (and, if the records from DTC and Computershare are not sufficient, from Palantir) are required in discovery to establish that Plaintiffs purchased registered shares.

51.      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on May 24, 2024, at Scarsdale, New York.

_____

JOSHUA R. MITTS, PH.D.

**MAY 24, 2024**

Movants' Appendix 024

# APPENDIX A

Movants' Appendix 025

# JOSHUA R. MITTS

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law. Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism. Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations. He has extensive experience supporting the U.S. Department of Justice.

## ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*David J. Greenwald Professor of Law* (July 1, 2023 – present)
*Professor of Law* (July 1, 2022 – June 30, 2023)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-2023)
      Subcommittees: Racial Justice, Fossil Fuels

## EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

## PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Can Section 11 Be Saved?: "Tracing" A Path to its Survival*** (with John C. Coffee, Jr.) (forthcoming, HARV. BUS. L. REV., 2024), https://ssrn.com/abstract_id=4644888

***Trading on Terror*** (with Robert J. Jackson, Jr.) (working paper, 2023), https://ssrn.com/abstract_id=4652027

***Passive Exit***, 28 STAN. J.L. BUS. & FIN. 155 (2023), https://ssrn.com/abstract_id=3716249

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox), 78 BUS. LAW. 1 (2023).

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD., 2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019), https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

    *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019) (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

    Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

Movants' Appendix 026

*I Promise to Pay*, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

*What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,* 175 J. INST. & THEO. ECON.
178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

*Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in
Immigration Removal,* 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue),
https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

*Informed Trading and Cybersecurity Breaches,* 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley),
https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

*Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?*, 104 CORNELL
L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.),
https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-
activist-director-goes-on-the-board/

    One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

*The Cost of Transparency* (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

*The 8-K Trading Gap* (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

*Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority*,
1 J. FIN. REG. 51 (2015)

*Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV.
99 (2014) (with Jonathan R. Macey)

*Anti-Herding Regulation*, 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

*Mechanism Design in M&A Auctions*, 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of
Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

*Three Proposals for Regulating the Distribution of Home Equity*, 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

*Law and Mechanism Design: Procedures to Induce Honest Bargaining*, 68 NYU ANN. SURV. AM. L. 729 (2013)
(with Steven J. Brams)

*Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine*, 23
CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

*A Private Ordering Solution to Blockholder Disclosure*, 35 N.C. CENT. L. REV. 203 (2013)

Comment, *Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"*
122 YALE L.J. 507 (2012)

## RULEMAKING PETITIONS

*SEC Rulemaking Petition on Short and Distort* (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.),
https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox**, Brainerd Currie Professor of Law, Duke University School of Law;  **Edward F. Greene**,
General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior
Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School;
**Meyer Eisenberg**, Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange
Commission (1998-2006); **Colleen Honigsberg**, Associate Professor of Law, Stanford Law School; **Donald Langevoort**, Thomas
Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk**, Associate Professor of Law, University of
Florida Levin College of Law; **Randall Thomas**, John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor
of Management. Owen Graduate School of Management; **Robert B. Thompson**, Peter P. Weidenbruch, Jr. Professor of Business
Law, Georgetown University Law Center; **Andrew Verstein**, Professor of Law, Wake Forest University School of Law; and **Charles
K. Whitehead**, Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

2

OTHER PUBLICATIONS

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                                                                  2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Corporations (Fall 2022, Fall 2023)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                                                              2013 – 2014
*Associate*

PRESENTATIONS

**2021-present**

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

3

**2019-20**

2020 UF Business Law Conference; 2020 George A. <u>Leet</u> Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Securities & Exchange Commission; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

*Allison v. Oak Street Health, Inc. et al* (N.D. Ill. Jan 10, 2022)
*USA v. Berman* (D.D.C., 2024)
*In re The RealReal, Inc. Securities Litigation* (Ca. Sup. Ct., County of Marin, 2024)
*In re Talis Biomedical Securities Litigation* (C.D. Ca., 2023)
*Crews v. Rivian* (C.D. Ca., 2023)
In re *Hewlett Packard Enterprise Co. Shareholder Litigation* (Ca. Sup. Ct., County of Santa Clara, 2023)
In re *Turquoise Hill Resources Securities Litigation* (S.D.N.Y., 2023)
In re *Bayer Securities Litigation* (N.D.C.A., 2022)
*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL,* Alberta Securities Commission (2021)
*Burford v. LSE,* CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## BAR ADMISSION

New York

Movants' Appendix 029