IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Lead Civil Action No. 22-cv-02384-GPG-SBP
*Consolidated with Civil Actions 1:22-cv-02805-GPG-SBP*
*and 1:22-cv-02893-GPG-SBP*

MINCHIE GALOT CUPAT, Individually
and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

PALANTIR TECHNOLOGIES, INC.,
ALEXANDER C. KARP,
DAVID GLAZER, and
SHYAM SANKAR,

      Defendants.

---

**ORDER**

---

Before the Court are Plaintiffs' Motion for a Partial Lift of the PSLRA Discovery Stay (the

Motion to Lift Stay) (D. 94), Defendants' Combined Motion and Brief to Dismiss Second

Amended Complaint (D. 102) (the Motion to Dismiss), Defendants' Request for Judicial Notice

and Notice of Documents Incorporated by Reference in Support of Defendants' Motion to Dismiss

Plaintiffs' Second Amended Complaint (the Request for Judicial Notice) (D. 103), and Plaintiffs'

Objection to Additional Materials Improperly Submitted with Defendants' Reply in Support of

their Motion to Dismiss Plaintiffs' Second Amended Complaint (the Objection to Reply Materials)

(D. 117).

1

For the reasons stated below, the Court DENIES the Motion to Lift Stay, GRANTS the Motion to Dismiss, GRANTS IN PART and otherwise DENIES AS MOOT the Request for Judicial Notice, and DENIES AS MOOT the Objection to Reply Materials.

## I. FACTUAL BACKGROUND

This Order assumes the reader's familiarity with Plaintiffs' allegations and operative legal theories, as expressed in Plaintiffs' Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the Complaint) (D. 92). But it provides a brief overview of Plaintiffs' allegations below for some context.[1]

Defendants Alexander Karp, Peter Thiel, and Stephen Cohen founded Defendant Palantir Technologies, Inc. (Palantir) in 2003 (*id.* at ¶ 26). Palantir sells software products built on two customer-facing platforms: Gotham and Foundry (*id.*). Gotham—the first platform Palantir developed—organizes and analyzes complex datasets and is used to design software for Palantir's government clients (*id.*). Palantir's second platform, Foundry, caters to commercial clients (*id.*). Foundry is used to link disparate data sets into a central operating system (*id.*).

Historically, Palantir insiders disclaimed their intent to take the company public (*id.* at ¶ 27). For instance, in 2014, Mr. Karp, Palantir's Chief Executive Officer (CEO), was quoted in the *New York Times* as stating that a public offering would be "corrosive to [Palantir's] culture, [and] corrosive to [Palantir's] outcomes" (*id.*). But Mr. Karp held a substantial number of Palantir options, set to expire in 2021 (*id.* at ¶¶ 27–28). Other Palantir insiders held options too (*id.* at ¶ 28).

---

[1] As used in this Order, the term "Plaintiffs" has the same meaning as it does in the Complaint. It refers to Lead Plaintiff California Public Employees' Retirement System (CalPERS) and additional named plaintiff Shijun Liu (*see* D. 92 at 6).

Mr. Karp and the others wanted to exercise their options and sell their Palantir stock for top dollar (*id.*). To do so, they came up with a "scheme" to take Palantir public, mislead the market about Palantir's growth prospects (both through statements about those prospects and by orchestrating "sham" transactions to boost Palantir's commercial revenues), and sell off large amounts of their holdings at artificially high prices (*id.* at ¶¶ 2–3, 28–171, 187–92). In other words, they settled on a pump-and-dump play.

## A. Palantir Goes Public

Defendants began executing this scheme by taking Palantir public in September 2020 (*id.* at ¶ 29).[2] Palantir went public through a direct listing (the Offering) (rather than through a more traditional initial public offering (IPO)) (*id.*). Unlike an IPO, a direct listing does not utilize an underwriter (*id.*). Because no underwriter is involved, a direct listing avoids the scrutiny and diligence that typically accompanies the underwriting process (*id.*). Moreover, when a company goes public via direct listing, it does not raise any capital itself (*id.*). Rather, a direct listing simply enables the company's existing shareholders to publicly sell their existing equity (*id.*). As Mr. Karp put it, the point of the direct listing was to provide "the people at Palantir who built this company over 17 years [with] access to liquidity" (*id.* at ¶ 233).

When Palantir went public, a total of 489,128,232 Palantir shares initially became available for trading (*id.* at ¶ 234). Of that amount, 257,135,415 shares were registered under the

---

[2] This Order uses the term "Defendants" in the same way as that term is used in the Complaint (*see* D. 92 at ¶ 24 (defining "Defendants")). The term includes Messrs. Karp, Cohen, and Thiel, as well as David Glazer (Palantir's Chief Financial Officer and Treasurer), Shyam Sankar (Palantir's Chief Operating Officer and Executive Vice President), Kevin Kawasaki (Palantir's Global Head of Business Development), and Palantir itself (*see id.* at ¶¶ 18–20, 24). The Court notes that Plaintiffs are also suing other individuals in connection with their Securities Act claims (*see id.* at ¶ 216).

Registration Statement (*id.*).  The balance of 231,992,817 shares was exempt from registration under Securities and Exchange Commission (SEC) rules (*id.* at ¶ 234).

Though Palantir had created a public market for its securities, it placed limits on how much equity its insiders could immediately sell (so as to preserve investor confidence) (*id.* at ¶ 130 n.31). Palantir imposed a partial lockup, which prevented Palantir's insiders from selling more than 20% of their shares before February 18, 2021 (*id.*).

### B.  Palantir's Growth Stalls

Palantir's transition from a private company to a public company coincided with a period of explosive growth.  Indeed, in 1H20,[3] the first half of the fiscal year in which Palantir went public, Palantir posted 49% year-over-year growth (and had significantly improved its margins) (*id.* at ¶ 30).  Both before and after the Offering, Palantir insiders publicly and extensively touted Palantir's purportedly increasing operational efficiencies, high growth rate, and other positive performance metrics relevant to Palantir's future growth potential (*see*, *e.g.*, *id.* at ¶¶ 34, 36–38, 39, 47, 49–52, 225–29).  In short, they painted Palantir as a high-margin, high-growth company with significant untapped potential.

But the story Palantir insiders painted of improving efficiency and accelerating growth was misleading.  Palantir's growth had peaked, and the operational characteristics of Palantir's products limited Palantir's potential.  Palantir's revenue growth began decelerating in 2021, as short-term contracts relating to the COVID-19 pandemic ended (*id.* at ¶ 31).  Palantir's government

---

[3] Palantir's fiscal year runs concurrent with the calendar year (D. 92 at ¶ 3 n.3).  The Court refers to periods within Palantir's fiscal year using a number to designate the period, the letters "Q" and "H" to indicate whether it is referring to a quarter- or half-year period, and the year in which the period fell.  Under this convention, for example "1H20" refers to the first half of Palantir's fiscal year (FY) 2020.  And "2Q20" would refer to the second quarter of Palantir's FY2020.

revenue growth rate reached its high-water mark in 4Q20—the quarter beginning the day after Palantir went public—and declined in every following quarter (*id.*). Meanwhile, Palantir's commercial growth—or at least, commercial growth attributable to legacy-type clients—likewise stagnated (*id.*). This so-called "organic growth" in Palantir's commercial revenues dropped significantly in 4Q20 and did not recover (*id.*).

Moreover, Palantir did not have "SaaS [Software as a Service] like economics" or the ability to deploy its products efficiently, like Defendants represented it did (*id.* at ¶¶ 33–35). Instead, Palantir functioned more like a traditional services company (*id.* at ¶¶ 33, 35, 40–44). Deploying its products remained time- and labor-intensive, particularly for new use cases, limiting Palantir's potential margins (*id.* at ¶ 35). There was nothing "drag-and-drop" or plug and play about Palantir's software—its engineers had to customize it and modify it to meet the needs of individual customers, effectively creating bespoke, custom products for different users (*id.* at ¶¶ 35, 40).

Defendants knew that Palantir's growth would slow down in advance of this drop off (and in advance of the Offering) (*id.* at ¶ 57). They also knew that Palantir was offering customers bespoke, custom-built systems and so operated as more of a low-margin services company than as a high-margin sales company (*id.* at ¶¶ 44, 54, 78).

Defendants knew these things because—as they claimed—they had "strong visibility into future revenues across [Palantir's] customer base" and because Palantir's "sales efforts . . . historically depended on the significant direct involvement of [its] senior management team," which included Defendants (*id.* at ¶¶ 125–26). Defendants also had access to regularly updated dashboards that provided them with "granular" information about Palantir's contracts (*id.*

at ¶ 126).  Further, Mr. Karp painted himself as an involved CEO, stating, "I run this business, for better or worse.  I know how the business is doing" (*id.*).  Moreover, as Defendants claimed, several features of Palantir's business explained their visibility into Palantir's future performance, including the limited size of Palantir's customer base, the average length of Palantir's contracts, the fact that Palantir recognized revenue ratably over the lives of its contracts, and Palantir's total remaining deal value on its existing contracts (*id.* at ¶ 125).

### C.  Palantir Invests in SPACs to Preserve Growth Trends

To prolong their window for offloading their equity at high prices, Defendants needed a way to keep the market from finding out about Palantir's darkening prospects and to maintain their high-growth, high-efficiency narrative.  So, starting in early 2021, they embarked on an investment program to create the illusion of continued accelerating growth and to artificially bolster Palantir's performance metrics (*id.* at ¶¶ 32, 58).

Defendants caused Palantir to invest in a series of special purpose acquisition companies (SPACs) and/or SPAC target companies,[4] in exchange for reciprocal commitments from those companies to purchase Palantir subscriptions (*id.* at ¶ 58).  All told, Palantir invested in over 20 SPACs between March and December 2021 (*id.* at ¶¶ 58, 62–63, 93).  Most of the companies that Palantir invested in had poor commercial prospects, were quickly burning through cash, and had

---

[4] Per the Complaint:

> Special purpose acquisition companies ("SPACs") are "blank check" companies that raise cash in an initial public offering ("IPO") to acquire a private company and bring that company public. SPACs typically raise money through the private placement of additional equity securities in order to complete the acquisition, fund operations post-closing, and/or serve as a backstop to shareholder redemptions. These private investments in public equity are known as "PIPE" financings.

(D. 92 at ¶ 3 n. 4).

no viable products (*id.* at ¶¶ 64, 68, 76, 84–86, 93–94, 98).  Defendants knew this, because they personally participated in the SPAC negotiations, conducted extensive pre-transaction diligence, and, after Palantir supplied its software, gained full access to these companies' data (*id.* at ¶ 59).

Palantir's SPAC deals lacked commercial substance.  Palantir's investment targets were too small and new to afford or effectively leverage Palantir's software (*id.* at ¶ 58).  And in any event, Palantir wasn't selling these companies its best stuff: Palantir provided a watered-down version of its products that required no customization and little support (with the effect of boosting performance metrics, such as Palantir's contribution margin) (*id.* at ¶¶ 55, 89, 103, 109).[5]  But while the SPAC entities did not need Palantir's products, they needed its cash (*id.* at ¶¶ 75, 78, 89).  And Defendants needed the SPAC entities' subscription agreements to prop up the growth narrative they were shilling (*id.* at ¶ 97).  In essence, Palantir's investments and its investment targets' reciprocal software purchases were mere "sham" or "round-trip" transactions with no genuine commercial justification and were simply a scheme allowing Defendants to defraud Palantir's outside shareholders (*id.* at ¶¶ 3, 55, 64, 156).  Some of Palantir's subscription agreements and investments involved similar consideration—a fact that underscores these deals' lack of substance (*see, e.g.*, *id.* at ¶ 76).  Further, Palantir—in connection with multiple of the SPAC deals—asked for most of its money back up front (*see, e.g.*, *id.* at ¶ 78).

All the while, Defendants defended their SPAC scheme.  For instance, when a participant in an earnings call noted that "[t]he talk is Palantir's buying revenue," Mr. Kawaski painted the SPAC deals as bona fide investments:

---

[5] Per the Complaint, "Contribution margin is Palantir's 'revenue less [the] cost of revenue and sales and marketing expenses, excluding stock-based compensation, divided by revenue'" (D. 92 at ¶ 104 n.22)

> Thank you. This is a huge opportunity for us to invest in our customers. And that's something we feel we've always done. Now we can do it with our balance sheet. These are companies that we think we will be working with for a very long time.
>
> ***
>
> So I'll also break down the numbers a little bit here. Dave already mentioned that less than 1% of our revenue came from this program in Q2. Additionally, of the $925 million of total TCV in Q2, $543 million from this program. This is a long-term strategy, and the deal is a long term as well. So we expect longer duration and time to revenue recognition.

(*Id.* at ¶ 83). Defendants made various other statements portraying the SPAC program as involving genuine, long-term investments that they thought made sense for Palantir's business (*see, e.g.*, *id.* at ¶¶ 65–66, 74, 77, 83). They also touted Palantir's new customer acquisitions and metrics that artificially benefited from the SPAC investments (*see, e.g.*, *id.* at ¶¶ 111, 116). But they hid details of the SPAC deals from shareholders, including by failing to promptly name some of the SPACs Palantir invested in (*see, e.g.*, *id.* at ¶¶ 61, 63, 99).

### D. Palantir's Insiders Cash In

Between September 30, 2020, and August 5, 2022, Defendants sold more than $2.2 billion of their stock, accounting for substantial portions of their saleable holdings (*id.* at ¶¶ 6, 189). They did so while Palantir's share price remained artificially inflated because of their misstatements about Palantir's continued growth prospects and by the fictitious image Palantir's SPAC transactions created (*id.*).

### E. Defendants' Narrative Falls Apart

Starting in November 2021, Defendants could no longer maintain their narrative of strong and accelerating growth. On November 9, 2021, Palantir issued its 3Q21 Release, which revealed that Palantir's revenue growth was decelerating (*id.* at ¶ 175). Palantir's share price fell by 9.3%

that day (*id.*).  Analysts commented on Palantir's disappointing results, flagging that there were "[c]racks [e]merging in the [SPAC] [s]tory" and speculating that revenue from Palantir's SPAC investments was not sustainable (*id.* at ¶ 176).  In the wake of these comments, Palantir's stock price declined another 7.1% on November 10, 2021 (*id.* at ¶ 177).

On February 17, 2022, Palantir issued its FY21 Release and a FY21 Business Update presentation (*id.* at ¶ 178).  These statements revealed that Palantir's government business was decelerating, and that performance metrics like contribution margin were falling (*id.*).  They also revealed that, factoring out Palantir's SPAC scheme, Palantir's total deal value was almost flat year-over-year (*id.*).  Again, analysts reacted negatively to these revelations (*id.* at ¶ 179).  For instance, Deutsche Bank published a report reducing its price target for Palantir stock because Palantir's total deal value exclusive of SPAC transactions had decelerated to 1% year-over-year growth (*id.*)

On May 9, 2022, Palantir issued its 1Q22 Release, which revealed that Palantir anticipated 25% year-over-year revenue growth for 2Q22—a figure below 30% long-term revenue guidance Defendants had long presented to investors (*id.* at ¶¶ 157, 181).  Palantir also filed its 1Q22 Form 10-Q that day, which revealed that Palantir's ex-SPAC 1Q22 revenue growth would have only been 19%, and convened a conference call, on which Defendants revealed that they were winding down the SPAC program and that SPACs' contribution to Palantir's total deal value was $755 million in the quarter, over $200 million less than it had been in 4Q21 (*id.* at ¶ 181).  Palantir's share price declined 21% on May 9, 2022, and fell another 10% over the next few days (*id.* at ¶ 183).

Palantir issued its 2Q22 Release on August 8, 2022 (*id.* at ¶ 184). This release revealed that Palantir's expected annual year-over-year revenue growth for 2022 would be only 23%—well below Palantir's long-term guidance (*id.*). It also revealed that Palantir had terminated several of its SPAC contracts (*id.*). Market commentator RBC published a report the following day examining Palantir's SPAC investments and estimating that "the SPAC-related [total contract value] potentially at-risk of not fully converting into revenue is $406M," noting that at least 15 of Palantir's SPAC clients had substantial doubt as going concerns, and stating that none of the SPACs was trading above their $10 reference price (and most were trading in the penny stock range) (*id.* at ¶ 185). Palantir's share price declined on this news, falling 19% from August 8, 2022 to August 9, 2022 (*id.* at ¶ 186).

### F. Plaintiffs Sue Defendants for Securities Fraud

Based on these alleged facts, several plaintiffs sued Defendants. These various cases were consolidated (*see* D. 34). Plaintiffs' operative complaint alleges five claims for relief (*see* D. 92). First, Plaintiffs allege that Defendants violated Section (10)(b) of the Exchange Act of 1934 (the Exchange Act), 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, on two theories: scheme and misrepresentation liability (D. 92 at 86–88).[6] Second, Plaintiffs assert a claim under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a) (D. 92 at 88–89). Third, Plaintiffs assert a claim under Section 20A of the Exchange Act (D. 92 at 89–90). Fourth, Plaintiff bring a claim under Section 11 of the Securities Act of 1933 (the Securities Act), 15 U.S.C. §77k (D. 92 at 101–

---

[6] All references this Order makes to the page numbers of documents in the record rely on the pagination that the Court's CM/ECF system automatically applies—not the internal pagination of any such document.

103).  Fifth and finally, Plaintiffs assert a claim for violations of Section 15 of the Securities Act,

15 U.S.C. §77o (D. 92 at 103–105).

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a complaint

must contain sufficient factual matter, accepted as true and interpreted in the light most favorable

to the non-moving party, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Additionally,

the complaint must sufficiently allege facts supporting all the elements necessary to establish an

entitlement to relief under the legal theory proposed; however, a complaint may be dismissed

because it asserts a legal theory not cognizable as a matter of law.  *Forest Guardians v. Forsgren*,

478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo.

2004).  A claim is not plausible on its face "if [the allegations] are so general that they encompass

a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[] their claims

across the line from conceivable to plausible."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th

Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  In assessing a claim's plausibility, legal

conclusions contained in the complaint are not entitled to the assumption of truth.  *See Kansas

Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).  The standard, however,

remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes

a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

11

unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks and citation omitted).

### B. Rule 9 and PSLRA

Federal Rule of Civil Procedure 9(b) applies special pleading requirements to claims sounding in fraud. It requires that, "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Securities fraud claims asserted under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 CFR § 240.10b-5, sound in fraud and must satisfy this requirement. Arguably, claims asserted under Section 11 of the Securities Act also must satisfy Rule 9(b)'s requirements if those claims depend on allegations of fraud. *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1101 (D. Colo. 2017); *see also In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1015 (D. Colo. 2016), *as amended* (Jan. 28, 2016) (applying Rule 9(b) to the plaintiffs' Section 11 claims where they "relied on the same alleged misrepresentations that [were] central to [their] Section 10(b) fraud claim").

The Private Securities Litigation Reform Act (PSLRA) imposes further unique pleading requirements for securities-fraud claims. In particular, "[t]he PSLRA requires that a plaintiff plead falsity by specifying each allegedly misleading statement, the reason why the statement is misleading, and, if made on information and belief, all facts on which that belief is formed. For scienter, the complaint must state with particularity, for each act or omission, facts giving rise to a strong inference that the defendant acted with an intent to defraud or recklessness." *Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1149 (D. Colo. 2019) (citations omitted); *see also* 15 U.S.C. § 78u–4(b)(1)–(2).

## III. ANALYSIS

Plaintiffs' Complaint fails for two reasons. First, Plaintiffs did not adequately plead scienter, which is an element common to both their scheme- and misrepresentation-based theories for establishing Defendants' primary violations of the Exchange Act. Because Plaintiffs did not sufficiently allege a primary violation of the Exchange Act, their derivative claims under Sections 20(a) and 20A of the Exchange Act also fail. Second, Plaintiffs fail to allege that they purchased any shares traceable to the registration statement they challenge. This means that Plaintiffs did not adequately allege a violation of Section 11 of the Securities Act, which in turn defeats their derivative claim under Section 15 of the Securities Act.

### A. Exchange Act Claims

#### 1. Primary Violations

Plaintiffs attempt to allege primary violations of the Exchange Act on two theories: "scheme liability" pursuant to Rule 10b-5(a) and (c), and liability for misleading statements under Rule10b-5(b). Rule 10b-5 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To plead scheme liability under Rule 10b-5(a) and (c), "a plaintiff must allege that the defendant: a) committed a manipulative or deceptive act; b) in furtherance of the alleged scheme to defraud; c) scienter; and d) reliance." *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1143 (D. Colo. 2005). To plead liability based on purportedly misleading statements under Rule 10b-5(b), meanwhile, a plaintiff must allege that: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1304 (10th Cir. 2020).

"Scienter is an element common to either theory." *Britton v. Parker*, No. 06-CV-01797-MSK-KLM, 2007 WL 2871003, at *4 (D. Colo. Sept. 26, 2007). For purposes of claims under Section 10 and Rule 10b-5, "scienter is a mental state embracing (1) intent to deceive, manipulate, or defraud, or (2) recklessness." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1258–59 (10th Cir. 2022) (citation omitted). "Recklessness is conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation omitted).

Plaintiffs asserting claims under Section 10(b) "bear[] a heavy burden at the pleading stage," because under the PSLRA, they must state with particularity facts giving rise to a strong inference of scienter. *Smallen*, 950 F.3d at 1305. In deciding whether a plaintiff has met this burden, a court "must consider the complaint in its entirety, as well as other sources courts

ordinarily examine when ruling on Rule 12(b)(6) motions . . . .  The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (citation omitted).  Ultimately, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Here, the facts Plaintiffs allege give rise to neither a strong inference that Defendants acted with scienter with respect to their alleged misrepresentations, nor to a strong inference that Defendants acted with scienter with respect to their purported scheme to artificially inflate Palantir's share price while they offloaded their equity.

Plaintiffs try to meet their obligation to plead scienter in several ways.  First, they allege that Defendants were directly involved in core Palantir business operations directly relevant to the fraud Plaintiffs allege.  For instance, Plaintiffs point out that Defendants directly participated in Palantir's sales operations and were involved with negotiating the SPAC transactions.  Plaintiffs also reference statements certain Defendants made about their involvement in, and responsibility for, Palantir's business.  Second, Plaintiffs allege that Defendants had access to data germane to their alleged fraud, such as regularly updated dashboards and, as is relevant to the SPACs, diligence information and copies of client data.  Third, Plaintiffs allege that Defendants, by their own admission, acknowledged their high degree of visibility into Palantir's future revenue and prospects.  Fourth, Plaintiffs allege that Defendants sold massive amounts of their equity during the class period, both in absolute terms and as a percentage of their saleable holdings.  Fifth, Plaintiffs contend that the SPAC transactions were transparently fraudulent, round-trip

transactions.  And sixth, Plaintiffs allege that scienter may be inferred from the purported facts

that Defendants concealed information pertinent to the SPAC transactions from investors and

caused Palantir to stop reporting metrics that would have revealed cracks in Palantir's

performance.  But the sheer number of ways Plaintiffs try to plead scienter actually underscores

the fact that none of them are that compelling.  As Judge Sam Lindsay, writing for the United

States District Court for the Northern District of Texas, put it:

> Pleading scienter is not an insurmountable task if facts exist to support it.
> The approach is to state with particularity what each Defendant did and why
> the conduct rises to the level of scienter, rather than taking a shotgun
> approach in which Plaintiffs attempt to overwhelm the court with
> conclusory, speculative and esoteric allegations. Stated in plain language,
> Plaintiffs simply need to connect the dots and state with particularity facts,
> rather than hyperbole or conclusory statements, which demonstrate what
> each Defendant did that would point to a strong inference of scienter. This
> would be the simplest and most efficient or effective way to show scienter,
> rather than attempting to show it by cross-linking a myriad of conclusory
> allegations. A complaint need not be long and detailed to accomplish this,
> but it must be specific. The court finds Plaintiffs' method of pleading more
> telling about what does not exist in the complaint, rather than what does
> exist. The court has considered all the factual allegations and circumstances,
> taken together, and concludes that they fail to give rise to a strong inference
> of scienter.

*In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 565 (N.D. Tex. 2003).

These observations apply with force here.  When Plaintiffs' verbiage is peeled back, it

becomes clear that Plaintiffs over-rely on group pleading, conclusory allegations, and speculation.

Considering Plaintiffs' shotgun-style scienter allegations holistically, the Court does not find that

Plaintiffs have pleaded with particularity facts supporting an inference of scienter at least as

compelling as the inference that Defendants acted innocently.

*i. Alleged Personal Involvement of High-Level Executives*

Plaintiffs' contention that scienter can be inferred from Defendants' hands-on involvement in Palantir's business, including its sales process and SPAC negotiations, is not persuasive. As an initial matter, Plaintiffs rely heavily on group pleading (*see, e.g.*, D. 92 at ¶ 25 ("The Individual Defendants participated in the fraudulent scheme alleged herein, and because of their positions with the Company and their access to material nonpublic information, the Individual Defendants were aware of and/or recklessly disregarded the adverse facts specified herein"); *id.* at ¶ 59 ("[T]he Individual Defendants were personally involved in negotiating the SPAC deals"); *id.* at ¶ 72 ("Defendants knew from Palantir's SPAC due diligence and installation data that the First Stage SPACs were largely nonviable . . . ."); *id.* at ¶ 126 (generally alleging the "involvement of Palantir's c-suite executives and Thiel in the customer acquisition process")). This pleading style does little to move the ball on scienter. *See Smallen v. W. Union Co.*, No. 17-CV-00474-KLM, 2019 WL 1382823, at *40 (D. Colo. Mar. 27, 2019) (recognizing that a Section 10(b) plaintiff must "adequately allege scienter on the part of *each* Defendant" (emphasis added)); *TDC Lending LLC v. Priv. Cap. Grp., Inc.*, 340 F. Supp. 3d 1218, 1227 (D. Utah 2018) (observing that group pleading is incompatible with the PSLRA's particularity requirements).

Moreover, it is well established that courts "cannot infer scienter based only on a defendant's position in a company or involvement with a particular project." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016), *as amended* (July 6, 2016); *see also City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1263–64 (10th Cir. 2001) ("Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company."). And the Complaint only alleges scienter-by-virtue-of-position at a very general

17

level: it does not plead particularized facts showing what particular Defendants knew and how they knew it based on their respective roles in the company. Plaintiffs' position-oriented allegations do not suffice to establish scienter. *See Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1217 (10th Cir. 2023) (observing that "an executive's position in the company doesn't show knowledge of specific facts" and that access to company data that top level executives have by virtue of their roles does not support a strong inference of scienter).[7]

### ii. Data Access

Plaintiffs' allegations that Defendants had access to data that could have supplied knowledge that their claims about Palantir's performance (and the performance and viability of Palantir's SPAC investments) does little to clarify the scienter picture. Again, Plaintiffs' data-access allegations are generally group pled (*see* Section III.A.1.i, *supra*; *see also, e.g.*, D. 92 at ¶ 25 ("The Individual Defendants sent and received widely disseminated monthly email updates that included metrics on the state of the Company's business"); *id.* at ¶ 126 ("Karp, Glazer, and the other 'c-suite' executives had access to dashboards that were updated daily and provided them additional granular information on the Company's contracts – including a contract's signature date, expected 'completion date,' and Palantir's expenditures on the contract.")). And Plaintiffs do not

---

[7] Casting Palantir's sales activities and SPAC investments as core operations does not alter the analysis. Plaintiffs' underlying theory may be that "the nature of the alleged fraud was of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *See In re Molson Coors Beverage Co. Sec. Litig.*, No. 19-CV-00455-DME-MEH, 2020 WL 13499995, at *8 (D. Colo. Dec. 2, 2020) (internal quotation marks omitted). But such "core operations" inferences are insufficient to plead scienter in the Tenth Circuit, "absent particularized facts showing what executives actually knew." *Id.* (quoting *DaVita Inc.*, 372 F. Supp. 3d at 1154). The Complaint contains no such allegations.

allege specifically what each Defendant knew and when he knew it. These allegations are not an

adequate basis from which to infer scienter. Per the Tenth Circuit:

> [I]t would make little sense to draw a strong inference of scienter from
> access to information. If access alone were enough, a strong inference of
> scienter would exist for high-level executives whenever they make a public
> statement contradicting something in the company's files.
>
> A plaintiff must thus allege facts with particularity showing not only the
> executive's access to contradictory information but also the executive's
> fraudulent intent or reckless disregard of accessible information. . . . So we
> must consider what Spirit's speakers knew when they made the public
> disclosures, focusing on the particularity of the plaintiffs' allegations and
> the strength of the related inferences.

*Meitav Dash Provident Funds & Pension Ltd.*, 79 F.4th at 1217. Simply because Defendants could

have accessed data that contradicted their statements (assuming that data even existed) does not

mean Defendants knew what that data reflected or acted with reckless disregard to the falsity of

any statements they made.[8]

### iii. Statements Respecting Future Visibility

Plaintiffs make much of the fact that certain Defendants emphasized their "strong

visibility" into Palantir's future revenue growth. But strong visibility does not equate to total

visibility, and does not mean that Defendants intentionally or recklessly misled Palantir's

investors. *Cf. In re Pivotal Sec. Litig.*, No. 3:19-CV-03589-CRB, 2020 WL 4193384, at *17 (N.D.

---

[8] It also strikes the Court as pretty unlikely that Defendants actually had access to some of the data that Plaintiffs allege they did, and that, even if they did have access, they would have used it. For instance, Plaintiffs allege that Defendants knew the SPAC entities were not viable because Palantir's software enabled them to "unlock" and leverage their customers' (presumably highly confidential) data (*see, e.g.*, D. 92 at ¶¶ 59, 98). But Plaintiffs' allegations about the way Palantir's software functions do not support their contention that Palantir (or specific Palantir insiders) had unfettered access to customer data (*see id.* at ¶ 59 (noting Mr. Sankar's statement that "as a consequence of simply integrating *your* data into foundry, *you* now have a digital twin of *your* entire enterprise" (emphasis added)). But even assuming that Palantir's software did give it access to its customers data, the proposition that Defendants actually accessed that data is pure speculation.

Cal. July 21, 2020) (noting that it was "not clear why" the defendant's statement that it had "quite a bit of revenue visibility" "would plausibly allege scienter").  And the factors that allegedly created visibility—including the purportedly limited size of Palantir's customer base and the large size of individual deals—actually support the inference that there was an innocent explanation for Defendants' overly optimistic projections: it would not take very many sales misses to undercut those projections.

### iv.  Class-Period Stock Sales

Plaintiffs' strongest scienter theory is that Defendants had a $2.2-billion motive to commit securities fraud.  Indeed, "[m]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.  "[B]ut these factors are 'typically insufficient in themselves' to give rise to a strong inference of scienter." *Smallen*, 950 F.3d at 1310 (quoting *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003)).  Further, "[w]hile suspicious insider stock trading is evidence of motive and weighs in favor of inferring fraudulent intent, the amount of profit realized through executive stock sales, standing alone, is insufficient to support an inference of scienter." *Id.*

In context, Defendants' equity sales were not suspicious.  First, Defendants candidly explained that the whole point of the Offering was so that they could gain access to liquidity after running Palantir as a private company for 17 years (*see* D. 92 at ¶ 233).  It is not surprising that they did what they said they would do.  And it is unsurprising that shareholders with access to a public market for the first time would trade at a high volume.[9]  *Cf. Chicago & Vicinity Laborers'*

---

[9] The Court appreciates that the relative recency of the Offering here in relation to Plaintiffs' suit puts Plaintiffs in a bit of a bind—there is minimal historic data with which Defendants' class-period trading activity can be compared. And because there is little data for a meaningful comparison, it is difficult to infer that there was anything unusual or suspicious about Defendants trading activity.  But this paucity of data does not excuse Plaintiffs from pleading scienter.

*Dist. Council Pension Fund v. Amplitude, Inc.*, No. 24-CV-00898-VC, 2024 WL 4375775, at *3 (N.D. Cal. Oct. 2, 2024) (concluding that the timing of stock sales "shortly after [an] IPO" was not suspicious); *Miyahira v. Vitacost.com, Inc.*, No. 10-80644-CIV, 2011 WL 13136262, at *8 (S.D. Fla. Dec. 8, 2011) ("IPO sales, in and of themselves, are not suspicious or unusual and do not establish an inference that Defendants knew negative information when they sold the shares."); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) ("[T]hough the amount of stock sold during the Class Period is substantial, the timing of these sales was quite ordinary.  It is not uncommon or otherwise suspicious to sell stock in association with a public offering; indeed, the sale of stock is often the point of the offering.").

Second, even by Plaintiffs' own calculations, most Defendants retained substantial portions of their saleable equity (*see* D. 92 at ¶ 189 (table detailing Defendants' equity retention).  When Defendants' vested options are included, only Mr. Glazer sold a majority of his holdings, and Mr. Thiel only sold 22.5% of his (*id.*).  While Defendants' sales are significant in absolute terms, and while the proportion of their sales in comparison to their retained equity *might* be suspicious under different circumstances—e.g., if there were no apparently innocent explanation for the timing of the sales, such as the availability of a public market for the first time—they do not strike the Court as particularly suspicious here.

Third, while the consideration Defendants received for their equity sales is significant in relation to their salaries (*see* D. 92 at ¶ 190), the Court does not find that this argument merits

---

*See Curry v. Yelp Inc.*, No. 14-CV-03547-JST, 2015 WL 7454137, at *14 (N.D. Cal. Nov. 24, 2015) ("Plaintiffs once again argue that the Court should ignore this deficiency [in contextualizing class-period sales] because Yelp's initial public offering occurred in March 2012, and thus, Plaintiffs do not have enough historical data to show that the insides sales are 'unusual' or 'suspicious.'  However, it is Plaintiffs' burden to plead scienter with particularity should they wish to pursue a securities claim against Defendants." (citation omitted)).

much weight in the context of this case. Where a plaintiff alleges scienter based on defendants'
trading activity, a high ratio of profits from that trading activity to the defendants' normal
compensation can support a finding of scienter. *See In re Qwest Commc'ns Int'l, Inc.*, 396 F.
Supp. 2d 1178, 1195 (D. Colo. 2004). However, in the context of a technology firm that
compensates its executives primarily in equity, the fact that profits from equity sales far exceed
executive salaries says very little about those executives' motives. *See Scheller v. Nutanix, Inc.*,
450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) ("Plaintiffs further contend that each defendant's
stock sales far exceeded his annual salary. Although in some instances this might suggest motive,
as Nutanix notes, it is common for executives to be paid primarily in equity where the company is
not yet public.").

In sum, while Defendants' class period stock sales were clearly significant, they are entirely
consistent with the trading activity one would expect of executives who had access to liquidity for
the first time after building a company for 17 years.[10] The innocent explanation for Defendants'

---

[10] Defendants further contend that most of their sales were made pursuant to Rule 10b5-1 plans or automatic tax sales,
and that these facts cut against the suspiciousness of their sales. Documents Defendants filed in support of their
Motion to Dismiss—including specifically Defendants' publicly filed Form 4s and Annex F to the Motion to Dismiss,
a document aggregating data from those Form 4s—indeed reflect that Defendants' class period sales were mostly
attributable to automatic tax sales or were made under Rule 10b5-1 plans (*see* D. 102-3 at 660 (reflecting that 10b5-1
and tax sales accounted for 71% of Mr. Karp's class period equity sales); *id.* at 663 (42% for Mr. Cohen); *id.* at 655
(52% for Mr. Sankar); *id.* at 667 (57% for Mr. Glazer); *see also id.* at 333–568 (packets including Defendants' Form
4s)). These circumstances (as well as the absence of any allegations in Plaintiffs' complaint to the effect that
Defendants had any advance knowledge of the timing and terms of these sales) would seem to weigh against an
inference of scienter. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012) (concluding
that automatic tax sales rebutted an inference of scienter); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891
(4th Cir. 2014) (recognizing that the fact that trades occurred under Rule 10b5-1 plans "weaken[ed] any inference of
fraudulent purpose"); *cf. Pluralsight*, 45 F. 4th at 1266 (recognizing that a Rule 10b5-1 plan does not per se negate an
inference of scienter where the plaintiff alleges that the defendant was "motivated to mispresent or withhold material
information to affect a stock price in anticipation of a previously scheduled trade").

However, it is not clear that the Court may entertain Defendants' automatic trading argument in the first instance: the
parties dispute whether the Court may consider the documents Defendants draw their facts from at the motion-to-
dismiss stage (*compare* D. 103 (requesting the Court to consider exhibits consisting of SEC filings and attorney-
created documents aggregating data from those filings), *with* D. 113 (contending that while Form 4s may be judicially

sales is—as they suggest—that they were realizing 17 years of deferred compensation. And this explanation appears more compelling than Plaintiffs' theory that Defendants realized Palantir's growth was peaking and that they needed to cash out before the market figured that out.

### v. SPAC Red Flags

Plaintiffs further contend that scienter may be inferred from the fact that Palantir's SPAC deals lacked commercial substance, and were merely sham, round-trip transactions. The problem with this argument is that the SPAC transactions were not obviously lacking in commercial justification. The substance of Palantir's deals belies Plaintiffs' round-trip characterization: these were not the sort of "I'll pay you 50 bucks if you pay me 50 bucks" transactions that the term "round-trip" transaction more properly refers to. *See Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 169 (4th Cir. 2007) (defining "round-tripping"). Palantir indisputably received equity through its SPAC transactions in exchange for its investments. And it received cash consideration (often in amounts significantly differing from its investments) in return for providing its software.

While it is possible that Defendants could have been using the SPAC transactions to artificially goose Palantir's revenue, there is an alternative, non-fraudulent explanation:

---

noticed, the Court cannot take their contents for their truth; and describing Annex F as a "chart of insider trading wizardry" because of information it purports to convey about Defendants' equity retention). There is conflicting authority as to whether the contents of Form 4s may be taken for their truth to rebut allegations of scienter. *Compare, e.g., Dang v. Amarin Corp. plc*, 750 F. Supp. 3d 431, 480 (D.N.J. 2024) (taking judicial notice of the defendants' Form 4s and concluding that they "mitigate[d] the suspiciousness of the [defendants'] stock sales"), *with Luo v. Spectrum Pharms., Inc.*, No. 2:21-CV-01612-CDS-BNW, 2024 WL 4443323, at *5 (D. Nev. Oct. 7, 2024) (declining to consider the fact that transactions were made pursuant to tax withholding obligations or 10b5-1 plans, as purportedly reflected in the defendants' Form 4s). Ultimately, the Court need not resolve this issue. Plaintiffs' Complaint independently fails to adequately allege scienter. Thus, the Court declines to consider the Form 4s (as well as documents derived from the Form 4s) for the truth of their contents. And the Court does not consider Defendants' automatic trading argument in its scienter analysis. *See Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09-CV-5641, 2011 WL 1303387, at *13 (N.D. Ill. Mar. 31, 2011) ("At the end of the day, the Court concludes that it can resolve the motion to dismiss without any need to consider the Forms 4 . . . for the truth of the information contained in them. As explained . . . the complaint is subject to dismissal for failure to adequately allege scienter irrespective of the content of the disputed Forms 4.").

Defendants legitimately viewed the SPAC transactions as an opportunity to expand with a new set of customers and to make legitimate investments. The fact that some of Palantir's subscription agreements were front-loaded does not change the analysis—the innocent inference there is that Palantir was simply hedging its risks. Nor do Plaintiffs' general allegations that the SPACs were too small and new to use Palantir's products. These allegations are vague. For instance, Plaintiffs generally allege that, because some of the SPAC entities had not finished developing their products for sale, Palantir's software was useless to them. But Plaintiffs do not allege why Palantir's products can't be used for other purposes. And again, Plaintiffs point to no specific facts and data showing that each and every Defendant knew that Palantir's products were useless to the SPACs.

Plaintiffs also point to no specific facts or data that Defendants actually accessed that would have provided Defendants with more insight into the SPACs' performance prospects than the SPACs' other investors or the market more generally. Without such allegations, Defendants are left with the simple fact that the SPAC investments did not perform as Defendants may have hoped. But this is an impermissible fraud-by-hindsight theory.[11]

### vi. Concealment

Plaintiffs further allege that Defendants stopped reporting (or changed the way it reported) key metrics that would have alerted the market to Palantir's flagging prospects. Specifically, Plaintiffs contend that Defendants (1) changed their definition of "customer" in 1Q21 to include customers from the entire prior year; (2) stopped reporting average contract duration in 3Q21; (3)

---

[11] If truth and falsity were properly evaluated in hindsight, it would appear that Defendants—not Plaintiffs—would have the stronger position (*see* D. 115 at 10 (noting that "Palantir's quarterly revenue is now $678 million, representing 134% growth since 2020"; that Palantir achieved profitability in two years, after forecasting it in five; that Palantir has now joined the S&P 500 index, replacing American Airlines; and that Palantir now has a market capitalization of "approximately $100 billion, compared to $16 billion when it went public")).

abandoned reporting metrics related to its "acquire, expand, scale" model in 1Q22; (4) stopped breaking out its reporting of total remaining deal value across its commercial and government segments in 1Q22, and concealed quarterly total remaining deal value in its 1Q21, 2Q21, and 3Q21 Forms 10-Q; and (5) began reporting average revenue per customer for only its top 20 customers starting in 1Q22.  On balance, the Court finds the suspicious effect of these changes overstated.

For instance, while Defendants did not disclose average contract duration in its 3Q21, 1Q22, or 2Q22 earnings reports, allegedly to "obscure the deterioration in Palantir's prospects," it disclosed this information in its annual reports (including its FY21 10-K, which it released on February 24, 2022, i.e., in the reporting gap Plaintiffs allege) (*see* D. 102-1 at 451 ("As of December 31, 2021, we expect to generate revenue under our existing customer contracts for an additional 3.5 years on a dollar-weighted average contract duration basis")).[12]  And Defendants *did* report Palantir's total remaining deal value on its 1Q21, 2Q21, and 3Q21 earnings calls (*see id.* at 206, 368; D. 102-2 at 90), which makes it difficult to infer any sort of fraudulent intent from their alleged failure to disclose this information in their filings.[13]  As to average revenue per customer, even after this alleged change, Palantir continued to disclose its revenue and its total

---

[12] Though Plaintiffs object to aspects of Defendants' Request for Judicial Notice, they do not dispute that the Court may take judicial notice of (or otherwise consider) Palantir's class period securities filings and earnings call transcripts (at least, so long as the Court does not take statements made therein for their truth)).  The Court thus grants the Request for Judicial Notice to the extent conceded.  While the Court references certain of these documents for the *fact of* certain disclosures Palantir made, it does not take any statement made in the judicially noticed documents for its truth. Because the Court relied on these documents only for this limited purpose and to this limited extent, it need not resolve Defendants' argument that broader consideration is warranted.  Accordingly, the Court denies the Request for Judicial Notice as moot to the extent not conceded.

[13] That Defendants didn't provide a segment-level breakdown of their total remaining deal value as Plaintiffs would have preferred is fairly weak evidence that any particular statement they made or their purported SPAC scheme was motivated by fraudulent intent or that Defendants recklessly misled their investors, as is the fact that Defendants did not provide details about Palantir's SPAC investments as promptly as Plaintiffs would have liked.

customer numbers—average revenue per customer thus remained easily calculable (*see, e.g.*, D.

102-1 at 516, 521 (Palantir's May 9, 2022 10-Q)).[14]

### vii. Holistic Assessment of Scienter Allegations

Whether Plaintiffs adequately alleged scienter depends on the strength of their collective

allegations. *See Tellabs*, 551 U.S. at 322. But the fact that none of Plaintiffs' allegations or

scienter theories are individually compelling informs the Court's holistic review here. *See Meitav*

*Dash Provident Funds & Pension Ltd.*, 79 F.4th at 1233 (recognizing that while the scienter

inquiry involves a holistic assessment, a court may analyze the allegations separately before

considering them as a whole). The Court recognizes that when allegations are viewed collectively,

they can sometimes be stronger than the sum of their parts. *See id.* ("Though individual allegations

might not suffice, they can sometimes complement each other."). But that is not the case here—

Defendants allegations as to scienter are vague, conclusory, or overstate the import of more likely

innocent actions. Taken as a whole, Plaintiffs allegations do not create a particularized basis for

drawing a strong inference that any Defendant acted with scienter with respect to either any alleged

---

[14] The remaining metrics changes are also non-suspicious. Palantir stopped reporting its acquire, expand, and scale metrics concurrently with its announcement that it was winding down its SPAC investments. It is not clear to the Court what that decision reflects about Defendants' intent behind their SPAC-oriented scheme, or any particular statements they made. There are also plausible business justifications for Palantir's metrics changes—for instance, Defendants argue that as Palantir grew, rapidly expanding in terms of customer numbers, metrics like average revenue per customer became less meaningful (*see* D. 102 at 58 n.26). And there is nothing inherently suspicious about Palantir changing its definition of customer—which Palantir stated it did to "provide more meaningful period-over-period comparisons" (D. 102-1 at 228). Maybe the metrics changes Defendants enacted were used to perpetrate a fraud— but there are also innocent explanations, and these changes and Plaintiffs' speculation about what these changes say about Defendants' intent do not support a strong inference of scienter. *See United Ass'n Nat'l Pension Fund v. Carvana Co.*, No. CV-22-02126-PHX-MTL, 2024 WL 5153343, at *25 (D. Ariz. Dec. 16, 2024) ("Plaintiffs' fleeting allegations that Defendants knew Carvana's ADTS and customer purchases were spiking, and therefore, concealed the data with the intent to mislead investors do not meet the heightened pleading standards of the PSLRA. Accordingly, these allegations do not support an inference of scienter.").

misstatement or as to Defendants' alleged scheme.[15]  And absent adequate scienter allegations,

Plaintiffs' Section 10(b) claims are appropriately dismissed.

### 2.  Derivative Claims

Plaintiffs bring claims under Sections 20(a) and 20A of the Exchange Act.  These claims

depend on Plaintiffs' Section 10(b) claim.  *See In re Molycorp, Inc. Sec. Litig.*, No. 12-CV-00292-

RM-KMT, 2015 WL 1540523, at *29 (D. Colo. Mar. 31, 2015).  Because Plaintiffs did not

adequately allege any violation of Section 10(b), their Section 20(a) and 20A claims must likewise

be dismissed.

### B.  Securities Act Claims

Plaintiffs assert claims under Section 11 and Section 15 of the Securities Act.  Their Section

15 claim is derivative of their Section 11 claim, meaning that dismissal of the Section 11 claim

would necessarily require dismissal of the Section 15 claim.  *See, e.g.*, *Gaynor v. Miller*, 273 F.

Supp. 3d 848, 871–72 (E.D. Tenn. 2017); *In re Barclays Bank PLC Sec. Litig.*, No. 09 CIV. 1989

(PAC), 2017 WL 4082305, at *25 (S.D.N.Y. Sept. 13, 2017).

### 1.  Section 11

Defendants contend—and the Court agrees—that Plaintiffs have not adequately pleaded

they have standing to bring a Section 11 claim.  Section 11 provides in relevant part:

> In case any part of the registration statement, when such part became
> effective, contained an untrue statement of a material fact or omitted to state
> a material fact required to be stated therein or necessary to make the
> statements therein not misleading, any person acquiring such security

---

[15] The Court also notes that the Complaint is significant for what it does not allege—Plaintiffs' theories would benefit strongly from confidential witnesses or contemporaneous documents speaking to each Defendants' awareness of facts undercutting the truth of their statements or that they were running a deceptive scheme.  *City of New Orleans Employees' Ret. Sys. v. PrivateBankcorp, Inc.*, No. 10 C 6826, 2011 WL 5374095, at *4 (N.D. Ill. Nov. 3, 2011) (noting lack of confidential witnesses and contemporaneous documents reflecting scienter); *Roofer's Pension Fund v. Papa*, No. CV 16-2805, 2018 WL 3601229, at *19 (D.N.J. July 27, 2018) (same).

(unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [certain enumerated parties connected to the registration statement].

15 U.S.C. § 77k(a).

Recently, in *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023), the United States Supreme Court confirmed that this provision requires a Section 11 plaintiff "to plead and prove that he purchased shares traceable to the allegedly defective registration statement." But the Supreme Court did not opine on what this means exactly—it did not assess whether any specific allegations were sufficient to plead traceability, nor what evidence is sufficient to prove it.[16]

The question in the instant case is whether Plaintiffs' allegations suffice to plead traceability. Defendants' challenge presents a question of statutory standing. *See In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016) (describing traceability as a "statutory standing" inquiry). Such challenges are properly reviewed under Rule 12(b)(6) and Rule 8(a)'s associated plausibility standards. *See id.*; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (applying *Twombly* and *Iqbal* to determine whether the plaintiff adequately pleaded traceability).

There is no consensus among lower courts as to what sort of allegations are enough to plead traceability. Various district courts have held that traceability can be generally alleged. *See, e.g.*, *Northumberland Cnty. Ret. Sys. v. Kenworthy*, No. CIV-11-520-D, 2013 WL 5230000, at *6 (W.D. Okla. Sept. 16, 2013) (concluding that the plaintiff adequately pleaded traceability by alleging

---

[16] However, as discussed *infra*, the fact that *Slack* states a Section 11 plaintiff is "require[d]" to "plead . . . that he purchased [traceable] shares" and that Section 11 "liability runs with registered shares alone" certainly suggests that some pleading methods are deficient. 598 U.S. at 769–70.

merely that it purchased securities "pursuant to or traceable to" the relevant registration statement); *Perry v. Duoyuan Printing*, Inc., 2013 WL 4505199, at * 10 (S.D.N.Y. Aug.22, 2013) ("[T]he pleading requirement is not elaborate.  Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased 'pursuant to' or traceable to [a] false registration statement have been held sufficient to state a claim." (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 313 F.Supp.2d 189, 208 (S.D.N.Y. 2003)); *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 373 (S.D.N.Y. 2011) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to a false registration statement." (citation and internal quotation marks omitted)).

But the United States Courts of Appeals for the First and Ninth Circuits—the only two circuit courts that appear to have addressed the issue—have both held that such general allegations of traceability do not suffice.  *See In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d at 755–56; *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at1106–09.  As the First Circuit explained in *Ariad Pharmaceuticals*:

> *Twombly* teaches that, in order to survive a motion to dismiss, a complaint must include enough facts to state a claim to relief that is plausible on its face. This standard requires more than a mere formulaic recitation of the elements of a cause of action. Accordingly, allegations that merely parrot the relevant legal standard are disregarded. Moreover, where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

> We find this binding precedent difficult to square with the plaintiffs' contention that general allegations of traceability, without more, are sufficient at the pleading stage. Indeed, traceability is an element of a Section 11 claim. And, almost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a formulaic recitation of that element. Accordingly, we agree with the other circuit that has squarely addressed this issue and hold that such general allegations alone are not sufficient to avoid dismissal.

*In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d at 756 (citations omitted).

This Court finds the First Circuit's logic persuasive and agrees that bare allegations to the effect that Plaintiffs purchased securities traceable to or pursuant to the allegedly defective registration statement are insufficient. These allegations are conclusory, and logically equivalent to the allegation "Plaintiffs have statutory standing"—they are the exact sort that binding Supreme Court precedent directs courts not to consider at the pleading stage.

Here, Plaintiffs have attempted to allege more than this. Instead of the single, conclusory allegation that they acquired shares traceable or pursuant to the registration statement they challenge, they allege that (1) the probability that lead plaintiff CalPERS purchased at least one registered share is so high as to constitute a legal certainty, (2) that "with appropriate discovery, Plaintiffs will be able to prove that they acquired shares directly traceable to the Registration Statement," and (3) any unregistered shares they purchased should be deemed registered on an integrated offering theory.

In support of the first point, they further allege that—as of the first day of trading of Palantir Class A common stock—only 489,128,232 shares were excluded from lockup agreements and available for purchase (D. 92 at ¶¶ 234, 238). Of these shares, 257,135,415 were registered pursuant to the challenged registration statement (*id.*). The balance of 231,992,817 shares was exempt from registration under SEC rules (*id.*). The upshot is that approximately 53% of the shares that could be traded before the lockup period expired were registered (*id.* at ¶ 238). Plaintiffs further allege that—based on disclosures made by Palantir insiders required to report stock sales—at least 50,449,187 registered shares had actually been sold into the open market by the time that CalPERS began acquiring Palantir stock (*id.* at ¶ 240). Because no more than

231,992,817 unregistered shares would have been available to trade on any day when CalPERS

purchased shares, Plaintiffs assert that "registered shares constituted at least 17.9% . . . of shares

available to trade" (*id.*).  Based on the mix of registered and unregistered shares available for sale,

and the volume of shares CalPERS purchased (1,280,700 during the lockup period), Plaintiffs

argue that it is overwhelmingly likely that CalPERS purchased at least one registered share (*id.* ¶¶

241–42).

In support of their second point, Plaintiffs allege that:

> Broker-dealers, exchanges, and FINRA are required by law to maintain
> detailed, time-stamped transactional records which can be obtained through
> discovery. These records show when securities in one account are
> transferred to another account, whether within the same broker-dealer or
> between different broker dealers. Using these records along with transfer
> journals from Palantir's transfer agent Computershare Trust Company,
> N.A. ("Computershare") and underlying records regarding share
> registration from Computershare and/or Palantir, and applying well-
> accepted accounting methodologies such as first-in first-out and last-in first-
> out, Plaintiffs can reliably trace shares they purchased to the Registration
> Statement.

(*Id.* at ¶ 243).

And in support of their third point, Plaintiffs allege that Palantir went public "in a single,

unified liquidity event wherein all sales between September 30, 2020 and December 28, 2020: (i)

were all part of a single plan of financing; (ii) involved the same class of securities; (iii) were made

at or about the same time; (iv) received the same type of consideration; and (v) were made for the

same general purpose" (*id.* at ¶ 236).  The consequence, according to Plaintiffs, is that the

technically unregistered status of the shares that became available at this juncture is irrelevant, and

that they should be treated as if they were registered.

Notably, Plaintiffs have directed the Court to no case permitting a plaintiff to proceed on a Section 11 claim by pleading either or both (1) a probabilistic tracing theory like the one they advance here or (2) a plea to let the case proceed to discovery so that the plaintiff may locate the documents that may establish standing. And the Court finds that the weight of the authority is to the contrary. Several district courts have directly rejected pleading-by-probability, as opposed to actually pleading traceability through chain of title. *See, e.g.*, *Doherty v. Pivotal Software, Inc.*, No. 3:19-CV-03589-CRB, 2019 WL 5864581, at *10 (N.D. Cal. Nov. 8, 2019) ("Simply alleging that stock is traceable because of a favorable percentage does not give rise to a reasonable inference that plaintiffs' shares are traceable. Plaintiff's shares could have come from the offering, or alternatively, could not have." (internal quotation marks and citation omitted)); *Johnson v. CBD Energy Ltd.*, No. CV H-15-1668, 2016 WL 3654657, at *6 (S.D. Tex. July 6, 2016) (concluding that the "statistical tracing" theory of standing is not viable).

Moreover, the circuit opinions addressing the pleading requirements for Section 11 standing strongly suggest that a plaintiff must plead facts supporting a plausible inference that its shares *are* traceable, not simply facts supporting a plausible inference that its shares are *probably* traceable to the challenged registration statement. In *Century Aluminum*, the plaintiffs argued that they had plausibly alleged standing because they purchased shares on dates that coincided with the offer's underwriters introducing large numbers of registered shares to the market. The Ninth Circuit rejected this argument, writing:

> These allegations do not give rise to a reasonable inference that plaintiffs'
> shares are traceable to the secondary offering. Accepting the allegations as
> true, plaintiffs' shares could have come from the secondary offering, but the
> "obvious alternative explanation" is that they could instead have come from
> the pool of previously issued shares. *Twombly*, 550 U.S. at 567, 127 S.Ct.
> 1955. Plaintiffs' allegations are consistent with their shares having come

from either source. When faced with two possible explanations, only one of
which can be true and only one of which results in liability, plaintiffs cannot
offer allegations that are "merely consistent with" their favored explanation
but are also consistent with the alternative explanation. *Iqbal*, 556 U.S. at
678, 129 S.Ct. 1937 (internal quotation marks omitted). Something more is
needed, such as facts tending to exclude the possibility that the alternative
explanation is true, *see Twombly*, 550 U.S. at 554, 127 S.Ct. 1955, in order
to render plaintiffs' allegations plausible within the meaning of *Iqbal* and
*Twombly*. Here, plaintiffs' allegations remain stuck in "neutral territory,"
*Twombly*, 550 U.S. at 557, 127 S.Ct. 1955, because they do not tend to
exclude the possibility that their shares came from the pool of previously
issued shares.

*In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at 1108.[17]

Similarly, in *Ariad Pharmaceuticals*, the First Circuit, citing *Century Aluminum*, held that

Section 11 plaintiffs must plead facts excluding the possibility that their shares came from an

unregistered pool.[18]  842 F.3d at 756.

Plaintiffs' allegations that some of their shares are probably registered and that discovery

could show that they are indeed registered are not sufficient to plead standing.  CalPERS'

1,280,700 shares may have come from the pool of 257,135,415 registered shares.  But the

alternative is that they could have come from the pool of 231,992,817 shares that were exempt

---

[17] On remand in the *Slack* case, the Ninth Circuit concluded that the plaintiff had "waived any allegation that any of the shares he purchased are directly traceable to the allegedly false and misleading registration statement, [and so] ha[d] not stated a claim under section 11." *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1191 (9th Cir. 2025).  But the Ninth Circuit also confirmed—citing *Century Aluminum*—that the plaintiff's statistical tracing theory was "contrary to [Ninth Circuit] precedent," which had "implicitly rejected that theory by holding that plaintiffs" must trace the chain of title for their shares. *Id.*

[18] The Fifth Circuit rejected probability-based Section 11 standing arguments more emphatically in *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 496 (5th Cir. 2005).  In that case, "any share of [] stock chosen at random in the aftermarket" had at least a 90% chance of being registered.  Based on the high probability that any given share was registered, the plaintiffs asserted that they had established traceability at least by a preponderance of the evidence.  The *Krim* court rejected this logic, holding that "such 'statistical tracing' would impermissibly expand [Section 11's] standing requirement" by authorizing every aftermarket purchaser to lodge a claim.  While *Krim* was decided in an evidentiary posture (under Rule 12(b)(1)), and does not discuss the requirements for pleading—as opposed to proving—a section 11 claim, the Court nevertheless finds its reasoning persuasive.

from registration: Plaintiffs' allegations do not exclude that possibility.  Further, Plaintiffs'

probability and discovery related allegations are somewhat difficult to square with *Slack's* express

directive that a Section 11 plaintiff must plead traceability.  *Slack* instructs that a Section 11

plaintiff must "plead . . . that he purchased shares traceable to the allegedly defective registration

statement," not that there is a chance that he purchased shares traceable to that statement, or that

he might be able to determine that he did in fact purchase traceable shares if he obtains discovery.

598 U.S. at 770.

Plaintiffs' integrated offering allegations are likewise insufficient to plead standing.  As an

initial matter, this theory is also difficult to square with *Slack*.  Just like the case at bar, *Slack*

involved a direct listing that created—for the first time—a public market for the company's shares.

*Id.* at 764.  The *Slack* plaintiff argued (similar to what Plaintiffs argue here) that he should not be

required to trace his shares to plead or prove his shares were registered because, "but for the

existence of [the] registration statement for the registered shares, [the] unregistered shares would

not have been eligible for sale to the public."[19]  *Id.* at 768–69.  But the Supreme Court declined to

adopt the plaintiff's proposed rule, noting that the plaintiff did "not explain what the limits of [t]his

rule would be, how we might derive them from § 11, or how any of this can be squared with the

various contextual clues we have encountered suggesting that liability runs with registered shares

alone."  *Id.* at 769.  Allowing Plaintiffs to rely on the integrated offering doctrine would permit

them to make an end-run around what the Supreme Court has suggested is a strict tracing

requirement.

---

[19] In other words, what the *Slack* plaintiff was asking the Supreme Court to do was treat unregistered shares as if they were registered—which is what Plaintiffs' integrated offering theory asks this Court to do here.

Further, as Plaintiffs themselves note, the integrated offering doctrine applies when an issuer seeks to avoid registration regulations by dividing what is functionally a single offering into multiple offerings (*see* D. 112 at 54 (explaining that "[t]he integration doctrine prevents issuers from dividing a single offering into multiple parts to invoke an exemption to registration and thus evade the Securities Act's requirements")). But here, Palantir did not do that—there was only one offering (and thus, there are not multiple offerings to integrate). And there is no allegation that Palantir failed to comply with any registration requirement. In sum, the circumstances that justify applying the integrated offering doctrine do not exist.[20] Finally, Plaintiffs direct the Court to no authority (and the Court has located none) applying the integrated offering doctrine (or some variant of the doctrine) in a case involving a single direct listing or Section 11 standing. For these reasons, the Court finds Plaintiffs' integrated offering allegations and arguments unpersuasive.

The Court acknowledges that its reading of Section 11 (and its interpretation of the requirements for pleading a Section 11 claim) produces a harsh result: if Section 11 plaintiffs must do more than Plaintiffs have here to plead traceability (for instance, assert chain-of-title allegations), that likely forecloses Section 11 liability in the direct listing context, as prospective Section 11 defendants can structure their offerings to thwart tracing. The Ninth Circuit made this same observation in its reversed *Slack* opinion—and that logic partially justified its decision to construe Section 11 not to require tracing in the direct listing context:

> In a direct listing, registered and unregistered shares are released to the public at once. There is no lock-up period in which a purchaser can know if they purchased a registered or unregistered share. Thus, interpreting Section 11 to apply only to registered shares in a direct listing context would

---

[20] Though Plaintiffs purport to be invoking the integrated offering doctrine, the integrated offering doctrine has no application to this case. What Plaintiffs are really asking the Court to do is to treat unregistered shares as registered shares *outside* of an integration context—an approach the Supreme Court conclusively rejected in *Slack* when it asserted that Section 11 "liability runs with registered shares alone." *Slack*, 598 U.S. at 769.

35

> essentially eliminate Section 11 liability for misleading or false statements
> made in a registration statement in a direct listing for both registered and
> unregistered shares. While there may be business-related reasons for why a
> company would choose to list using a traditional IPO (including having the
> IPO-related services of an investment bank), from a liability standpoint it is
> unclear why any company, even one acting in good faith, would choose to
> go public through a traditional IPO if it could avoid any risk of Section 11
> liability by choosing a direct listing. Moreover, companies would be
> incentivized to file overly optimistic registration statements accompanying
> their direct listings in order to increase their share price, knowing that they
> would face no shareholder liability under Section 11 for any arguably false
> or misleading statements. This interpretation of Section 11 would create a
> loophole large enough to undermine the purpose of Section 11 as it has been
> understood since its inception.

*Pirani v. Slack Techs., Inc.*, 13 F.4th 940, 948 (9th Cir. 2021) (footnotes omitted), *vacated and
remanded sub nom. Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023).

But in reversing the Ninth Circuit, the Supreme Court signaled that Section 11's text
imposes tracing obligations on Section 11 plaintiffs, notwithstanding the policy concerns the Ninth
Circuit expressed. *See Slack*, 598 U.S. at 769 (rejecting "Mr. Pirani['s] argu[ments] from policy
and purpose"). In short, the Court reads *Slack* as holding Section 11 plaintiffs to a strict tracing
requirement, even if this requirement *does* create the prospect of a loophole for direct listings.
Perhaps there are judicial solutions to this loophole—for instance, permitting limited discovery to
establish tracing, as the Court invited the parties to brief here.[21] But more likely, this is an issue
best resolved through statutory or regulatory changes.

---

[21] The Court has reviewed the Motion to Lift Stay and the briefing and ancillary documents the parties filed in
connection with that motion. Ultimately, the Court is not persuaded that actual chain-of-title tracing is feasible under
the discovery approach Plaintiffs have proposed. Plaintiffs' proposed discovery approach involves using "[s]tandard
accounting methods" such as first-in first-out (FIFO) or last-in first-out (LIFO) and "records readily available in
discovery" consisting of Palantir's transfer agent's transfer journal, Participant Daily Activity Statements held by the
Depository Trust Company (DTC) (an entity that "provides depository and book-entry services and operates a
securities settlement system"), transaction records maintained by broker dealers, and registration status records from
Palantir to trace Plaintiffs' purchases of Palantir class A common stock back to the Registration Statement (*see* D. 94-
1 at ¶¶ 21, 29, 50).

### 2. Section 15

Because Plaintiffs' Section 15 claim depends on Plaintiffs' ability to assert a viable Section 11 claim, and Plaintiffs have not adequately pled their Section 11 claim, Plaintiffs' Section 15 claim must also be dismissed.  *See Gaynor*, 273 F. Supp. 3d at 871–72.

## IV.  CONCLUSION

Based on the foregoing, the Court DENIES the Motion to Lift Stay (D. 94), GRANTS the Motion to Dismiss (D. 102), GRANTS IN PART and otherwise DENIES AS MOOT the Request for Judicial Notice (D. 103), and DENIES AS MOOT the Objection to Reply Materials (D. 117).[22]

Plaintiffs' Complaint is DISMISSED WITH PREJUDICE.[23]  The Clerk of the Court is directed to close this case.

---

This proposed methodology asks the Court to replace one set of assumptions (probability based inferences) with another (accounting presumptions).  There may be policy justifications that support permitting tracing using accounting presumptions.  *See* John C. Coffee, Jr. & Joshua Mitts, *Slack v. Pirani and the Future of Section 11 Claims* 28–29 (Dec. 1, 2023), https://ssrn.com/abstract=4644888 (stating that the results of a "no tracing of commingled assets" approach, which would follow if the use of standard accounting methods were "rul[ed] out," are "quite likely to be a far *less* accurate representation of reality than those provided by FIFO or LIFO tracing" and noting that FIFO and LIFO tracing, unlike probability tracing, have the advantage of providing "yes/no results with 100% certainty").  But *Slack* implies that strict chain-of-title tracing is required—it emphasizes that liability runs with registered shares alone.  Allowing constructive tracing (e.g., by presuming purchases of registered shares under the accounting methodologies proposed) would short circuit that requirement.

The PSLRA authorizes a court to lift the automatic stay that statute imposes on discovery if the court "finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  15 U.S.C. §78u-4(b)(3)(B).  Here, the discovery that Plaintiffs seek is not necessary to prevent undue prejudice, because even if Plaintiffs obtained it, it would not permit them to plead traceability as required by *Slack*.  Accordingly, the Motion to Lift Stay is denied.

[22] Because the Court does not rely on any of the materials Defendants filed with their reply in support of their Motion to Dismiss, the Court and denies the Objection to Reply Materials as moot.

[23] The Court concludes that dismissal with prejudice is appropriate at this point given that Plaintiffs have already amended their Complaint multiple times.

DATED April 4, 2025.

BY THE COURT:

_____

Gordon P. Gallagher
United States District Judge